No. 23-40582

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————

HONORABLE TERRY PETTEWAY; HONORABLE DERRICK ROSE;
HONORABLE PENNY POPE,

Plaintiffs-Appellees

v.

GALVESTON COUNTY, TEXAS; MARK HENRY, in his official capacity as
Galveston County Judge; DWIGHT D. SULLIVAN, in his official capacity as
Galveston County Clerk,

Defendants-Appellants

(*See inside cover for continuation of caption*)

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

———————————

BRIEF OF APPELLEE UNITED STATES OF AMERICA

———————————

KRISTEN CLARKE
  Assistant Attorney General

NICOLAS Y. RILEY
MATTHEW N. DRECUN
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 550-9589

*(Continuation of caption)*

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

GALVESTON COUNTY, TEXAS; GALVESTON COUNTY COMMISSIONERS COURT; MARK HENRY, in his official capacity as Galveston County Judge,

Defendants-Appellants

DICKINSON BAY AREA BRANCH NAACP; GALVESTON BRANCH NAACP; MAINLAND BRANCH NAACP; GALVESTON LULAC COUNCIL 151; EDNA COURVILLE; JOE A. COMPIAN; LEON PHILLIPS,

Plaintiffs-Appellees

v.

GALVESTON COUNTY, TEXAS; MARK HENRY, in his official capacity as Galveston County Judge; DWIGHT D. SULLIVAN, in his official capacity as Galveston County Clerk,

Defendants-Appellants

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is scheduled for November 7, 2023.

**TABLE OF CONTENTS**

**PAGE**

STATEMENT REGARDING ORAL ARGUMENT

STATEMENT OF THE ISSUE.....................................................................1

INTRODUCTION .......................................................................................1

STATEMENT OF THE CASE....................................................................3

    A.    Factual Background...........................................................3

    B.    Procedural History...........................................................9

SUMMARY OF ARGUMENT.................................................................12

ARGUMENT

    I.    Plaintiffs comprehensively demonstrated a Section 2
        violation under settled law..................................................15

        A.    Settled law governs Section 2 claims. ....................15

        B.    Plaintiffs proved that minority voters are
            sufficiently numerous and compact. .........................17

        C.    Plaintiffs proved that Precinct 3's minority voters
            are cohesive...............................................................23

        D.    Plaintiffs proved that white bloc voting defeats
            minority voter's preferred candidates in Precinct 3.................30

        E.    The totality of the circumstances demonstrated a
            clear Section 2 Violation. ..........................................34

    II.    Galveston County's challenges to settled law lack merit....................36

A.  Section 2 permits coalition claims. ...........................................36

  1.  This Court's precedent is binding and sound. ................36

  2.  Galveston County's challenge to binding precedent lacks merit. ......................................................41

B.  Section 2's constitutionality is not in doubt..............................49

III.  The district court's remedial process should move forward. ..............................................................................52

CONCLUSION ....................................................................54

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:** **PAGE**

*Advocate Health Care Network v. Stapleton*, 581 U.S. 468 (2017) ........................42

*Allen v. Milligan*, 599 U.S. 1 (2023)................................................................. *passim*

*Alliance for Good Gov't v. Coalition for Better Gov't*,
 919 F.3d 291 (5th Cir. 2019) ................................................................................49

*Badillo v. City of Stockton, Cal.*, 956 F.2d 884 (9th Cir. 1992) ............................47

*Baldus v. Members of Wis. Gov't Accountability Bd.*,
 849 F. Supp. 2d 840 (E.D. Wis. 2012) ................................................................47

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ........................................................ 44, 46

*Brewer v. Ham*, 876 F.2d 448 (5th Cir. 1989) .................................... 24, 29, 40, 44

*Bridgeport Coal. for Fair Representation v. City of Bridgeport*,
 26 F.3d 271 (2d Cir.),
 *vacated on other grounds*, 512 U.S. 1283 (1994) ........................................47

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021)...................... 15, 31

*Campos v. City of Baytown, Tex.*, 840 F.2d 1240 (5th Cir. 1988),............. 19, 24, 37
 *reh'g denied*, 849 F.2d 943 (5th Cir. 1988)................................................45

*City of Rome v. United States*, 446 U.S. 156 (1980) ...............................................50

*Clark v. Calhoun County, Miss.*, 21 F.3d 92 (5th Cir. 1994) .......................... 18, 22

*Clark v. Calhoun County, Miss.*, 88 F.3d 1393 (5th Cir. 1996) ............................34

*Concerned Citizens of Hardee County v. Hardee County Bd. of Comm'rs*,
 906 F.2d 524 (11th Cir. 1990).........................................................................47

*Cooper v. Harris*, 581 U.S. 285 (2017) .................................................................32

*Easley v. Cromartie*, 532 U.S. 234 (2001)............................................................31

**CASES (continued):**                                                         **PAGE**

*Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018)....................................42

*Frank v. Forest County*, 336 F.3d 570 (7th Cir. 2003).....................................46-47

*Graves v. Barnes*, 378 F. Supp. 640 (W.D. Tex. 1974)..........................................40

*Grutter v. Bollinger*, 539 U.S. 306 (2003).................................................49

*Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004) ...........................................46

*Holloway v. City of Virginia Beach*,
    531 F. Supp. 3d 1015 (E.D. Va. 2021),
    *vacated on other grounds*, 42 F.4th 266 (4th Cir. 2022).......................46-47

*Huot v. City of Lowell*, 280 F. Supp. 3d 228 (D. Mass. 2017) ...............................47

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
    999 F.2d 831 (5th Cir. 1993) (en banc) .................................. *passim*

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    140 S. Ct. 2367 (2020)....................................................48

*Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721 (2020) ...........................................42

*LULAC v. Abbott*, 601 F. Supp. 3d 147 (W.D. Tex. 2022) .....................................26

*LULAC v. Midland Indep. Sch. Dist.*, 812 F.2d 1494 (5th Cir.),
    *aff'g* 648 F. Supp. 596 (W.D. Tex. 1986)....................................37
    *vacated on state-law grounds*, 829 F.2d 546 (5th Cir. 1987) (en banc)  37, 45

*LULAC v. Perry*, 548 U.S. 399 (2006) ....................................... 19, 20, 38

*Miller v. Johnson*, 515 U.S. 900 (1995)..................................................32

*Nixon v. Kent County*, 76 F.3d 1381 (6th Cir. 1996) (en banc)........................ 47, 48

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................53

*Overton v. City of Austin*, 871 F.2d 529 (5th Cir. 1989) ................................ 40, 44

**CASES (continued):** PAGE

*Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362 (5th Cir. 2023)..............52

*Pope v. County of Albany*, No. 1:11-cv-00736,
2014 WL 316703 (N.D.N.Y. Jan. 28, 2014) .................................................47

*Risher v. Aldridge*, 889 F.2d 592 (5th Cir. 1989) ....................................................49

*Robinson v. Ardoin*, 37 F.4th 208 (5th Cir. 2022) ...................................................53

*Rodriguez v. Pataki*, 308 F. Supp. 2d 346 (S.D.N.Y. 2004)....................................29

*Rollins v. Fort Bend Indep. Sch. Dist.*, 89 F.3d 1205 (5th Cir. 1996) ............. 40, 44

*Sensley v. Albritton*, 385 F.3d 591 (5th Cir. 2004) .................................................20

*Shaw v. Hunt*, 517 U.S. 899 (1996) .........................................................................49

*Shelby County v. Holder*, 570 U.S. 529 (2013) ....................................................4, 50

*Singleton v. Merrill*, 582 F. Supp. 3d 924 (N.D. Ala. 2022)
*aff'd sub. nom. Allen v. Milligan*, 599 U.S. 1 (2023) ...................................31

*Sneed v. Austin Indep. Sch. Dist.*, 50 F.4th 483 (5th Cir. 2022) ...................... 15, 30

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023)........................................................................................51

*Teague v. Attala County, Miss.*, 92 F.3d 283 (5th Cir. 1996)................................25

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ..................................................... *passim*

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc) ....................................54

*Vera v. Bush*, 933 F. Supp. 1341 (S.D. Tex. 1996) ................................................53

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
429 U.S. 252 (1977)........................................................................................11

*Wisconsin Legislature v. Wisconsin Elections Comm'n*, 595 U.S. 398 (2022).........5

**CASES (continued):**                                               **PAGE**

*Wright v. Rockefeller*, 376 U.S. 52 (1964)................................................................43

**STATUTES:**

Voting Rights Act
    52 U.S.C. 10301.........................................................................................1
    52 U.S.C. 10301(a).................................................................................38
    52 U.S.C. 10301(b)............................................................... 39, 41, 48
    52 U.S.C. 10303(f)(2)............................................................................38
    52 U.S.C. 10310(c)(3)...........................................................................39

28 U.S.C. 1915(g) ...........................................................................................42

Tex. Elec. Code Ann. § 172.023 .....................................................................6

**RULE:**

Fed. R. Civ. P. 23 ...........................................................................................39

**LEGISLATIVE HISTORY:**

S. Rep. No. 295, 94th Cong., 1st Sess. (1975)..............................................39

S. Rep. No. 417, 97th Cong., 2d Sess. (1982) ............................... 17, 42-43

**MISCELLANEOUS:**

Texas Sec'y of State, *Candidate Information*,
    https://perma.cc/ZWN2-4FD3 .......................................................9

# STATEMENT OF THE ISSUE

Whether the Galveston County Commissioners Court's 2021 redistricting plan violated Section 2 of the Voting Rights Act (VRA), 52 U.S.C. 10301.

# INTRODUCTION

This case concerns the 2021 redistricting plan adopted by the Galveston County Commissioners Court. For three decades, Galveston County's Black and Latino voters had the opportunity to elect their preferred candidate as the commissioner for Precinct 3. But in 2021, the commissioners court's other members "transformed Precinct 3 from the precinct with the highest percentage of Black and Latino residents to that with the lowest percentage." ROA.16029. There was "absolutely no reason to make major changes to Precinct 3," yet the 2021 redistricting plan "completely . . . extinguished the Black and Latino communities' voice on its commissioners court." ROA.16028-16029. Based on a ten-day bench trial held on Galveston Island, the district court concluded that the result was "a clear violation" of Section 2 of the Voting Rights Act.

In a 157-page opinion, the district court methodically carried out the intensely local appraisal of the political realities in Galveston County that Section 2 requires. It determined that plaintiffs—the United States and an array of private organizations and individuals—satisfied every element of Section 2's results test. Defendants—Galveston County, its commissioners court, its county judge, and its

county clerk—left critical elements of plaintiffs' case undisputed or unrebutted. The district court's careful fact-finding and analysis should be affirmed.

Because the district court's application of settled law to the detailed record shows a clear violation of Section 2, the County aims on appeal to change the law. It seeks to overturn more than three decades of this Court's precedent that allows Section 2 claims by "coalitions" of voters from two or more minority groups. *See League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 863-864 (5th Cir. 1993) (en banc). That precedent is both binding and the best interpretation of Section 2's text and history.

Otherwise, the County makes only a few challenges to the district court's fact-findings, often mischaracterizing the district court's decisions and the record on which it relied. None shows error, much less the clear error required for reversal. This Court likewise should decline the County's belated, unsubstantiated challenge to the constitutionality of Section 2. The Supreme Court reiterated the constitutionality of Section 2 just this year. *See Allen v. Milligan*, 599 U.S. 1, 41 (2023). The "stark and jarring" facts that the district court found (ROA.16029) demonstrate Section 2's continued vitality.

## STATEMENT OF THE CASE

### A.    Factual Background

1.  Galveston County lies southeast of Houston on the Texas coast, spanning mainland areas from League City and Dickinson down to Texas City, Galveston Island, and the Bolivar Peninsula.  ROA.15892-15896.  The Galveston County Commissioners Court is its governing body.  ROA.15896-15897.  It has five members:  four "commissioners," elected to staggered four-year terms from single-member "precincts," and a "county judge," elected countywide.  ROA.15897.

Historically, Precinct 3 has been the only majority-minority precinct in Galveston County.  ROA.15911.  It has included portions of Dickinson, La Marque, Texas City, and the City of Galveston—the areas where the County's Black residents mainly live.  ROA.15911-15912.  It has also included a substantial share of the Latino population that resides throughout the County.  ROA.15912. As of 2020, before the redistricting at issue here began, the citizen voting-age population of Precinct 3 was 58% Black and Latino.  ROA.15911.

The origins of historic Precinct 3 trace to 1988, when Galveston County's first Black commissioner, Wayne Johnson, was elected "in a close campaign marked by racially polarized voting."  ROA.15911.  In the 1991 redistricting cycle that followed the 1990 Census, the County's Black and Latino communities successfully advocated for the creation of a majority-minority precinct.

ROA.15911, 15948.  The product was Precinct 3, over time "an important political homebase for Black and Latino residents."  ROA.15911, 15950.  In 2001, the County preserved Precinct 3 in a redistricting process that followed transparent criteria and included public proceedings throughout the County.  ROA.15948-15949.  At that time, Galveston County's plans were still subject to preclearance requirements under Section 5 of the VRA.  ROA.15943; *see Shelby County v. Holder*, 570 U.S. 529, 537-539 (2013).  The Attorney General did not object to either the 1991 or the 2001 commissioners court plans.  ROA.15948-15949.

Galveston County altered its redistricting process in 2011.  It did not adopt transparent redistricting criteria, which the Attorney General determined was "a deliberate decision" to avoid being judged by a "procedural or substantive standard of conduct."  ROA.15945-15946.  The County "deliberate[ly]" excluded Stephen Holmes—then and now Precinct 3's commissioner—"from meaningful involvement in key deliberations."  ROA.15949-15950 (quoting ROA.24366-24370).  And it devised a plan that shrank Precinct 3's "minority electorate," reducing their ability to elect their preferred candidate.  ROA.15946.  After the Attorney General objected, the County instead adopted a map reflecting a "continuation" of Precinct 3 as created in 1991 and maintained in 2001.  ROA.15949-15950.

2. By 2021, Galveston County no longer had to submit its voting changes for preclearance. *See Shelby County*, 570 U.S. at 553. Rather than hire redistricting counsel through public bids as in the past, the County used an opaque, no-bid process to retain the same counsel, Dale Oldham, who helped produce the 2011 map to which the Attorney General objected. ROA.15949-15951, 15966. Oldham admitted at trial that the end of preclearance enabled the dismantling of the majority-minority Precinct 3. ROA.15964, 18550-18553.

The Census redistricting data for Galveston County, which it obtained in August 2021, showed that the Black population, 13.3% overall, remained concentrated in Precinct 3, while the Latino population, 25.3% overall, had grown throughout the County. ROA.15910, 15952-15953. Defendant Mark Henry, the County Judge, nevertheless questioned whether the commissioners court needed to retain a majority-minority precinct. ROA.15951-15952.[1] Henry had been County Judge in 2011, when the Attorney General objected to the proposed map that shrank Precinct 3's minority electorate. ROA.15897.

In September 2021, Henry told Oldham he wanted a map based on an idea that he had considered in 2011 but that he knew would have prompted the Attorney

---

[1] A jurisdiction may draw a map anticipatorily to comply with Section 2 of the VRA, sparing the need for litigation, when it has "a strong basis in evidence" to conclude that the VRA requires it. *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 595 U.S. 398, 402 (2022) (citation omitted).

General to object because it would diminish minority voting strength. ROA.15954, 18530-18531, 18639-18643. The idea was a new precinct combining all the County's islands and peninsular areas, which would fracture existing Precinct 3 by taking its territory on Galveston Island. ROA.18530-18531, 18639-18643. Henry's request yielded the map that Galveston County eventually enacted, known as "Map 2." ROA.15954.

After getting the Census data in August 2021, the County adopted no public redistricting criteria or timeline for completing the redistricting process. ROA.15964-15965. And it did not retain a map-drawer until October 14, 2021. ROA.15954-15955. By then, the start of candidate filing for primary elections, November 13, was only a month away. ROA.24476-24481; Tex. Elec. Code Ann. § 172.023 (2023). The map-drawer the County hired, Thomas Bryan, first spoke with Oldham on October 17, and that same day, he completed the two map proposals that the County moved forward. ROA.15955-15956.

Following Oldham's instructions, Bryan created Map 1, a "minimum change" plan, and Map 2, reflecting Henry's wish to try his idea from 2011. ROA.15956 (citation omitted). Map 1 "was drafted to accommodate Commissioner Holmes," except that it added the "predominantly Anglo Bolivar Peninsula" to Precinct 3. ROA.15977. Precinct 3 thus retained a Black and Latino citizen voting-age population near its existing share: 31% Black and 24% Latino,

or 55% combined, compared to 58% under the then-existing map. ROA.15911-15912.

In Map 2, however, Henry's wishes yielded a Precinct 3 with only 28% Black and Latino citizen voting-age population, the lowest of the four precincts. ROA.15911-15912. No other precinct had more than 35%. ROA.15911-15912. Map 2 contained one precinct with all the County's coastal areas, while fracturing the rest of existing Precinct 3 between the three mainland precincts. ROA.15956. This was a "dramatic change" to Precinct 3. ROA.15957. And its effect was plain. As Commissioner Darrell Apffel testified, "you can look at the picture and tell." ROA.19223. Henry blessed Map 2 as reflecting "essentially his criteria," while Holmes strenuously objected, arguing to Oldham that Section 2 required a majority-minority precinct. ROA.15958.

Thereafter, in late October and early November 2021, the County shut Holmes out of the process. Oldham and Bryan had numerous meetings about the maps with Henry and the three other commissioners, but not with Holmes. ROA.15959-15960. Bryan finalized the maps on October 29, and they were posted to the County's website for public comment, which Henry wanted done only after the maps were a "final product." ROA.15960, 15970 (citation omitted). The website did not give the public a deadline to submit their comments, nor did it provide the underlying data so the public could fully understand the maps.

ROA.15960, 15967.  The County also did not announce the posting of the maps, other than a post on Henry's campaign Facebook page that urged support for Map 2.  ROA.15960-15961.

The County did not hold any public hearings when the maps were still in development.  ROA.15966-15967.  Instead, it set a single public hearing on the maps—down from five it held in 2011—on November 12, 2021, only one day before the Texas deadline for commissioners courts to adopt revised maps.  ROA.15961, 15970.  A few days before the hearing, another commissioner, Darrell Apffel, informed Holmes that the commissioners court already had decided to adopt Map 2.  ROA.15961-15962.  Though Holmes told Apffel that Map 2 violated VRA Section 2, Apffel told Holmes that the commissioners court would approve it at the public hearing.  ROA.15962.

The commissioners court held the November 12 hearing at the League City Annex, a small space 27 miles away from the county courthouse where the commissioners court ordinarily conducts substantive business.  ROA.15962, 15972-15973.  Despite the venue's small size, many attended to express opposition to the proposed elimination of Precinct 3.  ROA.15974-15975.  With "aggressive" threats by Henry to clear the room, but no debate on the map or the public's opposition, the commissioners adopted Map 2.  ROA.15975-15976 (citation omitted).  The vote was 3-1, with Henry, Apffel (Precinct 1), and Commissioner

- 8 -

Joseph Giusti (Precinct 2) voting in favor, and only Holmes voting against. ROA.8169.[2]

## B.    Procedural History

1. In February 2022, three months after the County adopted the commissioners court map, the Petteway plaintiffs challenged the map under the Fourteenth Amendment, Fifteenth Amendment, and Section 2 of the VRA. ROA.15889. The United States' suit followed in March 2022, alleging both discriminatory purpose and results in violation of Section 2. ROA.15889; *see* Compl., *United States v. Galveston County, Tex.*, No. 3:22-cv-00093 (S.D. Tex. Mar. 24, 2022). NAACP and LULAC branches and members then filed constitutional and Section 2 claims in April. ROA.15889. The district court consolidated the cases in May 2022. ROA.313-314, 15890.

Plaintiffs did not seek a preliminary injunction, so elections for Precincts 2 and 4 in the new map went forward in November 2022. Republican incumbents, Giusti and Armstrong, won unopposed. *See* ROA.18921, 19492.[3] Two times in

_____

[2] Precinct 4 was represented then by Ken Clark, who missed the meeting because of health problems and passed away in 2022. ROA.15963 n.12. Robin Armstrong was selected by Judge Henry and Republican Party precinct chairs to replace him. ROA.15963 n.12, 19490-19492.

[3] See Texas Sec'y of State, *Candidate Information*, https://perma.cc/ZWN2-4FD3 (selecting 2022 November 8th General Election, County offices in Galveston County). Though Armstrong is Black, he acknowledged that he is not the preferred candidate of Black and Latino voters. ROA.15989.

2022, defendants moved to stay proceedings, pending the result in *Allen v. Milligan*, 599 U.S. 1 (2023).  ROA.214-226, 792-799.  Denying those motions, the district court noted that plaintiffs had "made clear that they hope to have the Commissioners Court precinct lines redrawn in time for the 2024 election."  ROA.260-261, 792-799.

2.  The district court held a ten-day bench trial on Galveston Island in August 2023.  ROA.15890.  Plaintiffs presented nine expert witnesses regarding the elements of their Section 2 claim.  ROA.15890-15891; Part I, *infra*.  Six addressed the "preconditions" to a Section 2 claim under *Thornburg v. Gingles*, 478 U.S. 30 (1986), and the district court found all of them credible and qualified.  ROA.15898-15906.  The court also found credible plaintiffs' three other experts, whose testimony related to *Gingles*' totality-of-the-circumstances inquiry and Galveston County's racially discriminatory intent.  ROA.15906-15910.  In addition, plaintiffs presented live testimony from four individual plaintiffs and eight County residents with experience in elected office or community service.  ROA.15890-15891.

The central players in the 2021 redistricting process—Henry, Oldham, and Bryan, along with commissioners Giusti and Apffel—then testified, followed by two experts and two other county officials testifying for defendants.  ROA.15891-15892.  Though the district court found one of the County's experts credible, John

Alford, it found that expert Mark Owens' testimony had "widespread shortcomings" and was not credible. ROA.15901-15902.[4]

3. On October 13, 2023, the district court issued a 157-page opinion concluding that Galveston County's 2021 commissioners court plan is "a clear violation" of Section 2's results test. ROA.16029. The "stunning" fragmentation of the historic Precinct 3 "completely . . . extinguished the Black and Latino communities' voice on [Galveston County's] commissioners court during 2021's redistricting." ROA.16028. The violation of Section 2's results test meant the court did not decide plaintiffs' discriminatory-purpose or racial-gerrymandering claims. ROA.16032. But it made detailed fact-findings under the framework for discriminatory purpose, *see Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252 (1977), which informed its Section 2 totality-of-the-circumstances analysis. ROA.15950, 15964.

The district court enjoined use of the enacted map. ROA.16035-16036. Citing the opening of candidate filing for 2024 elections on November 11, 2023, the court allowed the commissioners court until October 20 to file a remedial plan

---

[4] Among other "shortcomings," Owens did not "claim[] to focus any of his work on either redistricting or the first *Gingles* precondition"; published no relevant, peer-reviewed scholarship; had limited experience reviewing voting plans; and wrote a report that betrayed "a fundamental misunderstanding of traditional redistricting principles." ROA.15901-15902.

with at least one majority-minority precinct and set a remedial hearing for November 1. ROA.16035-16036.

The County moved the district court to stay its injunction on October 14, 2023. ROA.16043-16051. Denying the motion the next day, the court allowed the County until October 27 to file a remedial plan and rescheduled the hearing for November 8. ROA.16067-16068. If the County opted not to craft a new map, the court ordered it to choose either the illustrative plan prepared by plaintiffs' expert Anthony Fairfax or Map 1 from the 2021 redistricting process. ROA.16068. That order currently is stayed through November 10, 2023.

## SUMMARY OF ARGUMENT

1. The district court correctly held that the Galveston County Commissioners Court's 2021 redistricting plan violates Section 2's results test. Plaintiffs satisfied the first *Gingles* precondition, showing that Black and Latino voters are sufficiently numerous and compact to form a majority in a reasonably configured precinct. Indeed, they did for three decades until the County dismantled Precinct 3 in 2021. The County itself created Map 1 in 2021 that preserved a majority-minority precinct, and plaintiffs presented numerous illustrative plans at trial to confirm it could be done. The County relies in response only on inapt analogies to other cases and on mischaracterizing how communities of interest figure in the first *Gingles* precondition and in the trial record.

Plaintiffs likewise demonstrated that Black and Latino voters are highly cohesive, satisfying the second *Gingles* precondition. General elections, primary elections, and lay testimony all evinced their strong political cohesion. The County quibbles with the weight that primary-election results should receive compared to general-election results, but the question is immaterial because both showed cohesion here. The district court reasonably credited primary-election analyses that corroborate the high degree of cohesion that Black and Latino voters have exhibited in general elections. The County's attempt to question that fact-finding would mean discarding its own expert's analysis.

Plaintiffs also satisfied the third *Gingles* precondition by demonstrating an extreme degree of Anglo bloc voting that defeats Black and Latino voters' preferred candidate in the enacted map. The County's observation that Black and Latino voters vote heavily for one party in Galveston County while Anglo voters vote heavily for another does not defeat a Section 2 claim. The Supreme Court affirmed a Section 2 violation on an equivalent record earlier this year. The County also wrongly claims that the district court ignored its theory that partisanship better explains polarized voting in the County's elections. The court fully aired that theory and found it unavailing.

The County does not contest the district court's analysis of the totality of the circumstances, but that soundly favored plaintiffs too. The Senate Factors that

guide the totality inquiry weighed in their favor, as did the rushed, predetermined way that the County adopted the 2021 plan.  In total, the record established a clear violation of Section 2's results test.

2.  The County's pleas to change the law lack merit.  Binding precedent of long standing forecloses the County's argument that Section 2 does not permit coalition claims.  This Court's fact-based approach to coalition claims reflects the best interpretation of the VRA's text and history, and it is the approach chosen by nearly all courts to consider the question.  The County's contrary arguments elide the statutory text, while resorting to indeterminate legislative history and other unpersuasive authority.

Binding precedent likewise defeats the County's untimely, undeveloped attempt to question the constitutionality of Section 2.  The Supreme Court rebuffed a challenge to Section 2's constitutionality earlier this year, and the County's arguments also fail on their own terms.  Section 2 already provides the "oversight" that the County demands, because every Section 2 plaintiff must prove all the prerequisites to relief anew in every case.  Plaintiffs did so here, compiling a record that amply shows the continuing vitality of Section 2.

3.  The district court's remedial process should proceed.  Only temporary administrative stays have delayed it thus far, and those should be allowed to expire on November 10.  The district court is ready to move forward, and the County has

shown through both conduct and concession that it needs only a few days, at most, to create a new map. Undertaking the remedial process now will minimize disruption to the 2024 election cycle and protect voters from enduring another election under an unlawful redistricting plan.

## ARGUMENT

### I. Plaintiffs comprehensively demonstrated a Section 2 violation under settled law.

The district court made extensive findings to support its holding that Galveston County Commissioners Court's 2021 redistricting plan violates Section 2. Those fact-findings are reviewed only for clear error. *Sneed v. Austin Indep. Sch. Dist.*, 50 F.4th 483, 489 (5th Cir. 2022). "Fact findings after a bench trial are accorded significant deference." *Ibid.* They are not clearly erroneous unless "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Ibid.* (citation omitted). "If the district court's view of the evidence is plausible in light of the entire record, an appellate court may not reverse even if it is convinced that it would have weighed the evidence differently in the first instance." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021).

#### A. Settled law governs Section 2 claims.

*Thornburg v. Gingles*, 478 U.S. 30 (1986), "has governed our Voting Rights Act jurisprudence since it was decided 37 years ago." *Allen v. Milligan*, 599 U.S.

1, 19 (2023). "Congress has never disturbed" *Gingles*, while courts have applied it "in one § 2 case after another, to different kinds of electoral systems and to different jurisdictions in States all over the country." *Ibid.* The "theoretical basis" for a *Gingles* claim is that, "where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters." 478 U.S. at 48.

*Gingles* requires plaintiffs to satisfy three "preconditions." 478 U.S. at 50. First, "the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Milligan*, 599 U.S. at 18 (alteration and citation omitted). Second, "the minority group must be able to show that it is politically cohesive." *Ibid.* (citation omitted). Third, "the white majority votes sufficiently as a bloc to enable it to defeat the minority's preferred candidate." *Ibid.* (alteration and citation omitted). Together, these preconditions establish that the minority voters could elect a representative of their choice but the existing districting plan "thwarts" them, "at least plausibly on account of race." *Id.* at 18-19 (citation omitted).

Plaintiffs must then show, "under the 'totality of circumstances,' that the political process is not 'equally open' to minority voters." *Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 45-46). Factors identified in the Senate Report that accompanied 1982 amendments to the VRA guide that determination, including

"the extent to which voting . . . is racially polarized," "minority group members bear the effects of past discrimination," "members of the minority group have been elected to public office," and the "policy underlying" the challenged scheme is "tenuous." *Gingles*, 478 U.S. at 44-45 (citing S. Rep. No. 417, 97th Cong., 2d Sess. 28-29 (1982)). Ultimately, the district court "must conduct 'an intensely local appraisal'" of the challenged election practice or procedure, "as well as a 'searching practical evaluation of the past and present reality.'" *Milligan*, 599 U.S. at 19 (quoting *Gingles*, 478 U.S. at 79) (internal quotation marks omitted).

### B. Plaintiffs proved that minority voters are sufficiently numerous and compact.

1. At trial, the first *Gingles* precondition was scarcely in doubt. The Precinct 3 that Galveston County dismantled in 2021—"the county's historic and sole majority-minority commissioners precinct" (ROA.15887)—shows on its own that minority voters are numerous enough for a majority in a reasonably configured precinct. And Map 1, which the County itself devised in 2021, likewise "featured a reasonably compact commissioners precinct with a majority Black and Latino population by [citizen voting-age population]." ROA.15912, 15956.

Three plaintiffs' experts also prepared numerous "reasonably configured" illustrative plans, often more compact than the map Galveston County enacted. ROA.16008-16011. "A district will be reasonably configured, our cases explain, if it comports with traditional districting criteria, such as being contiguous and

reasonably compact." *Milligan*, 599 U.S. at 18. The purpose of such illustrative plans is not to satisfy "some aesthetic ideal of compactness," but simply to show the minority population is "sufficiently compact to constitute a majority in a single-member district." *Clark v. Calhoun County, Miss.*, 21 F.3d 92, 95 (5th Cir. 1994). Experts William Cooper, Anthony Fairfax, and Tye Rush each provided one or more illustrative plans that "contain one majority Black and Latino commissioners-court precinct and adhere to traditional redistricting criteria, including equal population, contiguity, and compactness." ROA.16008-16009.[5] These illustrative plans satisfy the first *Gingles* precondition. *See Milligan*, 599 U.S. at 18-19.

At trial, the County "[did] not dispute that Galveston County's Black and Latino communities, when considered as a coalition, are sufficiently large to satisfy the first *Gingles* precondition." ROA.16007. And though the court found defense expert Mark Owens not credible, even he agreed that plaintiffs' illustrative plans were at least as geographically compact as the County's enacted plan. ROA.16010-16011, 19080.

---

[5] Some illustrative plans preserved a majority-minority precinct while creating a single precinct for all coastal areas. ROA.15915-15916. These plans served to disprove the County's stated rationale that creating a new all-coastal precinct required eliminating historic Precinct 3. ROA.16026-16027.

2.  The County's main argument on the first precondition is to deny that coalition claims are cognizable, so Black and Latino voters cannot be combined to satisfy the precondition's numerical threshold.  ROA.16007-16008.  The district court correctly rejected that, because this Court has held for more than three decades that coalition claims are cognizable under Section 2.  *See Campos v. City of Baytown, Tex.*, 840 F.2d 1240, 1245 (5th Cir. 1988); Part II.A, *infra*.

Despite the experts' agreement that plaintiffs' illustrative plans are geographically compact, the County argues they are not.  It first observes (at 40-41) that Latinos reside throughout Galveston County, but it cites no law establishing that this somehow precludes VRA relief for those Latino residents who would be included in a remedial precinct.  The first *Gingles* precondition is simply whether a "reasonably configured" illustrative plan can be shown that includes a majority of Black and Latino voters.  *Milligan*, 599 U.S. at 18.  That other Latinos reside elsewhere in the County makes no difference.

The only law the County brings to bear are inapt analogies to certain districts viewed as too distended and extreme to be geographically compact.  Br. 41, 44.  It cites the Texas congressional district rejected in *LULAC v. Perry*, 548 U.S. 399, 430-435 (2006), which stretched 300 miles between dissimilar Latino communities in Austin and the Rio Grande Valley.  That vast district featured "enormous geographical distance" between "farflung" communities, and the record showed

they had "disparate needs and interests." *Id.* at 435. The district court correctly distinguished that district here. It noted that "substantial quantitative evidence, supported by lay-witness testimony," showed that Galveston County's predominantly Black and Latino areas are neither distant nor dissimilar in their needs and interests. ROA.16010.

The County's reliance on *Sensley v. Albritton*, 385 F.3d 591 (5th Cir. 2004), is similarly misplaced. *Sensley* concerned a nine-member county body, for which Black plaintiffs sought the creation of a third majority-minority district. Their proposed plans had an "extended and distorted shape," divided towns previously kept whole in single districts, and thereby "disrupted relationships between incumbents and constituents." *Id.* at 597-598. Plaintiffs' plans here—largely preserving the historic Precinct 3—have none of those problems.

The County's various criticisms of plaintiffs' experts and the district court's fact-finding (at 42-43) frequently mischaracterize the record. For instance, the County says expert Rush did not consider communities of interest, but he expressly testified that he did. ROA.17069-17070. Rush also opined that the County's enacted map cracked communities of interest in La Marque and Texas City. ROA.17065-17066. The County says the district court endorsed plaintiffs' illustrative plans with "no findings or explanations," but the court made specific findings, focusing particularly on the plans' compactness and the number of

municipalities they split or preserved compared to the County's enacted plan. ROA.15915-15920.

The County also appears to assume (at 43) that plaintiffs can satisfy the first *Gingles* precondition only with an illustrative plan in which the communities included in the illustrative precinct all add up to "form a community of interest." That is not the law. Illustrative plans must only "comport[] with traditional districting criteria, such as being contiguous and reasonably compact." *Milligan*, 599 U.S. at 18. A plan might violate traditional criteria by overly *splitting* communities of interest, as in *Sensley*, or by *combining* too-disparate communities of interest, as in *LULAC*, but the County does not show that either problem arose here. *Cf. Milligan*, 599 U.S. at 20-21 (rejecting Alabama's arguments that plaintiffs' illustrative plans divided a community of interest).

Even if the County were correct that an illustrative precinct must add up to a community of interest, plaintiffs satisfied that standard. The court found that historic Precinct 3, the model for plaintiffs' illustrative plans, was "an important political homebase for Black and Latino residents" because it was "responsive" and "reflective of their priorities." ROA.15911 (quoting ROA.17532). The County cites nothing that shows otherwise.

The County falls back (at 43) on the fact that plaintiffs' illustrative plans combine "separate communities" in a single precinct. But the County does not

identify any significant difference between the communities joined by plaintiffs' illustrative plans.[6]  Indeed, the County seems to concede (at 43) that the communities combined in plaintiffs' illustrative plans and historic Precinct 3 have political and socioeconomic commonalities.  And it does not try to show that its enacted plan protects communities of interest any better.

The mere fact that a county-level district contains several municipalities does not defeat compactness at the first *Gingles* precondition.  *See Clark*, 21 F.3d at 96.  Here, it could hardly be otherwise.  The County contains many municipalities, has "complex geography," and is divided only four ways to make commissioners court precincts.  ROA.15914-15915.

Finally, the County offers (at 42-43) a handful of trivial facts to contest the court's fact-finding on plaintiffs' illustrative plans.  These do not show any error, much less clear error.  Leon Phillips' testimony that he is more familiar with the parts of the County where he lives than the parts where he does not is unremarkable.  ROA.24129-24140.  Lucille McGaskey's testimony that the County's Black population has two clusters—fractured in the enacted map but

---

[6]  If the County means to argue (at 43) that mainland communities are too "disparate" to be combined with communities on Galveston Island, Cooper's Illustrative Plans 3 and 3A showed that a highly compact majority-minority precinct can be formed from only mainland areas.  ROA.16726-16734, 35210, 35386-35387.

combined in historic Precinct 3—supports plaintiffs' showing on the first *Gingles* precondition, if anything. Indeed, the County concedes elsewhere (at 8) that the Black population is "concentrated along a central corridor through the County," which historic Precinct 3 encompassed. And the County misrepresents expert Cooper's testimony about the dissimilarity of Texas City and League City. Cooper included only small portions of League City in his illustrative plans, so the two cities' dissimilarity does not impugn those plans. ROA.16818-16820. The testimony cited by the County was Cooper's explanation of why *Owens* erred by relying on obsolete statistical categories that lumped Texas City and League City together. ROA.16748-16751, 16841.

**C.     Plaintiffs proved that Precinct 3's minority voters are cohesive.**

1.  "A showing that a significant number of minority group members usually vote for the same candidates" satisfies *Gingles*' cohesion requirement. *Gingles*, 478 U.S. at 56. Here, the district court found that "undisputed evidence" showed "the combined Black and Latino coalition is highly cohesive." ROA.16016-16017. Galveston County's expert, John Alford, "testified that it would be hard to find 'a more classic pattern of what polarization looks like in an election.'" ROA.15926-15927 (quoting ROA.19312). Such "close correlation between the preferences of [Latino] and Black voters" is "overwhelming" evidence of their coalition's

cohesion.  *See League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 864-865 & n.29 (5th Cir. 1993) (en banc).

All experts, including the County's, agreed that general-election results are the "most probative."  ROA.16015; ROA.16905-16907 (Barreto); ROA.17233-17235 (Trounstine); ROA.17343 (Oskooii); ROA.19440 (Alford).  These results "strongly support[ed] [the] conclusion that a supermajority of Black voters vote for Latino-preferred candidates and vice-versa."  ROA.16015; ROA.15926 (same).  In addition, reconstituted-election analysis showed that Black and Latino voters would elect their candidate of choice if they were placed back into a majority-minority precinct.  ROA.16016-16017.  These findings satisfy the *Gingles* cohesion requirement.  *See Gingles*, 478 U.S. at 50; *Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989); *Campos*, 840 F.2d at 1245.

Primary elections, though "less probative," likewise showed cohesion.  ROA.15928, 16015.  The most relevant primary was the 2012 primary for Precinct 3, the last contested primary in the precinct at issue.  That primary "featured a highly cohesive Black and Latino electorate."  ROA.15929, 19434.  The district court also credited the opinions of plaintiff and defense experts—Kassra Oskooii and Alford, respectively—that "Blacks and Latinos usually support the same top-choice candidate in primary contests."  ROA.15929; ROA.15073-15074 (showing

Black and Latino voters supported same top-choice primary candidate in 22 of 24 elections that Oskooii and Alford analyzed).

Extensive lay-witness testimony corroborated that the County's Black and Latino voters are cohesive. ROA.15931. Community leaders testified to it, while others testified about Black and Latino voters' common "interests and policy preferences," including in "education, housing, healthcare, and employment." ROA.15931. And witnesses testified about shared services, resources, and membership between the County's LULAC and NAACP branches. ROA.15931.

2. The County's brief largely is silent on the strong cohesion that Black and Latino voters demonstrated in general elections and on the lay testimony about cohesion. It appears to lodge just one criticism of the general-election evidence, pointing (at 48-49) to the "confidence intervals" in plaintiff expert Matthew Barreto's estimates of Latino voting. But the County does not identify any deficiency in his methods. In fact, Barreto used advanced methods, including Bayesian Improved Surname Coding, which other experts and the district court agreed is reliable. ROA.15924-15925, 16891. And he analyzed a large number of elections, 29, to be sure his inferential estimates of Latino voting were consistent. ROA.15070. *See Teague v. Attala County, Miss.*, 92 F.3d 283, 289 (5th Cir. 1996) (rendering judgment for plaintiffs where plaintiffs' two experts established racially

polarized voting by analyzing eight and six elections, respectively). There is no error here.

3.a. The County's brief also is silent on the consensus among experts—including its own, Alford—that general elections "provide the clearest picture." ROA.19440-19442 (Alford: "[I]f we found something, say, in the primary that contradicted what we found in the general . . . in my view, it would be the general [that] is more important."). Despite the uniform expert testimony, the County contends (at 46) that primary-election results should receive more weight. The point is immaterial, because the district court found cohesion in both primary and general elections. Changing the relative weights does not change the outcome.

The County points instead (at 46) to testimony Alford gave in another case. *See LULAC v. Abbott*, 601 F. Supp. 3d 147 (W.D. Tex. 2022). That decision—by a three-judge court including the judge in this case—is not in conflict. The *Abbott* court said only that primaries can be "relevant," *id.* at 166; the court here agreed they could be probative. The *Abbott* court credited Alford's example that, in the 2014 primary for the state-senate seat at issue there, Black and Hispanic voters preferred different candidates. *Ibid.* By contrast, the court here found that this case's equivalent primary—the 2012 primary for Precinct 3—featured "highly cohesive" Black and Latino voting, which Alford recognized. ROA.19434.

b.  This Court need not decide the relative weight that general and primary elections should receive, because the district court found cohesion in both. Regardless, the district court was right to give primary elections less weight, consistent with the expert consensus.  *See* p. 24, *supra*.

The expert testimony established that general-election results typically are more probative because primary results convey less useful information.  Primaries have far fewer voters, so accurate statistical inference of their voting choices is harder.  ROA.15928.  And those primary voters are less representative of the full electorate that participates in general elections, whose rights are also at stake in Section 2 cases.  ROA.15928, 19441.  Primary candidates and their positions are more similar, so voter preferences are weaker; voting for one candidate need not imply real opposition to another.  ROA.15928, 17341.  And when divergence occurs within a primary, it is less meaningful because it is to be expected. Primaries' very purpose is to surface and resolve differences among generally like-minded voters who then work together as a coalition in a general election. ROA.17310-17311.

c.  The County tries two ways to dispute the district court's fact-finding on primaries, but its arguments lack support and conflict with the County's own showing at trial.  *First*, the County insists (at 46-47) on high percentage thresholds for cohesion in primary elections that have no basis in case law or expert opinion.

Such thresholds may make sense in general elections, but that does not mean they make sense in primaries. The district court did not credit these thresholds as meaningful or appropriate for primaries, and even the County's own expert, Alford, was reticent to endorse them. He testified cohesion is a "continuous" variable, so he is "not a fan" of "bright line" approaches to assessing it and refused to "advocat[e] for a cutoff point." *See* ROA.19394-19396.

Applying such thresholds to primaries is counterintuitive. Primary candidates often resemble one another in profile and views, and they are competing to win over the same voters. There is no reason to expect that the voters in a party primary, presented with similar options, always unify on a single candidate. The fact that competitive primaries sometimes occur within a like-minded pool of voters should not disqualify them—and all the general-election voters who did not participate in the primary—from protection under the VRA.

*Second*, the County contests (at 47-48) the district court's choice to credit Oskooii's and Alford's ecological-inference analyses of primary-election results. The County's remarkable argument means throwing its own expert overboard.

Oskooii analyzed one set of primary elections (ROA.34936), while Alford and expert Jessica Trounstine presented conflicting analyses of another set of primary elections (ROA.24002). The district court credited Oskooii's estimates and credited Alford's estimates over Trounstine's. ROA.15929. That was a

reasonable decision on this record: Alford maintained he used a more advanced regression package than Trounstine. ROA.19464-19466. Oskooii used the same one as Alford, testifying that it was "the gold standard method." ROA.17350.

Using that method, Oskooii and Alford together found that Black and Latino voters in Galveston County had the same top-choice candidate in 22 of the combined 24 primary elections they analyzed. ROA.15073. Thus, Black and Latino voters consistently responded the same way to the same primary candidates, corroborating the robust evidence of their cohesion in general elections. This record is a far cry from *Rodriguez v. Pataki*, on which the County relies, where the evidence showed, with only one exception, that "Hispanic voters were never cohesive for a black candidate and black voters were never cohesive for a Hispanic candidate." 308 F. Supp. 2d 346, 419-422 (S.D.N.Y. 2004) (alteration and citation omitted).

Alford's analysis was the County's only evidentiary showing on cohesion. The County offered no other evidence to counter plaintiffs' cohesion evidence, such as lay witness testimony. *See, e.g.*, *Brewer*, 876 F.2d at 453-454 (noting lay witnesses testified "they saw no signs of political cohesion among [minority] groups"). And the County provides no clear reason that the district court should have credited Trounstine's results over Alford's. It does not, for instance, say

Alford was wrong to prefer his methods to Trounstine's. Its brief simply focuses on Trounstine's results, while ignoring all the foregoing context.

The County's abandonment of its own evidence in favor of an analysis the district court reasonably did not credit fails to demonstrate any error, much less error so clear that, in view of "the entire evidence," it creates "the definite and firm conviction that a mistake has been committed." *Sneed*, 50 F.4th at 489 (citation omitted).

**D. Plaintiffs proved that white bloc voting defeats minority voters' preferred candidates in Precinct 3.**

1. The district court found that plaintiffs satisfied the third *Gingles* precondition because the County "[did] not dispute" that "more than 85% of Anglos vote cohesively for candidates running in opposition to those supported by more than 85% of Black and Latino voters." ROA.16017. The County also "[did] not dispute" that reconstituted-election analysis of the enacted map showed Anglo bloc voting consistently defeating minority-preferred candidates in every precinct. ROA.16017.

Rather than contest these facts, the County urged partisanship, not race, as the main driver of polarization. ROA.15937. But the mere fact of overlap between racial and partisan polarization does not defeat a Section 2 claim. Plaintiffs can, and do, prevail in "cases where racially divergent voting patterns correspond with partisan affiliation." *Clements*, 999 F.2d at 860-861. The Supreme Court upheld

that result just this year. *See Singleton v. Merrill*, 582 F. Supp. 3d 924, 1017 (N.D. Ala. 2022) (granting relief in case with "black voters overwhelmingly supporting the Democratic candidate and more than a majority of white voters casting a ballot for the Republican candidate"), *aff'd sub. nom. Milligan*, 599 U.S. at 21-22.

Here, the County "failed to show that a race-neutral explanation explains the racially divergent voting patterns." ROA.15937. Beyond the "extreme" statistical divergence in Anglo and minority voting, the overall record contradicted the County's partisanship theory. Among other facts, the district court cited the "overwhelming[]" racial difference between the voters participating in each party's primaries; the "lack of successful minority candidates emerging from Republican primaries"; minority candidates' lack of success outside majority-minority areas; and "continued racial appeals in Galveston County politics." ROA.15939; *see* ROA.15986-15988.

2.a. The County's attempt to rehabilitate its partisanship theory starts (at 50) by citing the wrong law. It quotes the distinction between partisan and racial motives drawn by *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321, 2349 (2021), but *Brnovich* was dealing there with a discriminatory-purpose claim, not a Section 2 results claim.

The County also suggests (at 50) that plaintiffs' burden here is governed by *Easley v. Cromartie*, 532 U.S. 234, 241 (2001). But *Easley* addressed a racial-

gerrymandering claim, which is "analytically distinct" from the vote-dilution claims at issue here. *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (citation omitted). Racial-gerrymandering claims assert that race was the "predominant factor motivating [a] legislature's decision" to place voters in certain districts. *Id.* at 916. When defendants invoke partisanship to defend their actions, a trial court must "assess whether the plaintiffs have managed to disentangle race from politics and prove that the former drove a district's lines." *Cooper v. Harris*, 581 U.S. 285, 308 (2017). That search for scienter is not essential to Section 2's results test, which "turns on the presence of discriminatory effects, not discriminatory intent." *Milligan*, 599 U.S. at 25.

b. The County claims repeatedly (at 51-52) that the district court failed to consider its theory that partisanship explained polarized voting better than race did, but that too is wrong. The district court considered the County's theory and found it wanting. It determined that "a partisan explanation for voting patterns in Galveston County does not overcome the weighty evidence of racially polarized voting on account of race." ROA.15938.

At trial, Alford's opinions formed the core of the County's partisanship theory. ROA.15935-15938. The County's brief is tellingly silent on those opinions, pretending instead (at 51-52) that the court failed to consider some key evidence that the County does not specify. Alford had theorized that if race were

more explanatory than partisanship, then a candidate's race would have more impact on minority voters' choices than the candidate's party. ROA.23987-23988. Alford relied mainly on only one election, Texas's 2018 U.S. Senate race, supposing that if race were more explanatory, Republican voters would have supported Ted Cruz less and minority voters would have supported him more. ROA.15935-15936, 19347, 23989-23990. But, as noted, the district court made contrary findings tailored to Galveston County: minority candidates did not win Republican primaries and tended to only be elected from majority-minority areas. ROA.16019. Therefore, it was not clearly erroneous for the district court to reject Alford's, and thus the County's, partisanship theory at trial.

The district court thus committed no error under *Clements*, on which the County relies. *See* Br. 50-52 (citing *Clements*, 999 F.2d at 850, 854). To start, the district court in *Clements* had excluded evidence of non-racial explanations for polarized voting patterns as "irrelevant." *Id.* at 850. Here, the district court gave the County's theory a full hearing and found it unpersuasive.

*Clements* also featured evidence of behavior driven by partisanship that race on its own could not explain: Anglo voters participated substantially in both parties' primaries; Republicans "aggressively" recruited minority candidates; and minority candidates received at least as much support from their party as Anglo candidates of the same party. 999 F.2d at 861. The County did not make any such

showings here, and the court found the opposite was true: Anglo voters "overwhelmingly" participated only in Republican primaries; those primaries rarely yielded minority candidates; and minority candidates tended only to win in majority-minority areas. ROA.16019.

To dispute the court's findings, the County now musters all of four examples of minority county officeholders (a commissioner, two county clerks, and a district judge) going back to 2012. Br. 52-53. It asserts (at 52) that the court ignored Robin Armstrong, a Black Republican and commissioner for Precinct 4, but that is incorrect. The court recognized that Armstrong was *appointed* to his office in 2022, after this litigation began; he did not win a primary for it. ROA.15936-15937, 19491-19492. The paucity of examples the County can manage only corroborates the district court's findings.

### E. The totality of the circumstances demonstrated a clear Section 2 violation.

The district court determined that the totality of the circumstances supported plaintiffs, and it "anchored its judgment in evidence." ROA.16022; *Clark v. Calhoun County, Miss.*, 88 F.3d 1393, 1397 (5th Cir. 1996). The County forgoes criticizing the court's totality-of-the-circumstances analysis. It apparently does not dispute any of the court's determinations.

Among other factors, "extensive evidence" showed racially polarized voting in Galveston County (Senate Factor 2). ROA.16022. Undisputed "pervasive

socio-economic disparities" existed between Black and Latino communities and the white population, "negatively affect[ing]" their turnout (Senate Factor 5). ROA.16023-16024. There was "unrebutted evidence of racial appeals in recent political campaigns" in the County (Senate Factor 6). ROA.16023-16024. Minority candidates' electoral success was "slow, slight, and disproportionately low[]" (Senate Factor 7). ROA.16025 (citation omitted). The commissioners court exhibited a "lack of responsiveness to minority concerns" (Senate Factor 8). ROA.16025-16026. And the justification for remaking the map—creating "a single coastal precinct"—was tenuous. ROA.16026-16027. Few people called for it, and a coastal precinct could be made without dismantling Precinct 3. ROA.16026-16027.

The rushed, predetermined nature of the plan's adoption also informed the totality of the circumstances in plaintiffs' favor. ROA.15950, 15967-15968. The record showed many "procedural deviations" from past cycles: no public timeline or criteria to guide the redistricting process; the opaque engagement of redistricting counsel; inadequate time and means for the public to review the proposed maps; the tempestuous November 12 public meeting; the commissioners' "disregard for minority input" on the proposed Map 2; and the "exclusion of Commissioner Holmes from the process." ROA.15963. Bryan and Oldham admitted they could have finished the maps faster and given the public more transparency and input.

ROA.15968-15970.  But Judge Henry wanted no public hearings until the map was a "final product," waiting until the day before the state-law deadline for adopting maps to hold the *fait accompli* hearing on the plan that fractured Precinct 3. ROA.15970.  The County neither rebutted nor justified these deviations at trial (ROA.15964-15969, 15973), nor does it try to now.

***

All told, the evidence established "a clear violation" of Section 2. ROA.16029.  "Precinct 3 was summarily carved up and wiped off the map." ROA.16028.  The district court's considered judgment that "it must be overturned" (ROA.16029), should be affirmed.

## II.    Galveston County's challenges to settled law lack merit.

### A.    Section 2 permits coalition claims.

Galveston County argues (at 17) that the VRA does not permit coalition claims by voters of two or more minority groups, but that has been the law of this circuit for more than three decades.  Galveston County's argument therefore fails.

### 1.    This Court's precedent is binding and sound.

This Court treats the issue of coalition claims "as a question of fact, allowing aggregation of different minority groups where the evidence suggests that they are politically cohesive." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 864 (5th Cir. 1993) (en banc).  "If blacks and Hispanics

vote cohesively, they are legally a single minority group." *Ibid.* That en banc

precedent requires rejecting the County's argument.

This Court first affirmed a coalition claim in *LULAC v. Midland*

*Independent School District*, 812 F.2d 1494 (5th Cir.), *vacated on state-law*

*grounds*, 829 F.2d 546 (5th Cir. 1987) (en banc), which concerned the at-large

voting scheme of the school district in Midland, Texas. The Court upheld the

district court's findings that Black and Hispanic voters' "common experiences in

past discriminatory practices" and "common social, economic, and political

interests" converged to make them politically cohesive. *Id.* at 1500-1501.

Unrebutted statistical evidence also demonstrated that "minorities and non-

minorities voted along racial lines." *Id.* at 1501 & n.14. Though the en banc court

vacated the panel decision to consider a state-law issue regarding the structure of

school districts' elected boards, it affirmed the district court's judgment that

ordered the school district to adopt a single-member structure. *See Midland*, 829

F.2d at 548, *aff'g* 648 F. Supp. 596 (W.D. Tex. 1986).

Applying the fact-based approach to coalition claims, this Court determined

in *Campos v. City of Baytown, Tex.*, 840 F.2d 1240 (5th Cir. 1988), that Black and

Hispanic voters challenging Baytown, Texas's at-large city council had

demonstrated cohesion. *See id.* at 1245-1248. Similarly, in *Clements*, where Black

and Hispanic voters challenged Texas's countywide elections for state district

judges, "the evidence indisputably showed that blacks and Hispanics were politically cohesive" in certain counties, though their claims failed for other reasons. 999 F.2d at 864; *id.* at 865 n.29 (noting "overwhelming evidence of cohesiveness among black and Hispanic voters"). The en banc court discerned "no error in the district court's findings of cohesion" in certain other counties because "a significant number of blacks and Hispanics *usually* voted for the same candidates." *Id.* at 864-865.

This Court's fact-based approach to coalition claims is the correct interpretation of Section 2. Rather than categorically barring a type of claim without regard to the supporting evidence, this Court's approach means evaluating coalition claims through the same "searching practical evaluation of the past and present reality" that governs Section 2 claims overall. *Milligan*, 599 U.S. at 19 (quoting *Gingles*, 478 U.S. at 79).

This Court's precedent also is consistent with Section 2's text. Subsection (a) protects an individual right, "the right of *any citizen* of the United States to vote," against "denial or abridgment" by a voting practice or procedure "on account of race or color" or membership in a "language minority group." 52 U.S.C. 10301(a), 10303(f)(2) (emphasis added); *see LULAC*, 548 U.S. at 437 ("[T]he right to an undiluted vote does not belong to the minority as a group, but rather to its individual members." (citation and internal quotation marks omitted)).

Subsection (b) defines violations of that individual right as occurring when "members of a class of citizens protected by subsection (a) . . . have less opportunity than other members of the electorate" to participate politically. 52 U.S.C. 10301(b).

When individual Black and Latino citizens' right to vote is abridged by the same practice or procedure, such as a districting plan, together those injured individuals are all "members of a class of citizens protected by subsection (a)." *See Clements*, 999 F.2d at 864 ("If blacks and Hispanics vote cohesively, they are legally a single minority group."). The text contains no restriction that requires "class" to mean "a single racial group" or the "members" to be only one race. Instead, the text uses "a class" and its "members" simply to denote a group of injured individuals, which is well established in legal usage. *See* Fed. R. Civ. P. 23 ("Class Actions") (permitting "[o]ne or more members of a class [to] sue or be sued . . . on behalf of all members").

Moreover, this Court's acceptance of coalition claims is consistent with the VRA's history. Congress added protection for language minority groups to the VRA in 1975, defined to include persons "of Spanish heritage." 52 U.S.C. 10310(c)(3). The Senate report explaining that choice extensively likened the experiences of Mexican Americans in Texas to Blacks' experiences there and across the South. *See* S. Rep. No. 295, 94th Cong., 1st Sess. (1975). The report

noted the similar "effects of discrimination" both endured, and the "efforts to minimize the impact of their political participation" both faced. *Id.* at 25. It cited a decision that found "a pattern of racial discrimination that has stunted the electoral and economic participation of the black and brown communities" in Texas. *Id.* at 30 (quoting *Graves v. Barnes*, 378 F. Supp. 640, 643 (W.D. Tex. 1974)). And it noted that many local governments in Texas had used at-large voting schemes to "effectively deny Mexican Americans and black voters in Texas political access in terms of recruitment, nomination, election and ultimately, representation." *Id.* at 27-28. It would be anomalous to wall off voters that Congress saw as having so much in common.

Treating coalition claims as a question of fact does not mean plaintiffs always win. *See Rollins v. Fort Bend Indep. Sch. Dist.*, 89 F.3d 1205, 1214-1215 & n.21 (5th Cir. 1996) (no cohesion where statistical analysis did not support it and no qualitative evidence of cohesion was shown); *Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989) (no cohesion where plaintiffs did not provide statistical evidence and lay witnesses largely "testified that they saw no signs of political cohesion among these groups"); *cf. Overton v. City of Austin*, 871 F.2d 529, 543-544 (5th Cir. 1989) (Jones, J., concurring) (no cohesion where Black and Hispanic voters "did not *usually* combine to support candidates who were usually disfavored

by Anglo voters").  Coalition plaintiffs still must satisfy *Gingles*' requirements, like any other plaintiffs.

> ## 2. Galveston County's challenge to binding precedent lacks merit.

Galveston County's brief does not directly acknowledge that it is calling on this Court to discard longstanding precedent, including the en banc *Clements* decision, nor does it suggest that binding precedent somehow does not apply here. Instead, it elides the statutory text, while resorting to indeterminate legislative history, nonbinding opinions, and mischaracterization of other circuits' authority.

a.  The County paraphrases and elides (at 18-19) the key statutory text.  The question is the meaning of Subsection (b)'s phrase, "members of a class of citizens protected by subsection (a)."  52 U.S.C. 10301(b).  Does it mean members of a single racial group, as the County maintains?  Or, consistent with this Court's cases, does it mean simply members of a class of the citizens described in Subsection (a), that is, "any citizen[s]" whose right to vote is denied or abridged on account of race, color, or language minority?  The County's discussion of the text avoids the issue (at 18) by deleting the reference to Subsection (a) and paraphrasing the rest as "a minority group."  That begs the question.

The County's transformation of "a class of citizens protected by subsection (a)" into "a minority group" is contrary to standard statutory interpretation.  Courts "may not narrow a provision's reach by inserting words Congress chose to omit."

*Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1724-1725 (2020).  As in *Lomax*, where "dismissed" in 28 U.S.C. 1915(g) did not only mean "dismissed with prejudice," *ibid.*, "a class" in Section 2 does not only mean "a single racial class."  Had Congress wanted to limit plaintiffs to claims on behalf of a single racial group, it would not have been hard to craft the few words necessary, such as by specifying "citizens of the same race or color."  "But Congress did not adopt that ready alternative."  *Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017).

b.  Rather than parse the statute's text, the County parses (at 24-28) the legislative history of the 1982 VRA amendments.  To be sure, the 1982 amendments are critical to the scope of Section 2.  *See Milligan*, 599 U.S. at 11-14.  "But legislative history is not the law."  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018).  Once Congress reduces its deliberations to enacted text, "[courts] do not inquire what the legislature meant; [they] ask only what the statute means."  *Ibid.* (citation omitted).

The County overreads the legislative history in any event.  It never locates even a suggestion that Congress intended to bar coalition claims, instead sifting stray words for dubious inferences.  It elicits (at 26) a bar on coalition claims from the mere use of an "or" in a Senate Report discussion not concerned with coalition claims.  *See* S. Rep. No. 417, 97th Cong., 2d Sess. 36 (1982) ("However, if an

electoral system operates today to exclude blacks *or* Hispanics from a fair chance to participate" (emphasis added)).  That is a thin reed, particularly given that the report's next sentence refers generically to "minorities" without imposing the dividing line the County demands.  *Ibid.* ("The standard under the committee amendment is whether minorities have equal access to the process of electing their representatives.").

The County suggests (at 24) that the Senate Report shows "Congress envisioned Section 2 protections to [give] Black citizens an equal chance at effective political participation."  But the idea that only Black voters were given protection is untenable in view of the VRA's amendment history.  *See* pp. 39-40, *supra*.  The County also discerns (at 25) from the Senate Report's "references to a single race of VRA plaintiffs" that Congress did not intend to allow coalition claims.  But those (unspecified) references reflect only that most cases are brought by voters of a single race.  If stray references in committee reports are to be decisive, the 1982 Senate Report notably cites *Wright v. Rockefeller*, 376 U.S. 52 (1964), a case by Black and Puerto Rican voters in New York.  S. Rep. No. 417, 97th Cong., at 304 & n.60.  Despite acknowledging *Wright*, Congress did not add an express textual bar on coalition claims.

The County warns (at 24-25) that allowing coalitions to sue under Section 2 would "greatly expand and increase the impact and rate of VRA claims," thereby

"vastly overstep[ping] the VRA's intended purpose." This Court's cases belie that prediction. Only a handful of coalition cases have reached this Court over the decades since it decided *Midland*, and they have often failed. *See, e.g.*, *Rollins*, 89 F.3d at 1214-1215; *Clements*, 999 F.2d at 893-894; *Brewer*, 876 F.2d at 453; *Overton*, 871 F.2d at 538. The County's unfounded fear is no basis to bar coalition claims altogether.

c. For the same reason, the County's reliance (at 33) on *Bartlett v. Strickland*, 556 U.S. 1 (2009), is inapt. *Bartlett* expressly reserved the question of coalition claims. *Id.* at 13-14. *Bartlett* dealt only with "crossover" districts, which it regarded as distinct. *Ibid.* In crossover districts, minority voters are "less than a majority of the voting-age population," but large enough to elect their preferred candidate with help from "members of the majority" who "cross over" to support that candidate. *Id.* at 13.

The issue in *Bartlett* was whether Section 2 protected Black voters who made up 39% of a North Carolina legislative district—and could win it with help from crossover white voters—against map changes that would have dropped their percentage to 35%. 556 U.S. at 8. The Supreme Court ruled that Section 2 did not apply, in part because it would otherwise mean potentially "[i]njecting this racial measure into the nationwide districting process." *Id.* at 22. Any change to a legislative district with a substantial number of minority voters would potentially

raise a VRA issue, engendering far more litigation. The sheer rarity of coalition claims that satisfy the *Gingles* framework dispels that concern here.

d. The County cites (at 29) nonbinding opinions from judges of this Court that would have rejected coalition claims categorically. Two of the three predated *Clements*. *See Campos v. City of Baytown, Tex.*, 849 F.2d 943, 944 (5th Cir. 1988) (Higginbotham, J., dissenting from denial of reh'g); *Midland*, 812 F.2d at 1503 (Higginbotham, J., dissenting). Both opinions took issue with the showing of cohesion in those cases, doubting that the asserted coalitions were anything more than "ephemeral" or "occasional" alliances. *Midland*, 812 F.2d at 1504-1506. But the en banc Court's opinion in *Clements*, authored by the same judge, declined to adopt a categorical rule against coalition claims, even though certain judges would have. *See* 999 F.2d at 894-898 (Jones, J., concurring). The record in *Clements* presented "overwhelming evidence of cohesiveness among black and Hispanic voters," allaying doubts that sufficient cohesion to support a coalition claim could be shown. *See id.* at 865 n.29 (majority opinion).

*Clements'* fact-based approach for coalition claims is the best way to address the concerns raised in the nonbinding opinions the County cites. *Gingles'* "searching evaluation" of political reality enables courts to distinguish "ephemeral political alliances having little or no necessary connection to discrimination" from genuine, durable coalitions sharing that connection. *Midland*, 812 F.2d at 1504

(Higginbotham, J., dissenting). If racial groups lack the cohesion derived from common experiences and interests, their claims will fail of their own accord. That outcome need not be assumed in advance.

e. Finally, Galveston County asserts a circuit split (at 31-34) that depends on older decisions it mostly misinterprets. This asserted split is not a compelling basis to overturn this Court's settled precedent.

The County misreads *Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004), which was about a crossover district involving Black and white voters voting together, not a coalition district. *See id.* at 425; *Bartlett*, 556 U.S. at 15 (distinguishing "crossover" districts from "coalition" districts). *Hall* did not decide the lawfulness of coalition claims. *See Holloway v. City of Virginia Beach*, 42 F.4th 266, 292 & n.24 (4th Cir. 2022) (Gregory, J., dissenting) (explaining that the Fourth Circuit has "not yet decided" whether coalition claims are permissible). Crossover districts raise different concerns than coalition claims: it is harder for minority plaintiffs to prove that "the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate," *Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 51), when a meaningful share of that majority is supporting the same candidates as the minority.

The County also cites *Frank v. Forest County*, 336 F.3d 570 (7th Cir. 2003). But *Frank*, like this Court's cases, made only a case-specific determination that

Native American plaintiffs had not shown cohesion with Black voters. *Id.* at 576.

*Frank* coheres, rather than conflicts, with this Court's approach.

As Galveston County concedes (at 32), most other circuit courts to consider coalition claims agree with this Court and treat them as a question of fact. *See Bridgeport Coal. for Fair Representation v. City of Bridgeport*, 26 F.3d 271, 275-276 (2d Cir.), *vacated on other grounds*, 512 U.S. 1283 (1994) (holding coalition plaintiffs proved cohesion); *Badillo v. City of Stockton, Cal.*, 956 F.2d 884, 890-891 (9th Cir. 1992) (holding plaintiffs did not prove cohesion); *Concerned Citizens of Hardee County v. Hardee County Bd. of Comm'rs*, 906 F.2d 524, 526-527 (11th Cir. 1990) (same).

Thus, the only exception is *Nixon v. Kent County*, 76 F.3d 1381 (6th Cir. 1996) (en banc), a decision nearly three decades ago that courts since have not found persuasive.[7] *Nixon* rejected coalition claims categorically based on

---

[7] Though few courts have come to the question of coalition claims without binding circuit authority or guidance, they have rejected *Nixon* consistently. *See Holloway v. City of Virginia Beach*, 531 F. Supp. 3d 1015, 1051-1053 (E.D. Va. 2021), *vacated on other grounds*, 42 F.4th 266 (4th Cir. 2022); *Huot v. City of Lowell*, 280 F. Supp. 3d 228, 233-236 (D. Mass. 2017); *Pope v. County of Albany*, No. 1:11-cv-00736, 2014 WL 316703, at *6 (N.D.N.Y. Jan. 28, 2014) (considering question despite Second Circuit's *Bridgeport* decision, and rejecting *Nixon*'s interpretation of the VRA's text); *cf. Baldus v. Members of Wis. Gov't Accountability Bd.*, 849 F. Supp. 2d 840, 857-858 (E.D. Wis. 2012) (rejecting defendants' argument that challenged district was a proper coalition district, but acknowledging, despite *Nixon*, that "if the[y] had offered concrete evidence

misreading the text of Section 2.  As noted, Section 2's Subsection (a) protects an individual citizen's right to vote, and violations occur when "members of a class of citizens protected by subsection (a) . . . have less opportunity than other members of the electorate" to participate politically.  52 U.S.C. 10301(b).  *Nixon* read "class" to mean a single racial or language-minority group, 76 F.3d at 1386-1387, imputing a restriction that the statutory text does not contain.

*Nixon* insisted that Congress could and should have used "*classes*," not "a class," if it meant to allow coalition claims.  76 F.3d at 1386.  But that double-edged point just as easily cuts the other way:  Congress could and should have specified "a single racial class" if that is all it meant to allow.  Instead, Congress used the broad, unrestricted term "class," the typical legal usage for a group of injured individuals, and defined membership in that class individually.  Those textual choices do not bear the restrictions *Nixon* imposed.  "It is a fundamental principle of statutory interpretation that absent provision[s] cannot be supplied by the courts."  *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2380 (2020) (citation and internal quotation marks omitted).  *Nixon*'s disregard of that principle should not be emulated.

---

demonstrating that New Assembly District 8 is a coalition district, such a showing would have supported a finding of no Section 2 violation").

## B. Section 2's constitutionality is not in doubt.

Galveston County argues at much greater length in its brief that Section 2 has outlived its constitutionality than the County ever did in the district court. Br. 54-59. It did not develop the argument before or at trial. It waited until its post-trial brief to dispute Section 2's constitutionality, devoting fewer than two pages of a 60-page brief to the argument. ROA.15437-15438. The County raised the issue so quietly and belatedly that it drew just one paragraph across the three plaintiffs' post-trial response briefs. ROA.15808-15809.

There was no excuse for tardiness. The cases on which the County now relies largely were decided well before this litigation began. *See* Br. 56-58 (citing, *e.g.*, *Shaw v. Hunt*, 517 U.S. 899 (1996) and *Grutter v. Bollinger*, 539 U.S. 306 (2003)). "This Court does not look with favor upon tardy arguments that are brought to the lower court's attention post-trial." *Risher v. Aldridge*, 889 F.2d 592, 595 (5th Cir. 1989). When so little time and attention was given to an issue in the trial court, this Court is entitled to disregard it on appeal. *See Alliance for Good Gov't v. Coalition for Better Gov't*, 919 F.3d 291, 297 (5th Cir. 2019). That is especially so when the issue is as momentous as this.

Regardless, Galveston County's argument fails under controlling precedent. *Shelby County v. Holder*, invalidating the VRA's preclearance coverage formula, specified that it "in no way affects" Section 2. 570 U.S. 529, 557 (2013). And

*Milligan* upheld Section 2 against a constitutional challenge just this year. *See* 599 U.S. at 41-42. The Court reiterated that a "ban on electoral changes that are discriminatory in effect . . . is an appropriate method of promoting the purposes of the Fifteenth Amendment." *Id.* at 41 (quoting *City of Rome v. United States*, 446 U.S. 156, 177 (1980)). It therefore rejected Alabama's arguments that Section 2 "exceeds the remedial authority of Congress." *Id.* at 41-42.

Galveston County's call to invalidate Section 2 fails on its own terms. It is premised (at 55) on the need for "oversight" of "race-conscious decisions," but Section 2 provides only a cause of action, subject to a demanding framework. *See Milligan*, 599 U.S. at 28-29. There is "oversight" in every case: every plaintiff must demonstrate anew that racially polarized voting and the other prerequisites to relief exist in the challenged jurisdiction. Section 2's application must be justified every time, not presumed based on long-ago decisions. This distinguishes Section 2 from the coverage formula invalidated in *Shelby County*. The coverage formula obligated only certain jurisdictions to ask the Attorney General "for permission to implement laws that they would otherwise have the right to enact and execute on their own," based principally on their electoral practices and conditions in the 1960's and 1970's. 570 U.S. at 537-539, 544. Section 2 imposes no such prior restraint, applies equally nationwide, and must always be tied to current conditions.

Similarly, because plaintiffs must prove Section 2 claims in adversarial litigation, Section 2 is unlike the college admissions policies at issue in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 221 (2023). A college applies its admissions policies in deliberations that are private, non-adversarial, and unreviewable. If a college cannot justify its use of race in those deliberations, the only appropriate remedy therefore may be to bar the policy, because no other efficient means of correction exists. Section 2 plaintiffs, by contrast, must prove their case against an adversary entitled to critique and rebut, before a court undertaking a "searching" review of the evidence, with appellate review to follow. *Milligan*, 599 U.S. at 19. While a given plaintiff may fail to run that gauntlet for various reasons, that is no basis to take Section 2 away from the plaintiffs that can.

Despite calling (at 55) for a "logical endpoint," the County does not explain why current conditions have changed so much that Section 2 should no longer be available to plaintiffs that need it. Nor could it, having failed to develop any record at trial. Section 2 is self-regulating in any event. Should residential segregation diminish, racially polarized voting fade, or minority electoral gains grow, it will be harder for plaintiffs to satisfy Section 2. *Milligan*, 599 U.S. at 28-29. For instance, the County speculates (at 39) that "Hispanic voters [may] continue along a trend of voting for more Republican candidates." But then it

would be harder for Hispanic plaintiffs to show they are cohesive or submerged by white bloc voting. If such trends develop, invalidating Section 2 altogether is unnecessary; its own requirements will defeat claims that lack merit. The effect of invalidating Section 2 thus would fall only on those plaintiffs who could otherwise establish they deserve relief.

Here, plaintiffs manifestly proved a Section 2 violation with "stark and jarring" facts. ROA.16028. The facts of this case reveal one of "those instances of intensive racial politics," *Milligan*, 599 U.S. at 30 (citation omitted), that demonstrates Section 2's continuing constitutionality and warrants its continued application.

## III. The district court's remedial process should move forward.

This Court has thus far imposed only temporary administrative stays to permit itself time to assess Galveston County's appeal. When the current administrative stay expires on November 10, the district court's remedial process should be permitted to move forward.

"A stay pending appeal is extraordinary relief for which defendants bear a heavy burden." *Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362, 373 (5th Cir. 2023) (citations and internal quotation marks omitted). Galveston County has not carried that heavy burden: as explained above, its appeal does not succeed on the merits—the first and principal factor in an appellant's entitlement to a stay.

*See Nken v. Holder*, 556 U.S. 418, 434 (2009); *Robinson v. Ardoin*, 37 F.4th 208, 227 (5th Cir. 2022).

Galveston County's brief and earlier stay motion present no other reason to delay the district court's remedial schedule further. The district court's remedial orders show it is prepared to move expeditiously. ROA.16066-16069. The County likewise can adopt a remedial plan quickly. The commissioners court is five members in a single county who already have regular meetings. Their mapmaker created the challenged map in a single day. ROA.15955-15956. And the County's stay motion—which asked this Court to rule by October 24 ahead of the district court's then-existing October 27 deadline—tacitly conceded that the County needs three days, at most, to prepare a remedial plan with supporting data.

Moving forward now will permit the County or the district court to install a revised plan for 2024 with minimal disruption to state election deadlines. To the extent disruption is unavoidable, the district court can make necessary adjustments. *See Robinson*, 37 F.4th at 230 (District court has power to extend "time limitations imposed by state law." (citation omitted)); *e.g.*, *Vera v. Bush*, 933 F. Supp. 1341, 1342 (S.D. Tex. 1996) (three-judge court) (ordering new congressional map and primary and runoff schedule three months before scheduled election). But beginning the remedial process sooner rather than later will minimize that disruption and any consequent confusion.

Finally, the public interest is in moving forward promptly.  After 2024, Precinct 3 will have only one other election this decade—in 2028—before another Census is done.  It is important to implement a remedial map for the 2024 election cycle so that voters do not endure an unlawful map for four more years, an even longer period than the map has already been in place.  "It would be untenable to permit a law with a discriminatory effect to remain in operation for that election." *Veasey v. Abbott*, 830 F.3d 216, 270 (5th Cir. 2016) (en banc).

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's judgment and terminate the stay.

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Matthew N. Drecun
NICOLAS Y. RILEY
MATTHEW N. DRECUN
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 550-9589

**CERTIFICATE OF SERVICE**

On November 2, 2023, I filed this brief with the Clerk of the Court by using

the CM/ECF system.  Participants in the case are registered CM/ECF users, and

service will be accomplished by the CM/ECF system.

s/ Matthew N. Drecun
MATTHEW N. DRECUN
Attorney

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,018 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and 5th Cir. Rule 32.1. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Times New Roman 14-point font using Microsoft Word for Microsoft 365.

s/ Matthew N. Drecun
MATTHEW N. DRECUN
Attorney

Date: November 2, 2023