No. 23-40582

# UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

---

HONORABLE TERRY PETTEWAY; HONORABLE DERRICK ROSE; HONORABLE PENNY POPE,
*Plaintiffs-Appellees*

v.

GALVESTON COUNTY, TEXAS; MARK HENRY, IN HIS OFFICIAL CAPACITY AS GALVESTON COUNTY JUDGE; DWIGHT D. SULLIVAN, IN HIS OFFICIAL CAPACITY AS GALVESTON COUNTY CLERK,
*Defendants-Appellants*

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*

v.

GALVESTON COUNTY, TEXAS; GALVESTON COUNTY COMMISSIONERS COURT; MARK HENRY, IN HIS OFFICIAL CAPACITY AS GALVESTON COUNTY JUDGE,
*Defendants-Appellants*

---

DICKINSON BAY AREA BRANCH NAACP; GALVESTON BRANCH NAACP; MAINLAND BRANCH NAACP; GALVESTON LULAC COUNCIL 151; EDNA COURVILLE; JOE A. COMPIAN; LEON PHILLIPS,
*Plaintiffs-Appellees*

v.

GALVESTON COUNTY, TEXAS; MARK HENRY, IN HIS OFFICIAL CAPACITY AS GALVESTON COUNTY JUDGE; DWIGHT D. SULLIVAN, IN HIS OFFICIAL CAPACITY AS GALVESTON COUNTY CLERK,
*Defendants-Appellants*

---

On Appeal from the United States District Court for the Southern District of Texas

---

## BRIEF FOR PLAINTIFFS-APPELLEES DICKINSON BAY AREA BRANCH NAACP; GALVESTON BRANCH NAACP; MAINLAND BRANCH NAACP; GALVESTON LULAC COUNCIL 151; EDNA COURVILLE; JOE A. COMPIAN; AND LEON PHILLIPS

---

Hilary Harris Klein
Adrianne M. Spoto
SOUTHERN COALITION FOR SOCIAL JUSTICE
5517 Durham Chapel Hill Blvd.
Durham, NC 27707
919-323-3380

Hani Mirza
Joaquin Gonzalez
TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741

Nickolas Spencer
SPENCER & ASSOCIATES, PLLC
9100 Southwest Freeway, Suite 122
Houston, TX 77074

Richard Mancino
Michelle A. Polizzano
Andrew James Silberstein
Molly L. Zhu
Kathryn C. Garrett
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
212-728-8000

Aaron E. Nathan
Diana C. Vall-llobera
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006
(202) 303-1000

## CERTIFICATE OF INTERESTED PERSONS

No. 23-40582

HONORABLE TERRY PETTEWAY; HONORABLE DERRICK ROSE;
HONORABLE PENNY POPE,

*Plaintiffs-Appellees*

v.

GALVESTON COUNTY, TEXAS; MARK HENRY, IN HIS OFFICIAL CAPACITY AS
GALVESTON COUNTY JUDGE; DWIGHT D. SULLIVAN, IN HIS OFFICIAL CAPACITY AS
GALVESTON COUNTY CLERK,

*Defendants-Appellants*

―――――――――

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*

v.

GALVESTON COUNTY, TEXAS; GALVESTON COUNTY COMMISSIONERS COURT;
MARK HENRY, IN HIS OFFICIAL CAPACITY AS GALVESTON COUNTY JUDGE,

*Defendants-Appellants*

―――――――――

DICKINSON BAY AREA BRANCH NAACP; GALVESTON BRANCH NAACP;
MAINLAND BRANCH NAACP; GALVESTON LULAC COUNCIL 151; EDNA
COURVILLE; JOE A. COMPIAN; LEON PHILLIPS,

*Plaintiffs-Appellees*

v.

GALVESTON COUNTY, TEXAS; MARK HENRY, IN HIS OFFICIAL CAPACITY AS
GALVESTON COUNTY JUDGE; DWIGHT D. SULLIVAN, IN HIS OFFICIAL CAPACITY AS
GALVESTON COUNTY CLERK,

*Defendants-Appellants*

―――――――――

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

i

**Defendants**

1.    Galveston County, Defendant-Appellant

2.    Honorable Mark Henry, in his official capacity as Galveston County Judge, Defendant-Appellant

3.    Dwight D. Sullivan, in his official capacity as Galveston County Clerk, Defendant-Appellant

4.    Commissioner Joseph Giusti, in his official capacity as Galveston County Commissioner

5.    Commissioner Darrell Apffel, in his official capacity as Galveston County Commissioner

6.    Commissioner Robin Armstrong, in his official capacity as Galveston County Commissioner

7.    Commissioner Stephen Holmes, in his official capacity as Galveston County Commissioner

8.    Randy Ray Howry, Counsel for Commissioner Stephen Holmes

9.    J. Christian Adams, Counsel for Defendants-Appellants

10.   Jason Brett Torchinsky, Counsel for Defendants-Appellants

11.   Maureen S. Riordan, Counsel for Defendants-Appellants

12.   Robert Barron Boemer, Counsel for Defendants-Appellants

13.   Shawn T Sheehy, Counsel for Defendants-Appellants

14.   Angela Olalde, Counsel for Defendants-Appellants

15.   Dallin Brockbank Holt, Counsel for Defendants-Appellants

16.   Dalton L. Oldham, Counsel for Defendants-Appellants

17.   James Edwin Trainor, III, Counsel for Defendants-Appellants

18.   Jordan Raschke Elton, Counsel for Defendants-Appellants

19.   Joseph M. Nixon, Counsel for Defendants-Appellants

20.     Joseph R. Russo, Jr., Counsel for Defendants-Appellants

**NAACP/LULAC Plaintiffs**

21.     Dickinson Bay Area Branch NAACP, Plaintiff-Appellee

22.     Galveston Branch NAACP, Plaintiff-Appellee

23.     Mainland Area Branch NAACP, Plaintiff-Appellee

24.     LULAC Council 151, Plaintiff-Appellee

25.     Edna Courville, Plaintiff-Appellee

26.     Joe A. Compian, Plaintiff-Appellee

27.     Leon Phillips, Plaintiff-Appellee

28.     Richard Mancino, Counsel for Plaintiffs-Appellees

29.     Diana C. Vall-llobera, Counsel for Plaintiffs-Appellees

30.     Michelle Polizzano, Counsel for Plaintiffs-Appellees

31.     Andrew Silberstein, Counsel for Plaintiffs-Appellees

32.     Molly Zhu, Counsel for Plaintiffs-Appellees

33.     Kathryn Garrett, Counsel for Plaintiffs-Appellees

34.     Hilary Harris Klein, Counsel for Plaintiffs-Appellees

35.     Adrianne M. Spoto, Counsel for Plaintiffs-Appellees

36.     Hani Mirza, Counsel for Plaintiffs-Appellees

37.     Sarah Xiyi Chen, Counsel for Plaintiffs-Appellees

38.     Joaquin Gonzalez, Counsel for Plaintiffs-Appellees

39.     Christina Beeler, Counsel for Plaintiffs-Appellees

40.     Nickolas Anthony Spencer, Counsel for Plaintiffs-Appellees

41.     Aaron E. Nathan, Counsel for Plaintiffs-Appellees

**Petteway Plaintiffs**

42.  Honorable Terry Petteway, Plaintiff-Appellee

43.  Honorable Penny Pope, Plaintiff-Appellee

44.  Constable Derreck Rose, Plaintiff-Appellee

45.  Mark Gaber, Counsel for *Petteway* Plaintiffs-Appellees

46.  Valencia Richardson, Counsel for *Petteway* Plaintiffs-Appellees

47.  Simone Leeper, Counsel for *Petteway* Plaintiffs-Appellees

48.  Alexandra Copper, Counsel for *Petteway* Plaintiffs-Appellees

49.  Bernadette Reyes, Counsel for *Petteway* Plaintiffs-Appellees

50.  Sonni Waknin, Counsel for *Petteway* Plaintiffs-Appellees

51.  Neil Baron, Counsel for *Petteway* Plaintiffs-Appellees

52.  Chad Dunn, Counsel for *Petteway* Plaintiffs-Appellees

**United States of America**

53.  Alamdar S. Hamdani, Counsel for the United States

54.  Daniel D. Hu, Counsel for the United States

55.  Kristen Clarke, Counsel for the United States

56.  T. Christian Herren, Jr., Counsel for the United States

57.  Robert S. Berman, Counsel for the United States

58.  Catherine Meza, Counsel for the United States

59.  Bruce I. Gear, Counsel for the United States

60.  Tharuni A. Jayaraman, Counsel for the United States

61.  Zachary Newkirk, Counsel for the United States

62.  K'Shaani Smith, Counsel for the United States

63.    Michael E. Stewart, Counsel for the United States

64.    Matthew N. Drecun, Counsel for the United States

65.    Nicolas Y. Riley, Counsel for the United States

s/ Hilary Harris Klein

*Attorney of record for Plaintiffs-Appellees Dickinson Bay Area Branch NAACP; Galveston Branch NAACP; Mainland Branch NAACP; Galveston LULAC Council 151; Edna Courville; Joe A. Compian; and Leon Phillips*

November 2, 2023

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is scheduled for November 7, 2023.

# TABLE OF CONTENTS

Certificate of Interested Persons .................................................................. i

Statement Regarding Oral Argument .................................................... vi

Table of Contents .................................................................................. vii

Table of Authorities ............................................................................. ix

Introduction ............................................................................................1

Counter-Statement of the Issues ...........................................................4

Counter-Statement of the Case ..............................................................6

Standard of Review ...............................................................................15

Summary of Argument ..........................................................................16

Argument...............................................................................................19

I.   Binding Precedent, and the VRA's Text and Structure Dictate that Voters from Minority Coalitions May Bring § 2 Vote Dilution Claims. ................................................................................................19

   A. Circuit Precedent Forecloses Defendants' Challenge to Coalition Claims.............................................................................19

   B. Section 2's Plain Text and Structure Make Clear That It Protects Individuals Within Minority Coalitions. ....................22

   C. Defendants' Remaining Arguments Fail to Justify the Narrowing of Section 2 Claims They Seek.................................28

II.  The District Court Properly Applied the *Gingles* Framework to Its Factual Findings.............................................................................30

   A. The District Court's Findings of Compactness Were Correct and Consistent with the Standard for *Gingles* I Set Forth in *Allen v. Milligan.* ...................................................................30

   B. The District Court Correctly Found Galveston's Black and Latino Voters to Be Politically Cohesive in Satisfaction of *Gingles* II. ...............................................................................36

   C. The District Court Correctly Concluded that the Enacted Plan Thwarts a Distinctive Minority Vote at Least Plausibly on Account of Race in Satisfaction of *Gingles* III. .....................38

III. Section 2 of the Voting Rights Act Is Constitutional. .....................42

IV.     The Motion for a Stay Pending Appeal Should Be Denied, and
the Administrative Stay Should Promptly Be Dissolved. ............................48

A. Defendants Will Not Suffer Irreparable Harm Absent a Stay.................48

B. Plaintiffs and Galveston's Black and Latino Voters Are
Certain to Suffer Irreparable Harm if the Enacted Plan Is Used
in 2024, and the Public Interest Does Not Support a Stay. ......................50

Conclusion ........................................................................................................53

Certificate of Service ........................................................................................54

Certificate of Compliance ................................................................................55

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018)......................................................................49

*Allen v. Milligan,*
    599 U.S. 1 (2023)....................................................................*passim*

*Ardoin v. Robinson,*
    142 S. Ct. 2892 (2022)......................................................................50

*Badillo v. Stockton,*
    956 F.2d 884 (9th Cir. 1992) ...........................................................29

*Bartlett v. Strickland,*
    556 U.S. 1 (2009)..............................................................................20

*Brewer v. Ham,*
    876 F.2d 448 (5th Cir. 1989) ...........................................................19

*Bridgeport Coal. for Fair Representation v. City of Bridgeport,*
    26 F.3d 271 (2d Cir. 1994) ...............................................................28

*Brnovich v. Democratic Nat'l Comm.,*
    141 S. Ct. 2321 (2021)......................................................................26

*Bush v. Vera,*
    517 U.S. 952 (1996)....................................................................43, 45

*Campos v. Baytown,*
    840 F.2d 1240 (5th Cir. 1988) ....................................................19, 33

*Clark v. Calhoun County,*
    88 F.3d 1393 (5th Cir. 1996) ...........................................................45

*Concerned Citizens of Hardee Cnty. v. Hardee Cnty. Bd. of Comm'rs,*
    906 F.2d 524 (11th Cir. 1990) .........................................................29

*Cooper v. Harris*,
  581 U.S. 285 (2017)..........................................................................37

*Elrod v. Burns*,
  427 U.S. 347 (1976)..........................................................................52

*Frank v. Forest County*,
  336 F.3d 570 (7th Cir. 2003) .............................................................28

*Hall v. Virginia*,
  385 F.3d 421 (4th Cir. 2004) .............................................................28

*Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*,
  118 F. Supp. 3d 1338 (N.D. Ga. 2015)..............................................52

*Hall v. Virginia*,
  385 F.3d 421 (4th Cir. 2004) .............................................................28

*Holloway v. City of Va. Beach*,
  531 F. Supp. 3d 1015 (E.D. Va. 2021) ..............................................28

*Huot v. City of Lowell*,
  280 F. Supp. 3d 228 (D. Mass. 2017)................................................29

*Jacobs v. Nat'l Drug Intel. Ctr.*,
  548 F.3d 375 (5th Cir. 2008) .............................................................20

*Keyes v. Sch. Dist. No. 1*,
  413 U.S. 189 (1973)..........................................................................25

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
  999 F.2d 831 (5th Cir. 1993) (en banc) ...........................19, 24, 39, 42

*League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 ......................................................................................34

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) .......................................................51, 52

*Loughrin v. United States*,
  573 U.S. 351 (2014)..........................................................................27

*LULAC Council No. 4386 v. Midland Indep. Sch. Dist.*,
  812 F.2d 1494 (5th Cir. 1987) .....................................................19, 34

*Mercado v. Lynch*,
   823 F.3d 276 (5th Cir. 2016) ............................................................47

*Nixon v. Kent County*,
   76 F.3d 1381 (6th Cir. 1996) (en banc) ............................................29

*Overton v. City of Austin*,
   871 F.2d 529 (5th Cir. 1989) ............................................................19

*Patino v. Pasadena*,
   229 F. Supp. 3d 582 (S.D. Tex. 2017) ..............................................49

*Perry v. Perez*,
   565 U.S. 338 (2012) ..........................................................................21

*Price v. Austin Indep. Sch. Dist.*,
   945 F.2d 1307 (5th Cir. 1991) .....................................................37, 42

*Robinson v. Ardoin*,
   37 F.4th 208 (5th Cir. 2022) .......................................................33, 50

*Sensley v. Albritton*,
   385 F.3d 591 (5th Cir. 2004) .........................................................2, 15

*Shelby County v. Holder*,
   570 U.S. 529 (2013) ..........................................................................45

*Singleton v. Allen*,
   No. 2:21-cv-1291, 2023 WL 5691156 (N.D. Ala. Sept. 5, 2023) ......47

*Students for Fair Admissions, Inc. v. President & Fellows of Harv.
   Coll.*,
   600 U.S. 181 (2023) ..........................................................................46

*Teague v. Attala Cnty.*,
   92 F.3d 283 (5th Cir. 1996) ..............................................................42

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) ......................................................................*passim*

*United Jewish Orgs. of Williamsburgh, Inc. v. Carey*,
   430 U.S. 144 (1977) ..........................................................................25

*United States v. Longoria*,
   958 F.3d 372 (5th Cir. 2020) ...............................................................20

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338 (2013).............................................................................27

*Valle del Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) .............................................................52

*Veasey v. Abbott*,
   830 F.3d 216 (5th Cir. 2016) (en banc) .......................................15, 26

**Statutes**

52 U.S.C. § 10301 ...............................................................................4, 24

52 U.S.C. § 10301(a) ...............................................................................23

52 U.S.C. § 10301(b) ...............................................................................23

Pub. L. No. 94-73, 89 Stat. 400 (Aug. 6, 1975)........................................27

**Other Authorities**

Black's Law Dictionary (11th Ed. 2019).................................................23

S. Rep. No. 97-417...................................................................................28

S. Rep. No. 295, *reprinted in* 1975 U.S.C.C.A.N....................................28

**INTRODUCTION**

After a ten-day bench trial, in which the district court (Hon. Jeffrey Vincent Brown) heard testimony from 30 witnesses and admitted hundreds of exhibits into evidence, the district court concluded that the commissioners-precinct plan at issue in this case (the "enacted plan") was "fundamentally inconsistent with § 2 of the Voting Rights Act." ROA.15886. Quoting Plaintiffs' expert, the district court agreed the enacted plan was "a textbook example of a racial gerrymander" and "egregious." ROA.15886. After faithfully applying settled legal standards to the voluminous record, and carefully assessing the appropriate weight and credibility to each witness's testimony, the district court found that "the enacted plan illegally dilutes the voting power of Galveston County's Black and Latino voters by dismantling Precinct 3, the county's historic and sole majority-minority commissioners precinct," and "distribut[ing] the county's Black and Latino voters, who comprise 38% of the county's eligible voter population," among each of four newly drawn precincts. ROA.15887. The district court thus reached the "grave conclusion" that it "must enjoin" future use of the map. ROA.15886.

On appeal, Defendants assert that the Voting Rights Act ("VRA") should be reinterpreted to bar "coalition" claims under § 2. That argument is foreclosed by binding precedent and this Court's rule of orderliness. What's more, it is wrong: it contravenes § 2's plain text, structure, and history, which make clear that voters are

afforded protection from unlawful vote dilution on account of race regardless of whether government actors have targeted voters from a single or—as is the case here—multiple minority groups.

Defendants also challenge the district court's application of the well-established standard for assessing vote dilution claims, as first set forth in *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986), and reaffirmed most recently in *Allen v. Milligan*, 599 U.S. 1 (2023). The district court found each of the three *Gingles* preconditions satisfied here based upon overwhelming record evidence. Defendants attempt to manufacture legal issues for review, but ultimately their arguments invite this Court to re-weigh the trial evidence, which it cannot do. And Defendants have failed to substantiate any error, much less clear error, in the "intensely local appraisal" called for by binding precedent and carefully performed by the district court. *Gingles*, 478 U.S. at 79 (quoting *Rogers v. Lodge*, 458 U.S. 613, 622 (1982)). As is well established, that appraisal is due substantial deference on appeal, and subject only to clear-error review. *Sensley v. Albritton*, 385 F.3d 591, 595 (5th Cir. 2004). The truth is that this was a straightforward case involving application of the well-established *Gingles* standard to "egregious" facts. Defendants have identified no colorable basis to disturb Judge Brown's careful findings.

Lastly, Defendants boldly assert that this Court should declare § 2 unconstitutional. In addition to the serious flaws with that argument on its face, the

concrete facts of this case—detailed in Judge Brown's careful findings below—well illustrate the continuing necessity of the VRA to ensure minority voters are not "shut out" of the political process as Galveston's Latino and Black voters will be under the enacted plan. ROA.16028.

At their core, Defendants' arguments—and in truth, this entire appeal—are "not about the law as it exists," but "about [their] attempt to remake . . . § 2 jurisprudence anew." *Allen v. Milligan*, 599 U.S. 1, 33 (2023). The Supreme Court has consistently rejected such attempts, including only months ago. This Court should do the same.

## COUNTER-STATEMENT OF THE ISSUES

1.     Did the district court err in holding, consistent with binding Fifth Circuit decisions, that § 2 of the Voting Rights Act, codified as amended at 52 U.S.C. § 10301, does not prohibit claims brought by coalitions of more than one minority group?

2.     Did the district court commit clear error in finding the first *Gingles* precondition satisfied when all experts agreed that Plaintiffs' illustrative plans contain at least one majority Black and Latino precinct by Citizen Voting Age Population that are as compact as districts in the enacted plan, and where all qualified expert evidence concluded those districts comport with traditional redistricting criteria, are reasonably compact, and that race did not predominate in their construction?

3.     Did the district court commit clear error in finding the second *Gingles* precondition satisfied when statistical evidence from both plaintiff and defense experts demonstrated that the minority group votes consistently for the same candidates across a series of general elections and primary elections?

4.     Did the district court commit clear error in finding the third *Gingles* precondition satisfied when it is undisputed that Black and Latino voters will have no opportunity to elect a candidate of choice in any commissioners precinct of the enacted plan due to undisputed high levels of statistical Anglo bloc voting and

accompanied by detailed factual findings regarding racially polarized voting patterns?

5.     Did the district court err in holding that § 2 of the Voting Rights Act is consistent with the United States Constitution?

6.     Should this Court grant a stay of the district court's injunction pending appeal?

## COUNTER-STATEMENT OF THE CASE

This case centers on the precinct map for Galveston County's commissioners court adopted in November of 2021. As Judge Brown found, Galveston County's historic Precinct 3 has since 1991 provided Black and Latino voters an opportunity to elect a candidate of their choice. ROA.15950. Covering portions of Dickinson, La Marque, Texas City and the City of Galveston, historic Precinct 3 was the product of advocacy by Black and Latino voters. ROA.15911. In 2021, Defendants engaged in a redistricting process marked by severe lapses in transparency, several procedural deviations from prior redistricting cycles, and the exclusion of the commissioners court's sole minority commissioner, Stephen Holmes. The result was a new map that cracks Precinct 3, and Galveston's Black and Latino voters, among four new majority-Anglo commissioners precincts, thereby depriving Galveston's minority voters of any opportunity to again elect a candidate of their choice to the commissioners court.

On February 15, 2022, the Petteway Plaintiffs[1] filed an action in the U.S. District Court for the Southern District of Texas, Galveston Division, challenging the enacted plan on constitutional and VRA § 2 grounds. ROA.65-87. The

---

[1] The Petteway plaintiffs include the Honorable Terry Petteway, Constable Derrick Rose, and the Honorable Penny Pope.

NAACP/LULAC Plaintiffs[2] filed a similar suit on April 14, 2022. ROA.19939-72. On March 24, 2022, the United States of America also filed a suit, raising only §2 claims. ROA.19788-812. The three cases were consolidated before Judge Brown on June 1, 2022. ROA.313-4.

In June 2022, the district court denied Defendants' motions to dismiss all three consolidated claims, finding Plaintiffs had adequately stated a claim for relief and had established jurisdiction, with the exception of dismissing Plaintiff Michael Montez for lack of standing. ROA.15890. On May 12, 2023, Defendants moved for summary judgment in all three cases, which the court denied on July 11, 2023. ROA.3877-4734, 8047-48.

From August 7-18, 2023, the Court held a ten-day bench trial featuring live testimony from 30 lay and expert witnesses, including individual plaintiffs, individual defendants, county residents, and expert witnesses. ROA.15890-92. On October 13, 2023, the district court found Defendants' adoption of the enacted plan was "egregious" and "fundamentally inconsistent with § 2 of the Voting Rights Act" and enjoined Defendants from using the enacted plan in future elections. ROA.15886.[3] This conclusion was based on a 157-page decision with detailed

---

[2] The NAACP/LULAC Plaintiffs include Dickinson Bay Area Branch NAACP, Galveston Branch NAACP, Mainland Branch NAACP, Galveston LULAC Council 151, Edna Courville, Joe A. Compian, and Leon Phillips.

[3] The district court did not reach the private Plaintiffs' constitutional claims. ROA.16032-16033.

factual findings relating to each of the *Gingles* preconditions and the Senate Factors relevant under the totality of the circumstances.

*Gingles* **I.** The district court found the first *Gingles* precondition satisfied based upon several illustrative plans offered by Plaintiffs and testimony that a "multitude" of potential configurations exist, demonstrating "that Galveston County's Black and Latino population is sufficiently large and geographically compact to constitute a majority in a single commissioners precinct that is both reasonably configured and comports with traditional redistricting principles." ROA.15920; ROA.16007-13. The district court determined that "[a]ll the plaintiffs' experts on the first *Gingles* precondition credibly testified to applying traditional redistricting criteria in developing their illustrative maps" and that race did not predominate. ROA.15914-17. After examining expert testimony, reports and accompanying exhibits, the district court determined that Plaintiffs' illustrative plans performed as well or better on various traditional redistricting criteria as the enacted plan, including geographic compactness. ROA.16011-12.

In considering the plans from NAACP/LULAC Plaintiffs' expert, William Cooper, the district court found that that "Cooper Maps 2, 3, and 3A prove that achieving these [redistricting] metrics and maintaining a majority-Black and Latino precinct is possible, even with a unified coastal precinct," a feature Defendants asserted during this litigation that they considered. ROA.15917, 15977. The district

court also found that the alternative plan drafted by the commissioners court during the 2021 redistricting process, Map 1, also "featured a reasonably compact commissioners precinct with a majority Black and Latino population," was deemed "legally defensible" by the counties' redistricting counsel during the process, and also satisfied *Gingles* I according to both Defendants' and Plaintiffs' experts. ROA.15912-13.

The district court determined that the testimony of Defendants' *Gingles* I expert, Dr. Mark Owens, had "widespread shortcomings" and assigned "little to no weight" to his opinions, ROA.15902, including no weight to his opinions on the compactness of Galveston's Latino and Black community. ROA.15920.

***Gingles* II/III.** The district court determined there exists legally significant racially polarized voting in Galveston County based on largely undisputed expert testimony supplemented with lay witness testimony on the cohesion of Galveston's Black and Latino voters. As for Black and Latino cohesion, it found that "statistical analyses from general elections, statistical analyses from primary elections, and non-statistical evidence of cohesion all support the conclusion that Black and Latino voters in Galveston County act as a coalition for purposes of the second *Gingles* precondition because '[B]lack-supported candidates receive a majority of the [Hispanic] vote [and] Hispanic-supported candidates receive a majority of the

[Black] vote.'" ROA.16015-16 (quoting *Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989)).

By contrast, "Anglo voters in Galveston County vote cohesively and for candidates opposing those supported by a majority of Black and Latino voters" and "do so at a rate sufficient to defeat the minority-preferred candidate consistently in each of the enacted commissioners-court precincts." ROA.16017. In a majority of the most "recent general elections, over 85% of Anglos across Galveston County voted for candidates running against the minority-preferred candidates." ROA.15933. Similarly high levels of bloc voting were observed in the individual-precinct level in the enacted plan. *Id.* Even Defendants' expert, Dr. John Alford, testified that it would be hard to find "a more classic pattern of what polarization looks like in an election." ROA.15927 (quoting Dr. Alford).

The trial court fully considered Defendants' arguments that voting patterns were wholly attributable to partisan considerations and dismissed them, concluding that Defendants "failed to present reliable or methodologically sound evidence sufficient to dispute that Anglo bloc voting 'thwarts' the Black and Latino voting coalition in Galveston County for reasons wholly unconnected to race." ROA.16019. Defendants' expert "based his conclusions regarding the role of partisanship versus race primarily on one election: the 2018 Senate race between Senator Ted Cruz and Beto O'Rourke." ROA.15935-36. By contrast, in reaching its conclusion that the

enacted plan "thwarts a distinctive minority vote at least plausibly on account of race," ROA.16019 (quoting *Milligan*, 599 U.S. at 19), the district court gave "considerable weight" to several race-specific facts present in Galveston, including the lack of successful minority candidates emerging from Republican primaries, the "extreme degree" of Anglo bloc voting for candidates running against minority-preferred candidates, the tendency for minority candidates to only be elected from majority-minority areas, the continued racial appeals in Galveston County politics, lay witness accounts of discrimination in the county, persistent racial disparities across a wide range of measures, and the overwhelming rates at which Anglos and minority voters choose to participate in different primaries. ROA.16019. The district court also found that "Anglo commissioners are evidently not actively engaged in specific outreach to Galveston County's minority residents," and noted that this lack of responsiveness by Anglo-preferred elected officials to minority communities "is intimately related" to the legal significance of bloc voting because bloc voting "'allows those elected to ignore [minority] interests without fear of political consequences.'" ROA.15990, 16018 (quoting *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 857 (5th Cir. 1993) (*en banc*)).

Thus, the district court found that a partisan explanation for voting patterns in Galveston County did not overcome the weighty evidence of racially polarized

voting on account of race, and that Plaintiffs satisfied all three *Gingles* preconditions.

ROA.15938; ROA.16020.

***Totality of the Circumstances.*** The district court found that "most of the

Senate factors support § 2 liability," and specifically:

> Substantial socio-economic differences between Black and Latino residents and Anglo residents in Galveston County create barriers to voting. The presence of racial appeals in recent local political campaigns, relative lack of Black and Latino electoral success, and lack of responsiveness on the part of Galveston County's officials to the needs of the Black and Latino communities further support this finding. Finally, the 2021 redistricting plan's justifications are tenuous and will prevent Galveston County's Black and Latino communities from electing a candidate of their choice.

ROA.16022; *see also* ROA.16022-27 (assessing each individual factor in detail);

ROA.15984 (observing that Black and Latino residents have "a depressed level of

political participation"). In view of the totality of the circumstances, the court found

"it is stunning how completely the county extinguished the Black and Latino

communities' voice on its commissioners court during 2021's redistricting."

ROA.16028. "The results of 2021's redistricting . . . has amounted to Black and

Latino voters, as a coalition of like-minded citizens with shared concerns, 'being

shut out of the process altogether.'" ROA.16028 (quoting *Johnson*, 593 F. Supp. 3d

at 608).

***2021 Redistricting Process.*** The district court also made specific findings as

to the sequence of events leading up to the adoption of the enacted plan, finding the

process littered with procedural and substantive departures for which Defendants offered no credible explanation. *See generally* ROA.15964-15971. This included the deliberate exclusion of the county's then-sole minority commissioner Stephen Holmes, elected from Precinct 3, during the redistricting process, ROA.15976-15977, and "a disregard for public input from the minority communities and those critical of the enacted plan's discriminatory effect." ROA. 15974-75. The county's sole opportunity for public comment on November 12, 2021, held on the eve of the candidate filing deadline, "was unusual not only for its singularity during the redistricting cycle but also for its lack of accessibility for many of Galveston County's Black and Latino residents." ROA.15971. And "[t]he commissioners court's handling of the November 12 special meeting also portrayed a lack of responsiveness." ROA.15991.

On this record, the district court found that "this is not a typical redistricting case," "[w]hat happened here was stark and jarring," and that the circumstances and effect of the enacted plan were "mean-spirited" and "egregious" given that "there was absolutely no reason to make major changes to Precinct 3." ROA.16029. The trial court found that the contemporaneous objections to numerous irregularities during the redistricting process had "put [County] Judge Henry on notice of procedural defects that could raise concerns about the exclusion of minority stakeholders and lack of transparency—lapses that could be viewed as evidence of

intentional discrimination." ROA.15964. Based upon these findings, and its consideration of all of the trial evidence, the trial court concluded that the 2021 redistricting process "was a clear violation of § 2 of the Voting Rights Act" and the resulting map "must be overturned." *Id.*

On October 14, 2023, Defendants filed a notice of appeal, and moved in the district court to stay the judgment pending appeal to this Court. *See* ROA.16041, 16043-50. On October 15, Judge Brown denied the motion to stay, holding that Defendants "established none of the[] factors" necessary to warrant a stay, and finding Defendants' "contention that the court's deadline [for adopting a remedial plan] is too short lacks credibility." ROA.16066-67. Nonetheless, the district court adjusted its remedial schedule to provide Defendants additional time, until October 27, 2023, to file a new plan. ROA.16067. The district court also provided Plaintiffs until November 3, 2023, to file objections to any new plan filed by Defendants and to propose alternative plans and set a remedial hearing for November 8, 2023. ROA.16067-68. The district court further ordered that if Defendants "fail or prefer not to submit a revised plan," they would be required to implement either the illustrative plan submitted at trial from the United States' expert Anthony Fairfax (the "Fairfax Plan"), or the alternative plan drawn by the commissioners court during the 2021 redistricting process ("Map 1"). ROA.16068.

On October 16, 2023, Defendants moved in this Court for a stay of Judge Brown's injunction pending appeal. On October 18, 2023, a motions panel granted a temporary administrative stay until November 2, 2023, deferring decision on the stay motion to a merits panel, and ordered that the appeal be expedited and set for argument before the next available merits panel. Order, No. 23-40582 (5th Cir. Oct. 18, 2023). On October 19, 2023 this Court extended the administrative stay through November 10, 2023. Order, No. 23-40582 (5th Cir. Oct. 19, 2023).

## STANDARD OF REVIEW

"This court reviews *de novo* the legal standards the district court applied to determine whether Section 2 has been violated." *Sensley v. Albritton*, 385 F.3d 591, 595 (5th Cir. 2004). "However, because Section 2 vote dilution disputes are determinations 'peculiarly dependent upon the facts of each case that require an intensely local appraisal of the design and impact of the contested electoral mechanisms,' [this Court] review[s] the district court's findings on the *Gingles* threshold requirements and its ultimate findings on vote dilution for clear error." *Id.* (quoting *Gingles*, 478 U.S. at 79). Under that clear error standard, "[i]f the district court's findings are plausible in light of the record viewed in its entirety, [this Court] must accept them, even though [it] might have weighed the evidence differently if [it] had been sitting as a trier of fact." *Veasey v. Abbott*, 830 F.3d 216, 229 (5th Cir. 2016) (en banc).

## SUMMARY OF ARGUMENT

The district court faithfully applied well-established and binding precedent to its intensely local appraisal of Galveston County, the county's redistricting process, and the enacted plan to conclude Defendants violated § 2. Defendants seek a reversal based upon unwarranted departures from well-established law and factual arguments unsupported by the credible and reliable evidence adduced at trial.

As Defendants acknowledge, binding precedent of this Court recognizes coalition claims under § 2. Under this Court's rule of orderliness, Defendants' lead argument must therefore be rejected. But even if it were not foreclosed by precedent, Defendants' arguments against coalition claims are unpersuasive. First, and most importantly, the statutory text authorizes such claims. Defendants' contrary reading of the text, like the divergent readings from other circuits, isolates the term "class" as though § 2(b) used that term to refer to particular racial groups. But in fact, the statutory text defines "a class of citizens" to include individuals who are protected by § 2(a) against discrimination "on account of" race, color, or language-minority status. Text, logic, and Supreme Court precedent compel the conclusion that two or more voters may experience a common § 2 violation "on account of" their minority group status even if they do not all belong to the same minority group (and indeed, even if some individual voters belong to multiple minority groups). This is because

16

§ 2 is violated just as much when vote dilution occurs because members of the target "class of citizens" are *not* a particular race as when it occurs because they *are*.

Defendants next attempt to impose a vague and fabricated additional hurdle to the first *Gingles* precondition's compactness requirement that is unmoored from applicable law and entirely absent from the clear instructions provided by the Supreme Court in *Milligan*. But Defendants cannot establish clear error in the district court's compactness findings, whether under the correct legal standard or, given the fundamentally unqualified and unreliable testimony of their *Gingles* I expert (whose opinions the district court assigned little or no weight), even under their own fabricated standard.

In requesting reversal on the second and third *Gingles* preconditions, Defendants ask this Court to second-guess the district court's thorough credibility findings and weighing of the evidence. Defendants suggest that the district court erred by failing to properly consider evidence regarding primary elections despite the fact that the district court *did* consider primary election evidence; it just assigned these elections less weight after finding such evidence was less probative than general elections evidence—in accord with the testimony of *every expert* in this case (including Defendants'). Similarly, Defendants ignore the district court's extensive factual findings regarding the distinct role of race in voting behavior in the jurisdiction.

Defendants are also wrong to suggest that § 2 is unconstitutional. Those contentions are in direct conflict with *Milligan*, which held mere months ago that race consciousness does not lead inevitably to impermissible race discrimination. Moreover, as this case clearly demonstrates, compliance with the VRA does not necessarily require that the map-drawer construct districts with race predominating over the consideration of other redistricting principles.

Finally, this Court should deny Defendants' motion for a stay pending appeal and permit the administrative stay to expire on November 10. For the reasons explained in this brief, Plaintiffs have not established that they are likely to succeed on the merits of this appeal. The multitude of alternative plans available to Defendants, many of which perform as well or better on Defendants' purported redistricting criteria than the enacted plan, and many of which include the coastal precinct Defendants claimed at trial to desire, underscores that they will suffer no harm in undergoing a remedial process in which these options remain open to them.

Meanwhile, Plaintiffs and Galveston's Latino and Black voters will suffer irreparable harm if forced to vote in 2024 under this discriminatory plan, which would shut them out of representation by denying them any opportunity to elect a candidate of their choice. The district court's decision should be affirmed, the stay dissolved, and the case immediately remanded for remedial proceedings.

## ARGUMENT

I.   **Binding Precedent, and the VRA's Text and Structure Dictate that Voters from Minority Coalitions May Bring § 2 Vote Dilution Claims.**

A. **Circuit Precedent Forecloses Defendants' Challenge to Coalition Claims.**

Defendants' lead argument for reversal is that § 2 does not permit coalition claims. Appellants' Br. 17-39. But as they acknowledge, that argument is foreclosed by binding circuit precedent. As this Court rightly held 35 years ago, "[t]here is nothing in the law that prevents the plaintiffs from identifying the protected aggrieved minority to include both Blacks and Hispanics." *Campos v. Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988). Accordingly, for decades this Court has recognized § 2 coalition claims and has "treated the issue as a question of fact, allowing aggregation of different minority groups" for the purpose of the first *Gingles* precondition "where the evidence suggests that they are politically cohesive." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 864 (5th Cir. 1993) (en banc); *see also Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989); *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989); *Campos*, 840 F.2d at 1244; *LULAC Council No. 4386 v. Midland Indep. Sch. Dist.*, 812 F.2d 1494, 1499-1502 (5th Cir. 1987), *opinion vacated on reh'g on other grounds*, 829 F.2d 546 (5th Cir. 1987).

"It is a well-settled Fifth Circuit rule of orderliness that one panel . . . may not overturn another panel's decision"—much less a decision of the *en banc* Court—

"absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or [the] *en banc* court." *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008). That remains true "even if a panel's interpretation of the law appears flawed" to the subsequent panel. *Id.* Otherwise, "judges would have too much leeway to invalidate caselaw they did not like in the first place." *United States v. Longoria*, 958 F.3d 372, 378 (5th Cir. 2020).

Defendants cite no authority that could warrant revisiting this Court's binding panel and en banc decisions recognizing coalition claims. Their reliance on the plurality opinion in *Bartlett v. Strickland* is misplaced given this very opinion distinguished its holding on crossover districts (where minority voters receive "help from voters who are members of the majority and who cross over to support the minority's preferred candidate") rather than coalition districts (where "minority groups form a coalition to elect the candidate of the coalition's choice"). 556 U.S. 1, 13-14 (2009) (plurality opinion); *id.* ("We do not address that type of coalition district here."). The concerns expressed in *Bartlett* about combining majority and minority voters thus do not apply to a coalition claim, just as they do not apply to a claim brought by a single-minority group.[4] And Defendants do not contend that the "crossover" scenario discussed in *Bartlett* is at issue here.

---

[4] Defendants similarly overstate the significance of the Supreme Court's *per curiam* decision in *Perry v. Perez*, where the Court, in addressing an "unclear," "somewhat

The Supreme Court's recent decision in *Allen v. Milligan* underscores that the key distinction, for § 2 purposes, is between minority voters overall as compared to their majority peers:

> A district is not equally open, in other words, when *minority voters* face—unlike their *majority* peers—bloc voting along racial lines, arising against the backdrop of substantial discrimination within the State, that renders a *minority* vote unequal to a vote by a nonminority voter.

599 U.S. at 25 (emphasis added). That language describes precisely the harm suffered by Galveston's Black and Latino voters who were, for decades, successful in electing a candidate of their choice to the commissioners court and will be denied *any* opportunity to do so under the enacted plan. It is undisputed that Galveston's Black and Latino voters are the minority in Galveston County, and that they "suffer similarly from discrimination" compared to Anglo residents in ways that "combine to increase the costs of voting and decrease political participation." ROA.15983-84. The district court's intensely local appraisal of the facts on the ground in Galveston determined this denial would be "on account of race" based on substantial evidence of racially polarized voting, and specifically quantitative expert and qualitative lay

---

ambiguous" order simply found that the district court in that case had "no basis" for drawing a coalition district. 565 U.S. 338, 398-99 (2012).

witness testimony indicating that minority voting power was cohesive and being thwarted for racial, and not political, reasons.[5]

Defendants' arguments ignore § 2's demonstrated necessity for protecting the community of Black and Latino voters in Galveston County. As binding precedent in this Circuit recognizes coalition claims under § 2, and Defendants have failed to identify any intervening change in the law, this Court must reject Defendants' argument under its rule of orderliness.

### B. Section 2's Plain Text and Structure Make Clear That It Protects Individuals Within Minority Coalitions.

In any event, this Court's prior holdings recognizing that § 2 authorizes coalition claims are correct. Beginning with the statute's plain text, Section 2(a) prohibits any practice or procedure "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of" race, color, or language minority status. 52 U.S.C. § 10301(a). Section 2(b), in turn, provides:

---

[5] In finding as much, the district court gave considerable weight to facts equally impacting Black and Latino voters, including: (1) there is a lack of successful minority candidates emerging from Republican primaries, (2) there is an extreme degree of Anglo bloc voting for candidates running against minority-preferred candidates, (3) minority candidates tend to only be elected from majority-minority areas, (4) there are continued racial appeals in Galveston County politics, (5) lay witnesses recounted instances of discrimination in Galveston County, (6) there are persistent racial disparities across a wide range of measures in Galveston County, and (7) Anglo voters in Galveston County overwhelmingly participate in Republican primaries, while Black and Latino voters in Galveston County overwhelmingly participate in Democratic primaries. *See* ROA.16019.

> [a] violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 10301(b). The textual linchpin of a § 2 effects claim is, therefore, that a given practice or procedure "results in a denial or abridgement of the right . . . to vote *on account of*" race, color, or language-minority status. *Id.* § 10301(a) (emphasis added). Citizens in a particular jurisdiction who have suffered vote dilution on account of minority group status may prove as much by joining as a "class of citizens protected by subsection (a)" to prove they have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

The familiar term "class" means "[a] group of people . . . that have common characteristics or attributes." Black's Law Dictionary (11th Ed. 2019). Crucially, the statutory text makes clear the only prerequisite for membership in such a "class of citizens" is that they are "protected by subsection (a)," *i.e.*, that the individual class members suffer abridgment or denial of the right to vote "on account of" race, color, or language-minority status. 52 U.S.C. § 10301; *see Milligan*, 599 U.S. at 25 (§ 2(a) protects "[i]ndividuals," not groups).

In other words, the plain text of § 2 defines the relevant "class of citizens" as those who share the "common characteristic" of suffering a "denial or abridgment of the right . . . to vote on account of" race, color, or language-minority status in a particular jurisdiction. 52 U.S.C. § 10301. Nothing in the text of § 2 requires every member of the "class of citizens" to share the same race or belong to the same language-minority group. To the contrary, § 2(a) protects "*any* citizen" from the denial of voting rights on "account of race or color" or language-minority status, and § 2(b) refers back to the "class of *citizens* protected by" § 2(a)—each unambiguous, capacious terms that include, not exclude, all who suffer such denials. *Id.* (emphasis added).

The language in the rest of the operative sentence in subsection (b) further confirms this reading and demonstrates the foundation for the minority-majority distinction recently clarified in *Allen v. Milligan* discussed above. The text contrasts the ability of "members of a class of citizens protected by subsection (a)" to participate in the political process with that of "other members of the electorate." The "members of a class of citizens" are defined against those other *individual* voters who do not experience an abridgment of the right to vote based on their minority status. When Black voters suffer a denial on account of their minority-status, it would be nonsensical to define them against other minority voters suffering the same denial on account of their minority status rather than against the majority members

24

of the electorate who are not subject to a vote dilution scheme targeting minorities within the jurisdiction.

Furthermore, reading a single-minority-group requirement into the text of § 2 would fly in the face of the clear textual authorization for § 2(b) claims by "members of a class of citizens" experiencing the denial or abridgment of voting rights because they are *not* members of a particular racial group (*e.g.*, because they are not Anglo). But as a textual matter, this type of denial is just as much "on account of race" as a denial of rights because an individual *is* a member of a particular racial group. And, as the Supreme Court has confirmed in other contexts, members of different minority groups can suffer "identical discrimination" as compared to their Anglo majority peers. *See Keyes v. Sch. Dist. No. 1*, 413 U.S. 189, 198 (1973) (holding that Black and Hispanic students, despite being "of different origins," had "suffer[ed] identical discrimination in treatment when compare[d] with the treatment afforded Anglo students"); *see also United Jewish Orgs. of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 150 n.5 (1977) (classifying Puerto Rican and Black citizens as a minority group and using the term "nonwhite" to refer to them collectively).

Precisely because it is unmoored from the statutory text, limiting vote dilution claims to voters of a single minority group would create an incongruity between vote dilution claims and time, place, and manner claims brought under § 2. No party disputes that voters experiencing a common discriminatory practice may bring time,

place, and manner claims under § 2 regardless of whether they belong to a single racial group that can make up a majority of some theoretical single-member district on its own. *See, e.g., Veasey v. Abbott*, 830 F.3d 216, 264-65 (5th Cir. 2016) (en banc); *cf. Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2339 (2021) ("The size of any disparities in a rule's impact on *members of different racial or ethnic groups* is also an important factor to consider.") (emphasis added). Nothing in the statutory text contemplates that vote dilution claims should operate any differently.[6]

The post-1965 amendments to the Voting Rights Act illustrate that Congress knew how to limit § 2(b) vote dilution claims to single-minority groups had it wished to do so. For example, in 1975, Congress added protection for language-minority groups and defined the term "language minority group" to mean "persons who are

---

[6] The *Gingles* I threshold framework employed to assess vote dilution claims is a judicial doctrine utilized to assess the familiar jurisprudential concepts of causation, harm, and redressability in such claims. *See, e.g.*, *Gingles* 478 U.S. at 50-51, n.17 ("Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice."). Preventing minority voters who suffer vote dilution due to a common experience of discrimination in a particular jurisdiction, and whose common harm could be addressed by a common remedy, from being joined for the purposes of *Gingles* I would run directly contrary to the "intensely local appraisal" necessary to determine whether "minority voters face—unlike their majority peers— bloc voting along racial lines . . . that renders a minority vote unequal to a vote by a nonminority voter." *Milligan*, 599 U.S. at 19, 25 (quoting *Gingles*, 478 U.S. at 79). It would rest upon an assumption that minority voters do not have the potential to elect a candidate of their choice, a highly disfavored race-based assumption about the cohesiveness of these groups that is already measured and accounted for in the second *Gingles* precondition.

American Indian, Asian American, Alaskan Natives, or of Spanish heritage." Pub. L. No. 94-73, § 207, 89 Stat. 400, 402 (Aug. 6, 1975). In amending a separate provision of the Voting Rights Act requiring election materials in additional languages, it clarified that the requirement only applied where "more than five per centum of the citizens of voting age residing in such State or political subdivision are members of a *single* language minority." *Id.* § 203, 89 Stat. at 401-02 (emphasis added). But in amending § 2 in 1982 to add an effects test, Congress did *not* limit those claims to a "single racial or single language minority" group at a time; instead, it maintained protection to "*any*" citizen from the denial or abridgment of the right to vote "on account of" protected status regardless of the particular status. "[W]hen Congress includes particular language in one section of a statute but omits it in another," Congress presumptively "intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (quotations omitted); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 357 (2013).[7]

---

[7] This inference is even stronger given that, when Congress added minority language groups, it observed their similarities to Black voters in the South and there was evidence "before the Subcommittee documented that Texas also has a long history of discriminating against members of both minority groups." S. Rep. No. 295 at 25, *reprinted in* 1975 U.S.C.C.A.N. at 791. It would be illogical that those voters, experiencing common discriminatory practice, would have no recourse. Congress was also aware of coalition claims in 1982. *See* S. Rep. No. 97-417, at 19 n.60 (1982) (citing *Wright v. Rockefeller*, 376 U.S. 52 (1964)).

### C. Defendants' Remaining Arguments Fail to Justify the Narrowing of Section 2 Claims they Seek.

Defendants plainly overstate the degree to which other circuits have adopted their unduly narrow interpretation of § 2 by asserting that the Fourth and Seventh Circuits have also held coalition claims impermissible. The Fourth Circuit was actually referring to crossover districts, *Hall v. Virginia*, 385 F.3d 421, 43 (4th Cir. 2004); *see also Holloway v. City of Va. Beach*, 531 F. Supp. 3d 1015, 1052-53 (E.D. Va. 2021) (observing that the Fourth Circuit did not "foreclose minority coalitions"), *vacated as moot*, 42 F.4th 266 (4th Cir. 2022), and the Seventh Circuit simply declined to allow plaintiffs to rely on a coalition on the facts of the particular case after finding that Black and Native American voters in the relevant jurisdiction had little in common. *See Frank v. Forest County*, 336 F.3d 570, 575-76 (7th Cir. 2003). To argue that these cases rejected any claims by a politically cohesive minority coalition—like the ones raised here—is mistaken and misleading. In fact, only one court of appeals has foreclosed coalition claims under § 2 in a published decision and, as far as Plaintiffs can deduce, no other Circuit has adopted its reasoning in a binding decision. *See Nixon v. Kent County*, 76 F.3d 1381, 1386 (6th Cir. 1996) (en banc).[8]

---

[8] By contrast, in addition to this Court, courts in the First, Second, Ninth, and Eleventh Circuits considered coalition claims under a traditional *Gingles* analysis. *See, e.g., Bridgeport Coal. for Fair Representation v. City of Bridgeport*, 26 F.3d 271, 273, 278 (2d Cir. 1994), *vacated and remanded on other grounds*, 512 U.S.

Finally, Defendants' other concerns about proportionality and political alliances are directly contravened by the facts in this case. Despite accounting for almost 40% of the eligible voting population, the district court's remedy would only afford Galveston's Black and Latino the opportunity to elect one out of five (20%) of the offices that sits on Galveston County's governing body, far less than what proportional representation would require. ROA.15887-88. As the district court's detailed findings demonstrate, a judicious application of the second and third *Gingles* preconditions and the totality factors ensures that Section 2 remedies race-based, not political, harms. *See, e.g.,* ROA.16019. The remedy provided by the district court under § 2 here would thus provide neither proportionality nor the protection of a mere "political alliance"; instead, it would prevent a result "fundamentally inconsistent with § 2 of the Voting Rights Act." ROA.15886.

---

1283 (1994); *Badillo v. Stockton*, 956 F.2d 884, 891 (9th Cir. 1992) (finding no evidence of cohesion on the facts); *Concerned Citizens of Hardee Cnty. v. Hardee Cnty. Bd. of Comm'rs*, 906 F.2d 524, 526 (11th Cir. 1990) (same); *Huot v. City of Lowell*, 280 F. Supp. 3d 228, 233 (D. Mass. 2017). The Sixth Circuit thus remains an outlier, and its reasoning is worthy of reconsideration in light of the arguments set forth above.

## II.    The District Court Properly Applied the *Gingles* Framework to Its Factual Findings.

### A. The District Court's Findings of Compactness Were Correct and Consistent with the Standard for *Gingles* I Set Forth in *Allen v. Milligan*.

The district court faithfully applied the standard set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986), and most recently reaffirmed in *Allen v. Milligan*, 599 U.S. 1 (2023), when it determined that the first *Gingles* precondition is satisfied in Galveston County.

As the Supreme Court made clear in June of this year, a minority group satisfies *Gingles* I if it is "sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Milligan*, 599 U.S. at 18 (internal citations omitted). Districts are "reasonably configured" where they "comport[] with traditional districting criteria, such as being contiguous and reasonably compact," and plaintiffs may prove reasonably compact majority-minority districts exist by producing illustrative districts that are "roughly as compact" as a challenged plan and contain "equal populations, [a]re contiguous, and respect[] existing political subdivisions." *Id.* at 18, 20; *see also* ROA.16004-05 (citing same).

NAACP/LULAC Plaintiffs' expert William Cooper, a demographer and redistricting expert with decades of experience, produced four illustrative plans that all include one majority Black and Latino commissioners precinct by Citizen Voting Age Population (CVAP). ROA.15998, 15913. The district court credited Cooper's

testimony that he applied traditional redistricting criteria in each of his plans and that race did not predominate. ROA.15914-17, 16012. Instead, Cooper prioritized different non-racial criteria to achieve variations that all resulted in a majority-minority precinct. This included drawing "least-change" plans based on the Benchmark Precinct 3, which he determined was a community of interest, and prioritizing the creation of a coastal precinct to varying degrees, all while considering other traditional redistricting criteria such as compactness, political boundary splits, VTD splits, population equalization, and incumbency. ROA.15914-17, ROA.35204-05.

Using this approach, Cooper produced four plans with districts that performed as well or better than the enacted plan on several metrics, including geographic compactness and maintaining traditional and municipal boundaries. *See* ROA.15914-15918, ROA.16010-16012. At trial, "[e]ven [Defendants' expert] Dr. Owens agreed that the illustrative plans are as compact as the enacted plan." ROA.16011. Based upon Cooper's and other Plaintiffs' expert illustrative plans, as well as the majority-minority precinct in alternative "Map 1" considered by the commissioners court, *see* ROA.15912, the district court found the first *Gingles* precondition satisfied. ROA.16013.

These findings track almost exactly with those affirmed by the Supreme Court in *Milligan*. *See* 599 U.S. at 20 (affirming the district court's findings that William

Cooper's produced districts that were "roughly as compact as the existing plan" and that "satisfied other traditional districting criteria" and "split the same number of county lines as (or even *fewer* county lines than) the State's map" "strongly suggested that Black voters in Alabama could constitute a majority in a second, reasonably configured, district." (quotations omitted)).

As *Milligan* makes clear, the district court did not err in stating that plaintiffs "do not need to consider *specific* communities of interest when drawing illustrative maps to satisfy the first *Gingles* precondition" as Defendants argue. Appellants' Br. 42 (quoting ROA.16009) (emphasis added). Courts need not conduct a "beauty contest" between maps, especially where the state and plaintiffs have split *different* communities of interest, as they did in *Milligan*. 599 U.S. at 21. Here, the district court determined that Plaintiffs' illustrative maps "still sufficiently preserve communities of interest," thus supporting its conclusion that the illustrative plans comport with traditional redistricting criteria and are reasonably configured. ROA.16009.

Defendants also argue that *Gingles* I is not satisfied because the Latino community is "evenly dispersed throughout the county." Appellants' Br. 41 (quoting ROA.15912). They provide no legal citation for this proposition, and it is plainly inconsistent with *Gingles* and *Milligan*, which call for considering the compactness of a population *within* the illustrative district, not outside it. *See* 599 U.S. at 18; 478

U.S. at 46-51. It also directly contradicts established precedent from this Circuit. *See Campos v. Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988) ("The fact that there are members of the minority group outside the minority district is immaterial."); *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022) (*Gingles* I analysis "relates to the compactness of the minority population *in the proposed district*." (emphasis added)).

Defendants also imply that Plaintiffs' illustrative plans include "farflung segments" of minority communities. *See* Appellants' Br. 44. But the reasonable compactness of Plaintiffs' illustrative plans proves otherwise, and there is no evidence any illustrative plan combines groups "hundreds of miles apart, that represent different communities of interest" as in the case on which Defendants' rely. *See* Appellants' Br. 44 (quoting *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 441 (2006) (*LULAC I*)). The trial court rightfully dismissed these arguments, finding Defendants' expert provided "no authority or reference for the significance" of distances he observed or "even a definition for what would be considered 'distant and disparate' in Galveston County" that could substantiate it. ROA.15921. Defendants have not remedied these deficiencies in their brief nor disputed the trial court's assessment of the credibility of their own expert's testimony.

At bottom, Defendants seek a result the Supreme Court just rejected in *Milligan*: a heightened evidentiary burden for *Gingles* I that would "remake [the Supreme Court's] § 2 jurisprudence anew." 599 U.S. at 23. According to Defendants, plaintiffs must now under all circumstances "establish adequate geographic, historic, or other interests beyond politics or socioeconomic status" before including voters within an illustrative district to satisfy *Gingles* I. Appellants' Br. 43. But they provide no legal citation to support this requirement (and thus no indication of how such a requirement could be met). And it plainly does not serve the purpose of a *Gingles* I precondition "focused on *geographic* compactness and numerosity" meant to "'establish that the minority has the potential to elect a representative of its own choice in some single-member district.'" *Milligan*, 599 U.S. at 18 (emphasis added) (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)).

The district court therefore correctly dismissed "cultural compactness" as neither an element of a § 2 claim nor a component of the first *Gingles* precondition, but instead a misreading of *LULAC I*. ROA.16009. In *LULAC I*, the Supreme Court "emphasize[d] it is the enormous geographical distance separating the [two] communities, coupled with the disparate needs and interests of these populations— not either factor alone—that renders [the district] noncompact for § 2 purposes." 548 U.S. at 435. In Galveston, the "Black and Latino areas joined in the plaintiffs' illustrative maps are marked by neither 'enormous geographical distance' nor

'disparate needs and interests.'" ROA.16010. These findings are based on "substantial quantitative evidence, supported by lay-witness testimony, that the needs and interests of communities included in the plaintiffs' illustrative plans are similar, including issues of ongoing discrimination." ROA.16010.

This holds true even in the more affluent League City neighborhood, where Cooper found (and the district court credited) that "disparities between Black and Latino residents as compared to their Anglo counterparts persist . . . which indicates that they share the common socio-economic challenges of Black and Latino residents in Galveston." ROA.15921-22 (quoting ROA.35376-89). This conclusion was based upon Cooper's extensive analysis of socioeconomic factors in Galveston County and across its municipalities and Census Designated Places. ROA.35394-402. Defendants' expert Dr. Owens, by contrast, "had no basis for disputing that Black and Latino residents throughout Galveston County fare worse than their Anglo counterparts across most socio-economic measures." ROA.15921. Plaintiffs' quantitative evidence on this point was reinforced with the lay testimony of Lucretia Henderson-Lofton, the former president of the Dickinson Bay Area NAACP and a Black resident of League City, who testified "to the racial discrimination her family and others have experienced in League City and the significant contacts that she maintains in Texas City." ROA.15922.

Defendants' attempt to cherry pick testimony from three witnesses that address neither geographic distance nor the needs and interests of communities in the county, *see* Appellants' Br. 42, cannot show any (much less clear) error with the court's findings that Galveston's Black and Latino voters are sufficient in number and geographic compactness to constitute a majority in a single commissioner precinct. As Defendants have failed to identify any error in the district court's determination that the first *Gingles* precondition is satisfied, this finding should be affirmed.

### B. The District Court Correctly Found Galveston's Black and Latino Voters to Be Politically Cohesive in Satisfaction of *Gingles* II.

The district court determined that Galveston's Black and Latino voters are cohesive based upon undisputed expert analysis showing that "on average, over 85% of Black and Latino voters have voted for the same candidate countywide and within the illustrative Precinct 3 plans" provided by Plaintiffs. ROA.15925. Even Defendants' expert testified it would be hard to find "a more classic pattern of what polarization looks like in an election." ROA.15927 (quoting Dr. Alford).

Defendants assert that the district court "erred by discounting the importance of nonpartisan elections, such as primaries." Appellants' Br. 45. This argument fails for two reasons. First, the district court attributed relatively less weight to primary election than general election evidence because "[a]ll experts agreed that general elections are more probative than primary elections in this case." ROA.15928. This

included defense expert Dr. John Alford, who testified that he primarily relied on a general election in reaching his conclusions. ROA.15929. Defendants might object to the district court's weighing of the evidence, which was informed by their own expert's testimony, but in doing so they "merely seek to have this court reassess the credibility of witnesses and the overall weight of the evidence," which this Court "cannot do." *Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1317 (5th Cir. 1991); *see Cooper v. Harris*, 581 U.S. 285, 316 (2017) (an appellate court "will not take it upon [itself] to weigh the trial evidence as if [it] were the first to hear it").

Second, the district court unquestionably weighed evidence relating to primary elections in its analysis of political cohesiveness and found such evidence supported its ultimate conclusion of cohesion. See ROA.16015. Taken together, the analyses of NAACP/LULAC Plaintiffs' expert Dr. Kassra Oskooii and Defendants' expert Dr. John Alford "show that Blacks and Latinos usually support the same top-choice candidate in primary contests." ROA.15929. Indeed, the record demonstrated that Black and Latino voters preferred the same candidate in 22 out of 24 primary contests analyzed by these experts. ROA.15073. The district court also found that "[t]he 2012 primary election for Precinct 3 provides very probative evidence because it is the most recent endogenous contest for Precinct 3" and "[t]hat election featured a highly cohesive Black and Latino electorate." ROA.15929. Evidence of primary elections was therefore consistent with the general election data in demonstrating

Black and Latino cohesion, and had the District Court placed more weight on primaries, the conclusion would have been the same.

Overall, the overwhelming statistical evidence from both general and primary elections supported a finding of cohesion. This was bolstered by witness testimony and other non-statistical evidence of cohesion, which correctly informed the trial court's finding that Galveston "county's Black and Latino populations act as a coalition and are politically cohesive." ROA.16017.

## C. The District Court Correctly Concluded that the Enacted Plan Thwarts a Distinctive Minority Vote at Least Plausibly on Account of Race in Satisfaction of *Gingles* III.

The basic voting patterns in Galveston County are undisputed: "Anglo voters in Galveston County vote cohesively and for candidates opposing those supported by a majority of Black and Latino voters" and "do so at a rate sufficient to defeat the minority-preferred candidate consistently in each of the enacted commissioners-court precincts." ROA.16017. In a majority of the most "recent general elections, over 85% of Anglos across Galveston County voted for candidates running against the minority-preferred candidates." ROA.15933. Plaintiffs' experts' analysis demonstrated that "[u]nder the enacted plan, Anglo bloc voting defeated the candidate of choice of Black and Latino voters in every election in every commissioners precinct." ROA.15932. Defendants' expert Dr. Alford did not dispute these results, and the district court found that as a precinct's minority

population percentage "moves up or down, the performance of minority-preferred candidates moves in direct proportion." ROA.15933. Additional statistical evidence supported that polarized voting in Galveston was on account of race given that, "in about 93% of racially contested elections," Anglo voters were cohesive behind the Anglo candidate while minority voters were cohesive behind the minority candidate. ROA.15936.

Defendants' only argument on appeal is that the district court failed to "address political causation" as an explanation for racially polarized voting patterns. Appellants' Br. 51. This is plainly false: the district court unequivocally considered Defendants' arguments and found that "a partisan explanation for voting patterns in Galveston County does not overcome the weighty evidence of racially polarized voting on account of race." ROA.15938.

In support of this finding, the district court performed a local, fact intensive inquiry into voting behavior in the jurisdiction and listed several factors that merited significant weight in determining that the evidence supports the conclusion that the enacted plan "'thwarts a distinctive minority vote' at least plausibly on account of race." ROA.16019 (listing factors) (quoting *Milligan*, 599 U.S. at 19, *Growe*, 507 U.S. at 40). The first two factors listed by the district court—the lack of successful minority candidates emerging from Republican primaries and the extremity of Anglo bloc voting—are precisely the two factors that the Fifth Circuit in *Clements*

highlighted as the most important factors in determining the legal significance of racially polarized voting. 999 F.2d 831, 861 (5th Cir. 1993) ("We instead focus on the same two factors cited by the Court in *Whitcomb* and the concurring Justices in *Gingles*."). The additional factors considered by the court all pertain to the racial dynamics present in Galveston County, including that minority candidates in both partisan and non-partisan elections tend to emerge only from majority-minority areas of the County, there exist recent examples of racial appeals in political campaigning, lay witnesses credibly testified about continuing experiences of racial discrimination and persistent racial disparities for Black and Latino residents across a wide range of socioeconomic measures (including in "income, poverty, education, and health"), and voting patterns show that Anglos and Blacks/Latinos "overwhelmingly" diverge when it comes to voting behavior in primary elections as well. ROA.15983-84, 16019.

The district court also found a lack of responsiveness on the part of County officials to minority needs, ROA.16022, which "'is intimately related' to the legal significance of bloc voting . . . ." ROA.16018 (quoting *Clements*, 999 F.2d at 857).

Defendants puzzlingly criticize the District Court for not "account[ing] for Commissioner Dr. Armstrong (a Black Republican) . . . and [scuttling] over the past and present reality of the number of minority elected officials in Galveston County, at all levels of government, both past and present." Appellants' Br. 52. The district

court *did* consider Dr. Armstrong's position on the commissioners court, and the fact that Commissioner Armstrong was appointed to the court after the Republican Primary Election, and after it was too late for contenders to appear on the General Election ballot. ROA.15936-37. The district court therefore correctly found, and Defendants cannot dispute, that "[n]o Black or Latino Republican has ever won a primary election to be the Republican Party's nominee for county judge or a county commissioner." ROA.15936. The district court also found that "[t]he limited number of successful Black and Latino elected officials within the county have tended to be members of city councils elected from majority-minority districts in cities with larger minority populations, such as Texas City and La Marque, or—in the case of the city of Galveston—elected from single-member districts created by court order to be majority-minority," ROA.15989, "which is consistent with racially polarized voting patterns." ROA.15930-31.

Defendants lastly point to two Anglo-surnamed Republican Latino officials in Galveston County, but again, the district court considered this and found that "Latino candidates with Spanish surnames have had minimal success in the county's Republican primaries," noting that even the Anglo Republican Galveston County Commissioners could not identify these candidates as minority candidates when asked on the stand. ROA.15989.

Thus, Defendants are wholly incorrect to suggest that the district court erred by not finding they had established their "affirmative defense that politics, rather than race, explains the reasons for Galveston County voting." Appellants' Br. 53. The district court correctly applied the framework laid out in *Clements* and *Teague v. Attala Cnty.*, 92 F.3d 283, 290 (5th Cir. 1996), weighed evidence from both sides, and found that "a partisan explanation for voting patterns in Galveston County does not overcome the weighty evidence of racially polarized voting on account of race." ROA.15938. It thus concluded that "[t]he preponderance of the evidence supports the conclusion that the enacted plan 'thwarts a distinctive minority vote' at least plausibly on account of race." ROA.16019 (quoting *Milligan*, 599 U.S. at 19; *Growe*, 507 U.S. at 40). Defendants merely ask this Court to re-weigh the evidence, which it cannot do. *Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1317 (5th Cir. 1991).

## III.    Section 2 of the Voting Rights Act Is Constitutional.

Defendants assert that § 2 is unconstitutional because it "requires governments to consider race in making redistricting decisions" creating "tension" with the Equal Protection Clause, and that it "cannot survive strict scrutiny because it lacks any temporal limitations." Appellants' Br. 53-58. Neither of these arguments has merit in light of *Milligan* and the facts on the ground in Galveston County.

As to the first argument, racial considerations in redistricting are not unique to Voting Rights Act-compliance given that "redistricting legislatures will . . . almost

always be aware of racial demographics." *Milligan*, 599 U.S. 30 (quoting *Miller*, 515 U.S. at 916). And while § 2 itself "demands consideration of race," *id.* (quoting *Abbott*, 138 S. Ct. at 2315), "race consciousness does not lead inevitably to impermissible race discrimination." *Id*. (quoting *Shaw v. Reno*, 509 U.S. 630, 646 (1993)). The Voting Rights Act's requirement that government officials consider race to protect against vote dilution in no way automatically requires racial predominance when government bodies redraw voting districts, and thus in no way demands "exception to equal protection" as Defendants' contend. *See Bush v. Vera*, 517 U.S. 952, 958, 962 (1996) (plurality op.) ("For strict scrutiny to apply, traditional districting criteria must be subordinated to race" and it "does not apply merely because redistricting is performed with consciousness of race." (citing *Miller*, 515 U.S. at 916 and *Shaw v. Reno*, 509 U.S. at 646) (emphasis omitted)).

Galveston County is the perfect example of how the Voting Rights Act does not *de facto* require any use of race in redistricting that would contravene the Fourteenth Amendment. Judge Henry, the architect of the enacted plan, admitted he already understood that Galveston County's Black and Latino population was centered around Precinct 3 and thus was already aware of racial considerations going into the process. ROA.15953. He then oversaw the drawing and adoption of a "textbook" racial gerrymander that "dismantle[ed] Precinct 3, the county's historic and sole majority-minority commissioners precinct," without any regard to the

requirements of the Voting Rights Act. ROA.15885-15887. This design "summarily carved up and wiped off the map" historic Precinct 3 despite "absolutely no reason to make major changes to Precinct 3." ROA.16028-16029.

The resulting vote dilution for Black and Latino voters was not an inevitable result of population rebalances. To the contrary, as Plaintiffs' illustrative maps prove (and the district court found) there is a "multitude" of potential district configurations that adhere to traditional redistricting criteria and that would have maintained the historic majority-minority district in Galveston County, and all *without race predominating* to achieve those designs. ROA.15920. The abundance of alternative map configurations that maintain a majority-minority precinct without race predominating proves there exists no "tension" at all between the county's duty to comply with the Voting Rights Act and the Fourteenth Amendment.

Even if this were not the case, Defendants' "temporal" argument against § 2 would fail because, as the district court rightly found, the remedy provided in § 2 is narrowly tailored to fulfill a compelling government interest.

As the Supreme Court most recently observed in *Milligan*, "the VRA's 'ban on electoral challenges that are discriminatory in effect . . . is an appropriate method of promoting the purposes of the Fifteenth Amendment.'" 599 U.S. at 41 (quoting *City of Rome v. United States*, 446 U.S. 156, 177 (1980)). Courts have authorized race-based redistricting as a remedy for § 2 violations "under certain circumstances"

and not as a blanket mandate. *Id.* Any court-ordered remedy under § 2 is only available once the three *Gingles* preconditions are satisfied and it is proven, "under the 'totality of circumstances,' that the political process is not 'equally open' to minority voters." *Id.* at 18 (quoting *Gingles*, 478 U.S. at 43). In making these findings, courts must conduct "'an intensely local appraisal' of the electoral mechanism at issue, as well as a 'searching practical evaluation of the past and present reality.'" *Id.* at 19 (quoting *Gingles*, 478 U.S. at 79). These jurisdictional and evidentiary hurdles to achieving any relief under § 2 prove it is narrowly tailored to serve a compelling interest of preventing discriminatory voting plans that are proven to impermissibly dilute the voting power of minority "on account of race," thereby surviving strict scrutiny. *Bush*, 517 U.S. at 976; *Clark v. Calhoun County*, 88 F.3d 1393, 1395-96 (5th Cir. 1996).

This "intensely local appraisal" and "searching practical evaluation of the past and *present* reality," *Gingles*, 478 U.S. at 79 (emphasis added, quotations omitted), sets these claims apart from the preclearance coverage formula that was invalidated in *Shelby County*, which the Court found singled out jurisdictions for coverage relying solely on "40-year-old facts having no logical relation to the present day." *Shelby County v. Holder*, 570 U.S. 529, 554 (2013); *see also id.* at 557 ("Our decision *in no way* affects the permanent, nationwide ban on racial discrimination in voting found in §2.") (emphasis added).

Defendants' assertion that the district court's finding of historical discrimination in Galveston exemplifies the need for temporal limitations is factually and legally inapposite. Appellants' Br. 57. The district court did not substantially rely on its historical findings to reach its conclusion on the totality of the circumstances. *See* ROA.16020-29. But even if it had, consideration of this factor is necessary to evaluate the "essence of a § 2 claim": that a "certain electoral law, practice or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed" by voters on account of race. *Milligan*, 599 U.S. at 17 (quoting *Gingles*, 478 U.S. at 47).[9] It cannot be that, where a district court considers a jurisdiction's history in addition to its present reality and, among its factual findings, finds historical discrimination in voting, any remedy would automatically be rendered unconstitutional.

Section 2 claims are likewise easily distinguished from race-based college admissions decisions because "remediating specific, identified instances of past discrimination that violated the Constitution or a statute" remains a "compelling

---

[9] Similarly, Defendants' claim that Section 2 is outdated because "it is easier to vote now than it has ever been" is unpersuasive. Appellants' Br. 12. Any evidence that access to voting in Galveston County has improved overall does not negate evidence that Black and Latino voters in Galveston County face barriers to voting. *See* ROA.15984-88. Further, mere access to the ballot box cannot strengthen a vote that has been illegally diluted through the dismantling of the "historic and sole-majority minority" Precinct 3, ROA.15887, and in a manner that "thwarts a distinctive minority vote at least plausibly on account of race." *Milligan*, 599 U.S. at 19.

interest[] that permit[s] resort to race-based government action." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 207 (2023) (citing *Shaw v. Hunt*, 517 U. S. 899, 909-10 (1996)) [10]; *see also Singleton v. Allen*, No. 2:21-cv-1291, 2023 WL 5691156, at *70-71 (N.D. Ala. Sept. 5, 2023) (rejecting arguments similar to Defendants').

The compelling interest of § 2 is well-established in Galveston, where the enacted plan would result in Black and Latino voters "being shut out of the process altogether," ROA.16025, the precise harm the Fifteenth Amendment and the VRA exist to prevent. *See Milligan*, 599 U.S. at 9-10; *see also* ROA.16029-32 ("Although the defendants speculate that the Voting Rights Act has outlived its usefulness, they have not shown that § 2 does not narrowly remedy the current discriminatory effects in Galveston County's commissioners-court elections."). The facts on the ground underscore the ongoing need for the narrowly tailored relief provided under § 2, which remains "an appropriate method of promoting the purposes of the Fifteenth Amendment." *Milligan*, 599 U.S. at 41 (*quoting City of Rome*, 446 U.S. at 177).

---

[10] In any event, nothing in *SFFA* addresses § 2, much less calls it into question, which is plainly insufficient to undermine its constitutionality; to justify such a stark departure from established precedent, Supreme Court case law must "be unequivocal, not a mere 'hint' of how the Court might rule in the future." *Mercado v. Lynch*, 823 F.3d 276, 279 (5th Cir. 2016) (*quoting United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013).

**IV.    The Motion for a Stay Pending Appeal Should Be Denied, and the Administrative Stay Should Promptly Be Dissolved.**

As set forth above, Defendants are not likely to succeed on the merits of this appeal. The remaining equitable factors also weigh against a stay pending appeal, even to the extent the Court perceives "serious questions" going to the merits. The Court should accordingly permit the administrative stay to expire on November 10, 2023—or dissolve it earlier, if administratively feasible—and deny Defendants' motion for a more permanent stay pending appeal. NAACP/LULAC Plaintiffs further respectfully request this Court to immediately allow the remedial proceedings to resume below to ensure a legally compliant map is used in the 2024 election for commissioners precincts 1 and 3. Failure to do so would risk dramatically changing the status quo by depriving Galveston's Black and Latino voters of any representation on the commissioners court for the first time in decades.

**A. Defendants Will Not Suffer Irreparable Harm Absent a Stay.**

Defendants' contention that they will be irreparably injured absent a stay is illusory in light of the many plans in their possession that account for incumbency and thus would preserve the current status quo of political representation they contend is put at risk by the judgment below. Plaintiffs have provided many such plans that account for current incumbency, several of which include the coastal precinct that Defendants have previously argued they desired. ROA.15980.

Defendants also already have a map of their own that would resolve the § 2 violation: Map 1. ROA.15912. A majority of the commissioners court expressed an initial preference for this map configuration. ROA.15958. And both the county's redistricting counsel Dale Oldham and Judge Mark Henry testified to believing that Map 1 would be legally compliant. ROA.15912-13, 15961. Defendants even argued in their closing brief that Commissioner Giusti and Judge Henry would have voted for Map 1 had Commissioner Holmes asked. ROA.15387-88. They cannot now contend this same map is no longer a viable alternative.

And even if Defendants want to draw a *new* plan, there is every reason to believe that whatever new remedial schedule the district court orders will allow Defendants sufficient time to do so, "considering that the defendants required Thomas Bryan to draw . . . the enacted plan adopted during the 2021 redistricting cycle[] in just eight days." ROA.16067 (denying motion for stay pending appeal). Thus, Defendants' concerns about timing do not justify a stay.

The district court was also correct in rejecting Defendants' *Purcell* arguments relying on *Abbott v. Perez*, 138 S. Ct. 2305 (2018), given "the 2024 primary election is still several months away, and the general election will not occur for another year." ROA.16067. *Cf. Patino v. Pasadena*, 229 F. Supp. 3d 582, 588-89 (S.D. Tex. 2017) (denying a motion for stay pending appeal when the close of candidate filing was one month away, the primary was four months away, and the general was five

months away). "The classic *Purcell* case is different. It concerns an injunction entered days or weeks before an election—when the election is already underway." *Robinson v. Ardoin*, 37 F.4th 208, 228 (5th Cir. 2022).[11] Furthermore, to the extent the candidate filing period is an issue, "'the District Court has the power appropriately to extend' that deadline and other 'time limitations imposed by state law.'" *Id.* at 230 (quoting *Sixty-Seventh Minn. State Senate v. Beens*, 406 U.S. 187, 201 n.11 (1972)) (alterations in original). And seeing as Defendants themselves orchestrated an unjustifiably "rushed process," and waited until the day before the candidate filing period opened to adopt the enacted plan in 2021, they cannot complain that they are now being required to adopt a legally compliant map close to that timeframe. ROA.15968-69. The alleged harm to Defendants is illusory or, at best, minimal, and does not warrant the drastic remedy they seek.

**B. Plaintiffs and Galveston's Black and Latino Voters Are Certain to Suffer Irreparable Harm if the Enacted Plan Is Used in 2024, and the Public Interest Does Not Support a Stay.**

There is no dispute that the enacted plan "disproportionately affects Galveston County's minority voters by depriving them of the *only* commissioners precinct where minority voters could elect a candidate of their choice." ROA.15939

---

[11] Importantly, when the Supreme Court subsequently granted a stay in *Ardoin* it did so on different grounds and due to circumstances not at issue here: a controlling case already before the Supreme Court that warranted holding the case in abeyance. 142 S. Ct. 2892 (2022).

(emphasis added). Defendants' assertion that a stay would preserve the status quo is therefore wrong. If the 2024 elections are permitted to proceed under the enacted plan, the status quo will actually *change* in a way particularly harmful to the Black and Latino community: they will be effectively "shut out" from any representation in the commissioners court. ROA.16028. The dramatic change from the Benchmark Plan, which has been in effect for well over a decade, to the enacted plan also risks significant voter confusion, as the likelihood of "voters not knowing in which commissioner's precinct they reside . . . is high." ROA.15981-82.

The denial of equal voting power is a severe restriction on the right to vote of Plaintiffs and Galveston's Black and Latino voters, and "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (citing *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986)). "Once the election occurs, there can be no do-over and no redress" for citizens whose voting rights were violated: "The injury to these voters is real and completely irreparable" if the election is held under the enacted plan. *League of Women Voters of N.C.*, 769 F.3d at 247.[12]

---

[12] There also remain viable constitutional claims that the district court would revisit on remand, and which would likely succeed in invalidating the enacted plan. *See, e.g.*, ROA.16028-16029 (finding that Defendants dismantled Precinct 3 in a "mean-spirited" and "egregious" manner despite "absolutely no reason to make major changes to Precinct 3"); ROA.15886 (crediting expert William Cooper's testimony

Likewise, "the public interest is best served by ensuring not simply that more voters have a chance to vote but ensuring that all citizens of [the] County have an equal opportunity to elect the representatives of their choice." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1348-49 (N.D. Ga. 2015). Moreover, "[i]t is clear that it would not be equitable or in the public's interest to allow the [County] . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (second alteration in original) (quoting *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011)). Allowing the enacted plan to be used in 2024 would deny a most basic and fundamental right to thousands of Galveston's voters, and thus the public interest and the risk of irreparable harm to interested parties weigh heavily in favor of denying a stay.

---

that the enacted plan was a "textbook example of a racial gerrymander"). This further warrants dissolving the current stay pending appeal, since a denial of constitutional rights "for even minimal periods of time" constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). It also underscores the importance of upholding the constitutionality of § 2 and affirming this lower court's judgment, as one purpose of § 2 was to avoid courts having to make "unnecessarily divisive" rulings on intentional racial discrimination." *Gingles*, 478 U.S. at 44 (internal quotation marks omitted).

## CONCLUSION

The judgment of the District Court should be affirmed, and the motion for stay

pending appeal should be denied.

Respectfully submitted.

November 2, 2023

s/ Hilary Harris Klein

Hilary Harris Klein
Adrianne M. Spoto
SOUTHERN COALITION FOR SOCIAL
JUSTICE
5517 Durham Chapel Hill Blvd.
Durham, NC 27707
919-323-3380

Hani Mirza
Joaquin Gonzalez
TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741

Nickolas Spencer
SPENCER & ASSOCIATES, PLLC
9100 Southwest Freeway, Suite 122
Houston, TX 77074

Richard Mancino
Michelle A. Polizzano
Andrew James Silberstein
Molly L. Zhu
Kathryn C. Garrett
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
212-728-8000

Aaron E. Nathan
Diana C. Vall-llobera
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006
(202) 303-1000

## CERTIFICATE OF SERVICE

I certify that on November 2, 2023, this brief was served on counsel for all parties via the ECF system. I further certify that all parties required to be served have been served.

s/ Hilary Harris Klein

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this brief contains 12,170 words, as determined by the word-count function of Microsoft Word 2016, and was prepared in a proportionally spaced 14-point Times New Roman font.

s/ Hilary Harris Klein