No. 23-40582

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

HONORABLE TERRY PETTEWAY; HONORABLE DERRICK ROSE;
HONORABLE PENNY POPE,

Plaintiffs-Appellees

v.

GALVESTON COUNTY, TEXAS; MARK HENRY, in his official capacity as
Galveston County Judge; DWIGHT D. SULLIVAN, in his official capacity as
Galveston County Clerk,

Defendants-Appellants

(*See inside cover for continuation of caption*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

RESPONSE OF APPELLEE UNITED STATES OF AMERICA TO APPELLANTS'
RENEWED EMERGENCY MOTION TO STAY PENDING APPEAL

KRISTEN CLARKE
  Assistant Attorney General

NICOLAS Y. RILEY
MATTHEW N. DRECUN
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 550-9589

*(Continuation of caption)*

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

GALVESTON COUNTY, TEXAS; GALVESTON COUNTY COMMISSIONERS COURT; MARK HENRY, in his official capacity as Galveston County Judge,

Defendants-Appellants

DICKINSON BAY AREA BRANCH NAACP; GALVESTON BRANCH NAACP; MAINLAND BRANCH NAACP; GALVESTON LULAC COUNCIL 151; EDNA COURVILLE; JOE A. COMPIAN; LEON PHILLIPS,

Plaintiffs-Appellees

v.

GALVESTON COUNTY, TEXAS; MARK HENRY, in his official capacity as Galveston County Judge; DWIGHT D. SULLIVAN, in his official capacity as Galveston County Clerk,

Defendants-Appellants

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ...................................................................................1

BACKGROUND ...................................................................................3

ARGUMENT

    Galveston County has not carried its burden to obtain a stay...........................6

    A.    Galveston County has not shown it is likely to overturn
          longstanding precedent..........................................................7

          1.    *Stare decisis* should apply here.................................7

          2.    This Court has interpreted Section 2 correctly..........................9

          3.    Galveston County's challenge to precedent lacks
              merit. .......................................................................15

    B.    The equities disfavor a stay. ................................................21

CONCLUSION ...................................................................................24

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:**                                                    **PAGE**

*Allen v. Milligan*, 599 U.S. 1 (2023)............................................................ 10, 15, 18

*Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189 (2017) ..............................15

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ...................................................... 16, 17, 21

*Bostock v. Clayton County, Ga.*, 140 S. Ct. 1731 (2020) ........................................20

*Brewer v. Ham*, 876 F.2d 448 (5th Cir. 1989) ...........................................................19

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021)................................14

*Campaign for Southern Equality v. Bryant*, 773 F.3d 55 (5th Cir. 2014) ................6

*Campos v. City of Baytown, Tex.*, 840 F.2d 1240 (5th Cir.), *reh'g denied*,
    849 F.2d 943 (5th Cir. 1988) ....................................................................8, 19

*CFPB v. All Am. Check Cashing, Inc.*, 952 F.3d 591 (5th Cir. 2020) .......................8

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
    139 S. Ct. 1507 (2019)..................................................................................11

*Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004) .......................................................17

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
    530 U.S. 1 (2000)..........................................................................................19

*Holloway v. City of Virginia Beach*, 531 F. Supp. 3d 1015 (E.D. Va. 2021),
    *vacated on other grounds*, 42 F.4th 266 (4th Cir. 2022)...............................18

*Huot v. City of Lowell*, 280 F. Supp. 3d 228 (D. Mass. 2017) ...............................18

*Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768 (2020)............................12

*Jama v. Immigration & Customs Enf't*, 543 U.S. 335 (2005) ..................................16

**CASES (continued):** **PAGE**

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  140 S. Ct. 2367 (2020)..................................................................21

*Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*,
  478 U.S. 421 (1986)......................................................................15

*Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721 (2020) ....................................11

*LULAC v. Midland Indep. Sch. Dist.*, 812 F.2d 1494 (5th Cir.),
  *vacated on state-law grounds*, 829 F.2d 546 (5th Cir. 1987).....................7, 8

*LULAC v. Perry*, 548 U.S. 399 (2006) ....................................................9

*LULAC, Council No. 4434 v. Clements*, 999 F.2d 831 (5th Cir. 1993)
  (en banc) ................................................................................ *passim*

*McDonnell v. United States*, 579 U.S. 550 (2016) ..................................12

*Merrill v. Milligan*, 142 S. Ct. 879 (2022)...............................................23

*Miller v. Johnson*, 515 U.S. 900 (1995)..................................................22

*Nixon v. Kent County*, 76 F.3d 1381 (6th Cir. 1996) (en banc)..............18

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................6, 7

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998) .................... 19, 20

*Overton v. City of Austin*, 871 F.2d 529 (5th Cir. 1989) .........................19

*Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998) .......................... 15, 19

*Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362 (5th Cir. 2023)................6

*Pope v. County of Albany*, No. 1:11-cv-00736, 2014 WL 316703
  (N.D.N.Y. Jan. 28, 2014).................................................................18

*Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307 (5th Cir. 1991)...........................13

**CASES (continued):** **PAGE**

*Republic of Sudan v. Harrison*, 139 S. Ct. 1048 (2019) ............................................9

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) ...............................................15

*Shelby County v. Holder*, 570 U.S. 529 (2013) ......................................................3

*Smallwood v. Illinois Cent. R.R. Co.*, 385 F.3d 568 (5th Cir. 2004) (en banc)........8

*Thomas v. Bryant*, 919 F.3d 298 (5th Cir. 2019) ...................................................21

*Thornburg v. Gingles*, 478 U.S. 30 (1986) .........................................................4, 18

*United States v. Baylor Univ. Med. Cntr.*, 711 F.2d 38 (5th Cir. 1983)...................6

*United States v. Brown*, 561 F.3d 420 (5th Cir. 2009) ...........................................20

*United States v. Midland Indep. Sch. Dist.*, 519 F.2d 60 (5th Cir. 1975)...............13

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc) .............................. 14, 22

*Veasey v. Abbott*, 870 F.3d 387 (5th Cir. 2017) (per curiam)................................22

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
    429 U.S. 252 (1977)..................................................................................5, 22

*White v. Regester*, 412 U.S. 755 (1973)........................................................ 10, 11

*Williams v. Homeland Ins. Co. of New York*, 18 F.4th 806 (5th Cir. 2021)..............9

**STATUTES:**

Civil Rights Act of 1964
    42 U.S.C. 2000c-6(a)(1) .................................................................................13

Dictionary Act
    1 U.S.C. 1......................................................................................................16

**STATUTES (continued):** **PAGE**

Voting Rights Act
      52 U.S.C. 10301(a) ........................................................9
      52 U.S.C. 10301(b) ...................................................9, 11
      52 U.S.C. 10303(c) ......................................................12
      52 U.S.C. 10303(f)(2) .................................................. 9
      52 U.S.C. 10303(f)(3) .............................................. 12, 16
      52 U.S.C. 10310(c)(3) ..................................................13
      Pub. L. No. 89-110, § 4(c), 79 Stat. 438-439 (1965) ...................................12

**RULES:**

Fed. R. App. P. 8(a) ........................................................6

Fed. R. Civ. P. 23 ........................................................10

Fed. R. Civ. P. 23(b)(2)........................................................10

**LEGISLATIVE HISTORY:**

H. Rep. No. 227, 97th Cong., 1st Sess. (1981) ...................................... 14

S. Rep. No. 295, 94th Cong., 1st Sess. (1975)........................................ 13

S. Rep. No. 417, 97th Cong., 2d Sess. (1982) ........................................ 14

**INTRODUCTION**

Galveston County's belated stay motion should be denied, and the district court's remedial plan should remain in effect. The district court correctly determined that the Galveston County Commissioners Court's 2021 redistricting plan violates Section 2 of the Voting Rights Act because it "completely . . . extinguished the Black and Latino communities' voice on its commissioners court." ROA.16028-16029. A panel of this Court has affirmed that the district court correctly applied settled law to the facts of the case—facts the County's motion scarcely contests.

Granting the County's stay motion would work an injustice by depriving the United States and other appellees of relief to which existing law entitles them, at least through the en banc rehearing in May 2024, nearly six months away. That deprivation would be based solely on the expectation that the en banc Court will overturn longstanding precedent. That expectation is unfounded because this Court's precedent is correct.

Allowing Galveston County's Black and Latino voters to bring a "coalition" claim reflects the best interpretation of Section 2's text, context, history, and purpose. The County's plea to overturn that precedent (Mot. 7-11) ignores *stare decisis* as well as Section 2's text, relying instead on inapt cases and on non-

binding opinions that failed to persuade when this Court exhaustively considered coalition claims three decades ago.

Whether or not this Court adheres to precedent, it should decline to stay the district court's remedial plan. Appellees' claims that the County's 2021 redistricting plan reflects intentional discrimination and racial gerrymandering remain to be resolved. The County's motion is silent on these intent-based claims' strength. The district court found that "the heart of this case" is "a textbook example of a racial gerrymander" (ROA.15885-15886), and it regarded the County's 2021 redistricting plan as "egregious," "mean-spirited," and "stark and jarring." ROA.16029. The en banc rehearing will not affect appellees' intent-based claims. Should the en banc Court reverse the district court's judgment, the district court will regain jurisdiction to enter judgment and grant relief to appellees on those claims.

Because it would be unacceptable to permit a districting plan so tainted by racially discriminatory intent and effect to govern the County's next election, the County's stay motion should be denied.

# BACKGROUND

1.  The United States' brief details the background to this appeal.  *See* U.S. Br. 3-12.  From 1991 to 2021, Precinct 3 was the only one of the Galveston County Commissioners Court's four precincts that gave Black and Latino voters the opportunity to elect their preferred candidate.  ROA.15911-15912.

By 2021, Galveston County no longer had to submit its election changes to the Attorney General for preclearance.  *See Shelby County v. Holder*, 570 U.S. 529, 537-539, 553 (2013).  The 2020 Census showed that unequal population changes called only for modest adjustments to the four precincts.  The combined Black and Latino citizen voting-age population in Precinct 3 then was 58%.  ROA.15911. "Map 1," a minimum-change map the County devised but did not adopt in 2021, achieved equal population while keeping that figure at 55%.  ROA.15912-15913.

The County chose to destroy Precinct 3 instead.  "Map 2," the plan the County enacted, converted Precinct 3 "from the precinct with the highest percentage of Black and Latino residents to the one with the lowest."  ROA.15938. Map 2 fractured Precinct 3 by placing its coastal territory in one precinct, while splitting the rest between the three mainland precincts.  ROA.15956.  The effect of this "dramatic change" was plain.  ROA.15957.  As one commissioner testified, "you can look at the picture and tell."  ROA.19223.

To achieve this end, the County acted in a far more secretive manner than past redistricting cycles. It failed to adopt a public timetable for completing the process or public criteria to guide it. ROA.15963. It moved slowly to draw and publicize proposed maps. ROA.15954-15955. It excluded Precinct 3 Commissioner Stephen Holmes from later stages of the process. ROA.15959-15960. It gave the public scant notice of the maps under consideration, and it held only one public hearing, at which Map 2's adoption was already a done deal. ROA.15968-15973.

The County did this at the behest of County Judge Mark Henry. Most commissioners were happy with Map 1.[1] ROA.15958. But Henry had wanted a map like Map 2 since 2011. ROA.15954, 18530-18531, 18639-18643. Henry knew that Map 2 could not have survived preclearance; the Attorney General would have objected to the clear diminution in minority voting strength. *Ibid.*

2. In early 2022, the United States, individuals, and organizations challenged the County's 2021 redistricting plan under Section 2's results test. ROA.15889-15890; *see Thornburg v. Gingles*, 478 U.S. 30 (1986). The United States also alleged discriminatory purpose under Section 2, while the other

---

[1] Appellees accept Map 1 as a legally compliant remedial plan.

plaintiffs brought intentional-discrimination and racial-gerrymandering claims. ROA.15889-15890.

After a ten-day bench trial, the district court issued a 157-page opinion on October 13, 2023, concluding that the 2021 plan is "a clear violation" of Section 2's results test.  ROA.16029.  That violation meant the court "[did] not need to" decide plaintiffs' intent-based claims.  ROA.16032.  But the court found that "the heart of this case" is "a textbook example of a racial gerrymander."  ROA.15885-15886.  And it made extensive findings that "could be viewed as evidence of intentional discrimination."  ROA.15950-15982 (applying *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252 (1977)).  The court enjoined the 2021 plan and set a remedial schedule.  ROA.16035-16036.

3.  The County filed a stay motion on October 17, which this Court declined to grant.  The Court instead imposed only administrative stays.  On November 10, a panel affirmed the district court's judgment, while calling for en banc rehearing to reconsider circuit precedent that allows Black and Latino voters to bring a vote-dilution claim together under Section 2's results test.  It also extended the administrative stay "pending en banc poll."  The County never renewed its stay motion during the poll.

On November 28, the Court ordered en banc rehearing.  On November 30, Chief Judge Richman clarified that the administrative stay "terminated when the

court granted rehearing en banc." Because the district court's judgment was no longer stayed, the court ordered the County to adopt Map 1. *See* Order, *Petteway v. Galveston County, Tex.*, No 3:22-cv-00057 (S.D. Tex. Nov. 30, 2023). It accepted the "unwelcome obligation" of choosing a remedial plan because the County had not chosen one and candidate filing had already started. *Id.* at 2-3.

On December 1—three full days after the administrative stay terminated, and without any attempt first to obtain a stay from the district court, *see* Fed. R. App. P. 8(a)—the County filed the instant stay motion.

## ARGUMENT

**Galveston County has not carried its burden to obtain a stay.**

"A stay pending appeal is extraordinary relief for which defendants bear a heavy burden." *Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362, 373 (5th Cir. 2023) (citations omitted). It is "not a matter of right, even if irreparable injury might otherwise result"; it is an "exercise of judicial discretion." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citation omitted). Four factors guide that exercise: (1) whether the movant has made a "strong showing that he is likely to succeed on the merits";[2] (2) whether the movant will be "irreparably injured" absent a stay;

---

[2] The County's reliance (Mot. 6) on the lesser burden of merely "a substantial case on the merits" is misplaced. That standard applies when important questions lack a "definitive ruling." *United States v. Baylor Univ. Med. Cntr.*, 711 F.2d 38, 40 (5th Cir. 1983); *see*, *e.g.*, *Campaign for Southern Equality v. Bryant*,

(3) whether a stay would "substantially injure" other parties; and (4) the public interest. *Id.* at 434 (citation omitted).

### A. Galveston County has not shown it is likely to overturn longstanding precedent.

This Court has allowed coalition claims under Section 2 for more than three decades. That precedent reflects the correct interpretation of Section 2's text, context, history, and purpose. The County musters little argument on Section 2's text or the other determinants of statutory meaning. It relies instead on inapt cases and unpersuasive opinions. Accordingly, the County fails to make the strong showing of likely success that is required to obtain a stay.

### 1. *Stare decisis* should apply here.

This Court treats coalition claims "as a question of fact, allowing aggregation of different minority groups where the evidence suggests that they are politically cohesive." *LULAC, Council No. 4434 v. Clements*, 999 F.2d 831, 864 (5th Cir. 1993) (en banc). "If blacks and Hispanics vote cohesively, they are legally a single minority group." *Ibid.*

This Court reached that holding after thorough deliberation of the coalition issue. The Court first affirmed a coalition claim in *LULAC v. Midland*

---

773 F.3d 55 (5th Cir. 2014) (pre-*Obergefell* constitutionality of gay-marriage ban). Binding precedent answers the question on which en banc rehearing will focus.

*Independent School District*, 812 F.2d 1494 (5th Cir.), *vacated on state-law grounds*, 829 F.2d 546 (5th Cir. 1987) (en banc), over the dissent of *Clements'* eventual author. *See Midland*, 812 F.2d at 1503 (Higginbotham, J., dissenting). The Court then ruled for coalition plaintiffs in *Campos v. City of Baytown, Tex.*, 840 F.2d 1240, 1245-1248 (5th Cir. 1988). The Court declined to rehear *Campos*, again over the dissent of *Clements'* eventual author. *See Campos v. City of Baytown, Tex.*, 849 F.2d 943, 944 (5th Cir. 1988) (Higginbotham, J.).

In *Clements*, where Black and Hispanic voters challenged Texas's countywide elections for state district judges, "the evidence indisputably showed that blacks and Hispanics were politically cohesive" in certain counties, though their claims failed for other reasons. 999 F.2d at 864-865 & n.29. Importantly, the Court declined to adopt the divergent view of five judges—the same view now urged by the County—that Section 2 does not permit coalition claims. *See id.* at 894-898 (Jones, J., concurring).

That history makes this is a textbook case for *stare decisis*. The Court already has considered the same issue and arguments, and it has resolved the issue en banc. *See CFPB v. All Am. Check Cashing, Inc.*, 952 F.3d 591, 603 & n.6 (5th Cir. 2020) (Smith, J., dissenting). Courts should be "particularly circumspect in reconsidering decisions interpreting statutes," and they should not play "games . . . in order to escape the force of a fairly resolved issue." *Smallwood v. Illinois Cent.*

*R.R. Co.*, 385 F.3d 568, 585 (5th Cir. 2004) (en banc) (Smith, J., dissenting) (quotation omitted).

### 2.  This Court has interpreted Section 2 correctly.

In any event, this case does not present "a conflict between text and precedent." *Williams v. Homeland Ins. Co. of New York*, 18 F.4th 806, 818 (5th Cir. 2021) (Ho, J., concurring).  Allowing coalition claims is the correct interpretation of Section 2.

a.  "We begin where all such inquiries must begin: with the language of the statute itself." *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1056 (2019) (quotations omitted).  Subsection (a) protects an individual right, "the right of *any citizen* of the United States to vote," against "denial or abridgment" by a voting practice or procedure "on account of race or color" or language-minority status.  52 U.S.C. 10301(a), 10303(f)(2) (emphasis added); *see LULAC v. Perry*, 548 U.S. 399, 437 (2006) ("[T]he right to an undiluted vote does not belong to the minority as a group, but rather to its individual members." (quotation omitted)).  Subsection (b) defines violations of that individual right as occurring when "the political processes leading to nomination or election . . . are not equally open to participation by *members of a class of citizens protected by subsection (a)* in that its members have less opportunity than other members of the electorate" to participate politically.  52 U.S.C. 10301(b) (emphasis added).

- 9 -

When a redistricting plan dilutes both Black and Latino citizens' right to vote, those injured individuals are all "members of a class of citizens protected by subsection (a)."  The text contains no explicit requirement, nor even any concrete textual cues, that a "class" and its "members" must share the same race, color, or language-minority status.

Instead, the text uses "class" and its "members" generically to denote a group of injured individuals.  This non-restrictive meaning is familiar legal usage. *See* Fed. R. Civ. P. 23 (permitting "[o]ne or more members of a class [to] sue . . . on behalf of all members").  Rule 23 predates the 1982 amendments to Section 2 and was itself inspired by civil rights litigation.  *See* Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amendment (drawing on "actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration").  Rule 23 and Section 2 thus overlap in both language and substance.

b.  Congress chose not to include a single-group restriction in Section 2's text, even though the model it used for Section 2(b) appears to contain one. Crafting Section 2(b) in 1982, Congress "borrowed language" from *White v. Regester*, 412 U.S. 755 (1973).  *See Allen v. Milligan*, 599 U.S. 1, 13 (2023). *White*'s language differed in a critical respect from the language Congress ultimately adopted:  it obligated plaintiffs to prove that "the political processes

leading to nomination and election were not equally open to participation by *the group in question*—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." 412 U.S. at 766 (emphasis added). But Section 2(b), otherwise nearly identical, uses "members of a class of citizens protected by subsection (a)." 52 U.S.C. 10301(b).

Had Congress simply copied "the group in question" into Section 2(b), coalition claims might be more dubious. But Congress chose generic, non-restrictive language instead. To nevertheless read a single-group restriction into Section 2(b)—as the County urges—flouts the principle that courts "may not narrow a provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020).

c. Reading a single-group restriction into Section 2(b) would create conflict with usage elsewhere in the Voting Rights Act and the Civil Rights Act. *See Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019) (disfavoring "interpretations that would attribute different meanings to the same phrase" (quotation omitted)).

Congress knew how to specify when only a single group should be considered. Extending the VRA to protect language minorities in 1975, Congress redefined the "test[s] or device[s]" prohibited by the VRA—such as literacy

- 11 -

tests—to include providing voting materials only in English when more than five percent of a jurisdiction's voting-age citizens are "*members of a single language minority*." 52 U.S.C. 10303(f)(3) (emphasis added). Congress used no such single-group restriction in Section 2, and it is "generally presum[ed] that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 777 (2020) (quotation omitted).

As enacted in 1965, the VRA also contained a non-restrictive use of "class" and "member." Among other discriminatory tests, it prohibited requiring that a voter "prove his qualifications by the voucher of registered voters or *members of any other class*." Pub. L. No. 89-110, § 4(c), 79 Stat. 438-439 (1965) (emphasis added; 52 U.S.C. 10303(c)). Applying *noscitur a sociis*, under which "a word is known by the company it keeps," *McDonnell v. United States*, 579 U.S. 550, 569 (2016) (quotation omitted), this usage indicates "members" and "class" need not make any racial classification at all. At the same time, Congress opted for racial language elsewhere. *E.g.*, Pub. L. No. 89-110, 79 Stat. at 440 (authorizing federal election examiners based in part on "the ratio of nonwhite persons to white persons registered to vote"). That contrast further shows the generic meaning of "class" and "member" in the VRA.

- 12 -

The Civil Rights Act also used language akin to Section 2(b) that yielded coalition-like litigation.  The Act authorizes the Attorney General to bring school-desegregation suits upon receiving a complaint "signed by a parent or group of parents to the effect that his or their minor children, as *members of a class of persons similarly situated*, are being deprived by a school board of the equal protection of the laws."  42 U.S.C. 2000c-6(a)(1) (emphasis added).

The United States thereby brought extensive litigation, predating the 1982 amendments to Section 2, that challenged segregation of both Black and Latino students.  *See*, *e.g.*, *Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1310 & n.3 (5th Cir. 1991) ("During the 1970s, this court repeatedly held that AISD had intentionally discriminated against black and Mexican–American students."); *United States v. Midland Indep. Sch. Dist.*, 519 F.2d 60, 64 (5th Cir. 1975) (finding three school districts "segregate[d] Mexican-Americans and blacks").  Reading a single-group restriction into Section 2(b) would create inexplicable incongruity with this provision.

d.  Allowing coalition claims is consonant with the VRA's history and purpose.  Congress included persons "of Spanish heritage" among protected language minorities in 1975 because it recognized Mexican Americans' and Blacks' similar experiences with discrimination.  *See* 52 U.S.C. 10310(c)(3); S. Rep. No. 295, 94th Cong., 1st Sess. 25-28 (1975) (noting similar "effects of

discrimination," "efforts to minimize the impact of their political participation," and at-large voting schemes that "effectively den[ied] Mexican Americans and black voters in Texas political access").  It would be abnormal to wall off voters that Congress saw as having so much common experience.

Committee reports from the 1981-1982 amendment process likewise exhibit Congress's understanding that one election practice can discriminate against multiple groups.  The House Report cited a 1975 voter purge attempt in Texas, to which the Attorney General objected because of its discriminatory effect on "minority groups in Texas, namely, black and Mexican-Americans."  H. Rep. No. 227, 97th Cong., 1st Sess. 15-16 (1981).  The Senate Report cited a New York City redistricting plan with "gerrymandered districts [that] discriminated against black and Hispanic voters."  S. Rep. No. 417, 97th Cong., 2d Sess. 11 (1982).  Grafting a single-group restriction onto Section 2 would disregard this history.

e.  Barring coalition vote-dilution claims would create senseless discrepancy with other voting rights litigation.  No court has read Section 2 to disallow claims that an election practice discriminatorily *denies* the vote to voters of multiple groups.  Such litigation is common.  *See*, *e.g.*, *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2334 (2021) (Arizona provisions challenged for disparate impact on "American Indian, Hispanic, and African American citizens"); *Veasey v.*

- 14 -

*Abbott*, 830 F.3d 216, 251 (5th Cir. 2016) (en banc) (Texas law challenged for disparate impact on "African-American and Hispanic" voters).

The same is true across the civil rights landscape. *See, e.g.*, *Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189 (2017) (discrimination under Fair Housing Act against Black and Latino borrowers by banks); *Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*, 478 U.S. 421 (1986) (discrimination under Title VII against Black and Hispanic workers by union). Such suits reflect that one practice can discriminate simultaneously against multiple minority groups. It would be anomalous if only Section 2's results test is made blind to that reality.

### 3. Galveston County's challenge to precedent lacks merit.

a. Galveston County barely addresses the statutory text, and its short discussion makes elementary interpretive errors. The observation (Mot. 11) that "Congress made no reference to minority coalitions in the text of the VRA" is "irrelevant." *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998). "[T]he fact that a statute can be 'applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.'" *Ibid.* (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985)). And the County's point proves too much. Section 2 does not refer expressly to redistricting, yet courts have applied Section 2 to redistricting "in an unbroken line of decisions stretching four decades." *Milligan*, 599 U.S. at 38.

The assertion (Mot. 11) that Congress would have said "classes" of citizens if it meant to allow coalition claims is wrong too. As in Rule 23 class actions, a group of injured individuals is a "class." There is no need for that word to be plural. And if some as-yet-unidentified syntax does require it, the Dictionary Act covers that possibility. *See* 1 U.S.C. 1 ("[W]ords importing the singular include and apply to several persons, parties, or things.").

The argument that Congress could have been clearer can be made in virtually any genuine dispute over statutory interpretation. Indeed, it cuts the other way here: Congress could have limited Section 2(b) to members of a single minority, just as it did in 52 U.S.C. 10303(f)(3) ("members of a single language minority"). "[Courts] do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and [their] reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." *Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 341 (2005).

b. The County relies mainly (Mot. 7-9) on inapt decisions, which neither control the issue of coalition claims nor indicate this Court's precedent is wrong. *Bartlett v. Strickland*, 556 U.S. 1 (2009), expressly reserved whether Section 2 allows coalition claims. *See id.* at 13-14 (opinion of Kennedy, J.). *Bartlett*'s reasons for disallowing "crossover" claims—where minority voters are less than a

numerical majority but join with white voters to elect their preferred candidate—do not apply to coalition claims.  *Bartlett* was concerned with devising "an objective, administrable rule" for determining when plaintiffs have satisfied the first *Gingles* precondition.  *Id.* at 22.  Coalition claims, as in this case, satisfy *Bartlett*'s bright-line precondition that minority voters can compose a "numerical, working majority" in a geographically compact district.  *Id.* at 13, 17.

Crossover claims also pose "serious tension with the third *Gingles* requirement that the majority votes as a bloc to defeat minority-preferred candidates."  *Bartlett*, 556 U.S. at 16.  A minority arguably is not submerged by white bloc voting if it can elect its preferred candidates with white voters' help.  That problem does not undermine coalition claims, under which—as this case illustrates—cohesive minority groups can face submergence collectively.

The County misreads *Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004).  Mot. 7-8.  Like *Bartlett*, *Hall* dealt only with crossover districts, not coalition districts, holding that Section 2 does not protect minorities' "alliance with other voters in a district who do not share the same statutory disability as the protected class."  385 F.3d at 431 n.13.  But coalition claims involve voters who share the same statutory disability:  the violation of the individual right in Section 2(a).

The County inaccurately implies (Mot. 7) a trend away from recognizing coalition claims.  But district courts that have recently considered coalition claims

- 17 -

without binding circuit authority or guidance have allowed them. *See Holloway v. City of Virginia Beach*, 531 F. Supp. 3d 1015, 1051-1053 (E.D. Va. 2021) (distinguishing *Hall*), *vacated on other grounds*, 42 F.4th 266 (4th Cir. 2022); *Huot v. City of Lowell*, 280 F. Supp. 3d 228, 233-236 (D. Mass. 2017); *Pope v. County of Albany*, No. 1:11-cv-00736, 2014 WL 316703, at *6 (N.D.N.Y. Jan. 28, 2014) (considering question despite Second Circuit guidance). None viewed *Bartlett* as decisive, and none followed *Nixon v. Kent County*, 76 F.3d 1381 (6th Cir. 1996) (en banc), the erroneous outlier the County urges this Court to copy.

c. The County cites (Mot. 9-10) analytical "problems" that supposedly arise in adjudicating coalition claims. The present case belies those concerns. The *Gingles* analysis employs the same tests and methods for coalition claims as for any *Gingles* claim. Applied here, they established a "clear violation" of Section 2. ROA.16029. The County offers no examples of analytical problems from the present case that the district court was actually incapable of answering.

The County argues (Mot. 10) that coalition claims "force courts . . . into the decision making [sic] based on political judgments," but protecting the right to vote in a democracy cannot somehow be extricated from "politics." *See Milligan*, 599 U.S. at 19 (mandating "intensely local appraisal" of "past and present reality" (quoting *Gingles*, 478 U.S. at 79)). Even so, *Gingles*' demanding framework has proven more than capable of screening out deficient coalition claims. *See*, *e.g.*,

*Brewer v. Ham*, 876 F.2d 448 (5th Cir. 1989); *Overton v. City of Austin*, 871 F.2d 529 (5th Cir. 1989).

d.  Finally, the County relies (Mot. 11) on Judge Higginbotham's dissent from denial of rehearing in *Campos v. City of Baytown, Tex.*, 849 F.2d 943 (5th Cir. 1988).  The County does not acknowledge that he later authored the majority opinion in *Clements* allowing coalition claims and declining the concurrence's proposal to bar them.  *See* 999 F.2d at 864; *id.* at 894 (Jones, J., concurring).

The County does not cite the *Clements* concurrence, but it is unpersuasive. The concurrence suggests Congress should have referred to "classes" in Section 2(b), 999 F.2d at 894, but that is unnecessary under the text's best reading.  *See* pp. 9-10, *supra*.  A "class" is capacious enough.

The concurrence also says the proper interpretive question is "whether Congress *intended to protect* coalitions."  *Clements*, 999 F.2d at 895.  But statutory interpretation is about reading texts, not reading minds.  It "begin[s] with the understanding that Congress says in a statute what it means and means in a statute what it says there."  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (citation omitted).  That statutes may reach "situations not *expressly* anticipated by Congress" demonstrates only their "breadth," not ambiguity.  *Yeskey*, 524 U.S. at 212 (emphasis added).  "[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils."  *Oncale*

- 19 -

*v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998); *see*, *e.g.*, *United States v. Brown*, 561 F.3d 420, 432-435 (5th Cir. 2009) (affirming county violated Section 2 by discriminating against white voters). "[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale*, 523 U.S. at 79.

The concurrence has the intuition that a suit complaining about election practices with discriminatory effects on multiple groups reflects mere politics, not a genuine effort to combat discrimination. *Clements*, 999 F.2d at 895. But the problem with that theory is evident when it is transposed to other contexts, such as parents complaining that their school system segregates students of multiple races. *See* p. 13, *supra*. Discrimination is unlawful whether it affects one group or several, as Congress recognized in 1981-1982 when its committee reports noted examples of election practices that discriminated against voters from multiple groups. *See* p. 14, *supra*. The text Congress chose allows claims in such cases, and "none of these contentions about what the [concurrence] think[s] the law was meant to do, or should do, allow us to ignore the law as it is." *Bostock v. Clayton County, Ga.*, 140 S. Ct. 1731, 1745 (2020).

The concurrence also resorts to "naked policy appeals." *Bostock*, 140 S. Ct. at 1753. It speculates about the "enormous" "complications" posed by coalition claims, *Clements*, 999 F.2d at 896, but time has disproved the concurrence's

forecasts. Coalition claims rarely succeed; they have not yielded anything near proportional representation; and defendants have not strategically misused coalition districts to any discernable extent. *Contra id.* at 896-897.

At bottom, the concurrence seeks to engraft a single-group restriction onto Section 2's text that it does not contain. "It is a fundamental principle of statutory interpretation that absent provision[s] cannot be supplied by the courts." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2380 (2020) (quotation omitted). The concurrence's disregard of that principle should not be the law in this circuit, and the County's thin briefing has not made the required strong showing that it is likely the en banc Court will make it so.

### B.    The equities disfavor a stay.

When a district court has held that a redistricting plan violates the law, denying a stay means a government cannot use its enacted plan, while granting a stay means voters endure an election under an unlawful plan. *See Thomas v. Bryant*, 919 F.3d 298, 303-304 (5th Cir. 2019). Though those injuries offset, the equities nevertheless strongly favor denying the County's stay request.

1. The County's motion is silent on appellees' unresolved intent-based claims, and the coming en banc rehearing does not implicate them. Even as *Bartlett* rejected crossover claims, it made clear that its holding would not bar intentional-discrimination claims. *See* 556 U.S. at 20. And racial-gerrymandering

- 21 -

claims are "analytically distinct" from Section 2. *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (citation omitted).

The district court's opinion indicates that the intent-based claims are strong. The court found that "the heart of this case" is "a textbook example of a racial gerrymander." ROA.15885-15886. The County's destruction of Precinct 3 was "egregious," "mean-spirited," and "stark and jarring." ROA.16029. The court made extensive findings on the County's procedural aberrations that "could be viewed as evidence of intentional discrimination." ROA.15950-15982 (citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252 (1977)). It found appellees' experts on the County's discriminatory intent were credible. ROA.15906-15910. And it found the County's mapmakers did not actually consider the neutral criteria that ostensibly guided the redistricting process. ROA.15977-15982.

It is "untenable to permit a law with a discriminatory effect to remain in operation for [an] election." *Veasey*, 830 F.3d at 270. That principle is all the more forceful when strong evidence indicates not just discriminatory effect, but discriminatory intent. That principle also distinguishes this Court's cases that have merged the government's interest with the public's. *See*, *e.g.*, *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam). It cannot be correct that the public interest lies in intentional discrimination.

- 22 -

The County takes a surprising partisan stance on the equities.  It complains, without specific support (Mot. 13), that there may be "no qualified (or eligible) Republican candidates for two of its Commissioners Court seats."  Even if that speculative claim is true, the County cites no law recognizing a meaningful interest in having a qualified candidate of a specific political party, much less that this interest equals or supersedes the rights protected by Section 2.  Nor can it be claimed that such partisan interests merge with the public interest.

2.  Denying a stay will preserve the status quo.  The County failed to renew its stay motion during the en banc poll, and this Court unstayed the district court's judgment on November 28.  *See* Order (Nov. 30, 2023).  Moving with appropriate speed, the district court ordered the County to adopt Map 1, the minimum-change plan it devised but did not enact in 2021.  *See* Order, *Petteway v. Galveston County, Tex.*, No 3:22-cv-00057 (S.D. Tex. Nov. 30, 2023).  The candidate-filing period for the coming election will expire on December 11.  Interested candidates still have time to file for races under the remedial map.  But a stay would cause further confusion, the sort of "[l]ate judicial tinkering" that equity disfavors.  *See Merrill v. Milligan*, 142 S. Ct. 879, 880-881 (2022) (Kavanaugh, J. concurring).

## CONCLUSION

This Court should deny appellants' motion to stay.

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Matthew N. Drecun
NICOLAS Y. RILEY
MATTHEW N. DRECUN
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 550-9589

## CERTIFICATE OF SERVICE

On December 4, 2023, I filed this brief with the Clerk of the Court by using the CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

s/ Matthew N. Drecun
MATTHEW N. DRECUN
Attorney

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2) because it contains 5,176 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and 5th Cir. Rule 32.1.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) because it was prepared in Times New Roman 14-point font using Microsoft Word for Microsoft 365.

s/ Matthew N. Drecun
MATTHEW N. DRECUN
 Attorney

Date:  December 4, 2023