# In the United States Court of Appeals for the Fifth Circuit

Honorable Terry Petteway; Honorable Derrick Rose; Honorable Penny Pope,

*Plaintiffs-Appellees,*

*v.*

Galveston County, Texas; Mark Henry, in his official capacity as Galveston County Judge; Dwight D. Sullivan, in his official capacity as Galveston County Clerk,

*Defendants-Appellants.*

United States of America,

*Plaintiff-Appellee,*

*v.*

Galveston County, Texas; Galveston County Commissioners Court; Mark Henry, in his official capacity as Galveston County Judge,

*Defendants-Appellants.*

Dickson Bay Area Branch NAACP; Galveston Branch NAACP; Mainland Branch NAACP; Galveston LULAC Council 151; Edna Courville; Joe A. Compian; Leon Phillips,

*Plaintiffs-Appellees,*

*v.*

Galveston County, Texas; Mark Henry, in his official capacity as Galveston County Judge; Dwight D. Sullivan, in his official capacity as Galveston County Clerk

*Defendants-Appellants.*

# BRIEF FOR THE STATE OF TEXAS AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS-APPELLANTS

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

LANORA C. PETTIT
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

J. ANDREW MACKENZIE
Assistant Attorney General

Counsel for Amicus Curiae
the State of Texas

# TABLE OF CONTENTS

Page

Table of Authorities .................................................................ii

Identity and Interest of Amicus Curiae ..................................... 1

Introduction ........................................................................... 1

Argument ............................................................................... 4

    I.   *Campos* Was Flawed Statutory Interpretation ........................... 5

        A.   The plain text of Section 2(b) protects the ability of a minority to elect its preferred candidate, not a coalition of minorities ........................................................................... 5

        B.   Coalition claims are incompatible with historic and statutory context .......................................................... 7

   II.  The View of Section 2 That *Campos* Endorsed Raises Serious Constitutional Concerns ........................................ 10

  III. *Campos* Should Be Abandoned ............................................. 13

        A.   *Campos* has been criticized since the day it was issued ...................... 13

        B.   The Supreme Court has all but rejected *Campos*'s reasoning ............ 16

        C.   Coalition claims dilute minority votes ............................................. 17

        D.   Coalition claims create needless, resource-intensive litigation........... 19

        E.   Texas's experience demonstrates how coalition districts emphasize race-based distinctions among voters ..............................20

Conclusion ............................................................................25

Certificate of Service .............................................................26

Certificate of Compliance ......................................................26

# Table of Authorities

**Page(s)**

**Cases:**

*Abbott v. Perez,*
138 S. Ct. 2305 (2018) ........................................................ 11

*Allen v. Milligan,*
599 U.S. 1 (2023) ......................................................... 2, 11, 12

*Atascadero State Hosp. v. Scanlon,*
473 U.S. 234 (1985) ............................................................. 5

*Badillo v. City of Stockton,*
956 F.2d 884 (9th Cir. 1992) ............................................... 14

*Bartlett v. Strickland,*
556 U.S. 1 (2009) ............................................ 2, 9, 11, 13, 16, 17

*BedRoc Ltd., LLC v. United States,*
541 U.S. 176 (2004) ............................................................ 4

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023) ......................................................... 7

*Bond v. United States,*
572 U.S. 844 (2014) ............................................................ 5

*Bridgeport Coal. for Fair Representation v. City of Bridgeport,* 26 F.3d 271
(2d Cir. 1994) .............................................................. 14

*Campos v. City of Baytown,*
840 F.2d 1240 (5th Cir. 1988) .............................. 1, 2, 3, 13, 21

*Campos v. City of Baytown,*
849 F.2d 943 (5th Cir. 1988) ........... 1, 2, 3, 4, 5, 10, 12, 13, 15, 19, 20, 21

*Carcieri v. Salazar,*
555 U.S. 379 (2009) ............................................................ 4

*Chapman v. Meier,*
420 U.S. 1 (1975) .............................................................. 1

*Cipollone v. Liggett Grp., Inc.,*
505 U.S. 504 (1992) ............................................................ 5

*Concerned Citizens of Hardee Cnty. v. Hardee Cnty. Bd. of Comm'rs,*
906 F.2d 524 (11th Cir. 1990) ............................................. 14

*Conn. Nat'l Bank v. Germain*,
   503 U.S. 249 (1992) ........................................................5

*Frank v. Forest Cnty.*,
   336 F.3d 570 (7th Cir. 2003).......................................... 14

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991) ........................................................5

*Growe v. Emison*,
   507 U.S. 25 (1993) ..........................................................2

*Hall v. Virginia*,
   385 F.3d 421 (4th Cir. 2004) ................................ 10, 15, 16, 17

*Johnson v. De Grandy*,
   512 U.S. 997 (1994) ................................................2, 9, 11

*LULAC v. Abbott*,
   Nos. 3:21-cv-259, 1:21-cv-1006 (W.D. Tex. Nov. 18, 2022), 2022
   WL 19826358 ............................................................4, 22

*LULAC v. Clements*,
   986 F.2d 728 (5th Cir. 1993)........................................... 18

*LULAC v. Clements*,
   999 F.2d 831 (5th Cir. 1993) (en banc) ........... 6, 7, 8, 10, 12, 14, 15, 17

*LULAC v. Midland ISD*,
   812 F.2d 1494 (5th Cir. 1987) .................................... 10, 12

*Marks v. United States*,
   430 U.S. 188 (1977) ....................................................... 16

*Marshall v. Edwards*,
   582 F.2d 927 (5th Cir. 1978)...........................................20

*Nixon v. Kent County*,
   76 F.3d 1381 (6th Cir. 1996) (en banc) ............ 6, 7, 8, 9, 11, 12, 15, 19

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006) (per curiam)........................................20

*Richmond v. J.A. Croson Co.*,
   488 U.S. 469 (1989) ....................................................... 12

*Rucho v. Common Cause*,
   139 S. Ct. 2484 (2019) ................................................... 13

*Schuette v. Coal. to Def. Affirmative Action*,
    572 U.S. 291 (2014) ...........................................................24

*Shaw v. Reno*,
    509 U.S. 630 (1993)...........................................................24

*Shelby Cnty. v. Holder*,
    570 U.S. 529 (2013).......................................................... 12

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard*
    *Coll.*, 600 U.S. 181 (2023) .............................................. 4, 8, 11, 12, 21

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ............................................2, 3, 5, 10, 14, 16, 19

*Voinovich v. Quilter*,
    507 U.S. 146 (1993) ......................................................... 5, 7

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ......................................................... 7

**Statutes:**

52 U.S.C.:
    § 10301(a) ........................................................................ 2, 9
    § 10301(b) ....................................................................... 6
    § 10303(f)(2)................................................................... 2, 8, 9

**Other Authorities:**

Angelo N. Ancheta & Kathryn K. Imahara, *Multi-Ethnic Voting Rights:
    Redefining Vote Dilution in Communities of Color*, 27 U.S.F. L. Rev.
    815 (1993) .........................................................................8

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of
    Legal Texts* (2012) ...........................................................7

Frank Newport, *Race, Ethnicity Split Democratic Vote Patterns*, Gallup
    (Jan. 31, 2008), http://tinyurl.com/Gallup2008 ....................... 18, 22

Fed. R. App. P. 29(a)(2)..............................................................1

Jens Manuel Krogstad et al., *Hispanics' views of the U.S. political
    parties*, Pew Research Center (Sept. 29, 2022),
    http://tinyurl.com/PewHispanic2022 ..........................................22

Katherine Schaeffer, *Asian voters in the U.S. tend to be Democratic, but Vietnamese American voters are an exception*, Pew Research Center (May 25, 2023), http://tinyurl.com/PewAsian2023 .......................................22

Redistricting History: 2010, Texas Redistricting, https://redistricting.capitol.texas.gov/history ..................................................4

Rick G. Strange, *Application of Voting Rights Act to Communities Containing Two or More Minority Groups-When Is the Whole Greater Than the Sum of the Parts?*, 20 Tex. Tech L. Rev. 95 (1989)..............................18

U.S. Census Bureau, *Racial and Ethnic Diversity in the United States*, http://tinyurl.com/CensusDiversity...................................................1

Weiyi Cai & Ford Fessenden, *Immigrant Neighborhoods Shifted Red as the Country Chose Blue*, New York Times (Dec. 20, 2020), http://tinyurl.com/2du4kkzz.......................................................................23

# Identity and Interest of Amicus Curiae

In 1988, this Court became the first to adopt what six of its members described as a "disturbing reading of a uniquely important statute." *Campos v. City of Baytown*, 849 F.2d 943, 944 (5th Cir. 1988) (Higginbotham, J., dissenting from denial of rehearing). Namely, that two distinct minority groups can successfully prosecute a vote-dilution claim under Section 2 of the Voting Rights Act because *together* they *might* allegedly form a cohesive voting bloc. *See Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988). That ruling has had uniquely pernicious consequences, as it has led to demands that legislators adopt—and federal courts bless—electoral districts that give an upper hand to political cohorts with no shared history of discrimination. And its continued viability presents a question in which the State of Texas has a uniquely vital interest—not just because "reapportionment is primarily the duty and responsibility of the State," *Chapman v. Meier*, 420 U.S. 1, 27 (1975), but also because Texas is home to one of the most diverse populations of any State in the country.[1] The State is authorized to file this brief by Federal Rule of Appellate Procedure 29(a)(2). No party participated in or paid for the preparation of this brief.

# Introduction

"Spurred by the Civil Rights Movement," the Voting Rights Act "created stringent new remedies for voting discrimination, attempting to forever banish the

---

[1] U.S. Census Bureau, *Racial and Ethnic Diversity in the United States*, http://tinyurl.com/CensusDiversity. All websites were last accessed January 22, 2024.

blight of racial discrimination in voting." *Allen v. Milligan*, 599 U.S. 1, 10 (2023) (citation and alteration omitted). Section 2 of the Act specifically prohibits "denial or abridgement" of the right to vote "on account of race or color" or language. 52 U.S.C. §§ 10301(a), 10303(f)(2) ("Section 2"). This provision is not a means to guarantee minorities "the maximum possible point of power" in elections. *Johnson v. De Grandy*, 512 U.S. 997, 1017 (1994). Instead, it addresses a "special wrong"— "when a minority group has 50 percent or more of the voting population and could constitute a compact voting majority but, despite racially polarized bloc voting, that group is not put into a district." *Bartlett v. Strickland*, 556 U.S. 1, 19 (2009) (plurality op.).

"[I]n an unbroken line of decisions stretching four decades," *Allen*, 599 U.S. at 38, the Supreme Court has examined compliance with this mandate under the multi-factor test first announced in *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986). But that Court has consistently stopped short of allowing people of different races, ethnicities, or languages to insist that their *collective* vote is being diluted. *Bartlett*, 556 U.S. at 19; *Growe v. Emison*, 507 U.S. 25, 40-41 (1993). Acting in the immediate aftermath of *Gingles*, this Court has not been so cautious. *Campos*, 840 F.2d at 1241. "[C]it[ing] no authority and offer[ing] no reasoning to support its fiat," the *Campos* decision held that "'nothing in the law . . . prevents . . . plaintiffs from identifying [a] protected aggrieved minority to include both Blacks and Hispanics.'" 849 F.2d at 944-45 (Higginbotham, J., dissenting from denial of rehearing) (quoting panel opinion).

As Judge Higginbotham explained over thirty years ago, *Campos* reached the wrong result because it "ask[ed] the wrong question." *Id.* at 945. "A statutory claim cannot find its support in the absence of prohibitions," so the operative question was not whether Section 2 "intended to *prohibit* such coalitions" but whether Congress acted to "*protect* those coalitions." *Id.* The plain text of Section 2, history, precedent, and the canon of constitutional avoidance provide one resounding answer: No. The text of the Voting Rights Act, as interpreted by *Gingles*, aims to protect the collective voting power of a cohesive class of voters with a shared history of discrimination. Yet under *Campos*, a plaintiff minority group need not belong to any class as that term would ordinarily be understood by members of a legislative body. And as for cohesion, all that is required is that plaintiffs can define a coalition of minorities whose political interests might—however briefly—align to elect a candidate of their mutual choice. 840 F.2d at 1244-45. Rather than reducing discrimination because of race or language, this interpretation of Section 2 permits coalitions that rely on the very stereotypes and encourage the very same race-based decision-making that Section 2 was enacted to eradicate.

That has been the effect of coalition claims in Texas. Texas redistricting litigation is notoriously complicated as plaintiffs embroil the courts in deciding which minorities should be grouped or split, and when and to what extent. For example, litigation regarding the 2010 redistricting cycle did not finally end until September

2019[2]—just in time for the next redistricting cycle to begin. And, in this most recent cycle, the State is facing claims that (among others) Senate District 10 ("SD 10") should be redrawn based on a proposed coalition of African Americans, Hispanics, *and* Asians—a would-be bloc whose primary claim to cohesion is shared presidential preferences in the 2016 and 2020 elections. *See* Plaintiff Texas NAACP's Second Am. Compl. for Declaratory & Injunctive Relief ¶¶ 257-58, 276-77, *LULAC v. Abbott*, Nos. 3:21-cv-259, 1:21-cv-1006 (W.D. Tex. Nov. 18, 2022), 2022 WL 19826358. Neither state actors nor federal courts have any business making such blatantly race-based decisions: After all, "[e]liminating racial discrimination means eliminating all of it." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* (*SFFA*), 600 U.S. 181, 206 (2023).

The en banc Court should correct Circuit precedent and overrule *Campos*.

## Argument

Because the requirements of Section 2 present a question of statutory interpretation, the Court "must first determine whether the statutory text is plain and unambiguous." *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009). If it is, the inquiry "ends there." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (plurality op.). The Court "must apply the statute according to its terms." *Carcieri*, 555 U.S. at 287. In calling for en banc review, the panel correctly recognized that "[t]he text of Section 2 does not support the conclusion that distinct minority groups may be

---

[2] Redistricting History: 2010, Texas Redistricting, https://redistricting.capitol. texas.gov/history.

aggregated for purposes of vote-dilution claims." Panel Op. 3. But even if that were not enough, principles of constitutional avoidance and thirty years of history also counsel in favor of jettisoning *Campos*'s widely criticized rule.

## I. *Campos* Was Flawed Statutory Interpretation.

### A. The plain text of Section 2(b) protects the ability of a minority to elect its preferred candidate, not a coalition of minorities.

The Supreme Court has repeatedly reaffirmed that "[t]he preeminent canon of statutory interpretation requires us to 'presume that the legislature says in a statute what it means and means in a statute what it says.'" *Id*. (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (alteration omitted)). This principle is even more imperative when "federal law overrides the usual constitutional balance of federal and state powers," *Bond v. United States*, 572 U.S. 844, 858 (2014) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)), or abuts the limits of Congress's constitutional authority, *e.g.*, *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 546 (1992) (Scalia, J., concurring). Although Section 2 indisputably places limits on the States' traditional power to set electoral lines, nothing in its text makes it "unmistakably clear" that Congress intended to compel the creation of coalition districts. *Gregory*, 501 U.S. at 460 (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)).

Although Section 2 has been amended on numerous occasions over the last 50 years, its mandate remains the same: to "prohibit[] any practice or procedure that, 'interact[ing] with social and historical conditions,' impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters." *Voinovich v. Quilter*, 507 U.S. 146, 153 (1993) (quoting *Gingles*, 478 U.S. at 47). A "violation"

of this mandate "is established if, based on the totality of circumstances," a voting process is "not equally open to participation by members of *a class* of citizens protected by subsection (a) in that *its members* have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b) (emphasis added).

By homing in on the ability of the members of *a* protected class—rather than a coalition of protected class*es*—to elect a preferred candidate, Congress limited the circumstances in which a violation can be deemed established to those in which a particular protected group is denied the opportunity to form a majority. The failure to create a district in which two or more classes could band together to elect their preferred candidate does not suffice. "[T]he central element necessary to establish a violation is a showing that '*its* members have less opportunity than other members of the electorate' . . . not that '*their* members have less opportunity." *Nixon v. Kent County*, 76 F.3d 1381, 1386 (6th Cir. 1996) (en banc) (quoting and adding emphasis to Section 2). As Judge Jones observed, Congress could have "chosen explicitly to protect minority coalitions . . . by defining the 'results' test [of subsection (b)] in terms of protected *classes* of citizens." *LULAC v. Clements*, 999 F.2d 831, 894 (5th Cir. 1993) (en banc) (Jones, J., concurring). But "[i]t did not." *Id.*

This conclusion is further underscored by Congress's declaration that "[t]he extent to which members of *a protected class* have been elected" is "one circumstance that may be considered." 52 U.S.C. § 10301(b) (emphasis added). "[I]f Congress had intended to authorize coalition suits, the phrase would more naturally read: '[t]he extent to which members of the *protected classes* have been elected.'" *Nixon*,

76 F.3d at 1387. "According to customary legal analysis," the en banc Court should end its inquiry into Section 2's meaning with these textual observations. *Clements*, 999 F.2d at 849 (Jones, J., concurring).

## B. Coalition claims are incompatible with historic and statutory context.

There is no further need "to discuss the minority coalition theory of vote dilution because the text of the Voting Rights Act does not support it." *Nixon*, 76 F.3d at 1387. Nevertheless, the historic and statutory context of Section 2 also refutes the notion that it requires the creation of coalition districts.

"Context is a primary determinant of meaning." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012). "To strip a word from its context is to strip that word of its meaning." *Biden v. Nebraska*, 143 S. Ct. 2355, 2378 (2023) (Barrett, J., concurring); *id.* at 2378-80 (explaining that the meaning of a congressional command, like instructions given to a babysitter, depends on reasonable inferences drawn from context). A statute should therefore be read in both "its statutory and historical context." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001).

History could not be more clear: Congress enacted Section 2 to combat invidious discrimination against identified—and identifiable—minority groups, and thereby "effectuate the Fifteenth Amendment's guarantee that no citizen's right to vote shall 'be denied or abridged . . . on account of race, color, or previous condition of servitude.'" *Voinovich*, 507 U.S. at 152. At the time of its passage, Section 2 was primarily meant as "protective legislation for disenfranchised African Americans in

the deep south." *Nixon*, <u>76 F.3d at 1389</u> (citing Angelo N. Ancheta & Kathryn K. Imahara, *Multi-Ethnic Voting Rights: Redefining Vote Dilution in Communities of Color*, 27 U.S.F. L. Rev. 815, 815 & n.2 (1993)). It has since been expanded to include language minorities as well as persons of Spanish, American Indian, Asian, and Alaskan dissent. *Clements*, <u>999 F.2d at 894</u> (Jones, J., concurring). The American experience of disparate minority groups is far from identical. *SFFA*, <u>600 U.S. at 292</u> (Gorsuch, J., concurring) (warning that the "agglomeration" of different racial groups into a single category requires "pav[ing] over countless differences in 'language,' 'culture,' and historical experience" (citation omitted)); *infra* pp. 21-24. But each expansion of Section 2's reach has involved specific groups that Congress determined are entitled to special protection from disenfranchisement based on past discrimination. *Nixon*, <u>76 F.3d at 1390</u>. The coalitions of such groups created by plaintiffs for purposes of an election year or litigation, however, are accompanied by no such congressional finding of past discrimination.

The statutory context of Section 2's mandate similarly underscores the point. Subsection (a), which identifies the wrong that subsection (b) is meant to right, provides:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote *on account of* race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

52 U.S.C. § 10301(a) (emphasis added). Section 10303(f)(2) states: "No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote *because* he is a *member of a language minority group*." (emphasis added). Taken together, these provisions show that "[t]he Act protects a citizen's right to vote from infringement because of, or 'on account of,' that *individual's* race or color or membership in a protected language minority." *Nixon*, 76 F.3d at 1386. Any reading of subsection (b) that establishes a violation where such discrimination cannot be inferred on those bases is therefore suspect as a textual matter.

The failure of a legislature to draw a district favoring a coalition of protected racial minority or language groups does not support an inference of invidious discrimination. Where an election district could be drawn in which a class of protected minority voters could form a majority, a legislature's failure to draw that district is said to constitute a "discernible wrong that is not subject to [a] high degree of speculation and prediction." *Bartlett*, 556 U.S. at 18-19. By contrast, where no one protected group could make up a majority of the voting population in any district, all that can be said—absent "allegations of intentional and wrongful conduct"—is that the protected groups have "the same opportunity to elect their candidate as any other political group with the same relative voting strength." *Id*. at 20. And "minority voters are not immune from the obligation to pull, haul, and trade to find common political ground." *De Grandy*, 512 U.S. at 1020.

As members of this Court have previously explained, coalition claims make a hopeless muddle of the first *Gingles* condition because they "risk[] that ephemeral political alliances having little or no necessary connection to discrimination" on the grounds specified by Congress "will be confused with cohesive political units joined by a common disability of chronic bigotry." *LULAC v. Midland ISD*, <u>812 F.2d 1494, 1504</u> (5th Cir. 1987) (Higginbotham, J., dissenting). "A group tied by overlapping political agendas but not tied by the same statutory disability is," after all, "no more than a political alliance or coalition." *Campos*, <u>849 F.2d at 945</u> (Higginbotham, J., dissenting from denial of rehearing). And "the remedy afforded to the coalition may easily cross the line from protecting minorities against racial discrimination to the prohibited, and possibly unconstitutional, goal of mandating proportional representation." *Clements*, <u>999 F.2d at 896</u> (Jones, J., concurring).

Because a court may not "transform the Voting Rights Act from a law that removes disadvantages based on race, into one that creates advantages for political coalitions that are not so defined," the text and context of Section 2 preclude the plaintiffs here from proceeding on a coalition claim. *Hall v. Virginia*, <u>385 F.3d 421, 431</u> (4th Cir. 2004).

## II. The View of Section 2 That *Campos* Endorsed Raises Serious Constitutional Concerns.

Because Section 2 unambiguously limits its protection to distinct, identified minority groups, further analysis is unnecessary. But to the extent the Court considers the text ambiguous, the "serious constitutional concerns" that would result from a rule broadening Section 2's protection to coalition groups counsel

exercising greater caution here. *Bartlett*, <u>556 U.S. at 21</u>. Coalition suits raise at least two serious constitutional concerns, one going to the power of Congress to enact Section 2 as envisioned by the plaintiffs, the other going to the power of the courts to adjudicate their claims.

*First*, Section 2 is already at or outside the outer bounds of when the Constitution permits Congress—or a State—to legislate based on race. The Supreme Court "ha[s] time and again forcefully rejected the notion that government actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'" *SFFA*, <u>600 U.S. at 220</u>. But that is precisely what Section 2 encourages: In the name of protecting the ability of minority voters to act collectively, "Section 2 itself 'demands consideration of race.'" *Allen*, <u>599 U.S. at 30-31</u> (quoting *Abbott v. Perez*, <u>138 S. Ct. 2305, 2315</u> (2018)). Indeed, just last year, the Supreme Court reaffirmed that "the question whether additional majority-minority districts can be drawn … involves a 'quintessentially race-conscious calculus.'" *Id.* at 31 (quoting *DeGrandy*, <u>512 U.S. at 1020</u>).

Courts have permitted Section 2 to stand where other supposedly benign race-based legislation could not because "the Voting Rights Act is premised upon congressional 'findings' that each of the protected minorities is, or has been, the subject of pervasive discrimination and exclusion from the electoral process." *Nixon*, <u>76 F.3d at 1390</u>. But they have acknowledged the "concern" that the Act "may impermissibly elevate race in the allocation of political power within the States." *Allen*, <u>599 U.S. at 41-42</u>. For good reason: "[t]he government can plainly remedy a race-based injury that it has inflicted," but the remedies it selects "must be meant

to further a colorblind government, not perpetuate racial consciousness." *SFFA*, 600 U.S. at 249 (Thomas, J., concurring) (citing *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 505 (1989)). Moreover, because the Act "imposes current burdens," it must be "justified by current needs." *Shelby County v. Holder*, 570 U.S. 529, 536 (2013). The congressional findings underlying traditional Section 2 claims have not been revisited since 1982, leaving an open question whether "the authority to conduct race-based redistricting [can] extend indefinitely into the future." *Allen*, 599 U.S. at 45 (Kavanaugh, J., concurring) (reserving the issue).

Coalition claims exacerbate the constitutional concerns inherent in Section 2 because "[a] coalition of protected minorities is a group of citizens about which Congress has not made a specific finding of discrimination." *Nixon*, 76 F.3d at 1391. Given that uncertainty, this Court should eschew an interpretation of Section 2 that would go beyond even existing findings to "transform[] the Voting Rights Act from a statute that levels the playing field for all races to one that forcibly advances contrived interest-group coalitions of racial or ethnic minorities." *Clements*, 999 F.2d at 894 (Jones, J., concurring).

*Second*, in addition to raising questions about the authority of Congress, coalition districts push the outer boundaries of Article III. As Judge Higginbotham explained in 1988, coalition districts are effectively a form of partisan gerrymandering: "[i]f a minority group lacks a common race or ethnicity, cohesion must rely principally on shared values, socio-economic factors, and coalition formation." *Campos*, 849 F.2d at 945 (Higginbotham, J., dissenting from denial of rehearing) (quoting *Midland ISD*, 812 F.2d at 1504). And the "easiest and most likely alliance for a group of minority

voters is one with a political party." *Bartlett*, <u>556 U.S. at 22</u>. Since *Campos*, the Supreme Court has unequivocally held that, when pleaded as a separate claim, partisan gerrymandering presents a nonjusticiable political question. *Rucho v. Common Cause*, <u>139 S. Ct. 2484, 2506-07</u> (2019). Thus, by asserting that Section 2 protects coalition districts, the plaintiffs ask this Court to arrogate to itself a power the Constitution does not provide. The Court should decline that invitation.

## III. *Campos* Should Be Abandoned.

### A. *Campos* has been criticized since the day it was issued.

**1.** *Campos* proceeded on the theory that "[t]here is nothing in the law that prevents the plaintiffs from identifying the protected aggrieved minority to include both blacks and Hispanics," <u>840 F.2d at 1244</u>, and that "[t]he key is the minority group as a whole," *id.* at 1245. But, as Judge Higginbotham aptly put it, a statutory claim for affirmative relief "cannot find its support in the *absence* of prohibitions," *Campos*, <u>849 F.2d at 945</u> (Higginbotham, J., dissenting from denial of rehearing) (emphasis added), particularly when the claim seeks to "[p]lay[] with the structure of local government in an effort to channel political factions," *id.*

Multiple members of this Court have also warned that coalition claims might actually "*limit* the protections of the Voting Rights Act" by disqualifying from Section 2 relief the very groups it is meant to protect. *Id.* For example, in a statutory scheme allowing for coalition claims, a group of Hispanics may be unable to prove that other Hispanic voters were improperly excluded from their district if sufficient African Americans were included to bring the total potential minority-coalition

population above 50%. In other words, "the availability of a minority coalition theory could be a defense against an attack on an at-large system." *Clements*, 999 F.2d at 896 (Jones, J., concurring). Where two or more protected groups "comprise more than half of a voting population in a plausible single-member district," a legislature could use the group's "'cohesion' . . . as a device to 'pack' the minorities together." *Id*.

All of this causes "enormous" complications for the federal courts. *Id*. After all, "the problem of determining minority political cohesiveness under *Gingles* may be difficult even when the claims of one minority group are at issue." *Id*. But in "our increasingly multi-ethnic society," courts would have to be ever more vigilant to avoid being entangled in policymaking they are ill-suited to handle. *Id*. If a court permits "minority aggregation on too insubstantial a basis," it might "effectively submerge[] members of one group in a district controlled by the other group," which might have "radically different cultural and language backgrounds, socioeconomic characteristics and experiences of discrimination." *Id*. at 896-97.

**2.**   Perhaps unsurprisingly, though some of this Court's sister circuits have assumed that coalition claims are cognizable,[3] the two that have directly confronted

---

[3] *See Bridgeport Coal. for Fair Representation v. City of Bridgeport*, 26 F.3d 271 (2d Cir.), *cert. granted, judgment vacated on other grounds*, 512 U.S. 1283 (1994); *Badillo v. City of Stockton*, 956 F.2d 884, 891 (9th Cir. 1992); *Concerned Citizens of Hardee Cnty. v. Hardee Cnty. Bd. of Comm'rs*, 906 F.2d 524, 527 (11th Cir. 1990); *see also Frank v. Forest County*, 336 F.3d 570, 575 (7th Cir. 2003) (noting the "problematic character" of coalition claims).

the issue have declined to follow *Campos* based on the text and purpose of the Voting Rights Act.

*First*, the en banc Sixth Circuit rejected coalition claims in *Nixon v. Kent County*, concluding that "[e]ven the most cursory examination reveals that § 2 of the Voting Rights Act does not mention minority coalitions, either expressly or conceptually." 76 F.3d at 1386. Instead, the court explained, the text of Section 2 "consistently speaks of a 'class' in the singular" and "protects a citizen's right to vote from infringement because of, or 'on account of,' that *individual's* race or color or membership in a protected language minority." *Id*. Moreover, subsection (b), which describes the proof necessary to establish a violation, requires a showing "that the political processes . . . are not equally open to participation by members of *a class* of citizens protected by subsection (a)." *Id*. at 1385. The *Nixon* court further noted potential practical and constitutional problems with interpreting Section 2 to include coalition claims, which "provide minority groups with a political advantage not recognized by our form of government, and not authorized by the constitutional and statutory underpinnings of that structure." *Id*. at 1392; *see also id*. at 1391-92 (expounding on the administrability concerns articulated by Judge Jones in *Clements*, 999 F.2d at 896 (Jones, J., concurring)).

*Second*, although it arrived by a different road, the Fourth Circuit rejected multiracial claims as completely divorced from Section 2's purpose of combating invidious discrimination. *See Hall*, 385 F.3d at 430. The *Hall* court explained that "[a]ny claim that the voting strength of a minority group has been 'diluted' must be measured against some reasonable benchmark of 'undiluted' minority voting

strength," such as "[t]he electoral ability of [the] group concentrated within a hypothetical single-member district." *Id*. at 428-29. A baseline that instead established vote dilution based on the possibility that group could form political alliances with other groups "would transform the Voting Rights Act from a law that removes disadvantages based on race, into one that creates advantages for political coalitions that are not so defined." *Id*. at 431.

### B.   The Supreme Court has all but rejected *Campos*'s reasoning.

A controlling plurality of the United States Supreme Court all but repudiated coalition claims in *Bartlett v. Strickland*.[4] That case addressed the analytically distinct question whether Section 2 requires the creation of crossover districts, namely a district in which minority voters must ally with voters from the white majority (as opposed to another minority) to elect their candidate of choice. <u>556 U.S. at 13</u>. In holding that Section 2 did *not* require the creation of such crossover districts, the plurality explained that the "case turn[ed] on whether the first *Gingles* requirement can be satisfied when the minority group makes up less than 50 percent of the voting-age population in the potential election district." *Id*. at 12. And it held that when a minority group cannot form a majority, that group has "no better or

---

[4] Justice Kennedy's opinion is the controlling opinion in *Bartlett* under *Marks v. United States*, <u>430 U.S. 188, 193</u> (1977), because it is narrower than Justice Thomas's concurrence, which would have held that "[t]he text of §2 of the Voting Rights Act of 1965 does not authorize *any* vote dilution claim, regardless of the size of the minority population in a given district." *Bartlett*, <u>556 U.S. at 26</u> (Thomas, J., concurring in the judgment) (emphasis added).

worse opportunity to elect a candidate than does any other group of voters with the same relative voting strength." *Id*. at 14.

Although the Court opted to leave the issue of coalition claims for another day, *id*. at 13-14, the plurality's reasoning for rejecting crossover claims applies just the same to coalition claims. The plurality explained, for example, that because members of the protected class formed less than a majority, they had the same opportunity to elect their preferred candidate as anyone else. That is, they must "join other voters—including other racial minorities, or whites, or both—to reach a majority and elect their preferred candidate." *Id*. at 14. The plurality favorably cited the Fourth Circuit's decision in *Hall* for the proposition that "[r]ecognizing a § 2 claim" when a particular minority group's voters "cannot … elect [their preferred] candidate based on their own votes and without assistance from others" would "grant minority voters 'a right to preserve their strength for the purposes of forging an advantageous political alliance'"—which is a "special protection" that has nothing to do with Section 2. *Id*. at 14-15 (quoting *Hall*, 385 F.3d at 431).

## C.  Coalition claims dilute minority votes.

*Bartlett* also explained that the concerns of *Campos*'s detractors are well-founded because there is "a difference between a racial minority group's 'own choice' and the choice made by a coalition." 556 U.S. at 15. And because minority coalitions necessarily promote the interests of the coalition above those of any individual minority group, Section 2 no longer "levels the playing field for all races"; instead, it becomes a tool "that forcibly advances contrived interest-group coalitions of racial or ethnic minorities," *Clements*, 999 F.2d at 894 (Jones, J., concurring),

which has the effect of limiting the influence of individual groups within the coalition.

In a study of minority-coalition claims, one commentator gave the following example:

> [A]ssume a town of 1,200 which is governed by a six-member council. The town is composed of 90 Blacks and 370 Mexican-Americans. Together, the minority citizens could conceivably control three of the six districts. Assume however, that this could only be done if the Black community is evenly split between two districts, and that otherwise minorities could only control two seats. The dilemma therefore becomes whether to keep the Black community intact, at the possible cost of a lost safe seat, or to maximize minority voting power.

*see* Rick G. Strange, *Application of Voting Rights Act to Communities Containing Two or More Minority Groups-When Is the Whole Greater Than the Sum of the Parts?*, 20 Tex. Tech L. Rev. 95, at 124 & n.195-97 (1989). The very act of combining disparate races into one voting bloc entails prioritizing the interests of a coalition of minorities over those of disparate minority groups—even though Black and Hispanic voters may prefer different candidates from the same political party. Frank Newport, *Race, Ethnicity Split Democratic Vote Patterns*, Gallup (Jan. 31, 2008), http://tinyurl.com/Gallup2008. Thus, minority coalitions increase the risk that "members of one of the minority groups will increase their opportunity to participate in the political process at the expense of members of the other minority group." *LULAC v. Clements*, 986 F.2d 728, 785 n.43 (5th Cir. 1993).

As noted above, *see supra* pp. 13-14, governmental bodies can also point to minority coalitions as a defense to claims that they have diluted the votes of a single

minority group. A legislator could "pack" minorities into one district and provide evidence that this district is a minority coalition district and thus satisfies Section 2. *Nixon*, <u>76 F.3d at 1391</u> (citing *Campos*, <u>849 F.2d at 946</u> (Higginbotham, J., dissenting from denial of rehearing)). But that process submerges the interests of the individual groups in circumstances where they do not join their votes. *See id*. It also threatens vote dilution when particular minorities are at odds with the minority coalition.

### D. Coalition claims create needless, resource-intensive litigation.

The complications arising from minority-coalition claims will also engender increased litigation. The tension between separate minorities and minority coalitions will force courts to step in and mediate between them. That is, as the *Nixon* court explained, "[i]f district lines are drawn pursuant to a plan to enhance the political impact of minorities separately, the plan faces potential challenge by a coalition of minorities claiming that greater influence could have been achieved had the minorities been 'lumped' together." *Id*. But if "the lines are drawn to accommodate all minorities together, the plan faces potential challenge by an individual minority group on the ground that its influence could have been enhanced had it been treated separately." *Id*. The end result is a "puzzle which is impossible to solve," and one which forces "courts and legislatures . . . to 'choose' between protected groups when drawing district lines." *Id*.

In addition, the number of potential plaintiffs would increase exponentially because any district could be challenged not simply by the minority group with the greatest chance of satisfying the traditional *Gingles* test, but any minority group that

believes it could have formed a coalition of minorities but for the way the districts were drawn by the legislature. *See* Strange, *supra*, at 113.

Other than lawyers, few benefit from this type of litigation. It is beyond peradventure that "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy," which is undermined by "[c]ourt orders affecting elections," which "can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam). Moreover, "[t]he least representative branch must take care when it reforms the most representative branch" lest it undermine the faith of the public in the courts themselves. Strange, *supra*, at 125 & n.202 (quoting *Marshall v. Edwards*, 582 F.2d 927, 934 (5th Cir. 1978)). The more that federal courts insert themselves into insoluble policy debates regarding which racial groups have the most in common, the greater those risks become—particularly when the exercise is undertaken without explicit authorization from Congress. *Supra* Part I.

### E. Texas's experience demonstrates how coalition districts emphasize race-based distinctions among voters.

Experience demonstrates that these are not idle concerns. By aligning voters with differing racial and ethnic backgrounds—as well as different experiences of past and present-day discrimination—the *Campos* standard elides non-racial distinctions in favor of race-based stereotypes. Take, for example, the NAACP's ongoing litigation regarding Texas's failure to maintain a putative coalition among African Americans, Hispanics, *and* Asians in SD 10 in Tarrant County. *See* Plaintiff Texas

NAACP's Second Am. Compl. for Declaratory & Injunctive Relief, *supra*. Making predictions about how any one of those three groups would vote involves racial stereotyping.

True, *Campos* requires coalition plaintiffs to prove that "the minority group together votes in a cohesive manner for the minority candidate." *Campos*, <u>840 F.2d at 1245</u>. But that is hardly an antidote to racial stereotyping. The SD 10 plaintiffs claim that they are cohesive largely based on their agreement in the 2016 and 2020 presidential elections. *See* Plaintiff Texas NAACP's Second Am. Compl. for Declaratory & Injunctive Relief, *supra*, at ¶¶ 257-58, 276-77. Yet the fact that the SD 10 coalition, which is made up of groups with vastly different cultural, linguistic, religious, and economic backgrounds, twice coalesced around a presidential candidate is precious little reason to presume they will agree in the future—and it certainly does not justify binding their political fortunes in a voting district.

In most other areas of law, it would be impermissible to assume that members of *any* racial, ethnic, or language minority always have interests that align with one another and that differ from their white neighbors. After all, "[t]he entire point of the Equal Protection Clause is that treating someone differently because of their skin color is not like treating them differently because they are from a city or from a suburb, or because they play the violin poorly or well." *SFFA*, <u>600 U.S. at 220</u>. Racial assumptions further "stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution." *Id.* at 221 (quoting *Miller*, <u>515 U.S. at 912</u>).

Whatever the situation in 1965, modern demographic data reflects that it is no safer to lump together all members of a race for purposes of evaluating voting under the Fifteenth Amendment (or Voting Rights Act) than it is to do so for any of these other purposes. For example, although "Hispanics generally have more positive attitudes toward the Democratic Party than the Republican Party," within that group there are fairly sharp differences across religions and countries of origin. Jens Manuel Krogstad et al., *Hispanics' views of the U.S. political parties*, Pew Research Center (Sept. 29, 2022), http://tinyurl.com/PewHispanic2022. So too with Asian Americans. Katherine Schaeffer, *Asian voters in the U.S. tend to be Democratic, but Vietnamese American voters are an exception*, Pew Research Center (May 25, 2023), http://tinyurl.com/PewAsian2023. Even when racial groups share a political party and will ultimately vote together in the general election, they may prefer different primary candidates. A 2008 study showed that black Democrats preferred Barack Obama to Hilary Clinton, while Clinton was preferred by Hispanic voters by a margin of almost 30 points. Newport, *supra*, http://tinyurl.com/Gallup2008.

These differences are playing out in Texas elections. The Texas NAACP alleges that, per the 2020 census, 95% of Texas's growth over the past 10 years has been from communities of color, and that "Texas's 3,999,944 new residents were almost all Black, Hispanic, and Asian." Second Amended Complaint ¶ 2, *LULAC v. Abbott, et al.*, Nos. 3:21-cv-259, 1:21-cv-1006 (W.D.T.X. Nov. 18, 2022), 2022 WL 19826358. But while pundits have for years heralded a change in political fortunes to coincide with this demographic shift, the reality has been more complicated. "The long-anticipated purpling of Republican Texas that was supposed to come as more

Latinos joined the electorate was certainly nowhere in evidence on Election Day" in 2020, for example. Weiyi Cai & Ford Fessenden, *Immigrant Neighborhoods Shifted Red as the Country Chose Blue*, New York Times (Dec. 20, 2020), http://tinyurl.com/2du4kkzz. Indeed, one of the most remarked-upon aspects of the 2020 election was the swing of Hispanic voters toward the Republican Party. *Id.* "Across Texas, the red shifts were most pronounced in precincts with the highest proportion of Latinos." *Id.* And heavily Hispanic districts along the southern border gave Donald Trump his second-most sizable gains—between ten and thirty points—compared to the 2016 election, as illustrated by the New York Times figure below.



*Id.*

The Supreme Court has long rejected the assumption that "members of the same racial group—regardless of their age, education, economic status, or the

community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls." *Schuette v. Coal. to Def. Affirmative Action*, 572 U.S. 291, 308 (2014) (quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993)). Coalition claims compound that fraught assumption by applying it across racial groups. And "in a society in which [racial] lines are becoming more blurred, the attempt to define race-based categories also raises serious questions of its own." *Id.* Rather than identifying targets of past and present discrimination and ensuring those specific groups' votes are protected in response, "[g]overnment action that classifies individuals on the basis of race is inherently suspect and carries the danger of perpetuating the very racial divisions the polity seeks to transcend." *Id.*

## Conclusion

The Court should overrule *Campos* and reverse the judgment below.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Aaron L. Nielson
Solicitor General

/s/ Lanora C. Pettit
Lanora C. Pettit
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

J. Andrew Mackenzie
Assistant Attorney General

Counsel for Amicus Curiae the State
of Texas

## Certificate of Service

On January 22, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Lanora C. Pettit
Lanora C. Pettit

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,278 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Lanora C. Pettit
Lanora C. Pettit