No. 23-40582

# In the United States Court of Appeals for the Fifth Circuit

HONORABLE TERRY PETTEWAY; HONORABLE DERRICK ROSE; HONORABLE PENNY POPE,

*Plaintiffs-Appellees,*

*v.*

GALVESTON COUNTY; MARK HENRY, *in his official capacity as Galveston County Judge*; DWIGHT D. SULLIVAN, *in his official capacity as Galveston County Clerk*,

*Defendants-Appellants.*

———

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GALVESTON COUNTY, TEXAS; GALVESTON COUNTY COMMISSIONERS COURT; MARK HENRY, *in his official capacity as Galveston County Judge*,

*Defendants-Appellants.*

———

DICKINSON BAY AREA BRANCH NAACP; GALVESTON BRANCH NAACP; MAINLAND BRANCH NAACP; GALVESTON LULAC COUNCIL 151; EDNA COURVILLE; JOE A. COMPIAN; LEON PHILLIPS,

*Plaintiffs-Appellees,*

*v.*

GALVESTON COUNTY, TEXAS; MARK HENRY, *in his official capacity as Galveston County Judge*; DWIGHT D. SULLIVAN, *in his official capacity as Galveston County Clerk*,

*Defendants-Appellants.*

———

On Appeal from the United States District Court
for the Southern District of Texas, Galveston Division

———

**BRIEF OF AMICI CURIAE
NATIONAL REPUBLICAN REDISTRICTING TRUST AND
HONEST ELECTIONS PROJECT IN SUPPORT OF APPELLANTS**

———

*Counsel Listed on Inside Cover*

Kyle D. Hawkins
 *Counsel of Record*
Matthew H. Frederick
William T. Thompson
Lehotsky Keller Cohn LLP
408 W. 11st Street, 5th Floor
Austin, TX 78701
(512) 693-8350
kyle@lkcfirm.com

*Counsel for Amici Curiae*

## Supplemental Statement of Interested Parties

No. 23-40582
Honorable Terry Petteway; Honorable Derrick Rose;
Honorable Penny Pope,
*Plaintiffs-Appellees*,
*v.*
Galveston County; Mark Henry, *in his official capacity as Galveston County Judge*; Dwight D. Sullivan, *in his official capacity as Galveston County Clerk*,
*Defendants-Appellants*.

The undersigned counsel of record certifies that in addition to those listed in the parties' briefs, the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification of recusal.

**Amici Curiae:**

National Republican Redistricting Trust
Honest Elections Project

**Counsel for Amici Curiae:**

Kyle D. Hawkins
Matthew H. Frederick
William T. Thompson
Lehotsky Keller Cohn LLP

**Plaintiffs-Appellees:**

Terry Petteway
Derrick Rose
Penny Pope
Dickinson Bay Area Branch NAACP
Mainland Branch NAACP
LULAC Counsel 151
Edna Courville
Joe A. Compian
Leon Phillips

**Counsel for Plaintiffs-Appellees:**

Mark P. Gaber
Valencia Richardson
Simone Leeper
Alexandra Copper
Campaign Legal Center
Bernadette Samson Reyes
Sonni Watnin
UCLA Voting Rights Project
Chad W. Dunn
Brazil & Dunn
Neil G. Baron
Law Office of Neil G. Baron
Adrianne M. Spoto
Hilary Harris Klein
Southern Coalition for Social Justice
Andrew Silberstein
Diana C. Vall-Llobera
JoAnna Suriani
Michelle Anne Polizzano
Molly Linda Zhu

Richard Mancino
Willkie Farr & Gallagher
Hani Mirza
Joaquin Gonzalez
Sarah Xiyi Chen
Christina Beeler
Texas Civil Rights Project
Kathryn Carr Garrett
Nickolas Anthony Spencer
Spencer & Associates PLLC
Mimi Murray Digby Marziani
Aaron E. Nathan
Stanton Jones
Elisabeth S. Theodore
Arnold & Porter Kaye Scholer, LLP

**Defendants-Appellants:**

Galveston County, Texas
The Galveston County Commissioners Court
Galveston County Judge Mark Henry
Galveston County Clerk Dwight Sullivan

**Counsel for Defendants-Appellants:**

Joseph Russo, Jr.
Andrew Mytelka
Angela Olalde
Jordan Raschke Elton
Greer, Herz & Adams, L.L.P.
Joseph M. Nixon
J. Christian Adams
Maureen Riordan
Public Interest Legal Foundation

Holtzman Vogel Baran Torchinsky & Josefiak PLLC
Dallin B. Holt
Jason B. Torchinsky
Shawn T. Sheehy

**Other Party:**

United States of America

**Counsel for United States:**

U.S. Department of Justice
Robert S. Berman
Matthew Nicholas Drecun
Ben Franklin Station
Nicolas Riley
Alamdar S. Hamdani
Kristen Clarke
Catherine Meza
Bruce I. Gear
K'Shaani Smith
Michael E. Stewart
T. Christian Herren, Jr.
Tharuni A. Jayaraman
Zachary Newkirk
Daniel David Hu

Amici curiae certify that to the best of their knowledge, no publicly traded company or corporation has an interest in the outcome of this case or appeal.

/s/ *Kyle D. Hawkins*
Kyle D. Hawkins
*Counsel of Record for Amici Curiae*

# Table of Contents

Page

Supplemental Statement of Interested Parties.....................................................i

Table of Authorities ............................................................................ vi

Identity and Interest of Amici Curiae ................................................1

Introduction and Summary of Argument ...........................................2

Argument ............................................................................................5

    I.   Section 2 of the Voting Rights Act Does Not Require the
Creation of Coalition Districts. ................................................5

        A.   The text of the VRA does not support a mandate to
create coalition districts. ...................................................6

        B.   Requiring coalition districts is inconsistent with *Gingles*
and *Bartlett*. .....................................................................13

    II.   Interpreting Section 2 to Recognize Coalition Districts
Creates Intractable Legal and Practical Problems. ............................19

        A.   *Rucho* confirms there is no clear, manageable, and
politically neutral method for evaluating coalition-
district claims. ..................................................................19

        B.   Mandating coalition districts creates constitutional
problems that section 2 should be interpreted to avoid. ............24

Conclusion..........................................................................................26

Certificate of Service ..........................................................................27

Certificate of Compliance ..................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Milligan,*
599 U.S. 1 (2023)..................................................................15, 24

*Badillo v. City of Stockton,*
956 F.2d 884 (9th Cir. 1992).............................................12

*Bartlett v. Strickland,*
556 U.S. 1 (2009)......................... 3, 14, 15, 16, 17, 18, 19, 21, 22, 23, 25

*Bond v. United States,*
572 U.S. 844 (2014)..........................................................5, 6

*Brecht v. Abrahamson,*
507 U.S. 619 (1993)............................................................12

*Campos v. City of Baytown,*
840 F.2d 1240 (5th Cir. 1988).........................................4, 10, 11, 27

*Campos v. City of Baytown,*
849 F.2d 943 (5th Cir. 1988).............................................4, 6, 10, 11

*Concerned Citizens of Hardee Cnty. v. Hardee Cnty. Board of Comm'rs,*
906 F.2d 524 (11th Cir. 1990)...........................................11

*Ga. State Conf. of the NAACP v. Georgia,*
No. 121CV05338ELBSCJSDG, 2023 WL 7093025 (N.D. Ga. Oct. 26, 2023).................................................................11

*Georgia v. Ashcroft,*
539 U.S. 461 (2003)............................................................4, 23, 24

*Gregory v. Ashcroft,*
  501 U.S. 452 (1991)............................................................5, 6, 8

*Growe v. Emison,*
  507 U.S. 25 (1993)...................................................................14

*League of United Latin Am. Citizens, Council No. 4434 v. Clements,*
  999 F.2d 831 (5th Cir. 1993).................................8, 10, 11, 19

*League of United Latin Am. Citizens v. Perry,*
  548 U.S. 399 (2006).................................................23, 24, 25

*Nat'l Pork Producers Council v. Ross,*
  598 U.S. 356 (2023)................................................................24

*Nixon v. Kent County,*
  76 F.3d 1381 (6th Cir. 1996)..............................................9, 10

*Niz-Chavez v. Garland,*
  593 U.S. 155 (2021)..................................................................7

*Perez v. Perry,*
  565 U.S. 388 (2012)................................................................18

*Petteway v. Galveston Cnty.,*
  87 F.4th 721 (5th Cir. 2023)...............................2, 6, 12, 25

*Pope v. Cnty. of Albany,*
  687 F.3d 565 (2d Cir. 2012) ...............................................12

*Reyes v. City of Farmers Branch,*
  586 F.3d 1019 (5th Cir. 2009)...........................................16

*Rucho v. Common Cause,*
  139 S. Ct. 2484 (2019)...................... 4, 19, 20, 21, 22, 23, 24

*South Carolina v. Katzenbach,*
  383 U.S. 301 (1966).................................................................8

*Thornburg v. Gingles*,
478 U.S. 30 (1986)...................................................................3, 13, 14

*Valdespino v. Alamo Heights Indep. Sch. Dist.*,
168 F.3d 848 (5th Cir. 1999)...........................................................16

*Vieth v. Jubelirer*,
541 U.S. 267 (2004).........................................................................20

*Will v. Mich. Dep't of State Police*,
491 U.S. 58 (1989)............................................................................5

**Statutes**

1 U.S.C. § 1.........................................................................................8

42 U.S.C. § 1973b.............................................................................10

52 U.S.C. § 10301..............................................................................7

52 U.S.C. § 10303..........................................................................7, 9

52 U.S.C. § 10310..............................................................................7

Pub. L. No. 89-110, 79 Stat. 437 (Aug. 6, 1965)...............................8

Pub. L. No. 94-73, 89 Stat. 400 (Aug. 6, 1975).................................8

**Other Authorities**

Richard H. Pildes, *Is Voting-Rights Law Now at War with Itself?
Social Science and Voting Rights in the 2000s*, 80 N.C. L. Rev.
1517 (2002)................................................................................22, 23

Supp. En Banc Br. of Defendants-Appellants...................................22

Zach Stanton, *How 2020 Killed Off Democrats' Demographic Hopes*, Politico Mag. (Nov. 12, 2020), https://www.politico.com/news/magazine/2020/11/12/2020-election-analysis-democrats-future-david-shor-interview-436334 ................................................................................21

## IDENTITY AND INTEREST OF AMICI CURIAE

The National Republican Redistricting Trust, or NRRT, is the central Republican organization tasked with coordinating and collaborating with national, state, and local groups on a fifty-state congressional and state legislative redistricting effort. NRRT's mission is threefold. *First*, it aims to ensure that redistricting faithfully follows all federal constitutional and statutory mandates. Every citizen should have an equal voice, and laws must be followed in a way that protects the constitutional rights of individual voters. *Second*, NRRT believes redistricting should result in districts that are sufficiently compact and preserve communities by respecting municipal and county boundaries, avoiding the forced combination of disparate populations to the extent possible. Such districts are consistent with the principle that legislators represent individuals living within identifiable communities and not the political parties themselves. *Third*, NRRT believes redistricting should make sense to voters. Each American should be able to look at his or her district and understand why it was drawn the way it was.

The Honest Elections Project is a nonpartisan organization devoted to supporting the right of every lawful voter to participate in free and honest elections. Through public engagement, advocacy, and public-interest litigation, the Project defends the fair, reasonable measures that legislatures put in place to protect the integrity of the voting process. The Project supports

commonsense voting rules and opposes efforts to reshape elections for partisan gain.

Amici have a significant interest in this case, as it implicates the proper interpretation of federal law and the prerogative of state and local officials to draw districts consistent with federal law and the interests of the local community.

No party's counsel authored this brief in whole or in part. No party or a party's counsel contributed money that was intended to fund preparing or submitting this brief. No person—other than the amici curiae, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Plaintiffs-Appellees in this case ask the Court to mandate the imposition of so-called "coalition districts" under section 2 of the Voting Rights Act. In particular, they claim the VRA requires the Court to combine two protected classes—neither of which could form a voting majority on its own—who are expected to support the same candidates and combine their votes to win elections. To establish a duty under the VRA to create coalition districts, Plaintiffs-Appellees must point to unmistakably clear statutory language. They cannot do so. As a majority of this Court has already recognized, no clear language in the VRA requires the creation of coalition districts. *Petteway v. Galveston County*, 87 F.4th 721, 725 (5th Cir. 2023) (Oldham,

J., concurring). To the contrary, section 2's text treats black and Hispanic voters as separately protected classes, recognizing the diversity of their interests and policy considerations. Its operative language is grounded in the singular, concerning itself with "a protected class," not multiple protected classes cobbled together. The VRA's historical background and cases interpreting its text further confirm that Congress did not intend to—and in fact did not—require the creation of coalition districts.

So too does Supreme Court authority. *Thornburg v. Gingles*, <u>478 U.S. 30</u> (1986), articulated the framework for analyzing vote-dilution claims. That framework begins with a straightforward question: Is "*the* minority group" sufficiently large to constitute "a majority" in a single-member district? *Id.* at 50 (emphasis added). Coalition districts can never satisfy that *Gingles* precondition because they exist only when no protected class forms a majority.

The Supreme Court's subsequent analysis in *Bartlett v. Strickland*, <u>556 U.S. 1</u> (2009), confirms as much. Five Justices across two opinions agreed that the VRA does not require so-called "crossover districts," in which a protected class is not big enough to form a majority but may win elections if a sufficient number of white voters "cross over" to support the same candidates. *Id.* at 25-26; *see also id.* at 26 (Thomas, J. concurring). *Bartlett* reaffirmed that, for a section 2 claim to succeed, the protected class must be capable of forming a majority by itself. *Id.* at 26. The decision's logic applies with equal force any time a protected class needs the help of other voters to make a majority—including coalition districts. *Gingles* and *Bartlett* thus compel the

same conclusion as the VRA's text and history: section 2 does not require coalition districts. In particular, *Bartlett*'s reasoning thoroughly vindicates the dissent in *Campos v. City of Baytown*, <u>849 F.2d 943, 945</u> (5th Cir. 1988) (Higginbotham, J., dissenting from denial of rehearing en banc), and all but explicitly overrules the *Campos* majority, *Campos v. City of Baytown*, <u>840 F.2d 1240, 1244</u> (5th Cir. 1988).

Were that not enough, additional considerations marshal against the creation of coalition districts. Members of this Court have already recognized that coalition claims are difficult to administer if not unworkable. They further lead to inconsistent results that cannot be squared with section 2. And by unduly elevating racial considerations to override local election officials' policy judgments, they raise serious constitutional concerns under the Equal Protection Clause. The better course is to avoid these problems altogether by declaring that the VRA does not countenance coalition districts. All these problems lead inexorably to the conclusion that coalition districts implicate "a political choice," *Georgia v. Ashcroft*, <u>539 U.S. 461, 483</u> (2003), unfit for resolution by the federal judiciary. *Rucho v. Common Cause*, <u>139 S. Ct. 2484, 2500</u> (2019). The same considerations that compelled the *Rucho* Court to declare claims of partisan gerrymandering non-justiciable counsel against the judicial recognition of coalition districts.

The Court should align its precedents with the text, context, and history of the VRA, and the Supreme Court's decisions in *Bartlett* and *Rucho*. It

should reverse the decision below and hold that the VRA does not mandate the creation of coalition districts.

ARGUMENT

The Court should declare that the VRA does not require the creation of coalition districts. That result flows from the text, context, and history of the VRA, as well as the Supreme Court's decisions in *Gingles* and *Bartlett*. Furthermore, coalition districts implicate serious practical and constitutional concerns that the Court should avoid.

## I. Section 2 of the Voting Rights Act Does Not Require the Creation of Coalition Districts.

We begin with first principles. The federal "Constitution establishes a system of dual sovereignty between the States and the Federal Government" in order to ensure "a decentralized government that will be more sensitive to the diverse needs of a heterogenous society." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65, (1989) ("[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" (citation omitted)). The Supreme Court has reaffirmed repeatedly that "federal statutes that touch[] on several areas of traditional state responsibility" are subject to a "clear statement" rule. *Bond v. United States*, 572 U.S. 844, 858 (2014). That rule holds that "'it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' the 'usual constitutional balance

of federal and state power.'" *Id*. (quoting *Gregory*, <u>501 U.S. at 460</u>). As Judge Higginbotham summed up: "Playing with the structure of local government in an effort to channel political factions is a heady game; we should insist that Congress speak plainly when it would do so." *Campos*, <u>849 F.2d at 945</u> (Higginbotham, J., dissenting from denial of rehearing en banc).

That clear-statement rule sets the stage for this appeal. The question before the Court is whether Congress has declared in clear and unambiguous language an intent to "override" state sovereignty, *Gregory*, <u>501 U.S. at 461</u>, by mandating the creation of coalition districts. As a majority of this Court has already recognized, "such unambiguous language is lacking here." *Petteway*, <u>87 F.4th at 725</u> (Oldham, J., concurring). That resolves this case. So, too, does existing precedent: The Supreme Court's *Gingles* framework and *Bartlett* reasoning foreclose the creation of coalition districts.

## A. The text of the VRA does not support a mandate to create coalition districts.

The VRA does not compel governmental actors to lump together distinct protected classes. On the contrary, Congress enacted different text at different times to protect different classes for different reasons. There is no textual or historical basis for treating a combination of black voters and Hispanic voters as a single "class of citizens" under section 2.

1. Start with the text. The plaintiffs ask this Court to treat Galveston's black voters and Hispanic voters as one indistinguishable group, but the

VRA's text expressly treats them as distinct groups, and Congress included them in the VRA to address different policy concerns.

Section 2(a) addresses racial groups (such as black voters) and language-minority groups (such as Hispanic voters) in separate language, specifically distinguishing between (1) "on account of race or color" and (2) "in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b)." 52 U.S.C. § 10301(a). The "guarantees set for in section 10303(f)(2)," *id.*, prohibit discrimination "because [a citizen] is a member of a language minority group." *Id.* § 10303(f)(2). In turn, "'language minority group' means persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage." *Id.* § 10310(c)(3). If Congress intended to compel the aggregation of black voters and Hispanic voters, the VRA's text would not treat those groups separately. And nowhere does the text speak to aggregation to support a coalition-district claim.

Section 2(b)—which explains how to show a violation of section 2(a)—underscores that conclusion. Section 2(b) is framed in the *singular*: it requires a showing about "*a class* of citizens protected by subsection (a)." *Id.* § 10301(b) (emphasis added). Not *classes*. And it twice more refers "a protected class" in the singular rather than "protected classes" in the plural. *Id.*[1]

---

[1] Because Congress repeatedly used the indefinite article "a," the Dictionary Act's generic recognition that the use of a singular noun in a statute may in some contexts include the plural does not apply here. *See generally Niz-*

The text thus distinguishes between black voters and Hispanic voters, and it contemplates that a state might violate the rights of *a* class. That language does not suggest—much less clearly direct, *see Gregory*, 501 U.S. at 461—the creation of coalition districts.

2. This textual distinction between race-based claims and language-minority-based claims reflects the historical development of the VRA. As originally enacted, section 2 focused solely on discrimination "on account of race or color," not discrimination based on membership in a language-minority group. Pub. L. No. 89-110, § 2, 79 Stat. 437 (Aug. 6, 1965). That was because, in 1965, Congress confronted "the problem of racial discrimination in voting" with an understandable focus on combatting "institutions designed to deprive Negroes of the right to vote." *South Carolina v. Katzenbach*, 383 U.S. 301, 308, 311 (1966).

Not until 1975 did Congress amend the VRA to prohibit discrimination against members of specific language-minority groups: "persons of Spanish heritage; all American Indians; 'Asian Americans' including Chinese, Japanese, Korean and Filipino Americans; and Alaskan natives." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 894 (5th Cir. 1993) (en banc) (Jones, J., concurring); *see* Pub. L. No. 94-73, §§ 203, 206-07, 89 Stat. 400 (Aug. 6, 1975). Congress enacted the language-minority

---

*Chavez v. Garland*, 593 U.S. 155, 163 (2021) ("Congress's decision to use the indefinite article 'a'" refers to "a discrete, countable thing."); *cf.* 1 U.S.C. § 1.

provisions of the VRA to remedy the inability of non-English speakers to participate in elections conducted only in English. Congress explicitly found "that, where State and local officials conduct elections only in English, language minority citizens are excluded from participating in the electoral process." 52 U.S.C. § 10303(f)(1).

To combat the exclusion of non-English-speakers from elections, Congress deemed it "necessary to eliminate such discrimination by prohibiting English-only elections, and by prescribing other remedial devices." *Id.* When it came to language minority groups, Congress's focus was completely different than it had been in 1965. For example, Congress prohibited States and political subdivisions from issuing "materials or information relating to the electoral process, including ballots, only in the English language, where the Director of the Census determines that more than five per centum of the citizens of voting age residing in such State or political subdivision are members of a single language minority." *Id.* § 10303(f)(3).

Nothing about Congress's amendment to the VRA suggests it intended to lump black voters and Hispanic voters together. To the extent it is relevant, the legislative history of both the 1975 and 1982 amendments is devoid of "any reference, implicit or explicit, to the issue of aggregation." *Nixon v. Kent County*, 76 F.3d 1381, 1387 (6th Cir. 1996) (en banc). More importantly, in the one instance where Congress addressed the subject of aggregation in the text of the VRA, it rejected it. The VRA expressly states that different language-minority populations may not be aggregated to meet the VRA's

threshold for foreign-language ballots. *See id*. at 1387 n.7 (discussing [42 U.S.C. § 1973b(f)(3))](underlined).

3. Judicial opinions analyzing the text of section 2 confirm this understanding. In its 1996 decision in *Nixon*, for example, the Sixth Circuit conclusively rejected the claim that section 2 recognizes coalition districts. The court relied on multiple textual clues, including that section 2 "consistently speaks of a 'class' in the singular." *Id.* at 1386. The court concluded, "[i]f Congress had intended to sanction coalition suits, the statute would read 'participation by members of *the classes* of citizens protected by subsection (a)' or more simply, 'participation by citizens protected by subsection (a).'" *Id.*

Members of this Court who have studied section 2's text have likewise concluded Congress did not mandate coalition districts. As Judge Jones has noted previously, "[t]he 1982 amendment to [s]ection 2, which codified the 'results' test, . . . offers no textual support for a minority aggregation theory. It speaks only of a 'class of citizens' and 'a protected class.'" *Clements*, 999 F.2d at 894 (Jones, J., concurring) (quoting 42 U.S.C. § 1973(b)). And Judge Higginbotham correctly described the imposition of coalition districts as "disturbing." *Campos*, 849 F.2d at 944 (Higginbotham, J., dissenting from the denial of rehearing en banc). These analyses, like *Nixon*, properly reflect the will of Congress as reflected in section 2's text, context, and history.

By contrast, judicial decisions imposing coalition districts apply faulty reasoning—to the extent they offer any reasoning at all. This Court's decision in *Campos*, 840 F.2d at 1244, is emblematic. It concludes that section 2

requires coalition districts because "nothing in the law prevents" plaintiffs from pursuing a coalition-district theory. *Id*. That reasoning is not only wrong—section 2 does not require coalition districts for the reasons explained above—but it also turns the proper judicial inquiry on its head. Courts cannot infer from congressional silence a novel and constitutionally problematic obligation on state and local governments. *Campos* rests on the faulty premise that Congress affirmatively imposed a duty to create coalition districts by failing to expressly disclaim them. But when it comes to disturbing the balance of power between the federal government and the states and intruding upon traditional state prerogatives, Congress's failure to speak clearly means that Congress seeks to effectuate no such intrusion. *See supra* pp. 5-6; *see also Campos*, 849 F.2d at 945 (Higginbotham, J., dissenting from the denial of rehearing en banc) ("A statutory claim cannot find its support in the absence of prohibitions."); *Clements*, 999 F.2d at 894 (Jones, J., concurring) ("What Congress did not legislate, this court cannot engraft onto the statute.").[2]

---

[2] To the extent Plaintiffs rely on *Concerned Citizens of Hardee County v. Hardee County Board of Commissioners*, 906 F.2d 524, 526 (11th Cir. 1990), that case adds nothing, as its "assertion about coalition districts was dicta." *Ga. State Conf. of the NAACP v. Georgia*, No. 121CV05338ELBSCJSDG, 2023 WL 7093025, at *16 (N.D. Ga. Oct. 26, 2023) (Branch, J., concurring in part and dissenting in part). That "dicta" relied entirely on *Campos* without any independent analysis. *See Concerned Citizens of Hardee Cnty.*, 906 F.2d at 526.

Some members of this Court previously have noted that "[t]he Second and Ninth Circuits have *implicitly* allowed [coalition-district] claims to go forward," *Petteway*, 87 F.4th at 730–31 (Higginson, J., dissenting) (emphasis added), but the cited cases provide no precedential support for coalition districts. The Second Circuit rejected the plaintiffs' section 2 claims without ruling on whether coalition districts satisfy the first *Gingles* precondition. *See Pope v. Cnty. of Albany*, 687 F.3d 565, 573 n.5 (2d Cir. 2012). True, the court noted that an earlier Second Circuit panel had "identified a [s]ection 2 violation in a challenge that aggregated blacks and Hispanics, without specifically ruling that such aggregation was permissible," but it also noted that the previous opinion had been "vacated." *Id*. (italics removed). The Ninth Circuit also rejected plaintiffs' section 2 claims "without discussing whether aggregation [of black voters and Hispanic voters in a coalition district] was in fact permissible." *Id.* (describing *Badillo v. City of Stockton*, 956 F.2d 884, 890-91 (9th Cir. 1992)). Opinions that "never squarely addressed [an] issue" and "at most assumed the" answer are not precedential "by way of *stare decisis*." *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993).

* * *

In short, text, context, history, and precedent all support the County. The en banc Court should overrule its wayward decision in *Campos* and make clear that the VRA does not require coalition districts.

## B. Requiring coalition districts is inconsistent with *Gingles* and *Bartlett*.

There is yet another reason to overrule *Campos* and hold that section 2 does not require coalition districts: they cannot be squared with the Supreme Court's *Gingles* jurisprudence or its *Bartlett* reasoning. This Court should reject coalition districts for the same reasons that the Supreme Court has rejected crossover and influence districts.

In *Gingles*, the Supreme Court established three "preconditions" for a vote-dilution claim under section 2. 478 U.S. at 50. First, "*the* minority group"—singular—"must be . . . sufficiently large and geographically compact to constitute *a majority* in a single-member district." *Id.* (emphases added). Second, "*the* minority group"—again, singular—"must be able to show that *it* is politically cohesive." *Id.* at 51 (emphasis added). Third, "*the* minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* Properly understood, that test does not countenance a coalition district.

1.a. Start with the first precondition. In a challenge to multimember districts (*Gingles*' original context), the absence of the first precondition shows that "the *multi-member form* of the district cannot be responsible for minority voters' inability to elect its candidates." *Id.* at 50. If "the minority group is so small in relation to the surrounding white population that it could not constitute a majority in a single-member district, these minority voters cannot

maintain that they would have been able to elect representatives of their choice in the absence of the multimember electoral structure." *Id.* at 50 n.17. Similarly, in a challenge to the drawing of single-member districts (as in this case), the absence of the first *Gingles* precondition shows that a minority group is not able to elect its candidate of choice regardless of how the district is drawn. In other words, the first precondition is "needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Growe v. Emison*, 507 U.S. 25, 40 (1993). If that potential does not exist—that is, if a group fails to elect candidates because it is a numerical minority—"there neither has been a wrong nor can be a remedy" under section 2. *Bartlett*, 556 U.S. at 15 (plurality op.) (quoting *Growe*, 507 U.S. at 40-41).

That forecloses coalition districts because a plaintiff pursuing a coalition-district claim will never be able to satisfy the first *Gingles* precondition. He cannot establish that his protected class "has the potential to elect a representative of its own choice in some single-member district." *Growe*, 507 U.S. at 40. After all, a coalition-district claim, by definition, requires multiple minority groups "to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. It is therefore inconsistent with *Gingles*'s requirement that "*the* minority group"—in the singular—"constitute a majority." *Id.* (emphasis added).

"There is a difference between a racial minority group's 'own choice' and the choice made by a coalition." *Bartlett*, 556 U.S. at 15 (plurality op.)

(quoting *Growe*, <u>507 U.S. at 40</u>). When a class of minority voters "cannot . . . elect [their preferred] candidate based on their own votes and without assistance from others," then section 2 is not implicated because "[n]othing in § 2 grants special protection to a minority group's right to form political coalitions." *Id*. at 14-15.

To hold otherwise and recognize coalition districts would necessarily require modifying *Gingles*. *Cf. Bartlett*, <u>556 U.S. at 16</u> (plurality op.) ("Allowing crossover-district claims would require [the Supreme Court] to revise and reformulate the *Gingles* threshold inquiry that has been the baseline of [the Supreme Court's] § 2 jurisprudence."). But the Supreme Court has consistently refused to do so, *see id*., in part because "'the *Gingles* threshold inquiry . . . has been the baseline of [the Supreme Court's] § 2 jurisprudence' for nearly forty years," *Allen v. Milligan*, <u>599 U.S. 1, 26</u> (2023) (quoting *Bartlett*, <u>556 U.S. at 16</u>). Most importantly, the Supreme Court has refused "to revise and reformulate" the first *Gingles* precondition to accommodate crossover-district claims for reasons that apply with equal force to coalition-district claims. *Bartlett*, <u>556 U.S. at 16</u> (plurality op.). In light of the Supreme Court's reluctance to expand the first *Gingles* precondition, this Court should be especially chary to venture outside its confines.

b. *Gingles* provides yet another reason to avoid coalition districts: they inherently undermine the predictability *Gingles* promised.

The first *Gingles* precondition holds itself out as "a bright line test," designed to weed out cases "before it is necessary to proceed to the totality of

the circumstances test." *Valdespino v. Alamo Heights Indep. Sch. Dist.*, <u>168 F.3d 848, 852</u> (5th Cir. 1999). It can serve that purpose because the inquiry — whether a particular minority group represents a majority of a proposed district—is "an objective, numerical test." *Bartlett*, <u>556 U.S. at 18</u> (plurality op.). Properly applied, the first *Gingles* precondition does not require "any complicated statistical formulae or tests of significance that might bedazzle or bamboozle an unwary district court." *Valdespino*, <u>168 F.3d at 854</u>. That is not to say it is flawless in application, *see id*. at 853 (discussing the evidence needed "to overcome census data"), but the underlying inquiry is conceptually simple: Does a particular racial or ethnic group make up a numerical majority of the citizen voting age population in a defined geographic area? *See, e.g.*, *Reyes v. City of Farmers Branch*, <u>586 F.3d 1019, 1023</u> (5th Cir. 2009).

Coalition districts necessarily fail that bright-line test because no single group represents a majority of the proposed district. So, coalition-district claims necessarily ask courts to blur the once-bright line in the first *Gingles* precondition. *See Bartlett*, <u>556 U.S. at 15</u> (plurality op.) (recognizing "that the first *Gingles* requirement 'would have to be modified or eliminated' to allow crossover-district claims" (quoting *Voinovich v. Quilter*, <u>507 U.S. 146, 158</u> (1993)).

2. The Supreme Court's decision in *Bartlett* illustrates further why coalition districts are inconsistent with *Gingles*. There, the Court confronted the question of "whether the statute can be invoked to require state officials to draw election-district lines to allow a racial minority to join with other voters

to elect the minority's candidate of choice." <u>556 U.S. at 6</u> (plurality op.). Five Justices agreed across two separate opinions that the answer is "no." *Id*. at 6, 26; *see also id*. at 26 (Thomas, J., joined by Scalia, J., concurring in the judgment) ("The text of § 2 of the Voting Rights Act of 1965 does not authorize any vote dilution claim, regardless of the size of the minority population in a given district.").

The *Bartlett* plurality expressly recognized the tension between coalition claims and the *Gingles* framework. *Id*. at 19-21. It specifically rejected calls "for a less restrictive interpretation of the first *Gingles* requirement." *Id*. at 20. And it stated definitively: "Section 2 does not guarantee minority voters an electoral advantage." *Id*. In "crossover districts," the Court explained, "minority voters have the same opportunity to elect their candidate as any other political group with the same relative voting strength." *Id*.

The Court's analysis of crossover districts under section 2 applies with equal force to coalition-district claims. *Id*. at 16. *Bartlett* rejected the proposition that section 2 protects "the opportunity to join other voters—including other minorities, or whites, or both—to reach a majority and elect their preferred candidates." *Id*. at 14. It explained that recognizing a section 2 claim for voters unable to elect a candidate "based on their own votes and without assistance from others . . . would grant minority voters a right to preserve their strength for the purposes of forging an advantageous political alliance." *Id*. at 14-15 (quotation omitted). But section 2 does not support such a claim: "Nothing in § 2 grants special protection to a minority group's right

to form political coalitions." *Id*. at 15. *Bartlett* thus rejected the argument that "opportunity" under section 2 includes the opportunity to form a majority with other voters—whether those other voters are "other racial minorities, whites, or both." *Id*. at 14.

In light of that analysis, it is no surprise the Supreme Court has never faulted a defendant for failing to draw a coalition district. In fact, the Supreme Court has cited *Bartlett* for the proposition that section 2 does not require coalition districts. Evaluating a court-drawn remedial redistricting plan, the Court explained:

> The [district] court's order suggests that it may have intentionally drawn District 33 as a "minority coalition opportunity district" in which the court expected two different minority groups to band together to form an electoral majority. . . . If the District Court did set out to create a minority coalition district, rather than drawing a district that simply reflected population growth, it had no basis for doing so. Cf. *Bartlett v. Strickland*, <u>556 U.S. 1, 13</u>–15 (2009) (plurality opinion).

*Perez v. Perry*, <u>565 U.S. 388, 398</u>–99 (2012) (per curiam). This statement recognizes the clear implication of *Bartlett*'s logic: section 2 does not recognize coalition districts.

It follows that *Campos*, which recognized coalition districts, cannot be squared with the Supreme Court's reasoning two decades later in *Bartlett*. The Court should align its precedents with *Bartlett* and formally overrule *Campos*.

* * *

Plaintiffs-Appellees have no solution to the legal and practical problems that follow from requiring coalition districts under section 2. Instead, they ask the Court to *sub silentio* reformulate the *Gingles* framework, cast aside the predictability it sought to implement, ignore *Bartlett*, and disregard text, history, and precedent. The better course is to take *Bartlett* at its word and hold—consistent with section 2—that coalition districts are not required.

## II. Interpreting Section 2 to Recognize Coalition Districts Creates Intractable Legal and Practical Problems.

As Members of this Court have recognized previously, "[t]he difficulty of proving vote dilution on behalf of coalitions of minorities has been vividly realized in practice." *Clements*, 999 F.2d at 897 (Jones, J., concurring); *see also Bartlett*, 556 U.S. at 19 (plurality op.) (noting "many difficulties in assessing section 2 claims"). This difficulty manifests itself in at least two distinct ways. First, coalition-district claims invite the types of problems that *Rucho* instructed federal courts to avoid as incapable of clear, manageable, and politically neutral evaluation. Second, the creation of coalition districts poses serious constitutional concerns that are better avoided altogether.

### A. *Rucho* confirms there is no clear, manageable, and politically neutral method for evaluating coalition-district claims.

Coalition-district claims invite the types of problems the Supreme Court has declared beyond the purview of the federal judiciary.

1. Five years ago, in *Rucho*, the Supreme Court "conclude[d] that partisan gerrymandering claims present political questions beyond the reach of the

federal courts." <u>139 S. Ct. at 2506-07</u>. Just because a redistricting result "reasonably seems unjust . . . does not mean that the solution lies with the federal judiciary." *Id*. at 2506. After all, "'[j]udicial action must be governed by *standard*, by *rule*,' and must be 'principled, rational, and based upon reasoned distinctions' found in the Constitution or laws." *Id*. at 2507 (quoting *Vieth v. Jubelirer*, <u>541 U.S. 267, 278</u> (2004) (plurality op.)). As Justice Kennedy observed, "judicial intervention" in redistricting must be "confine[d]" by "clear, manageable, and politically neutral standards." *Vieth*, <u>541 U.S. at 307-08</u> (Kennedy, J., concurring); *see also Rucho*, <u>139 S. Ct. at 2498</u> ("clear, manageable, and politically neutral" (quotation omitted)).

*Rucho* held that partisan gerrymandering claims fail that basic requirement. Such claims inherently depend on "political judgment," which federal courts are neither "equipped" nor "authorized" to wield. *Id*. at 2499-2500. They require courts to choose among various potential redistricting criteria—but those "basic questions" "are political, not legal." *Id*. at 2500. The Court painstakingly recounted each of various proposed standards for assessing partisan gerrymandering claims, and it rejected each as unworkable. *Id*. at 2501-07. It went out of its way to disavow judicial "predict[ions]" about "how a particular districting map will perform in future elections." *Id*. at 2503. Such analyses, the Court warned, rest on "unstable ground outside judicial expertise." *Id*. at 2504.

2. Coalition-district claims present those same problems. To begin with, they require courts to ask where, in the future, different minority groups will

ally in a political coalition or split apart. But predicting future voting patterns of multiple racial groups is the sort of inherently speculative endeavor that routinely embarrasses political professionals.[3] For this reason, coalition-district claims, like crossover-district claims, require a "high degree of speculation and prediction." *Bartlett*, 556 U.S. at 19 (plurality op.). And courts cannot assess "how a particular districting map will perform in future elections." *Rucho*, 139 S. Ct. at 2503.

Coalition-districts further invite questions that no one can readily answer, and thereby "place courts in the untenable position of predicting many political variables and tying them to race-based assumptions." *Bartlett*, 556 U.S. at 17 (plurality op.). *Bartlett* presents examples in the context of crossover districts, but the same unanswerable questions apply here:

> What percentage of white voters supported minority-preferred candidates in the past? How reliable would the crossover votes be in future elections? What types of candidates have white and minority voters supported together in the past and will those trends continue?

---

[3] *See, e.g.*, Zach Stanton, *How 2020 Killed Off Democrats' Demographic Hopes*, Politico Mag. (Nov. 12, 2020), https://www.politico.com/news/magazine/2020/11/12/2020-election-analysis-democrats-future-david-shor-interview-436334 ("For years, the Democratic Party has operated under one immutable assumption: Long-term demographic trends would give the party something like a permanent majority as the country as a whole grows less white and more urban. President Donald Trump's reliance on the politics of racial resentment would only quicken the process, solidifying support for Democrats among people of color. Then came November 3, 2020. And all those assumptions now seem like total nonsense.").

Were past crossover votes based on incumbency and did that depend on race? What are the historical turnout rates among white and minority voters and will they stay the same?

*Id.*; *see also* Richard H. Pildes, *Is Voting-Rights Law Now at War with Itself? Social Science and Voting Rights in the 2000s*, 80 N.C. L. Rev. 1517, 1555 (2002) ("Exactly how large must a minority population be, for primary and general elections, to have what probability of success, before a coalitional district is required?"). *Bartlett* instructs that courts should not answer these questions: "A requirement to draw election districts on answers to these and like inquiries ought not to be inferred from the text or purpose of § 2." 556 U.S. at 17 (plurality op.); *see also Rucho*, 139 S. Ct. at 2498 ("[I]t is vital in such circumstances that the Court act only in accord with especially clear standards."). But these are the very questions that must be answered to create coalition districts.

Those same questions invite difficult questions of statistics, as the judgment below demonstrates. How would a court determine a statistically significant level of racially polarized voting across a single racial group? And even if it could figure that out, how would it determine a statistically significant level of racially polarized voting across *multiple* groups sufficient to justify a coalition claim? These are complicated questions on which well credentialed experts might disagree, as the district court recognized below. *See* Supp. En Banc Br. of Defendants-Appellants at 46-48. It is no surprise the Supreme Court has recognized the many "doubts" that have been "raised

about the competence of the federal courts to resolve those questions." *Rucho*, 139 S. Ct. at 2496.

The difficulty and unreliability only get worse from there. Courts considering coalition-district claims further have to assess whether the alleged candidates of choice represented (1) a particular minority group's "own choice," or (2) a compromise "choice made by a coalition," resulting from "the obligation to pull, haul, and trade to find common political ground." *Bartlett*, 556 U.S. at 15 (quotation omitted). Only the former could even potentially be protected. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 445 (2006) (hereinafter "*LULAC*") (plurality op.) (rejecting section 2 liability based on "the ability to influence the outcome between some candidates, none of whom is [the particular minority group's] candidate of choice").

Finally, and contrary to *Rucho*, coalition-district claims force questions of political judgments that courts are not equipped to resolve. *See* 139 S. Ct. at 2406-07. For example, when should a coalition district be created at the expense of "'safe' districts, in which it is highly likely that minority voters will be able to elect the candidate of their choice"? *Georgia*, 539 U.S. at 480. Or "should a plan that creates a relative certainty of electing one minority-preferred candidate be preferred to a plan that creates a 55% probability of two such candidates being elected?" *Pildes*, *supra*, at 1558. What if a state faces the choice of creating three coalition districts or creating one black-majority district and one Hispanic-majority district? None of these questions is fit for

the judiciary, because whether a minority group is better served by additional "coalitional districts . . . . ultimately may rest on a political choice of whether substantive or descriptive representation is preferable." *Georgia*, <u>539 U.S. at 483</u>. "No neutral legal rule guides the way" because "[t]he competing goods before [the Court] are insusceptible to resolution by reference to any juridical principle." *Nat'l Pork Producers Council v. Ross*, <u>598 U.S. 356, 381</u> (2023) (quoting *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, <u>486 U.S. 888, 897</u> (1988) (Scalia, J., concurring in judgment)).

In the end, all these questions are complex, hotly contested, and heavily litigated. To judge them "is like being asked to decide 'whether a particular line is longer than a particular rock is heavy.'" *Id.* Such political questions are best left to other branches of government. *See Rucho*, <u>139 S. Ct. at 2500</u> ("The initial difficulty in settling on a 'clear, manageable and politically neutral' test for fairness is that it is not even clear what fairness looks like in this context."). It is, after all, "a political choice." *Georgia*, <u>539 U.S. at 483</u>.

### B. Mandating coalition districts creates constitutional problems that section 2 should be interpreted to avoid.

To the extent section 2's "results" test compels governmental actors to engage in race-based decisionmaking, it stands in obvious tension with the Fourteenth Amendment's promise of equal protection and race neutrality. *See, e.g.*, *LULAC*, <u>548 U.S. at 446</u> (plurality op.). As time goes by, this tension should increasingly be resolved in favor of race neutrality. *See Allen*, <u>599 U.S. at 45</u> (Kavanaugh, J., concurring) ("[E]ven if Congress in 1982 could

constitutionally authorize race-based redistricting under § 2 for some period of time, the authority to conduct race-based redistricting cannot extend indefinitely into the future.").

Mandating coalition districts would exacerbate the constitutional problems by increasing the amount of race-based districting. Coalition-district claims are akin to influence-district claims because they rest on the theory that one minority group, though not a majority, can influence the outcome of the election by pairing with another group to support a candidate acceptable to both groups. "If § 2 were interpreted to protect this kind of influence, it would unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions." *LULAC*, 548 U.S. at 446 (plurality op.) (citing *Georgia*, 539 U.S. at 491 (Kennedy, J., concurring)). Mandating coalition districts "would result in a substantial increase in the number of mandatory districts drawn with race as 'the predominant factor motivating the legislature's decision," just as mandating crossover districts would have. *Bartlett*, 556 U.S. at 21-22 (plurality op.) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)).

As a majority of this Court has already recognized, the "plaintiffs would read § 2 to require race-based redistricting with no logical endpoint." *Petteway*, 87 F.4th at 725 (Oldham, J., concurring). The Court can and should "avoid[] serious constitutional concerns under the Equal Protection Clause" by interpreting section 2 not to require coalition districts. *Bartlett*, 556 U.S. at

<u>21</u> (plurality op.) (applying the canon of constitutional avoidance to hold section 2 does not require crossover districts).

CONCLUSION

The Court should overrule *Campos v. City of Baytown*, <u>840 F.2d 1240, 1244</u> (5th Cir. 1988), and hold that the VRA does not require coalition districts. The decision below should be reversed.

Respectfully submitted.

*/s/ Kyle D. Hawkins*
Kyle D. Hawkins
Matthew H. Frederick
William T. Thompson
LEHOTSKY KELLER COHN LLP
408 W. 11st Street, 5th Floor
Austin, TX 78701
(512) 693-8350
kyle@lehotskykeller.com

*Counsel for Amici Curiae National Republican Redistricting Trust and Honest Elections Project*

## CERTIFICATE OF SERVICE

On January 22, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ *Kyle D. Hawkins*
Kyle D. Hawkins

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,292 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

/s/ *Kyle D. Hawkins*
Kyle D. Hawkins