No. 23-40582

**United States Court of Appeals
for the Fifth Circuit**

Honorable Terry Petteway; Honorable Derrick Rose; Honorable Penny Pope,

*Plaintiffs-Appellees*

v.

Galveston County, Texas; Mark Henry, *in his official capacity as Galveston County Judge;* Dwight D. Sullivan, *in his official capacity as Galveston County Clerk*;

*Defendants-Appellants*

United States of America,

*Plaintiff-Appellee*

v.

Galveston County, Texas; Galveston County Commissioners Court; Mark Henry, *in his official capacity as Galveston County Judge*

*Defendants-Appellants*

Dickinson Bay Area Branch NAACP; Galveston Branch NAACP; Mainland Branch NAACP; Galveston LULAC Council 151; Edna Courville; Joe A. Compian; Leon Phillips,

*Plaintiffs-Appellees*

v.

Galveston County, Texas; Mark Henry, *in his official capacity as Galveston County Judge*; Dwight D. Sullivan, *in his official capacity as Galveston County Clerk*,

*Defendants-Appellants*

On appeal from the United States District Court
for the Southern District of Texas
USDC Nos. 3:22-CV-00057, 3:22-CV-00093, 3:22-CV-00117

**PETTEWAY APPELLEES' SUPPLEMENTAL EN BANC BRIEF**

| | | |
|---|---|---|
| Mark P. Gaber | Neil Baron | Chad W. Dunn |
| Valencia Richardson | Law Office of Neil G. Baron | Brazil & Dunn |
| Simone Leeper | 1010 E. Main St., Ste. A | 1900 Pearl Street |
| Alexandra Copper | League City, TX 77573 | Austin, TX 78705 |
| Campaign Legal Center | (281) 534-2748 | (512) 717-9822 |
| 1101 14th St. NW | | |
| Ste. 400 | | |
| Washington, DC 20001 | | |
| (202) 736-2200 | | |

*Counsel for* Petteway *Appellees*          *Additional Counsel on Inside Cover*

Bernadette Reyes
Sonni Waknin
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90095
(310) 400-6019

K. Scott Brazil
Brazil & Dunn
13231 Champion Forest Dr., Ste. 406
Houston, TX 77069
(281) 580-6310

*Counsel for* Petteway *Appellees*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| <u>**Appellants:**</u> | <u>**Counsel for Appellants:**</u> |
|---|---|
| Galveston County, TX | Joseph Russo, Jr. |
| Galveston County Commissioners Court | Andrew Mytelka |
| The Honorable Mark Henry | Angela Oldade |
| Galveston County Clerk Dwight Sullivan | Jordan Raschke Elton |
| | Greer, Herz & Adams, L.L.P. |
| | One Moody Plaza, 18th Floor |
| | Galveston, TX 77550 |
| | jrusso@greerherz.com |
| | amytelka@greerherz.com |
| | aolalde@greerherz.com |
| | jraschke@greerherz.com |
| | |
| | Joseph M. Nixon |
| | Maureen Riordan |
| | J. Christian Adams |
| | Public Interest Legal Foundation |
| | 107 S. West St., Ste. 700 |
| | Alexandria, VA 22314 |
| | jnixon@publicinterestlegal.org |
| | mriordan@publicinterestlegal.org |
| | jadams@publicinterestlegal.org |

Dallin B. Holt

Shawn T. Sheehy

Jason B. Torchinsky

Holtzman Vogel Baran Torchinsky &
Josefiak, PLLC

2300 N Street NW, Ste 643
Washington, DC 20037

dholt@holtzmanvogel.com

ssheehy@holtzmanvogel.com

jtorchinsky@holtzmanvogel.com

| **Appellees** | **Counsel for Appellees** |
|---|---|
| United States of America | T. Christian Herren Jr. |
| | Robert S. Berman |
| | Catherine Meza |
| | Bruce I. Gear |
| | Tharuni A. Jayaraman |
| | Zachary J. Newkirk |
| | K'Shaani Smith |
| | Nic Riley |
| | Matthew Drecun |
| | Attorneys, Voting Section |
| | Civil Rights Division |
| | U.S. Department of Justice |
| | 950 Pennsylvania Ave. NW |
| | Washington, DC 20530 |
| | catherine.meza@usdoj.gov |
| | nicolas.riley@usdoj.gov |
| | matthew.drecun@usdoj.gov |

**"Petteway" Appellees:**

Terry Petteway
Derrick Rose
Penny Pope

**Counsel for Petteway Appellees:**

Chad W. Dunn
Brazil & Dunn, LLP
1900 Pearl Street
Austin, TX 78705
chad@brazilanddunn.com

Bernadette Reyes
Sonni Waknin
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles CA 90095
bernadette@uclavrp.org
sonni@uclavrp.org

Mark P. Gaber
Simone Leeper
Valencia Richardson
Alexandra Copper
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
mgaber@campaignlegal.org
sleeper@campaignlegal.org
vrichardson@campaignlegal.org
acopper@campaignlegal.org

Neil G. Baron
Law Office of Neil G. Baron
1010 E Main Street, Ste. A
League City, TX 77573
(281) 534-2748
neil@ngbaronlaw.com

K. Scott Brazil
Brazil & Dunn
13231 Champion Forest Dr., Ste. 406
Houston, TX 77069
(281) 580-6310

**"NAACP" Appellees:**

Dickinson Bay Area Branch NAACP
Mainland Branch NAACP
LULAC Counsel 151
Edna Courville
Joe Compian
Leon Phillips

**Counsel for NAACP Appellees:**

Hilary Harris Klein
Adrianne M. Spoto
Southern Coalition for Social Justice
1415 W. Hwy 54, Suite 101
Durham, NC 27707
hilaryhklein@scsj.org
adrianne@scsj.org

Richard Mancino
Michelle Anne Polizzano
Andrew J. Silberstein
Molly Linda Zhu
Kathryn Carr Garrett
Diana C. Vall-llobera
Willkie Farr & Gallagher, LLP
787 Seventh Avenue
New York, NY 10019
rmancino@willkie.com
mpolizzano@willkie.com
asilberstein@willkie.com
mzhu@willkie.com
kgarrett@willkie.com
dvall-llobera@willkie.com

Hani Mirza

Joaquin Gonzalez
Sarah Xiyi Chen
Texas Civil Rights Project
1405 Montopolis Drive
Austin, TX 78741
hani@texascivilrightsproject.org
joaquin@texascivilrightsproject.org
schen@texascivilrightsproject.org

Nickolas Spencer
Spencer & Associates, PLLC
9100 Southwest Freeway, Suite 122
Houston, TX 77074
nas@naslegal.com

*/s/ Chad W. Dunn*
Chad W. Dunn

**STATEMENT REGARDING ORAL ARGUMENT**

Oral argument is set for the week of May 13, 2024 before the en banc Court.

*Petteway* Appellees intend to participate at oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS...........................................................i

STATEMENT REGARDING ORAL ARGUMENT.................................vi

TABLE OF AUTHORITIES..................................................................ix

STATEMENT OF ISSUES ...................................................................1

INTRODUCTION ................................................................................2

STATEMENT OF THE CASE...............................................................4

   I.      Factual Background ................................................................4

   II.     Procedural Background ...........................................................9

SUMMARY OF THE ARGUMENT ....................................................13

ARGUMENT .....................................................................................16

   I.      Coalition claims are supported by the plain text and legislative history of the Voting Rights Act....................................................................16

             A. Section 2's plain text supports coalition claims............................16

             B. Section 2's legislative history supports coalition claims ...............22

   II.     This Court's precedent correctly rejects a single-race limitation on Section 2 claims.........................................................................27

   III.   Recent Supreme Court and circuit court decisions support the viability of coalition claims......................................................................29

             A. Court precedent supports the viability of coalition claims ............29

             B. The County has contrived a circuit split on coalition claims.........33

   IV.   Coalition claims have not before and will not now yield the County's purported dire consequences ...................................................37

   V.    The district court did not err in finding *Gingles* 2 and 3 satisfied ..........42

             A. Plaintiffs properly established Black and Latino voter cohesion under *Gingles* 2 ...........................................................................42

             B. The County, not Plaintiffs, bears the burden of showing nonracial motivations behind voter behavior................................................44

   VI.   The district court's intentional discrimination findings preclude a take-nothing judgment because a ruling against Plaintiffs requires remand to resolve Plaintiffs' remaining claims .........................................45

CONCLUSION ..................................................................................47

CERTIFICATE OF COMPLIANCE......................................................49

CERTIFICATE OF SERVICE ..............................................................50

# TABLE OF AUTHORITIES

*Allen v. Milligan*, 599 U.S. 1 (2023) .................................................................11, 40

*Arkansas State Conference NAACP v. Arkansas Board of Apportionment*,
    86 F.4th 1204 (8th Cir. 2023) .....................................................................36, 37

*Badillo v. City of Stockton, California*, 956 F.2d 884 (9th Cir. 1992) ..............34, 39

*Barnhart v. Thomas*, 540 U.S. 20 (2003) ...............................................................17

*Bartlett v. Strickland*, 556 U.S. 1 (2009) (plurality op.) .................29, 30, 31, 32, 41

*Brewer v. Ham*, 876 F.2d 448 (5th Cir. 1989) .....................................................27, 33

*Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021) .............22, 30

*Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020) ..........................18, 22

*Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988) ("*Campos I*") 27, 29, 33,
    39

*Campos v. City of Baytown*, 849 F.2d 943 (5th Cir. 1988) (*"Campos II"*) .......28, 41

*Chisom v. Roemer*, 501 U.S. 380 (1991) .........................................18, 19, 22, 26, 28

*Concerned Citizens of Hardee County v. Hardee County Board of*
    *Commissioners*, 906 F.2d 524 (11th Cir. 1990) ...........................................34, 39

*Cooper v. Harris*, 137 S. Ct. 1455 (2017) .........................................................33, 46

*Frank v. Forest County*, 336 F.3d 570 (7th Cir. 2003) ................................35, 36, 39

*Growe v. Emison*, 507 U.S. 25 (1993) ....................................................................29

*Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004) ...................................................35, 36

*Houston Lawyers' Association v. Attorney General of Texas*,
    501 U.S. 419 (1991).........................................................................................30

*Huot v. City of Lowell*, 280 F. Supp. 3d 228 (D. Mass. 2017) ...............................33

*Johnson v. De Grandy*, 512 U.S. 997 (1994) ..........................................................29

*Johnson v. Hamrick*, 155 F. Supp. 2d 1355 (N.D. Ga. 2001) .................................39

*Kumar v. Frisco Independent School District*, 476 F. Supp. 3d 439
    (E.D. Tex. 2020)..............................................................................................39

*League of United Latin American Citizens, Council No. 4434 v. Clements,* 999 F.2d 831 (5th Cir. 1993) (en banc) ("*Clements*").......................27, 38, 39, 40

*League of United Latin American Citizens, Council No. 4386 v. Midland Independent School District*, 812 F.2d 1494 (5th Cir. 1987) ("*LULAC I*")........27

*League of United Latin American Citizens, Council No. 4386 v. Midland Independent School District*, 829 F.2d 546 (5th Cir. 1987) (en banc)...............27

*League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006).......30, 32

*NAACP, Spring Valley Branch v. East Ramapo Central School District,* 462 F. Supp. 3d 368 (S.D.N.Y. 2020), *aff'd sub nom. Clerveaux v. East Ramapo Central School District*, 984 F.3d 213 (2d Cir. 2021) ............34, 36

*Nixon v. Kent County*, 76 F.3d 1381 (6th Cir. 1996) (en banc).............20, 24, 34, 35

*Overton v. City of Austin*, 871 F.2d 529 (5th Cir. 1989) (per curiam) ....................27

*Perry v. Perez,* 565 U.S. 388 (2012) ..........................................................32

*Perez v. Abbott*, 274 F. Supp. 3d 624 (W.D. Tex. 2017), *reversed on other grounds, Abbott v. Perez*, 585 U.S. __, 138 S. Ct. 2305 (2018) ........................................39

*Pullman-Standard v. Swint*, 456 U.S. 273 (1982)...........................................47

*Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023) ....................................................37

*Romero v. City of Pomona*, 665 F. Supp. 853 (C.D. Cal. 1987) ..............................39

*Rowland v. California Men's Colony, Unit II Men's Advisory Council,* 506 U.S. 194 (1993)...................................................................19, 20

*Salas v. Southwest Texas Junior College District*, 964 F.2d 1542 (5th Cir. 1992) ..23

*Teague v. Attala County, Miss.*, 92 F.3d 283 (5th Cir. 1996) ............................42, 44

*Thornburg v. Gingles*, 478 U.S. 30(1986) ................................................................12

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016)....................................................45, 47

*White v. Regester*, 412 U.S. 755 (1973)...........................................................23, 29

*Whitman v. American Trucking Associations*, 531 U.S. 457 (2001)........................22

*Wilson v. Omaha Indian Tribe*, 442 U.S. 653 (1979)..............................................20

*Wright v. Rockefeller*, 376 U.S. 52 (1964) ....................................................24, 26, 30

# Rules, Statutes and Other Authorities

1 U.S.C. § 1 .................................................................................19, 22

52 U.S.C. § 10301(a) .............................................................16, 17, 18

52 U.S.C. § 10301(b) .......................................................................16

52 U.S.C. § 10303(f) ........................................................................16

52 U.S.C. § 10303(f)(3) ....................................................................24

Fed. R. Civ. P. 23 ............................................................................17

H.R. Rep. No. 94-196 (1975) ............................................................23

S. Rep. No. 94-295 (1975) ..........................................................22, 24

S. Rep. No. 97-417 (1982) ..........................................................24, 25

**STATEMENT OF ISSUES**

1.      Whether Section 2 of the Voting Rights Act imposes a single-race limitation on vote dilution claims.

2.      Whether the district court's decision to afford less weight to primary elections than to general elections in assessing the second Gingles precondition— which all parties' experts agreed it should—was not clearly erroneous and whether the district court's factual findings that race explained voting patterns in Galveston County were not clearly erroneous.

**INTRODUCTION**

Judge Jeffrey Vincent Brown presided over a two-week trial and, in a carefully reasoned 157-page opinion, observed that

> [t]his is not a typical redistricting case. What happened here was stark and jarring. The commissioners court transformed Precinct 3 from the precinct with the highest percentage of Black and Latino residents to that with the lowest percentage. The circumstances and effect of the enacted plan were mean-spirited and egregious given that there was absolutely no reason to make major changes to Precinct 3. Looking at the totality of the circumstances, it was a clear violation of §2 of the Voting Rights Act. And it must be overturned.

ROA.16029 (internal quotation marks and citation omitted). Later, the Court observed that it was "stunning how completely the county extinguished the Black and Latino communities' voice on its commissioners court during 2021's redistricting." ROA.16028.

Although the district court's Section 2 ruling rendered it unnecessary for it to formally decide Plaintiffs' intentional discrimination claim, the court's lengthy factual findings under the *Arlington Heights* intentional discrimination framework illustrate in detail why the district court found the circumstances of this case "[a]typical," "stark," "jarring," "mean-spirited," "egregious," and "stunning."

The County does not challenge these factual findings, nor could it. Instead, the County pleads this Court to impose a racial purity test on Section 2 claims, arguing that the Voting Rights Act only allows single racial minority groups to

bring Section 2 claims against jurisdictions. Then, the County challenges the district court's well-reasoned findings of political cohesion under *Gingles* II and III, and asks this Court for a take-nothing judgment despite ample findings by the district court supporting a finding of intentional discrimination and racial gerrymandering—independent claims the district court has not yet adjudicated and would require remand if the Court were not to affirm the district court's Section 2 ruling.

The County's position is untenable for several reasons. First, the County's single-race limitation on Section 2 would fly in the face of the text and purpose of the Voting Rights Act to extinguish the effects of lasting racial discrimination in voting. The County's position also ignores decades of jurisprudence, both in this circuit, the vast majority of other circuits, and the Supreme Court, which has logically interpreted Section 2 to protect all racial minority voters, whatever their skin color, and has encouraged a functional analysis of election data to determine political cohesion under *Gingles* II and III. The County's fearmongering against the consequences of minority coalition claims ignores the reality that plaintiffs have, for decades, brought minority coalition claims without any of the County's predicted consequences. This Court should reaffirm its 30-year precedent.

# STATEMENT OF THE CASE

## I.   Factual Background

In November 2021, the Galveston County's commissioners court adopted a redistricting plan that "summarily carved up and wiped off the map" the sole majority-minority commissioners precinct that had existed for thirty years. ROA.16028. This sole majority-minority precinct, Precinct 3, had been represented by two Black men during its 30-year history including current commissioner Stephen Holmes, who had held the seat since 1999. ROA.15911, 15988. The precinct became a source of "great pride" for the County's Black and Latino residents as they finally had a precinct that was "reflective of their priorities." *Id*. Although the 2020 Census revealed that little change was necessary to correct the map's malapportionment— "shifting only one voting district from Precinct 2 to Precinct 3" would have resolved the population deviation—the County instead adopted a drastically different map. ROA.15917.

The County's 2021 redistricting cycle began in November 2020 with County Judge Mark Henry ordering the hiring of redistricting attorney Dale Oldham. ROA.15951. Once he was hired, Judge Henry and the county's general counsel Paul Ready immediately inquired as to "whether the county 'had to draw a majority-minority district.'" ROA.15951-15952. Although already "pretty familiar" with the demographics of Galveston County, Oldham obtained a chart "reflecting the racial

breakdown of each commissioner precinct" as well as "racial-shading maps of Galveston County...to identify where Black populations were concentrated. ROA.15951-15953.

Judge Henry informed Oldham that he wanted a map drawn akin to one he conceived in 2011—a map that Oldham previously advised "wouldn't get preclearance because that map would retrogress the minority voting strength in the county."[1] ROA.18462. However, in 2021 with preclearance no longer in effect, Oldham was able to direct map-drawer, Thomas Bryan, to create two plans: a "minimum change" plan which would ultimately be known as Map 1 and the map Judge Henry requested, which would become Map 2, the eventual Enacted Plan. ROA.15956, 18636, 18672.

Bryan exercised no discretion while drawing the maps. Rather, Oldham told him "where to place the lines" and provided him with "very specific instructions." ROA.18787. Although Bryan testified that he did not consult racial data when drawing the maps, Oldham, who meticulously oversaw and directed the drawing of the maps, had reviewed extensive racial data, including racial shading maps to

---

[1] Judge Henry would ultimately get his wish as the map he configured in 2011 would ultimately serve as the basis for the map adopted by the County.

identify the concentration of Black voters in the county.[2]  ROA.15953, 18625-18628.

The differences between the two maps drawn by Bryan were stark. While Map 1 retained Precinct 3 as a majority-minority precinct, Map 2 drastically reduced the minority population in Precinct 3 from the highest to the lowest in the County. ROA.15911-15922. The County justified Map 2's creation by claiming they wanted to create a "coastal precinct," however the district court found this rationale wanting. ROA.15957, 15980-15981. Plaintiffs' experts undermined this rationale, providing five alternative maps that created a coastal precinct while still preserving the majority-minority Precinct 3. *Id*. The district court concluded that "the desire to create a coastal precinct cannot and does not explain or justify why Map 2...was drawn the way it was—and especially does not explain its obliteration of benchmark Precinct 3." ROA.15957.  Similarly, the County failed to provide any other evidence of any non-racial justification for Map 2. ROA.15978. The County's other claimed rationale, partisanship to favor Republicans, was disclaimed by both the commissioners and Oldham, who oversaw the drawing of the map.  ROA.15981.

---

[2] Tellingly, although Oldham testified at trial that he provided "incredibly clear" instructions to Bryan to not display or use racial data while drawing the lines, ROA.18562, Bryan denied this ever happened. ROA.18872. The district court credited Bryan's testimony and not Oldham's, and found that while Bryan had not in fact consulted racial data, that was not because of any instruction from Oldham. ROA.15956.

Following the development of the two maps, the Commissioners Court's next steps demonstrated a host of "procedural anomalies as compared to previous redistricting cycles." ROA.15963. It did not adopt any specific timeline or public criteria for the development of the maps, nor did it provide adequate public notice or opportunity for public comment on the maps that it did develop.[3] ROA.15963. Perhaps most significantly, the County held only one public meeting to present, discuss, and vote on the map, whereas in the past it had held several. ROA.15970-15971. This meeting was held at a small annex building miles away from the county seat in Galveston.[4] ROA.15971-15972. Lay witnesses testified to the inadequacy of the building, ROA.15973, and video recordings of the meeting illustrated the packed meeting room with elderly residents being forced to stand in the cramped room and hallway. *Id*. The County provided no explanation for holding the meeting in such an inappropriate location. ROA.15973-15974.

The behavior of Judge Henry and the other commissioners at the meeting demonstrated a similar disregard for the public. Judge Henry ignored public

---

[3] These procedural failures mirror those identified in a 2012 objection letter from the Department of Justice to Galveston County during their prior redistricting efforts a decade earlier. ROA.15963-15964.

[4] Tellingly, the County had gradually began to move meetings for topics "involving race" to be heard at the same small and inconveniently located annex building, including meetings about immigration and the Confederate statutes in the area, despite the building normally being used for "noncontroversial routine business." ROA.15972.

comments and criticisms of Map 2,[5] ROA.15975-15976, and even threatened to have attendees removed from the building after they voiced their concerns with not being able to hear the meeting. ROA.15975 (Judge Henry angrily stated "I'm going to speak at this tone. That's all I can do. I'm not going to scream. I don't have a microphone . . . I will clear you out. If you make a noise, I will clear you out of here. I've got constables here."). Even Commissioner Joe Giusti, who voted in favor of Map 2, testified that Judge Henry's behavior was "aggressive." ROA.15975-15976. At the end of this meeting, Judge Henry, Commissioner Apffel and Commissioner Giusti voted to adopted Map 2, despite an acute awareness that the map would dismantle the Black and Latino communities within Precinct 3. ROA.15939, 15953.

In the months following the adoption of Map 2, and following the filing of the underlying suit, Commissioner Ken Clark of Precinct 4 passed away. The County appointed a second Black commissioner, Republican Dr. Robin Armstrong, to fill his seat. ROA.15963. Soon after his appointment, the County filed a motion to dismiss the underlying suit. ROA.315. Among other things, the County argued that the suit was moot now that Robin Armstrong was appointed and the County Commission had two Black commissioners. ROA.316, 329. However, Robin Armstrong was not the candidate of choice for the Black or Latino community. ROA.16425-16426. This was not only supported by testimony of members of not

---

[5] All but one of the thirty-six speakers opposed Map 2. ROA.15975.

only both the Black and Latino community but also acknowledged by Commissioner Armstrong himself. See e.g., ROA.16569-16570, ROA.16425 and ROA.19504.

## II.     Procedural Background

At a 10-day bench trial, Plaintiffs presented credible and sufficient expert and lay witness testimony and evidence that the Enacted Map, Map 2, had the effect of diluting Black and Latino votes. The district court agreed. ROA.16007-16032. Analyzing the first of the *Gingles* preconditions, three experts, Anthony Fairfax, Bill Cooper and Tye Rush, all testified that several reasonably configured maps could be drawn preserving Precinct 3 as a majority-minority precinct. ROA.15891, 15898-15900, 15912-15914. Indeed, Map 1, drawn and considered by the County themselves, preserved Precinct 3 as majority-minority.[6] ROA.15912. Tye Rush alone drew seven maps that preserved Precinct 3 as a majority-minority district while still following the redistricting criteria the commission claimed to have followed. ROA.15913-15914. Three of those maps also created a coastal precinct. ROA.15914. As the County's redistricting attorney acknowledged, at least one of those coastal precincts was a near exact replica of Map 2's coastal precinct. ROA. 18661.

---

[6] Throughout trial the County characterized Map 1 as a compact and legal map, and simply faulted Commissioner Holmes for not "asking" the other commissioners and Judge Henry to support that map. *See e.g.*, ROA.18316-18317. Despite the County's high praises during trial of Map 1, this appeal continues because of its resistance to the district court's imposition of refusal Map 1.

Plaintiffs also established the second and third *Gingles* preconditions. ROA.15923, 15934; *see also generally* ROA.16014-16020. Another three experts, Matthew Barreto, Kassra Oskooii and Jessica Trounstine, testified as to the evidence of the second and third *Gingles* preconditions. ROA.15891. Analysis of relevant primary and general elections over the past decade showed consistently high levels of cohesion in voting between the Black and Latino communities of Galveston County. ROA.15925. The evidence to support the levels of voter cohesion was overwhelming, with Matthew Barreto finding consistent cohesion in more than 700 statistical models. ROA.16947-16948. Expert analysis also provided stark evidence that Anglo voters voted cohesively and consistently against the minority preferred candidates. ROA.15932-15933. This pattern was especially true under Map 2, where experts observed that Anglo bloc voting would defeat the candidate of choice of Black and Latino voters "in every election in every commissioner's precinct."[7] ROA.15932-33.

The County's expert did not dispute these findings of cohesion and white bloc voting. ROA.15905, 15925-15926. Indeed, the expert, John Alford, testified that it would be hard to find "a more classic pattern of what polarization looks like in an election" than what exists in Galveston County. ROA.15927 (quoting ROA.19311-

---

[7] Although the County notes that there had been Black and Latino elected officials in the county, these officials were primarily elected in the majority-minority areas within the former Precinct 3. ROA.19559.

19312). Instead, Alford argued that partisanship rather than race explained voter behavior in the County. However, Alford based this opinion on the outcome of a single election: the 2018 senate race between Senator Ted Cruz and Beto O'Rourke.[8] ROA.15935-15936, ROA.24006. Due to this scarcity of analysis, the district court found that the County failed to meet their burden of showing there exists a "race-neutral explanation explains the racially divergent voting patterns." ROA.15935-15936.

In addition to the overwhelming evidence supporting the three *Gingles* preconditions, Plaintiffs provided ample evidence that under the "totality of the circumstances" the "challenged political process is not 'equally open' to minority voters," supported by the expert testimony of Traci Burch, Max Krochmal and Rene Rocha. *Allen v. Milligan*, 599 U.S. 1, 18 (2023), ROA.15939, ROA.15906-15910. Plaintiffs provided evidence that "most of the senate factors support § 2 liability." ROA.16022. This evidence included instances of racial appeals in Galveston County election campaigns, ROA.15987-15988, evidence of socioeconomic disparities of the Black and Latino communities compared to the Anglo communities, ROA.16023, and the lack of responsiveness, particularly regarding public housing after Hurricane Ike, ROA.16025-16026. After considering that evidence, the district

---

[8] This is common practice for Dr. Alford and several federal courts have paid little credence to Dr. Alford's assertions that partisanship, not race, motivated voter behavior, as it is rarely accompanied by any analysis. *See e.g.* ROA.19381-19382.

court concluded that the totality of the circumstances supported Section 2 liability, ROA.16020-16029, and in particular that "most of the Senate factors support § 2 liability." ROA.16022-16027; *Thornburg v. Gingles*, 478 U.S. 30, 36-38 (1986).

On October 13, 2023, after hearing extensive expert and lay witness testimony at the 10-day August bench trial, ROA.15890-15892, the district court issued a 157-page opinion finding "defendants' actions to be fundamentally inconsistent with § 2 of the Voting Rights Act." ROA.15886. The district court explained:

> [t]his is not a typical redistricting case. What happened here was stark and jarring. The Commissioners Court transformed Precinct 3 from the precinct with the highest percentage of Black and Latino residents to that with the lowest percentage. The circumstances and effect of the enacted plan were 'mean-spirited' and 'egregious' given that 'there was absolutely no reason to make major changes to Precinct 3.'

ROA.16029 (citations omitted).

The district court accordingly found that the Enacted Plan was a "clear violation" of Section 2 and "must be overturned." ROA.16029. Due to the court finding sufficient evidence to determine that Map 2 produced discriminatory results in violation of Section 2 of the Voting Rights Act—and despite the many factual findings made by the district court related to intentional discrimination and racial gerrymandering that would support a finding in favor of Plaintiffs on those claims, *see e.g.*, ROA.15940-15982—the court abstained from ruling on Plaintiffs constitutional claims. ROA.16032-16033 (writing that "the court need not determine the outcome of the intentional-discrimination or racial-gerrymandering claims"

because the remedy for those claims is not broader than that to which Plaintiffs were entitled under Section 2). The Court enjoined the County from using the Enacted Plan and ordered a remedial process that would permit the district court to order the adoption of a new plan before the statutory opening date for candidate filing. ROA.16035-16036.

The County appealed the district court's decision and obtained a temporary administrative stay which ultimately expired on November 28, 2023. Docs. 40-1, 122-2. On November 30, 2023, the district court ordered the County to adopt Map 1—a map drawn by the County that included a majority-minority Precinct 3 drawn without considering racial data and that several commissioners testified they would be willing to adopt and that the County admitted was legally compliant, *see* ROA. 18317, 18613, 18950, 19187-19188—as the remedial plan; the County filed a motion with this Court to stay the district court's order during the pendency of the appeal. That motion was granted on December 7, 2023. Doc. 171-1.

## SUMMARY OF THE ARGUMENT

The district court's decision should be affirmed. It follows decades of settled precedent and correctly enjoins a redistricting map that arose from a "jarring," "egregious," and "mean-spirited" process. A ruling in favor of the County would mark the first time a court of appeals has allowed the intentional destruction of a majority-minority district without a rational or compelling basis and would deepen

a circuit split on whether Section 2 contains a single-race *Gingles* threshold requirement.

*First,* coalition claims are supported by the plain text and legislative history of the Voting Rights Act. Nothing in the text of Section 2, which protects a "class of citizens," requires a single-race limitation. Indeed, reading "class of citizens" to include a combination of racial minority groups accords with a textualist understanding of the Act. The plain text of Section 2 protects a class of voters who share a common characteristic: experiencing a minimized opportunity to participate in the electoral process on account of their race. A jurisdiction's voting maps violate Section 2 when they result in an unequal opportunity to participate in the electoral process for minority voters—whatever their skin color. That shared discriminatory experience—and not the color of one's skin—defines the class that Section 2's plain text protects. That reading also accords with the purpose of the Act, which is to eliminate the vestiges of lasting discrimination regardless of the racial identity of the individual. It is the County that asks this Court to "put a square peg in a round hole."

*Second*, the settled precedent of this circuit correctly squares with the plain textual meaning of Section 2 by making the assessment of coalition claims—in particular, the cohesion of coalitions—a question of fact. The County's cited dissents and concurrences to this Court's well-reasoned precedent fail to provide a compelling reason why that precedent is incorrect.

*Third,* Supreme Court precedent affirms that Section 2 protects all racial minorities from the effects of racial discrimination, whether alone or in combination. Appellants' position would require ignoring the Supreme Court's express instruction to avoid confusion between political coalitions and racial minority coalitions, and anyways, flies in the face of decades of court precedent which has never required a single-race limitation for Section 2 claims. The vast majority of circuits, including this one, have recognized that the only reasonable interpretation of *Gingles* requires protecting all racial minority groups, alone or in combination. Every circuit but one has so concluded, and the County's attempts to show otherwise falls flat.

*Fourth,* the parade of horribles portrayed by the County is betrayed by reality. In reality, coalition claims have been brought by litigants for decades—with mixed success. Like every other Section 2 claim, coalitions must demonstrate that they meet the requirements of *Gingles*; that is, that they are compact, vote cohesively individually and together, and together are consistently defeated by the majority. The clear standards of *Gingles* already provide guidance as to which claims are viable when more than one racial group suffers from the same discrimination. It is the County who seeks a reversal of the status quo, not Plaintiffs.

*Fifth,* the district court did not err—much less clearly so—by affording primary elections less weight than general elections in its *Gingles* 2 analysis, nor in rejecting the County's contention that partisanship, not race, explains the racially

polarized voting in the County. The County's own expert agreed with the district court's weighing of primary elections, and the County has not shown clear error in the district court's findings with respect to the racial basis for polarized voting.

*Finally,* Appellants' request for a take-nothing judgment is inappropriate in light of the district court's findings supporting a showing of intentional discrimination. In the event that this Court rules in favor of the County, this Court's precedent requires remand where rejection of a Section 2 claim would not dispose of Plaintiffs' intentional discrimination and racial gerrymandering claims, which remained unresolved by the district court and would, if successful, independently support judgment in Plaintiffs' favor.

## ARGUMENT

### I. Coalition claims are supported by the plain text and legislative history of the Voting Rights Act.

#### A. Section 2's plain text supports coalition claims.

The plain text of Section 2 authorizes vote dilution claims without imposing a single race threshold barrier to relief. Section 2(a) of the VRA prohibits any voting standard or practice that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color," or language-minority status. 52 U.S.C. §§ 10301(a), 10303(f). Section 2(b) sets forth how a violation of Section 2(a) is established, and notes that it applies to "a class of citizens protected by subsection (a)." *Id.* § 10301(b). The "class of citizens" to which Section 2(b) refers

is not a singular minority group, but rather those "protected by subsection (a)"—*i.e.*, "any citizen" subject to a denial or abridgment of voting rights "on account of race or color, or" language-minority status. *Id.* §§ 10301(a), (b). Nothing in the text of Section 2 requires that every member of the "class of citizens" share the same race, but rather requires that members of the class share the same experience of being politically excluded "on account of race," whatever their race is. *Id.* This is the common legal usage of "class"—a reference to those suffering the same injury caused by the defendant. *See, e.g.*, Fed. R. Civ. P. 23. And reading "class of citizens" to include a combination of protected minority citizens also accords with the last antecedent grammatical rule. *See Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). Accordingly, "class of citizens" means the class members must merely share the common characteristic of being a Section 2 protected racial, ethnic, or language minority voter experiencing vote dilution. Section 2 thus protects all minority voters, and where they are cohesive with other minority voters, the Act protects them together.

Nevertheless, the County argues that because Section 2(b) refers to "a class of citizens" rather than to "classes of citizens" all members of the protected class must be of the same race. Doc. 118-1 at 3; *id.* (noting the "singular" form of class); Br. at 32-33. That reasoning is unsound.

*First,* the County's reading of Section 2 ignores Congress's "broad remedial purpose of rid[ding] the country of racial discrimination in voting" through passage of the Voting Rights Act, and this Court's obligation to interpret Section 2 "in a manner that provides 'the broadest possible scope' in combatting racial discrimination," *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (citation omitted).[9] Section 2, like other civil rights statutes, is "written in starkly broad terms," *see Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1753 (2020). It empowers "any citizen" to challenge any "qualification or prerequisite to voting or standard, practice, or procedure" that discriminatorily "deni[es] or abridge[s]" the right to vote. 52 U.S.C. § 10301(a). Section 2's "broad language" does not limit its protections to a single minority group bringing claims *seriatim*; it instead reflects "Congress's presumed point to produce general coverage." *Bostock*, 140 S. Ct. at 1749 (internal quotation marks omitted). Accordingly, the absence of any express

---

[9] The County insists that *Chisom*'s mandate to interpret Section 2 broadly is misplaced here because the state judicial elections at issue in that case were covered under Section 2 prior to 1982, whereas coalition claims "were not a settled, permissible use of the VRA before the 1982 amendments." Br. at 35. As explained *infra* Sec. I.B though, Congress in both 1975 and 1982 invoked case law recognizing the validity of coalition claims and expressly contemplated a shared experience of discrimination among minority voters that entitles them to protection together under the VRA. The County likewise insists that, "[r]emedial or not," a broad construction of Section 2 cannot rewrite its "plain and unambiguous" text. Br. at 36-37. But, as discussed *infra*, Section 2's plain language as understood through basic canons of grammatical and statutory interpretation in no way contemplates a "single race" threshold barrier to relief, and thus should not be read to require one.

reference to coalition claims in the text of Section 2 is not dispositive to interpretation of the provision. *See id.* at 1747 ("[T]here [is no] such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception."). Interpreting Section 2 to authorize discriminatory vote dilution by a white majority against a cohesive population of Black and Latino voters would defeat its broad textual mandate and self-evidently frustrate Congress's desire to "rid[] the country of racial discrimination in voting." *Chisom*, 501 U.S. at 403. One need only read the district court's factual findings in this case to see that.

*Second*, Congress rejected the County's method of statutory interpretation in the Dictionary Act. "In determining the meaning of any Act of Congress, unless the context indicates otherwise—words importing the singular include and apply to several persons, parties, or things." 1 U.S.C. § 1. Section 2(b)'s use of "class" therefore includes "classes"—the very word the panel below and the County itself believe is necessary for Section 2 to protect multi-racial minority groups from vote dilution. The exception to this rule—*i.e.*, when "context indicates otherwise"—is not to be readily deployed. Only where the Dictionary Act's rule would "forc[e] a square peg into a round hole" and create an "awkward" result does the general rule give way. *Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 200 (1993). In making that determination, Congress's purpose in enacting the statute

guides the analysis. *Id.* at 209-10. For example, in *Wilson v. Omaha Indian Tribe*, the Supreme Court held that the general rule in the Dictionary Act that "person" includes artificial entities like corporations applied to a statute that placed the burden of proof on a "white person" litigating a property claim against an Indian. 442 U.S. 653, 658 (1979) (interpreting 25 U.S.C. § 194). The Court reasoned that the "protective purposes of the Acts of which § 194 . . . [was] a part" would be frustrated if it did not apply to artificial entities, and thus rejected the argument that "context indicate[d] otherwise" so as to make the Dictionary Act's rule inapplicable. *Id.* at 665-66. The Court highlighted the importance of consulting the overall statutory purpose, given that the reference to "white person" in § 194 was "one of the strongest contextual indicators imaginable that 'person' [in the statute] cover[ed] only individuals." *Rowland*, 506 U.S. at 209 (discussing *Omaha Tribe*, 442 U.S. at 665). If "white person" is insufficiently specific to refer to white humans as opposed to limited liability corporations, then there is no plausible argument here that Congress meant to limit "members of a class of citizens" in Section 2(b) to a single racial group, when it specified no racial group at all.

*Third*, it is *the County's* reading of Section 2 that would "forc[e] a square peg into a round hole." *Rowland*, 506 U.S. at 200. The blindered analysis of the County assumes that every Section 2 plaintiff must be of a single race. But, as Judge Keith explained in his dissent from the Sixth Circuit's *Nixon* decision, that reading of

Section 2 is "most disturbing," because it "requires the adoption of some sort of racial purity test." 76 F.3d at 1401 (Keith, J., dissenting). What of a plaintiff who is half Black and half Latino? Under the "single race" theory advanced by the County, such a plaintiff would seemingly be required to satisfy the *Gingles* preconditions for a class of exclusively half Black, half Latino citizens. That, after all, would be the "particular race, color, or language-minority status of [the] individual citizen[]" hypothetical plaintiff. Doc. 118-1 at 4. Or perhaps she would be forced to choose in her complaint; she could plead herself to be Black or Latina but not both—even though she *is* both and even if her ability to participate equally in the political process is undermined on account of *both* her Black and Latino heritage. This Court should abide by its own precedent and reject the County's proposed racial purity test as irreconcilable with the text of Section 2 and the Supreme Court's command to interpret the VRA in the broadest possible terms.

The County reads Section 2 of the Voting Rights Act to contain a glaring loophole in jurisdictions that have diverse minority populations. Even where minority voters vote cohesively, see their preferred candidates defeated by the strength of overwhelming white bloc voting, and share a history of official discrimination that continues to burden their ability to participate in the political process, the County would have the Court exempt those minority voters from the protections of the Voting Rights Act. The basis for this discrimination exemption?

Congress's use of the word "class" instead of "classes." Never mind that nowhere did Congress specify that "class" refers to a single racial group, and never mind that Congress codified its rejection of precisely that sort of plural/singular nitpicking of congressional intent on the opening page of the U.S. Code. *See* 1 U.S.C. § 1. The County's argument is far too thin a reed to support its contention that Congress, in a statute that must be accorded the broadest possible interpretation, *see Chisom*, 501 U.S. at 403, intended to give a free pass to racial discrimination in voting so long as its victims were racially diverse. Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001). Congress did not sanction racial discrimination in voting by omitting the letters "-es" in Section 2.

**B. Section 2's legislative history supports coalition claims.**

Even if it *were* ambiguous whether Section 2's text imposes a single-race threshold for relief, its legislative history and the broad remedial purpose of the VRA both support recognizing such claims. Courts may "consult[] the understandings of the law's drafters as some (not always conclusive) evidence," *Bostock*, 140 S. Ct. at 1750, and the Supreme Court often relies on Section 2's legislative history, *see, e.g.*, *Brnovich*, 141 S. Ct. at 2332-33; *Gingles*, 478 U.S. at 43 & n.7.

The 1975 amendment to Section 2 added language-minority protections because Congress sought to address "pattern[s] of racial discrimination that ha[ve] stunted . . . black *and* brown communities." S. Rep. No. 94-295, at 30 (1975)

(citation omitted; emphasis added); *see also generally id.* at 22-31. Congress knew that Texas, for example, had a substantial minority population "comprised primarily of Mexican Americans and [B]lacks" and "has a long history of discriminating against members of *both* minority groups." *Id.* at 25 (emphasis added); *see also id.* at 30 (noting that "Texas has a 'history pock-marked by a pattern of racial discrimination that has stunted the electoral and economic participation of the black *and* brown communities in the life of state'") (quoting *Graves v. Barnes*, 378 F. Supp. 640, 643 (W.D. Tex. 1974), *vacated sub nom. White v. Regester*, 422 U.S. 935 (1975), *on remand Graves v. Barnes*, 408 F. Supp. 1050, 1052 (W.D. Tex. 1976) (reaffirming prior hearing)) (emphasis added); H.R. Rep. No. 94-196, at 17, 25, 30 (1975). Congress thus sought to protect together all "racial or ethnic groups that had experienced appreciable prior discrimination in voting," noting that Latinos "suffered from many of the same barriers to political participation confronting [B]lacks," including "'invidious discrimination and treatment in the fields of education, employment, economics, health, politics and others'"—like that present here. *Salas v. Sw. Tex. Junior Coll. Dist.*, 964 F.2d 1542, 1549 & n.19 (5th Cir. 1992) (quoting S. Rep. No. 94-295, at 30). Indeed, the Senate stressed that "racial discrimination against language minority citizens seems to follow density of minority population" overall, citing examples of jurisdictions and electoral systems that have "den[ied] Mexican Americans *and* [B]lack voters in Texas political

access." S. Rep. No. 94-295, at 27-28 (emphasis added). And the Senate was aware of "at least one case in which African-Americans and Hispanics brought a joint claim" under the VRA. *Nixon*, 76 F.3d at 1395 (Keith, J., dissenting) (citing *Wright v. Rockefeller*, 376 U.S. 52 (1964)). Contrary to the County's assertions, Br. at 39-40, this record confirms that Congress contemplated a shared experience of discrimination among minority voters of different backgrounds that entitles them to equal protection under the VRA, including through the pressing of coalition claims.

When Congress amended Section 2 in 1982 it was no less aware of claims by minority groups whose racial makeup was not monolithic. In its Report on the 1982 amendments, the Senate Judiciary Committee twice referenced *Wright*—involving claims on behalf of Black and Hispanic voters, just as here. S. Rep. No. 97-417, at 19 n.60, 132 (1982) (citing *Wright*, 376 U.S. at 52-54).[10] And, beyond citation to

---

[10] Despite Congress's repeated invocations of *Wright*, the County insists that there is a better example from the VRA and its legislative history that directly addresses and prohibits coalition claims by minority voters. Br. at 40-41 (citing *Nixon*, 76 F.3d at 1387 n.7 & S. Rep. No. 94-295, at 47). Its example, however, proves only that Congress did *not* prohibit coalition claims beyond one isolated provision of the VRA. 52 U.S.C. § 10303(f)(3)—concerning requirements for obtaining foreign-language ballots—is alone in limiting claims to those brought by "members of a *single* language minority." (emphasis added); *see also* S. Rep. No. 94-295, at 31-32, 47. This confirms that, where Congress wanted to expressly limit aggregated claims, it knew how to do so and chose *not* to anywhere else in the VRA. And it makes logical sense that the VRA would not permit aggregation of different language minorities for a language minority to meet the threshold to require ballot access in a particular language—where the remedy for voters speaking different languages would necessarily be different—but *does* permit minority aggregation for Section 2

cases involving such claims, the 1982 Senate Report spoke repeatedly of the need to protect racial and ethnic minorities together, explaining that "the amendments would make racial and ethnic groups the basic unit of protection." *Id.* at 94; *see also, e.g.*, *id.* at 122 (local electoral arrangements are expected to conform with guidelines "established to maximize the political strength of racial *and* ethnic minorities") (emphasis added).[11] For example, in recounting an illustrative list of municipalities "in jeopardy of court-ordered change under the new results test," the Senate spoke of the overall minority population in each, without differentiating among Black, Latino, or other groups—including in jurisdictions like New York City, where the 40

---

vote dilution claims—where the remedy is the same for all voters in the class whose votes are diluted.

[11] The Senate Report includes dozens of references to "minorities" plural, without differentiating between protections for racial and ethnic minority groups. *See, e.g.*, S. Rep. 97-417, at 27 (plaintiffs must prove either intent or that the challenged system "results in *minorities* being denied equal access to the political process") (emphasis added); *id.* at 16 (the "crucial question" for judicial inquiry is "whether *minorities* have equal access to the electoral process") (emphasis added). The House Report likewise repeatedly discusses minorities plural, without distinguishing between different racial and ethnic groups. *See, e.g.*, H. Rep. No. 97- 227, at 3 ("The Voting Rights Act of 1965 was primarily designed to provide swift, administrative relief where . . . racial discrimination continued to plague the electoral process, thereby denying *minorities* the right to exercise effectively their franchise."), 7 (describing "progress in increasing registration and voting rates for minorities" and "improvements in the election of minority elected officials," citing registration and election rates for both Blacks and Latinos; *see also id.* at 28, 34-35 (noting the "overwhelming evidence of a continuing pattern and practice of voting discrimination against racial *and* language minorities" and that the VRA sought to extend protections "to all minorities") (emphasis added).

percent minority population necessarily encompassed multiple minority groups. *See id.* at 154-57. The Senate thus reinforced that minority groups, together, must have "a fair chance to participate" and "equal access to the process of electing their representatives." *Id.* at 36. Just as in 1975, if Congress meant to impose a single-race threshold showing for relief from vote dilution, "Congress would have made it explicit in the statute, or at least some of the Members would have identified or mentioned it at some point in the unusually extensive legislative history of the 1982 amendment." *Chisom*, 501 U.S. at 396 (holding that the absence of exclusion of judicial elections from Section 2's statutory text meant they were within Section 2's ambit).

The County nevertheless insists, Br. at 41-43, that Congress in 1982 did "not adopt the concept of a multiracial . . . fusion claim" and only ever referenced a single race of VRA plaintiffs. But this ignores entirely: the myriad references to protections for minorities plural; the discussion of racial and ethnic groups together as "the basic unit" (singular) of protection; the repeated cites to a case—*Wright*—upholding claims by a coalition of minority voters; and the discussion of the combined total minority populations of jurisdictions "in jeopardy of court-ordered change." It is thus clear that Congress, in both 1975 and 1982, was aware of and approved of coalition claims in its extension of protections for minority voters.

## II.    This Court's precedent correctly rejects a single-race limitation on Section 2 claims.

This Court's precedent is clear and well-reasoned that Section 2 does not have a single-race limitation and that the assessment of coalition claims is a matter of fact. *See League of United Latin Am. Citizens, Council No. 4434 v. Clements,* 999 F.2d 831, 864 (5th Cir. 1993) (en banc) ("*Clements*"); *Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989); *Overton v. City of Austin*, 871 F.2d 529 (5th Cir. 1989) (per curiam); *Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988) ("*Campos I*"); *League of United Latin Am. Citizens, Council No. 4386 v. Midland Indep. Sch. Dist.*, 812 F.2d 1494, 1500-02 (5th Cir. 1987) ("*LULAC I*").[12] In *Clements*, contrary to the County's suggestion, Br. at 18, this Court clearly explained that in a context devoid of discriminatory intent, whether minority coalitions can raise a vote dilution claim under Section 2 is "a question of fact" and that the Court "allow[s] aggregation of different minority groups where the evidence suggests they are politically cohesive." 999 F.2d at 864; *id*. ("If [B]lacks and Hispanics vote cohesively, they are legally a single minority group.").

---

[12] Although the *en banc* court vacated the *LULAC I* panel decision on other grounds, *see League of United Latin Am. Citizens, Council No. 4386 v. Midland Indep. Sch. Dist.*, 829 F.2d 546 (5th Cir. 1987) (en banc), the Fifth Circuit subsequently reinforced the panel's ruling and adopted its reasoning to allow coalition claims, *see, e.g.*, *Brewer*, 876 F.2d at 453; *Campos*, 840 F.2d at 1244.

The County's reliance on various dissents and concurrences disagreeing with this Court's precedent is misplaced. First, the County cites Judge Higginbotham's dissent in *Campos v. City of Baytown (Campos II)*, highlighting his argument that the district court in that case should not have asked "whether Congress in the Voting Rights Act intended to *prohibit* such coalitions" but rather "whether Congress intended to *protect* those coalitions." 849 F.2d 943, 945 (5th Cir. 1988) (Higginbotham, J., dissenting from denial of rehearing en banc). Setting aside whether Judge Higginbotham was applying the proper interpretative approach to the VRA,[13] *either* inquiry has the same result. Both the plain text and the legislative history, *supra* Sec. I, of the VRA support the interpretation that Section 2 provides for multi-member claims.

Next, the County incorrectly asserts that the *Campos II* district court "merely assume[d] that a group of two distinct minorities 'is itself a protected minority,'" without additional confirmation, Br. at 17 (citing *Campos II*, 849 F.2d at 945 (Higginbotham, J., dissenting). It did not. Rather, the district court followed the same exacting analysis that other courts have followed: the *Campos I* court required that the minority groups raising the coalition claim prove that they "actually vote together

---

[13] The Supreme Court's mandate that the VRA be interpreted "in a manner that provides 'the broadest possible scope' in combatting racial discrimination" suggests that he was not. *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (citation omitted), *see also supra* Sec. I.A.

and are impeded in their ability to elect their own candidates by all of the circumstances, including especially that the bloc voting of a white majority usually defeats the candidate of the minority." *Campos I*, 840 F.2d 1240, 1244.

Finally, the County contends that failing to apply a single-race limitation will open the floodgates of attenuated claims and lead to proportional representation, citing separate opinions from three decades ago by Judges Higginbotham and Jones. In the 30 years since a majority of this Court rejected their views, their predictions have not come to pass. [14]

## III. Recent Supreme Court and circuit court decisions support the viability of coalition claims.

### A. Court precedent supports the viability of coalition claims.

While the Supreme Court has not expressly resolved the issue, it has assumed that Section 2 does not have a single-race limitation. *Growe v. Emison*, 507 U.S. 25, 41 (1993); *White v. Regester*, 412 U.S. 755, 767 (1973); *see also Bartlett v. Strickland*, 556 U.S. 1, 13-14 (2009) (plurality op.) (declining to address whether minority coalition claims are cognizable); *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994) (explaining in the context of § 2 that "there are communities in which

---

[14] It bears noting that the County spends significant space arguing that the evidence in *LULAC I* did not pass muster to show cohesion between the Black and Latino communities in that 1987 case, but neglects to meaningfully contest the vast quantitative and qualitative evidence demonstrating cohesion between Black and Latino communities in *this* case.

minority citizens are able to form coalitions with voters from other racial and ethnic groups"). In *Houston Lawyers' Association v. Attorney General of Texas*, for example, the Court entertained a Section 2 challenge pursued by "a statewide organization composed of both Mexican-American and African-American residents." 501 U.S. 419, 421 (1991). Similarly, in *Wright v. Rockefeller*, the Court accepted that a coalition of Black and Puerto Rican voters brought a constitutional vote dilution challenge but rejected the merits. 376 U.S. 52, 54 (1964). The Supreme Court also recognizes coalition claims in the vote denial context. Indeed, just two years ago, the Court evaluated a coalition of Black, Hispanic, and Native American voters' Section 2 vote denial claims without any suggestion of a single-race barrier to relief. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2322 (2021).

The County's claim that the Supreme Court has rejected "sub-majority" Section 2 claims is misplaced because in those cases *white voters* were the majority of the prospective district at issue, not minority voters. *See Bartlett*, 556 U.S. at 13-15 (rejecting claim where white voters, not minority voters, were majority of district but sufficient crossed over to support minority-preferred candidate); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 439-447 (2006) ("*LULAC*") (rejecting claim where African Americans and Latinos were not cohesive). Here, *minority voters* comprise the majority of Plaintiffs' proposed district, so it is not a "sub-majority" claim. That those minority voters are not racially monolithic makes

no statutory difference. The *LULAC* "influence claim" and the *Barlett* "crossover claim" are not covered by Section 2 because each depend upon white voters to satisfy *Gingles* 1—voters who are not "member of a class of citizens protected by" the statute because they do not experience a "denial or abridgement of the right . . . to vote on account of race or color." 52 U.S.C. § 10301.

By contrast, here Plaintiffs have proffered a district in which a majority of eligible voters have experienced a "denial or abridgment of the right . . . to vote on account of race or color," making them part of a "class of citizens protected by subsection a." 52 U.S.C. § 10301. Where influence and crossover claims created *political* coalitions that depend upon voters who merely share a candidate preference with those plausibly covered by the statute, here the class is defined by its shared experience of vote dilution on account of race. Unsurprisingly, then, the Supreme Court expressly declined to extend its *Bartlett* holding to minority coalition claims in which majority-minority districts were proffered, taking care to avoid this very "confusion [between political coalitions] with coalition-district claims in which two minority groups form a coalition to elect the candidate of the coalition's choice." *Bartlett*, 556 U.S. at 13-14 ("We do not address that type of [minority] coalition district here").[15] Plaintiffs' established a majority-minority precinct could be drawn.

---

[15] The County's reliance on *Perry v. Perez* also reflects a strained attempt to conflate influence and crossover districts with minority coalition claims. Despite the County's assertions otherwise, *Perez* did not speak at all to a single-race limitation,

Likewise, *LULAC* makes no mention of a single-race limitation to Section 2 claims, instead holding that Section 2 "requires more than the ability to *influence* the outcome between some candidate." *Perry*, 548 U.S. at 445 (emphasis added). In neither case did the Supreme Court address whether Section 2 has a single-race limitation; indeed, in both cases, it was presumed that Section 2 protected minority voters, alone or in combination. *See Perry,* 548 U.S. at 443 (noting "that African–Americans do not vote cohesively with Hispanics" in assessing whether African Americans could state a Section 2 claim where they were less than 50 percent of the majority); *Perez*, 565 U.S. at 391 (addressing whether "Texas' enacted plans discriminate against Latinos and African–Americans and dilute their voting strength").

The County points to *Rucho* as demonstrating support for their understanding of *Bartlett*—namely, the advisement against wading into the political thicket in redistricting. Br. at 25-26. But again, this argument requires ignoring the distinction between political coalitions and racial minority coalitions, the latter of which has members all of whom are protected by Section 2(a)—and thus part of the class identified in Section 2(b), in contrast to a political coalition of white and minority voters. Minority coalition claims advance Section 2's goal to address the lasting

---

but to the impermissibility of crossover claims under *Bartlett. See Perry v. Perez,* 565 U.S. 388, 399 (2012) (citing *Bartlett v. Strickland*, 556 U.S. 1, 13–1).

effects of discrimination without "produc[ing] boundaries [that] amplify[] divisions between" voting groups. *See Cooper v. Harris*, 137 S. Ct. 1455, 1469 (2017). Indeed, the County's argument serves to demonstrate why a single-minority rule is antithetical to any reasonable interpretation of *Gingles* and its progeny. The County argues that the application of the *Gingles* preconditions to minority coalition claims involves "speculative inquiries." Br. at 23. But "whether coalition voters have turned out to support the same candidates in the past, whether they will continue to do so in the future, and whether any voting trends can be explained by factors such as incumbency," Br. at 23, are simply evidence which can show the presence of the *Gingles* preconditions. *Accord Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989) ("[T]he most persuasive evidence of inter-minority political cohesion for Section 2 purposes is to be found in *voting patterns*"); *Campos I*, 840 F.2d at 1245-55. Ultimately, Supreme Court precedent supports rather than precludes the viability of coalition claims.

**B.    The County has contrived a circuit split on coalition claims.**

The vast majority of circuit courts—including this Court—to consider the issue have held that Section 2 prohibits vote dilution of minorities, whether alone or combination. Specifically, courts in the First, Second, Ninth, and Eleventh Circuits agree with this Court that Section 2 protects minority coalitions. *See, e.g.*, *Huot v. City of Lowell*, 280 F. Supp. 3d 228, 235-36 (D. Mass. 2017) (applying *Latino*

*Political Action Comm., Inc. v. City of Boston*, 784 F.2d 409 (1st Cir. 1986)); *NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 379-80 (S.D.N.Y. 2020) (applying *Bridgeport Coal'n for Fair Representation v. City of Bridgeport*, 26 F.3d 271 (2d Cir. 1994)); *aff'd sub nom. Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021); *Badillo v. City of Stockton, Cal.*, 956 F.2d 884 (9th Cir. 1992) (holding that factual record did not demonstrate the coalition's cohesion); *Concerned Citizens of Hardee Cnty. v. Hardee Cnty. Bd. of Comm'rs*, 906 F.2d 524, 526 (11th Cir. 1990) (same).

Nevertheless, the County urges this Court to depart from its own precedent and from the majority rule, and instead follow a single outlier, the Sixth Circuit. *See Nixon v. Kent County*, 76 F.3d 1381 (6th Cir. 1996) (en banc). But the *Nixon* majority misinterpreted Section 2's text to reach its conclusion foreclosing coalition claims, detaching the word "class" from its context to mean a single racial group. *Id.* at 1386-87. This is contrary to the plain text, as discussed *supra* Sec. I.A. The Sixth Circuit's decision also depends on questionable "policy concerns," suggesting that even if there is proven discrimination against minority groups, "there is no basis for presuming such a finding regarding a group consisting of a mixture of both minorities." *Id.* at 1391. But as the *Nixon* dissent emphasized, the more problematic "policy concern" is that rejecting coalition claims "requires the adoption of some sort of racial purity test" that is inconsistent with Section 2's goal to eliminate racial

divisions in voting. *Id.* at 1401 (Keith, J., dissenting) (reasoning that if courts "are to make these [racial] distinctions, where will they end? Must a community that would be considered racially both Black and Hispanic be segregated from other Blacks who are not Hispanic?"). *Nixon* is thus a significant outlier based on dubious textual and policy interpretations.

In claiming a broader circuit split, the County also points, Br. at 27-28, to *Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004) and *Frank v. Forest County*, 336 F.3d 570 (7th Cir. 2003), as holding that the VRA does not protect minority coalitions—or at least indicating "strong concerns" with coalition claims. But both cases are inapposite. *Hall* does not proscribe coalition claims as the County contends, because it concerned only an alleged crossover district including "black and white voters." 385 F.3d at 430. Far from limiting Section 2 minority coalitions, the *Hall* court "noted that '[t]here are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups'" and seek to enforce their rights. *Id.* at 431 n.13 (quoting *Georgia v. Ashcroft*, 539 U.S. 461, 483 (2003)). The court's nuanced discussion of coalitions simply concluded that Section 2 does not "create an *entitlement* for minorities to form an alliance with [white crossover] voters in a district who do not share the same statutory disability as the protected class." *Id.* (emphasis added). But the inverse of this observation is that Section 2 *does* recognize a claim when minority voters *can prove* they "form an alliance with other voters"

who *do* "share the same statutory disability" of discriminatory vote dilution. *See id.* *Hall* reinforces that a coalition must be composed of cohesive, statutorily protected minority groups; it "does not stand for the proposition that minority groups cannot be combined." *See NAACP, Spring Valley Branch*, 462 F. Supp. 3d at 379 n.11.

*Frank* likewise did not proscribe minority coalitions. *See* 336 F.3d at 575-76. *Frank* turned solely on the lack of cohesion between Black and Native American voters, where evidence of their voting patterns was "limited to voting in Presidential elections—a far cry from voting in county board elections," and where the "only thing" that Black residents of a Job Corp Center had in common with Native American voters in the proposed district "is that they are not Caucasian," *id.* The plaintiffs even admitted that they had "no evidence that the Job Corps residents have any interests in county government that are in common with those of" Native American voters, *id.* at 576—a far cry from the voluminous record here of common interests shared by Galveston County's Black and Latino residents, *see, e.g.*, ROA.15982-16000.

As a last resort, the County points to an unrelated outlier in *Arkansas State Conference NAACP v. Arkansas Board of Apportionment*. In *Arkansas NAACP*, the Eighth Circuit held that there was no explicit or implied private right of action in Section 2 of the Voting Rights Act, reasoning that "[i]t is unclear whether § 2 creates an individual right;" that other provisions of the Act do not provide a right of action

for Section 2; and that the Supreme Court's decision in *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996), did not imply a private right of action. *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, 86 F.4th 1204, 1209-11 (8th Cir. 2023). This Court already rejected this argument in *Robinson v. Ardoin*. Reasoning that "[t]he purpose [of Section 2] surely is to allow the States to be sued by someone," the Court held that Section 3 did grant a private right of action for Section 2 claims, and that the Supreme Court's decision in *Morse* supported the existence of a private right of action. 86 F.4th 574, 588 (5th Cir. 2023). That same reasoning applies in full force; the plain and obvious understanding of the text, purpose, and precedent of Section 2 does not contemplate imposing a single-race rule.

In sum, the County's attempt to contrive a circuit split falls flat in the face of the case law and this Court's own recent decisions. While the Sixth Circuit has held differently, the vast majority of circuits have held that there is no single-minority rule in stating a Section 2 claim.

## IV. Coalition claims have not before and will not now yield the County's purported dire consequences.

Repeatedly, the County marches through a parade of horribles it claims will result if the Court does not impose a single-race requirement on Section 2, insisting that the question of "[h]ow coalition districts could even be implemented by jurisdictions across the country without giving rise to a myriad of VRA challenges

is unclear, at best." Br. at 24; *see also* Br. at 44-45 ("[W]hen it is unclear how legislators could traverse such interpretation, a court's ability to apportion districts in a Section 2 coalition claim is even more attenuated."). But there is no need for the County to postulate about what "could" be the consequences of a world where coalition claims are permitted, because that world is not imaginary. Plaintiffs across the country have stated claims with multiple minority groups for decades, and none of the alleged perils the County claims will result from coalition claims have come to pass, nor is there any reason to believe they will now.

The County claims that "[c]oalition claims frustrate the *Gingles* analysis because *Gingles* does not test for a homogeneity of a coalition comprised of distinct minority groups with different cultural, language and socio-economic experiences . . . beyond their maintenance of a joint lawsuit." Br. at 43 (internal citation omitted). But this assertion is belied by the reality of how the *Gingles* test has, in fact, been used to assess the cohesion of minority groups making up coalitions in coalition claims. The "line as to how many minority groups could join to form a VRA claim," Br. at 24, is outlined by the requirements of *Gingles*: if a group cannot demonstrate that they vote cohesively and are consistently defeated by the majority, then they cannot state a claim under Section 2. *See Clements*, 999 F.2d at 897 (collecting cases).

A key issue in all Section 2 claims is whether "the minority group as a whole" votes cohesively but are stifled because of white bloc voting. *Campos I*, 840 F.2d at 1245. And coalitions must, just like any other Section 2 claimant, prove their cohesion through quantitative and/or qualitative evidence. *See id*. And, as the County itself highlights, there is a high bar for coalition claims to provide sufficient evidence of *Gingles* cohesion, and, in many cases, plaintiffs have failed to clear it. Br. at 15 ("[W]hen coalition claims are tested on appeal, they consistently fail *Gingles* requirements.") (citing *Clements*, 999 F.2d at 897); *see, e.g.*, *Frank v. Forest County*, 336 F.3d 570, 575-76 (7th Cir. 2003); *Badillo v. City of Stockton, Cal.*, 956 F.2d 884, 891 (9th Cir. 1992); *Concerned Citizens of Hardee Cnty.*, 906 F.2d at 526; *Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 508 (E.D. Tex. 2020); *Perez v. Abbott*, 274 F. Supp. 3d 624, 670 (W.D. Tex. 2017), *reversed on other grounds*, *Abbott v. Perez*, 585 U.S. __, 138 S. Ct. 2305 (2018); *Johnson v. Hamrick*, 155 F. Supp. 2d 1355, 1370 (N.D. Ga. 2001); *Romero v. City of Pomona*, 665 F. Supp. 853, 858 (C.D. Cal. 1987). That there have only been approximately 25 cases even brought on behalf of multiple racial minorities demonstrates the demanding burden under *Gingles,* far from presenting an "unclear" standard. *See Clements*, 999 F.2d at 897 (Jones, J., concurring) ("The difficulty of proving vote dilution on behalf of coalitions of minorities has been vividly realized in practice.").

Additionally, the County and the panel's belief that proportionality will take hold if Section 2 is not limited to single-race plaintiff groups makes scant sense. Br. at 14-15, 33-34, 45; Doc. 118-1 at 4. First, as the Supreme Court explained last term in *Allen v. Milligan*, the first *Gingles* precondition and Supreme Court case law ward against proportionality. 599 U.S. at 26-27. Second, this case illustrates that the perceived threat of proportionality is misplaced—Black and Latino voters account for 38% of Galveston County's population but the district court's stayed injunction merely returns them to having an equal opportunity to elect their candidates of choice in 25% (rather than 0%) of the precincts—the configuration that has existed for three decades. Third, as discussed above, most claims on behalf of more than one racial group fail for want of sufficient evidence of political cohesion, not the outcome one would expect if coalition claims are supposedly an open floodgate for proportional representation.

The allowance of coalition claims in "our increasingly multi-ethnic society," *Clements*, 999 F.2d at 896, has neither "create[d] or increase[d] racial animosity among [coalition] members" nor "limit[ed] the protections of the VRA." Br. at 44-45.[16] In discussing the alleged "consequences and serious concerns that follow from

---

[16] The County also raises the concerns that coalition claims may force legislators and courts "to avoid favoring one minority group within a coalition over another, in the name of enforcing the VRA" and that "[c]oalitions could…be misused by a jurisdiction that chooses to redistrict to create a coalition group, while limiting an individual minority group's population within a district." Br. at 45. But the VRA

allowing coalition claims under Section 2," *id*. at 45, the County provides no

evidence that these harms have, in fact, resulted from coalition claims and instead

cites only to Judge Jones' *Clements* concurrence and Judge Higginbotham's *Campos*

*II* dissent. Br. at 43-45; *see also id*. at 16-19. But notably, in the intervening 30 years

since *Clements* and 35 years since *Campos II*, those Judges' postulated harms of

coalition claims have *not* transpired. The County can rest easy knowing that those

concerns, while perhaps alarming three decades ago, should have now been

thoroughly assuaged.

In contrast to the County's imaginary catastrophizing about the impact of

coalition claims, changing the law now to create a single-race requirement for

---

does not require minorities make up any particular population within a district.
Rather, where a minority group meets the *Gingles* preconditions and lacks equal
opportunity under the totality of the circumstances, the VRA requires the minority
group be provided an equal *opportunity to elect* their candidates of their choice, not
a district in which they make up any particular *percentage*. *See, e.g.*, *Bartlett*, 556
U.S. at 23 (stating that "§ 2 allows States to choose their own method of complying
with the Voting Rights Act, and we have said that may include drawing crossover
districts") (internal citations omitted). And, definitionally, the representational
desires of different minority groups *making up a coalition* are aligned, such that the
creation of a district where one minority group in the coalition has the opportunity
to elect candidates of their choice would necessarily benefit the interests of the other
minority group(s) in the coalition. And if minority groups are *not* cohesive and
therefore *not* entitled to an opportunity-to-elect district under the VRA, but
legislators nonetheless create a district on the basis of those groups' race, those
legislators would have crafted a racial gerrymander—just as the legislators would
have crafted a racial gerrymander by creating a district on the basis of a *single*
minority group's race where that group was not entitled to an opportunity-to-elect
district under the VRA.

Section 2 claims *would* create a new landscape with very real resulting harms. As discussed above, *supra* Sec. I.A, the County's reading of Section 2 requires the creation of a racial purity test for Section 2 claimants, exacerbating rather than ameliorating racial division.

## V.    The district court did not err in finding *Gingles* 2 and 3 satisfied.

The County erroneously implies that coalition claims require a higher standard of cohesion to satisfy the *Gingles* preconditions. Br. at 46. But no such standard exists. Rather, the County seeks to impose an imagined standard for coalition claims, requiring not only cohesion, but cohesion determinations that defy reasonable statistical data analysis. The County also seeks to impose a burden on Plaintiffs to provide an explanation for any coalition cohesion. This standard is unsupported and indeed inverts precedent. *Teague v. Attala County, Miss*., 92 F.3d 283, 290 (5th Cir. 1996). However, even if the County's manufactured standard was applied, Plaintiffs easily satisfied it.

### A.    Plaintiffs properly established Black and Latino voter cohesion under *Gingles* 2.

The County contends that Plaintiffs failed to examine all primary, nonpartisan and multicandidate elections, thus rendering their evidence of Black and Latino voter cohesion insufficient. Br. at 47. However, Plaintiffs provided overwhelming evidence of cohesion. *See* ROA.15923-15931. All experts agreed that general

elections, not primary elections, provide the clearest picture of voting patterns in Galveston County. ROA.15928, 16015. Furthermore, Galveston County Commission primaries provide little insight into voter cohesion. Many primaries were uncontested. ROA.16904. For example, all Democratic[17] primary elections for County Commission Precinct 3, were uncontested in the past decade. ROA.15928. Voter turnout is also usually low for primary elections which makes analysis of multicandidate primary elections unreliable due to the instability of the data. ROA.15928, 17342, 17373. Plaintiffs' expert Oskooii, whose primary analysis focused on two-candidate Democratic primary elections, correctly studied the only elections in Galveston County with data capable of producing accurate and stable results. *See* ROA.17367-17368, 17373.

Nonpartisan elections similarly lack reliable data from which to determine voter cohesion. ROA.15930. Nonpartisan elections in Galveston County cover only small portions of the County, failing to provide an accurate picture of voter behavior in the County as a whole. ROA.15930, 19347-19348. Although the County faults Plaintiffs' experts for not examining every single election within Galveston County,

---

[17] All experts agree that Latino and Black voters primarily participated in the Democratic primary election rather than the Republican primary elections. ROA.15936-15937.

Plaintiffs' experts correctly examined relevant elections with sufficient, stable and reliable data, as is sound statistical practice.

The presence of wider confidence intervals in some of Plaintiffs' expert results similarly do not evidence low voter cohesion. Confidence intervals do not measure the reliability of the vote pattern analysis. ROA.16973. Although confidence intervals can vary depending on number of voters or precincts, ROA.17331-17332, this alone does not make the data unreliable. ROA.16949-16950. Indeed, Plaintiffs' expert Dr. Barreto ran more than 700 models to determine voter cohesion over the past twenty years in Galveston County. ROA.16947-16948. These models consistently demonstrated high levels of Latino voter cohesion. *Id*.

## B. The County, not Plaintiffs, bears the burden of showing nonracial motivations behind voter behavior.

The County alone bears the burden of showing that factors other than race motivate voter behavior in Galveston County. *Teague,* 92 F.3d at 290. It failed to meet this burden at the trial and now tries to shift the burden using the presence of multiple minority groups as a pretext. ROA.15936. This position has no basis in law. *Teague,* 92 F.3d at 290.

Even if Plaintiffs did have such a burden, they readily satisfied it. ROA.16019. The district court made several factual findings rejecting the argument that partisan politics predominated over racial concerns in voter behavior. *See*

*Clements*, 999 F. 2d at 861. These findings included the recognition of stark racial composition of political parties in Galveston County, ROA.15936-15937, 1734, 19402-19403, the long history of lack of access to the political process for both Black and Latino voters, *see e.g.,* ROA.15941, and a lack of responsiveness by elected and public officials to Black and Latino needs. ROA.15990-15991. Given the overwhelming evidence in this case that race motivates voter behavior, the County's argument falls flat.

## VI. The district court's intentional discrimination findings preclude a take-nothing judgment because a ruling against Plaintiffs requires remand to resolve Plaintiffs' remaining claims.

The County seeks a take-nothing judgement from this Court in the event that it prevails. Br. at 48. But the County is precluded from a take-nothing judgment in light of the district court's factual findings supporting a showing of intentional discrimination and racial gerrymandering in this case. *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (en banc) ("Since the record does not permit only one resolution of the factual issue, and there is evidence that could support the district court's finding of discriminatory purpose, we must remand for a reweighing of the evidence.") (internal quotation marks omitted). Specifically, the district court observed that it was "stunning how completely the county extinguished the Black and Latino communities' voice on its commissioners court during 2021's redistricting." ROA.16028. The district court found, *inter alia,* that "[c]onduct by

Judge Henry and the county commissioners indicated a disregard for public input from the minority communities and those critical of the enacted plan's discriminatory effects." ROA.15974. It also rejected all other non-racial explanations for Map 2's purpose, ROA.15978 ("The rationales stated by members of the commissioners court in public, in deposition testimony, and at trial are inconsistent with these purported criteria."); *id.* ("Judge Henry admitted that he did not know of or apply the criteria the commissioners court claimed in its interrogatory responses to have used in the redistricting process."). The court further found that the map's impact on the minority population was "evident and foreseeable," that it would "depriv[e] them of the only commissioners precinct where minority voters could elect a candidate of their choice," and that "the commissioners court was aware of that fact when it adopted the enacted plan." ROA.15939. Likewise, the district court credited alternative maps satisfying the County's post-hoc "coastal precinct" justification that it found disproved the County's nonracial explanation for its districting decisions. ROA. 15978; *see Cooper*, 581 U.S. at 317-18 (explaining that such alternative maps are "key evidence" and "highly persuasive" for plaintiffs to show that racial gerrymandering, not a proffered justification, explains the challenged map's design). The district court only declined to draw legal conclusions about the County's intentional discrimination and racial gerrymandering claims in adherence to constitutional avoidance, because the "requested relief is neither

exclusive to intentional-discrimination or racial-gerrymandering claims nor broader than the relief allowed under § 2." ROA.16033. These claims were only unresolved by the district court because its judgment in favor of Plaintiffs' on their Section 2 claim afforded them all the relief they requested and left it unnecessary for the district court to decide anything further. If this Court overrules its 30-year-old precedent and reverses the district court on Section 2, due process will require Plaintiffs be afforded a decision by the district court on their unresolved intent and racial gerrymandering claims.

If this Court rules in favor of the County, the appropriate remedy is remand so that the district court may address the remaining intentional discrimination claims. *See Pullman-Standard v. Swint,* 456 U.S. 273, 292 (1982); *Veasey*, 830 F.3d at 230-35.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

February 14, 2023                           Respectfully submitted,

*/s/ Mark P. Gaber*                         */s/ Chad W. Dunn*
Mark P. Gaber                               Chad W. Dunn
Valencia Richardson                         Brazil & Dunn
Simone Leeper                               1900 Pearl Street
Alexandra Copper                            Austin, TX 78705
Campaign Legal Center                       (512) 717-9822
1101 14th St. NW, Ste. 400                  chad@brazilanddunn.com
Washington, DC 20005
(202) 736-2200                              K. Scott Brazil

mgaber@campaignlegal.org
vrichardson@campaignlegal.org
sleeper@campaignlegal.org
acopper@campaignlegal.org

Neil Baron
Law Office of Neil G. Baron
1010 E. Main St., Ste. A
League City, TX 77573
(281) 534-2748
neil@ngbaronlaw.com

Brazil & Dunn
13231 Champion Forest Dr., Ste. 406
Houston, TX 77069
(281) 580-6310
scott@brazilanddunn.com

Bernadette Reyes
Sonni Waknin
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90095
(310) 400-6019
bernadette@uclavrp.org
sonni@uclavrp.org

*Counsel for* Petteway *Appellees*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

1.      This document complies with the word limit of Fed. R. App. P. 32 because this document contains 11,496 words which is within the 13,000 word-count limit, excluding the portions exempted by the Rules.

2.      This document complies with the typeface and type style requirements of Fed. R. App. P. 27(d)(1)(E) because the document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2309 in Times New Roman 14-point font.

*/s/ Chad W. Dunn*
Chad W. Dunn
*Counsel for* Petteway *Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2023, this document was electronically served on all counsel of record via the Court's CM/ECF system.

*/s/ Chad W. Dunn*
Chad W. Dunn
*Counsel for* Petteway *Appellees*