# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 1, 2024

Lyle W. Cayce
Clerk

———————

No. 23-40582

———————

HONORABLE TERRY PETTEWAY; HONORABLE DERRECK ROSE;
HONORABLE PENNY POPE,

*Plaintiffs—Appellees,*

*versus*

GALVESTON COUNTY, TEXAS; MARK HENRY, *in his official capacity
as Galveston County Judge*; DWIGHT D. SULLIVAN, *in his official capacity
as Galveston County Clerk*,

*Defendants—Appellants,*

———————————————————

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

GALVESTON COUNTY, TEXAS; GALVESTON COUNTY
COMMISSIONERS COURT; MARK HENRY, *in his official capacity as
Galveston County Judge*,

*Defendants—Appellants,*

———————————————————

1

DICKINSON BAY AREA BRANCH NAACP; GALVESTON BRANCH NAACP; MAINLAND BRANCH NAACP; GALVESTON LULAC COUNCIL 151; EDNA COURVILLE; JOE A. COMPIAN,

*Plaintiffs—Appellees*,

*versus*

GALVESTON COUNTY, TEXAS; MARK HENRY, *in his official capacity as Galveston County Judge*; DWIGHT D. SULLIVAN, *in his official capacity as Galveston County Clerk*,

*Defendants—Appellants*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC Nos. 3:22-CV-117, 3:22-CV-57,
3:22-CV-93

---

ON PETITION FOR REHEARING EN BANC

Before RICHMAN, *Chief Judge*, and JONES, SMITH, BARKSDALE, STEWART, ELROD, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, WILLETT, HO, DUNCAN, ENGELHARDT, OLDHAM, WILSON, DOUGLAS, and RAMIREZ, *Circuit Judges*.

EDITH H. JONES, *Circuit Judge*, joined by RICHMAN[*], *Chief Judge*, and SMITH, BARKSDALE, ELROD, SOUTHWICK, WILLETT, HO[†], DUNCAN, ENGELHARDT, OLDHAM, and WILSON, *Circuit Judges*:

---

[*] JUDGE RICHMAN joins all but Section II.D.

[†] JUDGE HO joins Sections I, II.C., and III only.

No. 23-40582

The issue in this *en banc* case is whether Section 2 of the Voting Rights Act authorizes coalitions of racial and language minorities to claim vote dilution in legislative redistricting. In an increasingly multiracial and multi-language polity, the importance of this issue is obvious. We overrule this court's decision in *Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988), and its progeny, which allowed such claims to be maintained.

In 2021, the Galveston County Commissioners Court enacted a new districting plan for county commissioner elections. The enacted plan eliminated the county's sole majority-minority precinct, which had existed since 1991. The majority-minority population in that precinct was composed of two distinct minority groups, blacks and Hispanics.

In 2022, three sets of plaintiffs challenged the enacted plan in federal court, claiming that it diluted the votes of a coalition of black and Hispanic voters in violation of Section 2 of the Voting Rights Act. *See* 52 U.S.C. § 10301. The district court conducted a bench trial and rendered judgment in Plaintiffs' favor. In doing so, it applied this court's decision in *Campos v. City of Baytown*, which held that distinct minority groups may aggregate their populations for purposes of vote dilution claims under Section 2. 840 F.2d at 1244. This holding was critical to Plaintiffs' Section 2 claim because neither the black population nor the Hispanic population of Galveston County is large enough on its own to "constitute a majority" in a reasonably configured county commissioner precinct. *See Thornburg v. Gingles*, 478 U.S. 30, 50, 106 S. Ct. 2752, 2766 (1986) (describing this first precondition to vote dilution claims under Section 2).[1]

---

[1] Contrary to repeated statements in Judge Douglas's dissent, the issue of intentional discrimination was not part of the district court's Section 2 ruling. The court withheld ruling on that constitutional issue, which we remand for further consideration.

No. 23-40582

The panel decision affirmed the district court's judgment but called for the *en banc* court to reconsider *Campos*'s holding authorizing what are often called "minority coalition claims." Having vacated the panel opinion for rehearing *en banc*, we conclude that coalition claims do not comport with Section 2's statutory language or with Supreme Court cases interpreting Section 2, particularly *Bartlett v. Strickland*, 556 U.S. 1, 129 S. Ct. 1231 (2009). We OVERRULE *Campos*, REVERSE the district court's judgment, and REMAND for further proceedings.

## I. Background

### A. Factual Background

According to the 2020 census, Galveston County, Texas, has a total population of 350,682. The citizen voting-age population of the county is 58 percent white, 22.5 percent Hispanic, and 12.5 percent black. The Hispanic population is evenly dispersed throughout the county, while the black population is concentrated in the center of the county, i.e., in Texas City, La Marque, Dickinson, Hitchcock, and the city of Galveston.

Galveston County is governed by a county commissioners court, which consists of one county judge, elected county-wide, and four county commissioners elected from single-member precincts. *See* Tex. Const. art. V, §§ 16, 18(b). The current county judge is a Republican. Three of the commissioners are also Republicans, and one is a Democrat. One of the Republican commissioners is a black man. The only Democrat, Commissioner Stephen Holmes, is also a black man.

Commissioner Holmes represents Precinct 3. From 1991 to 2021, Precinct 3 was the county's only majority-minority precinct, and its borders encompassed the center of the county. The majority-minority population of Precinct 3 was composed of both black and Hispanic citizens of voting age.

4

As of 2020, blacks and Hispanics together amounted to 58 percent of the precinct's citizen voting-age population.

The county undertook redistricting efforts in 2021 after receiving the 2020 census data.  Two redistricting maps, or plans, were proposed during the redistricting process.  Map 1, a "minimal change" plan, retained Precinct 3 as a majority-minority precinct, with a 31 percent black and 24 percent Hispanic citizen voting-age population.  Map 2, an "optimal change" plan, did not contain a majority-minority precinct and reduced the minority population of Precinct 3 to the lowest of the four precincts.  The Commissioners Court voted to enact Map 2.  Only Commissioner Holmes voted against the enacted plan.

The Petteway Plaintiffs, the NAACP Plaintiffs, and the United States challenged the enacted plan in federal court.  All three sets of plaintiffs claimed that the enacted plan violated Section 2 of the Voting Rights Act by diluting the votes of Galveston County's black and Hispanic voters.  The Petteway Plaintiffs and NAACP Plaintiffs also pleaded that the enacted plan was (1) intentionally discriminatory in violation of the Fourteenth and Fifteenth Amendments and (2) racially gerrymandered in violation of the Fourteenth Amendment.

Following a ten-day bench trial, the district court found that the enacted plan violated Section 2 and enjoined Galveston County from using the plan.  "[T]he enacted plan," the district court wrote, "illegally dilutes the voting power of Galveston County's Black and Latino voters by dismantling Precinct 3, the county's historic and sole majority-minority commissioners precinct."  In reaching this decision, the district court followed *Campos*, 840 F.2d at 1244, which allows distinct minority groups to aggregate their populations when alleging vote dilution under Section 2.  The district court declined to reach the intentional discrimination and racial gerrymandering

claims brought by the Petteway Plaintiffs and NAACP Plaintiffs because the relief they requested with respect to those claims was no broader than the relief they were entitled to under Section 2. Galveston County appealed.

Following the original appellate panel's recommendation, this court voted to rehear the case *en banc* and subsequently stayed the district court's remedial orders pending resolution of *en banc* proceedings. 86 F.4th 1146 (5th Cir. 2023).

## B. Legal Background

Section 2 of the Voting Rights Act provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301.

Subsection (a) of the quoted statute incorporates by reference Section 4(f)(2) of the Voting Rights Act, codified at 52 U.S.C. § 10303(f)(2). That provision prohibits discrimination in voting against "language minorities," which the Act elsewhere defines as "persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage." *Id.* § 10310(c)(3). The 1975 Amendments to the Voting Rights Act added the protections for language minorities, who were not covered under the original version of the Act (enacted in 1965). *See* Pub. L. No. 94–73, 89 Stat. 400 (1975).

The 1982 Amendments to the Voting Rights Act added subsection (b) to Section 2. Pub. L. No. 97–205, 96 Stat. 131 (1982). The new subsection was Congress's response to the Supreme Court's controversial decision in *City of Mobile v. Bolden*, which held that proof of discriminatory intent was required for vote dilution claims under both the Fifteenth Amendment and Section 2 as it was then written. 446 U.S. 55, 61–65, 100 S. Ct. 1490, 1496–98 (1980). Subsection (b) abrogated *Bolden*'s holding as to Section 2 by adopting the "results test" from the leading pre-*Bolden* vote dilution case, *White v. Regester*, 412 U.S. 755, 766, 93 S. Ct. 2332, 2339 (1973). *See* S. Rep. No. 97-417, at 2 (1982).

In 1986, the Supreme Court decided *Thornburg v. Gingles*, which provides the framework for analyzing vote dilution claims under Section 2 today. 478 U.S. 30, 106 S. Ct. 2752. The *Gingles* Court specified three preconditions that a minority group must prove to succeed on a vote dilution claim. "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a [reasonably configured] single-member district." *Id.* at 50, 106 S. Ct. at 2766. "Second, the minority group must be able to show that it is politically cohesive." *Id.* at 51, 106 S. Ct. at 2766. And "[t]hird, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Id.*, 106 S. Ct. at 2766–67.

If these three preconditions are established, the minority group must then show that, "based on the totality of circumstances," the electoral process is not "equally open" to its members. 52 U.S.C. § 10301(b). This final step of the analysis entails considering several factors, often called the Senate factors because they originated from the Senate Judiciary Committee Report accompanying the 1982 Amendments. *Gingles*, 478 U.S. at 36–37, 106 S. Ct. at 2759 (citing S. Rep. No. 97-417, at 28–29); *see also Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 668–75, 141 S. Ct. 2321, 2338–41 (2021).

The primary issue here concerns the first *Gingles* precondition, which requires the minority group to be sufficiently large to constitute a majority in a reasonably configured single-member district. The Supreme Court has not decided whether distinct minority groups may aggregate their populations to satisfy this requirement. It expressly declined to do so on at least two occasions. *See Growe v. Emison*, 507 U.S. 25, 41, 113 S. Ct. 1075, 1085 (1993) ("[a]ssuming (without deciding) that it was permissible for the District Court to combine distinct ethnic and language minority groups for purposes of assessing compliance with § 2," and then holding that the coalition had failed to prove cohesion under the second *Gingles* precondition); *Bartlett v. Strickland*, 556 U.S. 1, 13–14, 129 S. Ct. 1231, 1242–43 (2009) (plurality opinion) ("We do not address [coalition claims] here.").

This court first held that distinct minority groups may aggregate their populations under Section 2 in *LULAC v. Midland I.S.D.*, 812 F.2d 1494, 1500–01 (5th Cir. 1987). Judge Higginbotham dissented, disagreeing with the panel's holding on aggregation. *Id.* at 1504. The panel opinion was later vacated on rehearing *en banc*, and the *en banc* court decided the case on different grounds. 829 F.2d 546 (5th Cir. 1987). *Midland I.S.D.* thus no longer serves as the operative precedent on coalition claims in this circuit.

No. 23-40582

Instead, the operative precedent is *Campos v. City of Baytown*, decided a year later.  840 F.2d 1240 (5th Cir. 1988).  In *Campos*, this court upheld a district court's finding that the City of Baytown's at-large election system for city council diluted the votes of a coalition of black and Hispanic voters in violation of Section 2.  On the propriety of coalition vote dilution claims under Section 2, the court reasoned only that "[t]here is nothing in the law that prevents the plaintiffs from identifying the protected aggrieved minority to include both Blacks and Hispanics."  *Id.* at 1244.  It explained that Section 2 protects the voting rights of both racial and language minorities.  *Id.*  "If, together, they are of such numbers residing geographically so as to constitute a majority in a single member district, they cross the *Gingles* threshold as potentially disadvantaged voters."  *Id.*  Further, to satisfy the second *Gingles* precondition, there must be proof that the coalition "together votes in a cohesive manner for the minority candidate."  *Id.* at 1245.  Thus, "if the statistical evidence is that Blacks and Hispanics together vote for the Black or Hispanic candidate, then cohesion is shown."  *Id.*  Judge Higginbotham, joined by five other judges, dissented from denial of rehearing *en banc* in *Campos*, again disagreeing with the panel's holding on minority coalitions.  849 F.2d 943, 944–46 (5th Cir. 1988).

Five years after *Campos*, this court, sitting *en banc*, decided *LULAC v. Clements*, 999 F.2d 831 (5th Cir. 1993).  Judge Higginbotham wrote the opinion for the court, which held that a coalition of black and Hispanic voters who challenged Texas's election system for trial judges failed to prove vote dilution under Section 2.  Notably, the *Clements* court did not "revisit" whether distinct minority groups may aggregate their populations under Section 2. *Id.* at 864.  It instead relied on precedent, explaining that "we have treated the issue as a question of fact, allowing aggregation of different minority groups where the evidence suggests that they are politically cohesive." *Id.*  A

concurring opinion would have decided the case solely on the ground that coalition claims are impermissible. *Id.* at 894–98 (Jones, J., concurring).

Only one other circuit court has thoroughly analyzed the issue before this court today. Sitting *en banc*, the Sixth Circuit created a circuit split by concluding that Section 2 does not authorize minority coalition vote dilution claims. *Nixon v. Kent Cnty.*, 76 F.3d 1381, 1387 (6th Cir. 1996) ("A textual analysis of § 2 reveals no word or phrase which reasonably supports combining separately protected minorities."). The court's opinion relied heavily on dissenting and concurring opinions from judges of this court in the cases described above.

The Eleventh Circuit reached the opposite conclusion in an earlier opinion that followed, without reasoning, this court's precedent. *See Concerned Citizens of Hardee Cnty. v. Hardee Cnty. Bd. of Comm'rs*, 906 F.2d 524, 526 (11th Cir. 1990) ("Two minority groups (in this case blacks and hispanics) may be a single section 2 minority if they can establish that they behave in a politically cohesive manner." (citing *Campos*, 840 F.2d at 1244, and *Midland I.S.D.*, 812 F.2d at 1500–02)). As a three-judge district court in Georgia recently observed, it would be inaccurate to characterize the Eleventh Circuit's decision as containing a holding that coalition claims are permissible under Section 2, because the court ultimately held against the coalition on other grounds. *Ga. State Conf. of the NAACP v. Georgia*, No. 1:21-cv-05338-ELB-SCJ-SDG, 2023 WL 7093025, at *16 (N.D. Ga. Oct. 26, 2023).

Finally, the Second, Seventh, and Ninth Circuits have resolved cases involving minority coalitions without discussing or deciding whether coalition claims are permissible. *See Pope v. Cnty. of Albany*, 687 F.3d 565, 572 & n.5 (2d Cir. 2012) (affirming denial of preliminary injunction for coalition of black and Hispanic voters because voters failed to show likelihood of success on third *Gingles* precondition); *Bridgeport Coal. for Fair Representation v. City*

*of Bridgeport*, 26 F.3d 271, 278 (2d Cir.) (holding that coalition of black and Hispanic voters were entitled to preliminary injunction), *vacated*, 512 U.S. 1283, 115 S. Ct. 35 (1994); *Frank v. Forest Cnty.*, 336 F.3d 570, 575–76 (7th Cir. 2003) (calling coalition claims "problematic," but ultimately rejecting plaintiffs' coalition claim for lack of political cohesion); *Badillo v. City of Stockton*, 956 F.2d 884, 890–91 (9th Cir. 1992) (holding that coalition of black and Hispanic voters lacked evidence of political cohesion). Plaintiffs are wrong to characterize these cases as holding that coalition claims are permissible under Section 2. Opinions that "never squarely addressed [an] issue" and "at most assumed the" answer are not precedential "by way of *stare decisis*." *Brecht v. Abrahamson*, 507 U.S. 619, 631, 113 S. Ct. 1710, 1718 (1993).

## II. Discussion

After reconsidering *Campos en banc*, this court holds that Section 2 of the Voting Rights Act does not authorize separately protected minority groups to aggregate their populations for purposes of a vote dilution claim. The analysis that leads to this conclusion is divided into five sections. We explain first that minority coalition claims are inconsistent with the text of Section 2. Second, because the statutory text is clear, we need not address the legislative history, but Plaintiffs' argument based on pre-1982 cases involving minority coalitions is meritless in any event. Third, coalition claims are inconsistent with Supreme Court cases rejecting similar "sub-majority" vote dilution claims, especially *Bartlett v. Strickland*. Fourth, other considerations, including the poor track record of coalition claims thus far and their tension with the proviso against proportional representation and with the purposes of the Voting Rights Act, also disfavor continuing to recognize coalition claims. And fifth, stare decisis does not require us to adhere to our erroneous decision in *Campos*.

No. 23-40582

## A. Statutory Text

The text of Section 2 does not authorize coalition claims, either expressly or by implication. "It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Lamie v. U.S. Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 1030 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S. Ct. 1942, 1947 (2000)).

Nowhere does Section 2 indicate that two minority groups may combine forces to pursue a vote dilution claim. On the contrary, the statute identifies the subject of a vote dilution claim as "a class," in the singular, not the plural. Section 2(b)'s results test requires a showing that the electoral processes "are not equally open to participation by members of *a class* of citizens protected by subsection (a) in that *its* members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 51 U.S.C. § 10301(b) (emphasis added). Twice after, the subsection uses the phrase "a protected class." "Had Congress chosen explicitly to protect minority coalitions it could have done so by defining the 'results' test in terms of protected *classes* of citizens. It did not." *Clements*, 999 F.2d at 894 (Jones, J., concurring).

Nor can "a class" be read to encompass two distinct minority groups. "[A] class" under Section 2(b) is defined according to the characteristic that all its members share, and by virtue of which its members are "protected by subsection (a)." The defining characteristics for purposes of Section 2 are race, color, or membership in one of several language minority groups. Section 2(a) makes this clear by tying the statute's protection of voting rights to the particular race, color, or language minority status of individual citizens. As the Sixth Circuit observed in *Nixon*, "The Act protects a citizen's right

12

No. 23-40582

to vote from infringement because of, or 'on account of,' that *individual's* race or color or membership in a protected language minority."[2] 76 F.3d at 1386 (citing provision now codified at 52 U.S.C. § 10301(a)); *see also* 52 U.S.C. § 10303(f)(2) (prohibiting states and political subdivisions from "deny[ing] or abridg[ing] the right of any citizen of the United States to vote *because he is a member of a language minority group*" (emphasis added)). Two individuals who do not share the same defining characteristic are not members of the same "class"; they are members of two distinct classes, and their vote dilution claims must be analyzed separately.[3]

---

[2] The *Nixon* court also points out that the only place where the Voting Rights Act referenced potential minority group aggregations *rejected* them. *Nixon*, 76 F.3d at 1387 n.7 (citing Section 4(f)(3) of the Voting Rights Act, currently codified at 52 U.S.C. § 10303(f)(3) (providing that foreign language ballots and other voting materials must be furnished only where "citizens of a single language minority" constitute at least 5 percent of the citizen voting age population of a political subdivision)).

I disagree with the dissent's contention that this limit inferentially supports Section 2(b) coalition claims. The provisions have completely different goals. Section 4(f)(3) requires local officials to print ballots in a foreign language *only if* at least 5 percent of the minority are dependent on that language; any other rule would provide no guideline and no limit on the tedious and costly process of printing foreign language ballots. Section 4(f)(3) demonstrates that there may be logical stopping points to accommodate "classes" of voters. Section 2(b), on the other hand, tackles the far more complex political problem of legislative redistricting, and it models pre-existing non-aggregated case law and non-aggregated civil rights legislation.

[3] The lead dissent from the Sixth Circuit's decision in *Nixon* argued that this interpretation imposes a "racial purity test" for Section 2 claims. 76 F.3d at 1401 (Keith, J., dissenting). This is not a credible concern today. *See, e.g.*, *Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1, 123 S. Ct. 2498, 2507 n.1 (2003) (recognizing that litigants may rely on the "Any Part Black" metric in defining the class of voters seeking protection under the Voting Rights Act), *superseded by statute on other grounds*, Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, 120 Stat. 577; *Robinson v. Ardoin*, 37 F.4th 208, 217 (5th Cir. 2022) ("[T]he district court did not err by using the 'Any Part Black' metric to calculate BVAP [black voting age population].").

No. 23-40582

This reading of the statute is not mere surmise. The second sentence of Section 2(b) provides, "The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered" when determining whether the electoral process is not equally open to members of the class. 52 U.S.C. § 10301(b). An inquiry into the electoral success of "a protected class" makes sense only if it is restricted to a specific racial or language-minority group. For example, black voters in San Antonio would hardly be persuaded that a vote dilution claim lacked merit simply because whites, a minority in the majority-Hispanic city, were being elected to local office.[4] Nor would Hispanics in Houston see citywide elected black politicians as evidence against any dilution of Hispanic votes. The election of black officials would be an irrelevant "circumstance" in determining whether a state or political subdivision is diluting the strength of Hispanic voters.

Section 2(b)'s use of the phrase "protected class" also supports our interpretation. In discrimination law, this phrase is typically used to acknowledge membership in a particular racial or ethnic group, when racial discrimination is alleged. *See, e.g.*, *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017) (describing *prima facie* case of employment discrimination under Title VII as requiring proof that the plaintiff "(1) is a member of a protected class, (2) was qualified for the position that he held, (3) was subject to an adverse employment action, and (4) was treated less favorably than others similarly situated outside of his protected class"). It is membership in the discrete racial or ethnic group that triggers protection and guides analysis of whether the plaintiff has been discriminated against. So too here.

---

[4] *Cf. United States v. Brown*, 561 F.3d 420 (5th Cir. 2009) (affirming finding of intentional vote dilution against white voters under Section 2).

14

No. 23-40582

None of Plaintiffs' textual arguments to the contrary is convincing. First, Plaintiffs urge us to read "a class of citizens protected by subsection (a)" to encompass all voters who claim a violation of the right protected by subsection (a), regardless whether they share the same race. This argument relies in part on the last antecedent grammatical rule, "according to which a limiting clause or phrase [here, the phrase 'protected by subsection (a)'] should ordinarily be read as modifying only the noun or phrase that it immediately follows [here, 'citizens' rather than 'class']." *See Barnhart v. Thomas*, 540 U.S. 20, 26, 124 S. Ct. 376, 380 (2003). As the Supreme Court has explained, however, "this rule is not an absolute and can assuredly be overcome by other indicia of meaning." *Id.* Section 2 provides other indicia of meaning by using "protected class" as shorthand for "a class of citizens protected by subsection (a)." In the shorthand form, "protected" plainly modifies "class," not "citizens."

Plaintiffs' interpretation also relies in part on Rule 23 of the Federal Rules of Civil Procedure, which governs class actions. The United States contends that the term "class" in Section 2(b) should be read "in Rule 23's sense," to mean "a group of individuals with a common injury and legal position." But Rule 23's sense of class does not transfer neatly to Section 2. After all, the *object* of Section 2(b) is to determine whether "a protected class" has suffered injury. Defining the class *in terms of* injury begs the question whether the class is "protected by subsection (a)" in the first place. And the answer to that question is determined by the individual characteristic of race, color, or language minority status, not by injury. Moreover, Rule 23 provides a procedural device to a class of persons with legal claims provided by other, underlying substantive law, whereas Section 2(b) is itself a source of that substantive law for members of a protected class.

Next, Plaintiffs invoke the Dictionary Act to argue that "class" should be read as "classes." The Dictionary Act provides, "In determining the

meaning of any Act of Congress, unless the context indicates otherwise—words importing the singular include and apply to several persons, parties, or things. . . ." 1 U.S.C. § 1. For reasons identified above, in Section 2 "the context indicates otherwise." It is clear from Section 2(b)'s second sentence (concerning the electoral successes of a protected class), for instance, that "a protected class" encompasses only one class, not multiple racial or language minority classes.

Finally, relying on the Supreme Court's decision in *Chisom v. Roemer*, 501 U.S. 380, 111 S. Ct. 2354 (1991), Plaintiffs argue that an expansive interpretation of Section 2 is warranted by the statute's broad remedial purpose. In *Chisom*, the Supreme Court held that Section 2 applies to the election of judges, even though the statute refers only to "representatives." In doing so, the Court observed that the Voting Rights Act was enacted for the broad remedial purpose of eliminating racial discrimination in voting and "should be interpreted in a manner that provides 'the broadest possible scope' in combating" such discrimination. *Id.* at 403, 111 S. Ct. at 2368 (citation omitted).

*Chisom* does not support Plaintiffs' interpretation of the statute. The Supreme Court recently emphasized that "vague notions of a statute's 'basic purpose' are . . . inadequate to overcome the words of its text regarding the *specific* issue under consideration." *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 150, 136 S. Ct. 651, 661 (2016) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261, 113 S. Ct. 2063, 2071 (1993)). In this case, *nothing* in the text of Section 2 supports a conclusion that distinct minority groups may aggregate their populations; the text, in fact, supports the opposite conclusion. Nor does anything in the statutory history of Section 2 support aggregation. That distinguishes the interpretative question in this case from the one in *Chisom*. As the Sixth Circuit explained:

> In *Chisom*, it was "undisputed that § 2 applied to judicial elections prior to the 1982 Amendment." . . . Unlike *Chisom*, here it is undisputed that the Voting Rights Act has *never* permitted coalition suits by its terms, and that no mention is made of them anywhere in the legislative history.

*Nixon*, 76 F.3d at 1389 (quoting *Chisom*, 501 U.S. at 390, 111 S. Ct. at 2361).

Congress's silence on the aggregation issue, textually and otherwise, ultimately means that minority vote dilution coalitions are impermissible. *Campos* got things precisely backwards when it held that coalition claims are permissible merely because Section 2 does not expressly prohibit them. 840 F.2d at 1244. It is Congress's failure to *expressly authorize* coalition claims that is dispositive of the issue. *See Campos*, 849 F.2d at 945 (Higginbotham, J., dissenting from denial of rehearing *en banc*) ("Playing with the structure of local government in an effort to channel political factions is a heady game; we should insist that Congress speak plainly when it would do so."); *see also Bond v. United States*, 572 U.S. 844, 858, 134 S. Ct. 2077, 2089 (2014) ("[I]t is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers." (citation and quotation marks omitted)). That Congress did not even impliedly authorize coalition claims—but instead impliedly prohibited them—underscores the error in *Campos*'s holding.

The statutory text points to only one conclusion, that coalition claims are impermissible.

## B. Legislative History

Plaintiffs and Galveston County each contend that the legislative history accompanying the 1975 and 1982 Amendments to the Voting Rights Act favors their respective interpretations of Section 2. The parties' arguments

are uniformly weak, "nicely prov[ing] th[e] point" that legislative history "on the whole, [is] more likely to confuse than to clarify." *Conroy v. Aniskoff*, 507 U.S. 511, 519, 113 S. Ct. 1562, 1567 (1993) (Scalia, J., concurring) (emphasis removed). Fortunately, we need not address these arguments at all, because the text of Section 2 is clear. *See Adkins v. Silverman*, 899 F.3d 395, 403 (5th Cir. 2018) ("[W]here a statute's text is clear, courts should not resort to legislative history." (citing *BedRoc Ltd. v. United States*, 541 U.S. 176, 183, 124 S. Ct. 1587, 1593 (2004))).

One argument that overlaps with Plaintiffs' legislative history arguments is, however, worth addressing, in part because it received attention during oral argument. Plaintiffs and their Amici contend that the legislative history shows that Congress was aware of cases involving coalition claims and yet chose not to include a single-race requirement. This purportedly demonstrates that Congress intended to authorize coalition claims. *See Nixon*, 76 F.3d at 1395 (Keith, J., dissenting) ("If Congress was thus aware that more than one minority group could be considered to constitute one plaintiff class in determining the availability of Voting Rights Act protection, certainly the absence of an explicit prohibition of minority coalition claims compels a construction of Section 2 which allows them.").

This argument is riddled with distortion and error. The cases on which it is based include *White v. Regester*, 412 U.S. 755, 93 S. Ct. 2332 (1973), *Graves v. Barnes*, 408 F. Supp. 1050 (W.D. Tex. 1976), *Wright v. Rockefeller*, 376 U.S. 52, 84 S. Ct. 603 (1964), and *United Jewish Organizations of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 97 S. Ct. 996 (1977). Unsurprisingly, none of these cases is cited in the legislative history for the proposition that coalitions of minority voters are protected from vote dilution under Section 2 or under the Constitution. Nor do any of the cases hold that coalition claims are permissible as a statutory or constitutional matter. Nor do any of them involve vote dilution claims under Section 2.

No. 23-40582

Indeed, *White* did not involve a coalition claim at all. There, the Supreme Court held that one multimember district encompassing Dallas County, Texas, diluted the votes of black voters, and that a *separate* multimember district encompassing Bexar County diluted the votes of Hispanic voters. 412 U.S. at 765–70, 93 S. Ct. at 2339–41. *Graves*, a continuation of the *White* lawsuit on remand, did involve a coalition claim, under the Fourteenth and Fifteenth Amendments, but it did not address whether such claims are permissible.[5] 408 F. Supp. at 1052. *Wright* also involved a coalition claim, again under the Fourteenth and Fifteenth Amendments, but it too did not address whether such claims are permissible and in fact held *against* the minority coalition. 376 U.S. at 53, 58, 84 S. Ct. at 604, 606. Finally, *Carey* only tangentially involved a coalition of minority voters. The plaintiffs in that case were Hasidic Jews, and only Hasidic Jews; they unsuccessfully challenged the constitutionality of a redistricting plan that had been revised after the Attorney General objected, during Section 5 preclearance, to the original redistricting plan's alleged dilution of the "voting strength of nonwhites (blacks and Puerto Ricans)." 430 U.S. at 149–50, 97 S. Ct. at 1002.

That none of these cases interpreted or even applied Section 2 defeats any statutory stare decisis argument based on Supreme Court precedent.[6] To

---

[5] The three-judge district court in *Graves* reaffirmed its holding in an earlier (vacated) decision that single-member districts were required in Tarrant County, Texas, because multimember districts diluted the votes of black and Hispanic voters there. For the earlier decision, see *Graves v. Barnes*, 378 F. Supp. 640, 644–48 (W.D. Tex. 1974), *vacated sub nom. White v. Regester*, 422 U.S. 935, 95 S. Ct. 2670 (1975). The Supreme Court summarily denied an application for stay of the district court's 1976 decision. *See Escalante v. Briscoe*, 424 U.S. 937, 96 S. Ct. 1404 (1976). This stay denial by the Supreme Court is minimally informative. *See* Trevor N. McFadden & Vetan Kapoor, *The Precedential Effects of the Supreme Court's Emergency Stays*, 44 Harv. J.L. Pub. Pol'y 827, 849 (2021) ("[D]ecisions by either a single Justice or the full Court to *deny* a stay application cannot have any precedential or persuasive effect.").

[6] Statutory stare decisis receives further attention in Section II.E, below.

No. 23-40582

be sure, the pre-1982 Fourteenth and Fifteenth Amendment cases that Plaintiffs cite are still potentially relevant to interpreting Section 2. Even in the absence of legislative history, "[w]e assume that Congress is aware of existing law when it passes legislation," *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32, 111 S. Ct. 317, 325 (1990); and Congress, in 1982, clearly was aware of existing (or pre-existing) voting rights law, since it drew the relevant language of Section 2(b)'s results test from *White*. Yet this helps Plaintiffs very little. None of the pre-1982 cases that Plaintiffs cite decided, as a matter of law, whether coalition claims are permissible. The issue evidently never was presented. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511, 45 S. Ct. 148, 149 (1925). Coalition claims were, therefore, not part of the existing body of law with which Congress had to contend in 1982, and the argument that Congress impliedly authorized such claims by failing to include a single-race qualifier in Section 2 is meritless.

### C. Supreme Court Precedent

Supreme Court precedent also disfavors Plaintiffs' preferred interpretation of Section 2. As explained above, the first *Gingles* precondition requires proof that the minority group is sufficiently large to constitute a majority in a reasonably configured single-member district. *Gingles*, 478 U.S. at 50, 106 S. Ct. at 2766. On two occasions, the Supreme Court has rejected Section 2 plaintiffs' attempts to circumvent this requirement, which the Plaintiffs in this case again attempt to circumvent.

In *LULAC v. Perry*, 548 U.S. 399, 126 S. Ct. 2594 (2006), the Court held that Section 2 does not require the creation of "influence districts." Influence districts are those in which a minority group cannot elect the candidate of its choice because of its sub-majority numbers, but the group may still

No. 23-40582

play an influential role in the electoral process. The Court held that the ability of members of a minority group to influence an election in a district was insufficient to state a claim for vote dilution under Section 2. "The opportunity 'to elect representatives of their choice,' requires more than the ability to influence the outcome between some candidates, none of whom is their candidate of choice." *Id.* at 445, 126 S. Ct. at 2625 (citing provision now codified at 52 U.S.C. § 10301(b)).

The more important case for present purposes, however, is *Bartlett v. Strickland*, 556 U.S. 1, 129 S. Ct. 1231 (2009), which answered a question that the Court had previously reserved, *viz.*, whether Section 2 requires the creation of "crossover districts." *See Perry*, 548 U.S. at 443, 126 S. Ct. at 2624; *Voinovich v. Quilter*, 507 U.S. 146, 154, 113 S. Ct. 1149, 1155 (1993). Crossover districts are those in which a minority group makes up less than a majority of the voting-age population but "is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Bartlett*, 556 U.S. at 13, 129 S. Ct. at 1242. The *Bartlett* Court held that Section 2 does not require the creation of such districts.

The plurality opinion[7] explained that crossover districts are inconsistent with Section 2 and with the *Gingles* preconditions. Section 2 requires a showing that minorities "have less opportunity than other members of the electorate to . . . elect representatives of their choice." *Id.* at 14, 129 S. Ct. at 1243 (quoting provision now codified at 52 U.S.C. § 10301(b)). When,

---

[7] Justice Kennedy's plurality opinion was joined by Chief Justice Roberts and Justice Alito. Justice Thomas, joined by Justice Scalia, concurred in the judgment, arguing, "The text of § 2 of the Voting Rights Act of 1965 does not authorize any vote dilution claim, regardless of the size of the minority population in a given district." *Bartlett*, 556 U.S. at 26, 129 S. Ct. at 1250.

No. 23-40582

however, a minority group constitutes less than a majority of the citizen voting-age population in a reasonably configured district, it has "no better or worse opportunity to elect a candidate than does any other group of voters with the same relative voting strength." *Id.* The group cannot elect its preferred candidate on its own; it would need assistance from other voters, "*including other racial minorities,* or whites, *or both.*" *Id.* (emphases added). "Recognizing a § 2 claim in this circumstance would grant minority voters 'a right to preserve their strength for the purposes of forging an advantageous political alliance'" with voters outside the minority group. *Id.* at 14–15, 129 S. Ct. at 1243 (quoting *Hall v. Virginia*, 385 F.3d 421, 431 (4th Cir. 2004)). But "[n]othing in § 2 grants special protection to a minority group's right to form political coalitions." *Id.* at 15, 129 S. Ct. at 1243 ("[M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground." (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1020, 114 S. Ct. 2647, 2661 (1994))). Indeed, unless the minority group can show that it has the potential to elect a representative of its *own choice* in a single-member district, "there neither has been a wrong nor can be a remedy" under Section 2. *Id.* (quoting *Growe*, 507 U.S. at 41, 113 S. Ct. at 1084).[8]

The *Bartlett* plurality then expressly reaffirmed the first *Gingles* precondition, which requires proof that the minority group is large enough to constitute a majority in a reasonably configured single-member district. The alternatives proposed by proponents of crossover claims would be unworkable, wrote the plurality, as they "would place courts in the untenable position of predicting many political variables and tying them to race-based

---

[8] Although not pertinent here, the *Bartlett* plurality also observed that allowing crossover claims would be in tension with the third *Gingles* precondition. *Id.* at 16, 129 S. Ct. at 1244 ("It is difficult to see how the majority-bloc-voting requirement could be met in a district where, by definition, white voters join in sufficient numbers with minority voters to elect the minority's preferred candidate.").

No. 23-40582

assumptions." *Id.* at 17, 129 S. Ct. at 1244.  The majority-minority rule established by *Gingles*, by contrast, provides "an objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" *Id.* at 18, 129 S. Ct. at 1245.[9]

Each of these reasons articulated in *Bartlett* for rejecting crossover claims applies with equal force to coalition claims.  First, coalition claims extend Section 2's protection to what are essentially political coalitions of distinct racial groups.  *See Midland I.S.D.*, 812 F.2d at 1504 (Higginbotham, J., dissenting) (explaining that minority coalitions are "almost indistinguishable from political minorities as opposed to racial minorities").  But *Bartlett* rejected the argument that Section 2 "grants special protection to a minority group's right to form political coalitions."  556 U.S. at 15, 129 S. Ct. at 1243.  As an amicus brief states, "*Bartlett* thus rejected the argument that 'opportunity' under Section 2 includes the opportunity to form a majority with other voters—whether those other voters are 'other racial minorities, whites, or both.'" *See id.* at 14, 129 S. Ct. at 1243.  When, as here, a minority group cannot constitute a majority in a single-member district without combining with members of another minority group, Section 2 does not provide protection.  "[T]here neither has been a wrong nor can be a remedy." *Growe*, 507 U.S. at 41, 113 S. Ct. at 1084.

In addition, coalition claims pose the same practical problems as crossover claims in determining the existence of the *Gingles* preconditions, especially whether the distinct minority groups are politically cohesive.  One need

---

[9] Following *Bartlett*, the Court held in a Section 5 preclearance case that a three-judge district court "had no basis" for creating "a minority coalition district" if it intended to do so.  *Perry v. Perez*, 565 U.S. 388, 399, 132 S. Ct. 934, 944 (2012) (citing *Bartlett*, 556 U.S. at 13–15, 129 S. Ct. at 1243–44).

No. 23-40582

only transpose *Bartlett*'s language to indicate the problems as they apply to the claim in this case:

> What percentage of [black] voters supported [Hispanic]-preferred candidates in the past? How reliable would the [coalition] votes be in future elections? What types of candidates have [black] and [Hispanic] voters supported together in the past and will those trends continue? Were past [coalition] votes based on incumbency and did that depend on race? What are the historical turnout rates among [black] and [Hispanic] minority voters and will they stay the same?

*Bartlett*, 556 U.S. at 17, 129 S. Ct. at 1245. Restricting Section 2's coverage to discrete minority groups obviates the need to confront these questions, which add judicially unmanageable complexity to the *Gingles* analysis. In fact, contemporary demographics suggest there is no stopping point if minority coalitions may be formed out of any minority racial or language groups. In *Growe*, for instance, the Supreme Court overturned (on other grounds) a remedial district that would have included blacks and "three separately identifiable minority groups." *Growe*, 507 U.S. at 38, 113 S. Ct. at 1083. The factual complexity of coalition claims only increases as the number of minority groups within the coalition increases.

Accordingly, consistent with *Bartlett*, we reject Plaintiffs' attempt to circumvent the majority-minority requirement by forming a political coalition composed of distinct racial groups.

## D. Other Observations

Several other observations are not applicable to our statutory construction but are relevant in responding to the dissents and to Plaintiffs' contentions. From an empirical standpoint, when litigated to judgment, coalition claims often fail, especially for lack of political cohesion, as in *Growe*, 507

U.S. at 41, 113 S. Ct. at 1085.[10] This low success rate shows that the questions identified in the above discussion of *Bartlett* have indeed proven difficult to answer affirmatively. Perhaps that is because they are not meant to be answered in vote dilution lawsuits at all. *See Clements*, 999 F.2d at 897 (Jones, J., concurring) (arguing that the low success rate of coalition claims shows the "utter bankruptcy" of the coalition theory and the "factual complexity" of claims premised on that theory).

Plaintiffs attempt to frame the low success rate positively, as evidence that recognizing such claims carries limited real-world consequences. But coalition claims have significant practical consequences for both legislative bodies and the judiciary. As the *Nixon* court observed, legislators seeking in good faith to undertake redistricting will be uncertain how to consider more than one racial minority or language group. 76 F.3d at 1391. Should they aim for one "coalition" district or two separate minority districts? How can their decisions avoid having considerations of race "predominate" in legislative line-drawing? *See, e.g.*, *Cooper v. Harris*, 581 U.S. 285, 292, 137 S. Ct. 1455, 1464 (2017); *Shaw v. Hunt*, 517 U.S. 899, 906–07, 116 S. Ct. 1894, 1901 (1996).

Moreover, minority coalition suits, even if they fail, are extraordinarily costly and time-consuming for public entities to litigate. To avoid these costs, defendants will often settle or will take preemptive redistricting actions in anticipation of litigation, even though the actions might be legally unsound or unnecessary. The mere availability of the theory of action, then, has real impacts on voters of all races.

---

[10] Additional cases that rejected coalition claims on substantive grounds include *Overton v. City of Austin*, 871 F.2d 529 (5th Cir. 1989) (per curiam), and *Brewer v. Ham*, 876 F.2d 448 (5th Cir. 1989), from this court; and *Hardee Cnty.*, 906 F.2d 524, *Pope*, 687 F.3d 565, *Frank*, 336 F.3d 570, and *Badillo*, 956 F.2d 884, from other circuit courts.

No. 23-40582

Finally, federal courts are ill-suited to resolve minority coalition claims. No legal principle can explain the superiority of one redistricting choice over any other as applied to more than one racial or language minority, nor do Section 2 or *Gingles* speak to such choices. Hence, absent intentional discrimination or racial gerrymandering, courts are incapable of revisiting the legislative redistricting choices under the guise of assessing actionable vote dilution. Such choices are quintessentially political and, like questions raised by political gerrymandering, are not susceptible of judicial decisionmaking. *Cf. Rucho v. Common Cause*, 588 U.S. 684, 139 S. Ct. 2484 (2019). These problems exist only because *Campos* created minority coalition vote dilution claims.

Despite these adverse consequences, Plaintiffs urge this court to continue the "current approach" of allowing coalition claims when there is proof that the distinct minority groups are politically cohesive under the second *Gingles* precondition. The "current approach," however, is indefensible because it "begs the question of statutory construction altogether." *See Clements*, 999 F.2d at 895 (Jones, J., concurring). The statutory question is whether Section 2 *allows* distinct minority groups to aggregate their populations. For reasons identified above, the answer to that question is no, and Plaintiffs cannot prove the first *Gingles* precondition as a result. That they might be able to prove the second precondition is irrelevant.

Second, by providing representation to a statutorily protected minority group despite its sub-majority numbers, coalition claims may "cross the line from protecting minorities against racial discrimination to the prohibited . . . goal of mandating proportional representation." *Id.* at 896 (Jones, J., concurring); *see also Allen v. Milligan*, 599 U.S. 1, 28, 143 S. Ct. 1487, 1509 (2023) ("Forcing proportional representation is unlawful and inconsistent with this Court's approach to implementing § 2."). In this case, for instance, Galveston County's black community, comprising only 12.5 percent of the county's

26

No. 23-40582

citizen voting-age population, would not be able to elect a commissioner of its choice in the absence of a coalition. With the minority coalition, however, the black community is represented by one-fourth (25 percent) of the county commissioners. That exceeds proportional representation.[11]

Finally, the Voting Rights Act implemented the Fifteenth Amendment in order to create equality of access to the vote for black Americans. Section 2 extended the Act by adding, first, language minorities, and then the results test to remedy cases where distinct minorities had been excluded from effective group representation in legislative bodies. By any measure, the Act has accomplished its original purposes with great success. This *en banc* court's decision will in no way imperil such success. Our decision in *Campos*, however, *extended* Section 2 into racial and ethnic territory that extinguishes the line between a group's immutable individual characteristics, which may signal real political cohesiveness, and opportunistic political combinations. It was this aspect of coalition claims that Judge Higginbotham objected to most vehemently from the start. *Midland I.S.D.*, 812 F.2d at 1504 (Higginbotham, J., dissenting). This court will not remain in the forefront of authorizing litigation, not compelled by law or the Supreme Court, whose principal effects are to (a) supplant legislative redistricting by elected representatives with judicial fiat; (b) encourage divisively counting citizens by race and ethnicity; and (c) displace the fundamental principle of democratic rule by the majority with balkanized interests.

---

[11] And despite their claims of political cohesion, the geographically dispersed Hispanic population has 22.5 percent of the county's voting age population, yet there is no elected Hispanic commissioner, and Hispanics are severely underrepresented compared with the black population in Precinct 3 under the proposed Map 1 (31 percent to 24 percent, respectively).

No. 23-40582

## E. Stare Decisis

Plaintiffs invoke stare decisis to support this court's existing precedent. Plaintiffs' arguments do not apply any of the typical stare decisis factors[12] but instead rely on two propositions: (1) that the operative precedent here has more weight because it was decided by this court *en banc*, and (2) that stare decisis is particularly strong when the underlying precedent interprets a statute.

First, the contention that this court's *en banc* decision in *LULAC v. Clements*, 999 F.2d 831 (5th Cir. 1993), is the operative precedent is wrong. Judge Higginbotham, the most vocal opponent of aggregation at the time, wrote the *Clements* decision for the court, which disposed of the minority coalition's Section 2 claims on other grounds. The opinion applied this court's precedent authorizing coalition claims and expressly stated that it would not "revisit" the issue. *Id.* at 864. The concurrence argued that the court "should have" addressed the coalition issue and should have held that Section 2 does not allow aggregation. *Id.* at 894 (Jones, J., concurring). *Clements* cannot, therefore, be said to have issued an *en banc* holding on coalition claims, and the *Campos* panel decision is the operative precedent.

Second, statutory stare decisis is not a compelling barrier to overturning *Campos*. The Supreme Court has recognized that "*stare decisis* carries enhanced force when a decision . . . interprets a statute." *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456, 135 S. Ct. 2401, 2409 (2015). But the justification for applying this rule at the circuit court level is weak, at best. *See* Amy

---

[12] *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 268, 142 S. Ct. 2228, 2265 (2022) (listing five factors for overturning precedential cases: "the nature of their error, the quality of their reasoning, the 'workability' of the rules they imposed on the country, their disruptive effect on other areas of the law, and the absence of concrete reliance").

No. 23-40582

Coney Barrett, *Statutory Stare Decisis in the Courts of Appeals*, 73 Geo. Wash. L. Rev. 317, 318 (2005) ("Whatever the merits of statutory stare decisis in the Supreme Court, the inferior courts have no sound basis for following the Supreme Court's practice."); *see also Planned Parenthood v. Kauffman*, 981 F.3d 347, 369 (5th Cir. 2020) (en banc) (noting that our stare decisis "analysis is not as exacting as that undertaken by the Supreme Court of the United States"). Plaintiffs cite no majority opinion of this court giving enhanced stare decisis effect to prior statutory interpretations. *But see Smallwood v. Ill. Cent. R.R. Co.*, 385 F.3d 568, 587 (5th Cir. 2004) (en banc) (Smith, J., dissenting); *Bhandari v. First Nat'l Bank of Com.*, 829 F.2d 1343, 1353 (5th Cir. 1987) (Higginbotham, J., concurring). "Nor has our en banc court hesitated to" overturn erroneous statutory interpretations. *United States v. Anderson*, 885 F.2d 1248, 1255 (5th Cir. 1989) (en banc). Any hesitation is especially unwarranted here, given the existence of a circuit split on coalition claims. *See id.* at 1255 n.12 ("[C]ongressional silence is not of great significance, given the split in the circuits . . . .").

In the end, *Campos*'s holding on aggregation is notable for its meager reasoning and for the magnitude of its error. Plaintiffs have offered no persuasive justification for this court to adhere to *Campos*.

## III. Conclusion

Galveston County's democratically elected Commissioners Court enacted Map 2. The district court determined that this map was unlawful under Section 2 of the Voting Rights Act and required the commissioners court to adopt a new one with a minority-majority precinct for the county's black and Hispanic voters. Having reconsidered *Campos*, we hold that this decision was wrong. Section 2 does not require political subdivisions to draw precinct lines for the electoral benefit of distinct minority groups that share political preferences but lack the cementing force of race or ethnicity.

No. 23-40582

*Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988), and its progeny are OVERRULED.

Accordingly, we REVERSE the judgment of the district court as to the Section 2 claim and REMAND for the district court to consider the intentional discrimination and racial gerrymandering claims brought by the Petteway Plaintiffs and the NAACP Plaintiffs.[13]

---

[13] Pertinent considerations on remand will include: (1) the appropriate analytical framework to apply to Plaintiffs' constitutional claims (*cf. Perez v. Abbott*, 253 F. Supp. 3d 864, 942–43 (W.D. Tex. 2017)), and, in particular, (2) whether Plaintiffs can prove that they have been injured, or are entitled to relief, when their claims are premised on a coalition theory (*cf. Hunter v. Underwood*, 471 U.S. 222, 232, 105 S. Ct. 1916, 1922 (1985) (requiring proof of both discriminatory impact and discriminatory effect)). We also observe that the Supreme Court recently rejected racial gerrymandering and vote dilution claims in *Alexander v. South Carolina State Conference of the NAACP*, 144 S. Ct. 1221 (2024). The majority's opinion includes a helpful discussion on the relationship and distinctions between these claims. *Id.* at 1251–52.

No. 23-40582

James C. Ho, *Circuit Judge*, concurring in part and concurring in the judgment:

I agree that the text of Section 2 of the Voting Rights Act and governing Supreme Court precedent foreclose vote dilution claims like the ones presented here. I write to briefly explain how I reach that conclusion.

"[T]hree members of the Supreme Court have suggested that courts should not decide vote dilution claims under Section 2 of the Voting Rights Act at all." *Harding v. County of Dallas*, 948 F.3d 302, 316 (5th Cir. 2020) (Ho, J., concurring in part and dissenting in part) (citing *Holder v. Hall*, 512 U.S. 874, 946 (1994) (Thomas, J., joined by Scalia, J., concurring in the judgment), and *Abbott v. Perez*, 585 U.S. 579, 622 (2018) (Thomas, J., joined by Gorsuch, J., concurring)).

That's why there was no majority opinion in *Bartlett v. Strickland*, 556 U.S. 1 (2009). A three-Justice plurality concluded that Section 2 does not require the creation of crossover districts. Justice Thomas, joined by Justice Scalia, concurred only in the judgment, reiterating their longstanding view from *Holder* that Section 2 does not permit *any* vote dilution claim. *Id.* at 26.

So a majority of the Justices agreed in *Bartlett* that, at a minimum, Section 2 does not require crossover districts. And the plurality's analysis also logically forecloses the coalition district theory presented here, as the en banc majority correctly explains.

Accordingly, the en banc majority is right to overturn our circuit precedent in *Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988).

\* \* \*

In *Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir. 2023), the en banc court overturned our precedent to bring our circuit in line with Title VII of the Civil Rights Act. Today, the en banc court overturns our precedent to

bring our circuit in line with Section 2 of the Voting Rights Act. In *Hamilton*, we concluded that our longstanding precedent construed Title VII too narrowly. Today, we conclude that our longstanding precedent construes Section 2 too broadly. But whether our precedent unduly narrowed or broadened the reach of a federal statute, our duty is the same. We reconcile our circuit precedent with the governing law, regardless of whose ox is gored.

No. 23-40582

HAYNES, *Circuit Judge*, dissenting:

I respectfully dissent from the decision to overturn *Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988). In my view, *Campos* properly concluded that § 2 of the Voting Rights Act allows for a group of minority voters to aggregate their populations to bring a vote dilution claim as long as the minority coalition satisfies the *Gingles*[14] preconditions. *See* 840 F.2d at 1244. The district court in this case found that the plaintiffs satisfied all the *Gingles* preconditions and met their burden to prove a § 2 violation. Because I cannot identify any reversible error of fact or law in the district court's reasoning, I would affirm on the same basis that the district court granted relief to the plaintiffs. Thus, I respectfully dissent from the majority opinion's decision.

---

[14] *Thornburg v. Gingles*, 478 U.S. 30 (1986).

No. 23-40582

Douglas, *Circuit Judge*, joined by Stewart, Graves, Higginson, and Ramirez, *Circuit Judges*, dissenting:

Today, the majority finally dismantled the effectiveness of the Voting Rights Act in this circuit, leaving four decades of en banc precedent flattened in its wake.[15] Because the majority reaches an atextual and ahistorical conclusion to overturn our own en banc precedent, I dissent.

## I

I begin today by providing what the majority does not: context.

First, I engage in a discussion of the history of the Voting Rights Act ("VRA"). Next, I discuss the development of the law surrounding minority coalition claims. Finally, I detail Galveston County's storied history of voting discrimination. Because the "very essence" of a § 2 claim, as the United States Supreme Court has made clear, is that "social and historical conditions" interact with the electoral process in such a way that the "'electoral structure operates to minimize or cancel out' minority voters' 'ability to elect their preferred candidates,'" *Allen v. Milligan*, 599 U.S. 1, 17-18 (2023) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 47-48 (1986)), we cannot, as the majority does, ignore these conditions as we engage in our analysis.

## A

After the emancipation of enslaved peoples, Congress passed and the states ratified the Fifteenth Amendment to enshrine in the United States Constitution the right to vote for all citizens, regardless of race. Despite the

---

[15] *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 894 (5th Cir. 1993) (en banc); *Brewer v. Ham*, 876 F.2d 448 (5th Cir. 1989); *Overton v. City of Austin*, 871 F.2d 529 (5th Cir. 1989); *Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988); *League of United Latin Am. Citizens Council No. 4386 v. Midland Indep. Sch. Dist.*, 812 F.2d 1494, 1503 (5th Cir.), *opinion vacated on reh'g*, 829 F.2d 546 (5th Cir. 1987).

No. 23-40582

sweeping language and lofty goals of the Fifteenth Amendment, it lacked enforcement. To remedy its failure, in 1965, Congress passed the VRA. Unlike the Fifteenth Amendment, the VRA had teeth, and it proved to be an extremely effective method of regulating discriminatory voting practices employed by the states throughout the 1900s. In the fifty years after the VRA's passage, Congress closely monitored its implementation and courts' interpretations. If the VRA failed to achieve its goals, and if the Supreme Court's interpretation was misaligned with Congress' interpretation, Congress acted through the amendments process.

1

"The right to vote is the essence of a democratic society and 'preservative of all rights.'" *Hopkins v. Watson*, -- F.4th -- , 2024 WL 3448028, at *16 (5th Cir. July 18, 2024) (DENNIS, J., dissenting) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S. Ct. 1064, 30 L.Ed. 220 (1886)). "It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, and to have their votes counted." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964) (internal citations omitted). And "it is 'as equally unquestionable that the right to have one's vote counted is as open to protection as the right to put a ballot in a box.'" *Id.* This is because "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Id.* at 555. And, as the Supreme Court has stated, "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* Through the Fifteenth Amendment and the VRA, Congress attempted to address "the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race." *Allen v. State Bd. of Elecs.*, 393 U.S. 544, 566 (1969).

No. 23-40582

Ratified in 1870, the Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. Though "the immediate concern of the Amendment was to guarantee to the emancipated slaves the right to vote, . . . the Amendment goes beyond it." *Rice v. Cayetano*, 528 U.S. 495, 512 (2000). Indeed, in granting protection to all persons, not just members of a particular race, the Amendment was designed "to reaffirm the equality of races at the most basic level"—the right to vote. *Id.* The Supreme Court has eloquently spoken on the importance of the Fifteenth Amendment: "A resolve so absolute required language as simple in command as it was comprehensive in reach. Fundamental in purpose and effect and self-executing in operation, the Amendment prohibits all provisions denying or abridging the voting franchise of any citizen or class of citizens on the basis of race." *Id.*

However, "[t]hough the commitment was clear, the reality remained far from the promise." *Id.* at 513; *see also Allen*, 599 U.S. at 10 ("In the century that followed, however, the [Fifteenth] Amendment proved little more than a parchment promise."). "Manipulative devices and practices were soon employed" to disenfranchise voters of color. *Rice*, 528 U.S. at 513 (collecting references to manipulative devices, including grandfather clauses, procedural hurdles, White primaries, registration challenges, racial gerrymandering, and interpretation tests). These devices essentially "render[ed] the right to vote illusory." *Allen*, 599 U.S. at 10.

The problems that the Fifteenth Amendment attempted to solve were not unique to Black Americans. After the Civil War, segregation and Jim Crow laws plagued Black and Latino citizens alike. Unfortunately, and as the Supreme Court has recently recognized, "Congress stood up to little of it; 'the first century of congressional enforcement of the Fifteenth Amendment

can only be regarded as a failure.'" *Allen*, 599 U.S. at 10 (alteration in original) (quoting *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 197 (2009)).

To remedy the "failure" of the Fifteenth Amendment, and spurred by the Civil Rights movement, Congress enacted the VRA in 1965. Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 445 (codified as amended at 42 U.S.C. §§ 1971, 1973 to 1973bb-1). The VRA was enacted by Congress as a means of "'attack[ing] the blight of voting discrimination' across the Nation." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 476 (1997); *see also Chisom v. Roemer*, 501 U.S. 380, 403 (1991) ("Congress enacted the Voting Rights Act of 1965 for the broad remedial purpose of 'rid[ding] the country of racial discrimination in voting.'"). In enacting the VRA, "the voluminous legislative history of the Act" illuminates two points. *South Carolina v. Katzenbach*, 383 U.S. 301, 309 (1966). "First: Congress felt itself confronted by an insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution." *Id.* And second: "Congress concluded that the unsuccessful remedies which it had prescribed in the past would have to be replaced by sterner and more elaborate measures in order to satisfy the clear commands of the Fifteenth Amendment." *Id.* As such, the Supreme Court has made clear that "the Act should be interpreted in a manner that provides 'the broadest possible scope' in combating racial discrimination." *Chisom*, 501 U.S. at 403 (quoting *Allen v. State Bd. of Elections*, 393 U.S. 544, 567 (1969)).

In particular, § 2 of the VRA "was designed as a means of eradicating voting practices that 'minimize or cancel out the voting strength and political effectiveness of minority groups.'" *Reno*, 520 U.S. at 479 (quoting S. Rep. No. 97-417, at 4 (1982)). As initially enacted, "§ 2 closely tracked the language of the Amendment it was adopted to enforce." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 656 (2021). Accordingly, § 2 simply

No. 23-40582

read: "No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color." Voting Rights Act § 2 (1965).

Because of its many enforcement mechanisms, the VRA was able to do what the Fifteenth Amendment could not—indeed, "in only sixteen years' time, many considered the VRA 'the most successful civil rights statute in the history of the Nation.'" *Allen*, 599 U.S. at 10 (quoting S. Rep. No. 97-417, at 111 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177). Over the next fifty years, Congress substantively amended the VRA four times.

**2**

In 1975, Congress amended § 2 to include a prohibition against discrimination on the basis of language. *Chisom*, 501 U.S. at 392. Congress recognized a need to explicitly extend the protections of § 2 to other groups that suffered from voting discrimination. Congress recognized that, like Black voters, "[l]anguage minority citizens . . . must overcome the effects of discrimination as well as efforts to minimize the impact of their political participation." S. Rep. No. 94-295, at 25, 28–29 (1975), *as reprinted in* 1975 U.S.C.C.A.N. 774, 791. That was particularly so in states like Texas, which Congress recognized had a "long history of discriminating against members of [Black and Latino communities] in ways similar to the myriad forms of discrimination practiced against [Black voters] in the South." *Id.* at 25, 28-29.

Also in its 1975 amendments, Congress made clear that where it intended a single group requirement, it was capable of expressly saying so. The amendments prescribed that states and political subdivisions must provide voting materials, including ballots, in non-English languages if a language minority makes up more than five percent of the citizens of voting

No. 23-40582

age. 42 U.S.C. § 1973aa-1b (codified as amended at 52 U.S.C. § 10303(f)(3)). The language of the 1975 Amendments specifically stated that the five percent must be made of "members of a *single* language minority." *Id.* (emphasis added); *cf. Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("When 'Congress includes particular language in one section of a statute but omits it in another' . . . this Court 'presumes' that Congress intended a difference in meaning.") (alteration in original).

Moreover, the Senate Report to the 1975 Amendments reveals that Congress explicitly relied on cases involving minority coalition claims as part of the amendment process, signaling its knowledge of courts' practices of accepting minority coalition suits. Congress relied on *Coalition for Education in District One v. Board of Elections of the City of New York*, 495 F.2d 1090, 1091 (2d Cir. 1974) ("*CEDO*"). In that case, the United States Court of Appeals for the Second Circuit affirmed a district court's finding that a school board election was invalid. *Id.* The plaintiffs—a group of Black, Hispanic, and Chinese voters—challenged the validity of the school board election under the Equal Protection Clause of the Fourteenth Amendment and the VRA. *Id.* The district court held, after a bench trial, that various acts of the Board of Elections had a discriminatory impact on the rights of minority voters that could have affected several hundred votes cast in the election. *Id.* As a result, the district court ordered a new election take place. *Id.* The Second Circuit affirmed. *Id.* at 1094.

**3**

In 1982, Congress amended § 2 of the VRA yet again, resulting, substantively, in today's version of the statute. 42 U.S.C. § 1973 (1982) (codified as amended in 52 U.S.C. § 10301). In large part, the 1982 Amendments were motivated by a series of decisions by the Supreme Court holding that discriminatory *intent*, rather than discriminatory *impact*, was

No. 23-40582

required under § 2 of the VRA. S. Rep. No. 97-417, at 15-16 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 192-93; *see, e.g.*, *Washington v. Davis*, 426 U.S. 229 (1976) (holding, for the first time, that discriminatory intent was required to successfully state a claim under § 2); *see also Veasey v. Abbott*, 830 F.3d 216, 241 n.31 (5th Cir. 2016) ("Congress amended the Voting Rights Act in 1982 to make it clear that plaintiffs could sue for discriminatory impact after Supreme Court precedent had required the showing of a discriminatory purpose under Section 2."). Also in the 1982 Amendments was the addition of the language at issue in this case: the reference to a class of citizens in the singular.

Section 2, in its modern form, substantively adopted in 1982, reads as follows:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by *members of a class of citizens protected by subsection (a)* in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which *members of a protected class* have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have *members of a protected class* elected in numbers equal to their proportion in the population.

No. 23-40582

52 U.S.C. § 10301 (formerly cited as 42 U.S.C. § 1973) (emphasis added).

In crafting those amendments, Congress again relied on several minority coalition suits like *United Jewish Organizations of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 150 n.5 (1977). S. Rep. No. 97-417, at 173. In *Carey*, the Supreme Court noted, and did not question, that "the court below classified Puerto Ricans in New York with blacks as a minority group entitled to the protections of the Voting Rights Act." *Carey*, 430 U.S. at 150 n.5. Congress also relied on *Wright v. Rockefeller*, 376 U.S. 52, 60 (1964), wherein the Supreme Court dismissed a minority coalition suit brought pursuant to the Fifteenth Amendment on other grounds, indicating tacit acceptance. S. Rep. No. 97-417, at 132. Though *Wright* pre-dated the VRA, the connection between the Fifteenth Amendment and the VRA indicates the Court's intent to condone minority coalition suits early on. *See also id.* at 10-11, 26 (favorably citing *Jones v. City of Lubbock*, 640 F.2d 777 (5th Cir. 1981), a Fifth Circuit case involving a coalition of Black and Latino voters).

### 4

Congress again amended the VRA in 1992. The 1992 Amendments stemmed from "the continuing need for language assistance in voting." S. Rep. No. 102-315, at 3 (1992). Congress affirmed that "language minority citizens had been effectively excluded from participation in the electoral process" and stated that "the denial of the right to vote of such minority group citizens is ordinarily directly related to the unequal educational opportunities afforded them, resulting in high illiteracy and low voting participation." *Id.* at 4. To address this need, Congress took three actions: Congress (1) extended the bilingual election requirements to remain in place through 2007; (2) provided additional coverage to Native Americans residing on reservations; and (3) extended "the coverage of the language assistance

provisions to counties with more than 10,000 voting-age language minority citizens who otherwise qualify for language assistance." *Id.* at 2.

Not all language minority groups are afforded protection. Congress affirmed in the 1992 Amendments that the four language minority groups covered by the VRA are "Hispanics, Asian Americans, American Indians and Alaska Natives." *Id.* at 4. However, Congress explicitly recognized that these groups are not homogenous and themselves account for a wide array of languages. *See id.* at 27. For example, the 1992 Senate Report consistently refers to languages (plural) when discussing lack of access to voting information for Native Americans. *See, e.g.*, *id.* at 9 ("Lack of access to absentee voting information to Native Americans in their native languages is further documented by their experience in the 1984 general election."); *id.* ("In another example, election officials provided little or no information in Native American languages regarding the process for purging names from their jurisdictions' voter registration lists."); *id.* at 14 (discussing costs and noting that "[i]n the case of traditionally unwritten languages, such as most Native American languages, only oral assistance is required"). Likewise, the 1992 Senate Report specifically discusses the fact that the "Asian American" category encompasses, *inter alia*, Chinese, Filipino, Vietnamese, and Japanese voters. *Id.* at 12.

## 5

Congress most recently amended the VRA in 2006. These Amendments largely addressed the now unconstitutional § 5 (preclearance), rather than § 2. However, it is the amendment process that is important in this instance.

Congress amended § 5 so it would closely track the language of § 2. The 2006 Amendments added § 5(b), which reads:

No. 23-40582

> Any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting that has the purpose of or will have the effect of diminishing the ability of any citizens of the United States on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, to elect their preferred candidates of choice denies or abridges the right to vote within the meaning of subsection (a) of this section.

52 U.S.C. § 10304(b). In comparison, § 2(a) reads: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color." *Id.* § 10301(a).

In adopting § 5(b), which contained nearly the same language as in § 2(a), Congress stated "[v]oting changes that leave a minority group less able to elect a preferred candidate of choice, either directly or *when coalesced with other voters*, cannot be precleared under Section 5." H.R. Rep. No. 109-478, at 71 (2006) (emphasis added). Congress also identified: "Naturally occurring majority-minority districts have long been the historical focus of the Voting Rights Act. They are the districts that would be created if legitimate, neutral principles of drawing district boundaries . . . were combined with the existence of a large and compact minority population to draw a district in which *racial minorities* form a majority." S. Rep. No. 109-295, at 21 (2006) (emphasis added).

## B

From its earliest interpretation of the VRA, the Supreme Court recognized that its protections were—and should be—broadly interpreted. *Chisom,* 501 U.S. at 403 ("[The VRA] should be interpreted in a manner that provides 'the broadest possible scope' in combating racial discrimination.");

No. 23-40582

*see also Johnson v. DeGrandy*, 512 U.S. 997 (1994) (noting the VRA is "a statute meant to hasten the waning of racism in American politics"). Consistent with this mandate, the Court has consistently permitted minority coalition claims. *Carey*, 400 U.S. at 150 n.5; *Wright*, 376 U.S. at 60. The circuit courts followed suit—including our own.

In 1986, the Supreme Court clarified the requirements of a § 2 vote dilution claim after the 1982 Amendments in *Thornburg v. Gingles*, 478 U.S. 30. In *Gingles*, the Supreme Court outlined the following three preconditions that a minority-group-plaintiff must demonstrate: (1) "that it is sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) "that it is politically cohesive"; and (3) "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* at 50-51. Next, plaintiffs must show that, under the totality of the circumstances, the political process is not "equally open" to them. The question of whether political processes are "equally open" depends upon a "practical evaluation of the 'past and present reality.'" *Id.* at 75. As such, "proof that some minority candidates have been elected does not foreclose a § 2 claim." *Id.*

Recently, in *Allen v. Milligan*, the Supreme Court gave further context to the purpose of each *Gingles* precondition:

> Each *Gingles* precondition serves a different purpose. The first, focused on geographical compactness and numerosity, is "needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district." The second, concerning the political cohesiveness of the minority group, shows that a representative of its choice would in fact be elected. The third precondition, focused on racially polarized voting, "establishes that the challenged districting thwarts a distinctive minority vote" at least plausibly on account of race. And finally, the totality of the

circumstances inquiry recognizes that application of the *Gingles* factors is "peculiarly dependent upon the facts of each case." Before courts can find a violation of § 2, therefore, they must conduct "an intensely local appraisal" of the electoral mechanism at issue, as well as a "searching practical evaluation of the 'past and present reality.'"

*Allen*, 599 U.S. at 18-19. The *Allen* Court also reaffirmed the *Gingles* test:

*Gingles* has governed our Voting Rights Act jurisprudence since it was decided 37 years ago. Congress has never disturbed our understanding of § 2 as *Gingles* construed it. And we have applied *Gingles* in one § 2 case after another, to different kinds of electoral system and to different jurisdictions in States all over the country.").

The *Gingles* test thus serves as the bedrock requirement charging courts with the responsibility to stop racial vote suppression through gerrymandering. Moreover, the *Gingles* test has provided lower courts with the practical tools to evaluate minority coalition claims brought pursuant to § 2.

We were in fact the first circuit to specifically consider the efficacy of minority coalition claims. In 1987, we correctly decided *League of United Latin American Citizens Council No. 4386 v. Midland Independent School District*, wherein we held that a coalition of Black and Mexican Americans had satisfied the *Gingles* factors in demonstrating that an at-large school board election diluted their votes. 812 F.2d 1494. Neither the district court, nor this court, took issue with the minority coalition as a basis for § 2. *See id.* at 1495 ("Blacks and Mexican-Americans in Midland, Texas, join hands in this class action to prevent their votes being diluted by an at-large system of voting in the election of trustees to the Board of Trustees for the Midland Independent School District."). Ultimately, the en banc court affirmed the district court's judgment on other grounds. *League of United Latin Am. Citizens Council No. 4386 v. Midland Indep. Sch. Dist.*, 829 F.2d 546, 548 (5th

No. 23-40582

Cir. 1987) (Wisdom, J., and Rubin, J., specifically concurring) (concurring in result and reaffirming their views stated in the panel opinion).

One year later, in *Campos v. City of Baytown*, we made our *Midland* holding explicit. In *Campos*, we affirmed the district court's finding that vote dilution of Black and Mexican American voters had occurred. *Campos*, 840 F.2d at 1250. In doing so, we held "[t]here is nothing in the law that prevents the plaintiffs from identifying the protected aggrieved minority to include both Blacks and Hispanics." *Id.* at 1244. We reasoned:

> Congress itself recognized "that voting discrimination against citizens of language minorities is pervasive and national in scope," 42 U.S.C. § 1973b(f)(1), and similar discrimination against Blacks is well documented. If, together, they are of such numbers residing geographically so as to constitute a majority in a single member district, they cross the *Gingles* threshold as potentially disadvantaged voters.

*Id.* We also clearly articulated the limiting principle that remains in effect today and prevents a windfall for minority coalitions: Plaintiffs must still prove "that the minorities so identified actually vote together and are impeded in their ability to elect their own candidates by all of the circumstances, including especially the bloc voting of a white majority that usually defeats the candidate of the minority." *Id.* (stating that "a minority group is politically cohesive if it votes together"); *see also Brewer*, 876 F.2d at 454 ("[C]ourts should not hastily assume that cooperation among minority groups in filing a Section 2 complaint will inevitably lead to a finding of political cohesion in their actual electoral practices. While appellants correctly note that statistical evidence is not a *sine qua non* to establishing cohesion, they must still satisfy their burden of proof under Section 2 and *Thornburg*.").

No. 23-40582

We then affirmed that holding several times over the next decade. *See id.* at 453-54 (reiterating that minority coalitions may be used to satisfy § 2); *Overton*, 871 F.2d 529 (implicitly recognizing the validity of a minority coalition claim). In 1993, we affirmed our *Campos* holding on this very issue en banc in *League of United Latin Am. Citizens, Council 4434 v. Clements*, 999 F.2d at 864 (affirming our *Campos* decision and holding that "[i]f blacks and Hispanics vote cohesively, they are legally a single minority group" under § 2). Indeed, scholarship has recognized that in the Fifth Circuit, minority aggregation is—or rather was—"a guarantee." Kevin Sette, *Are Two Minorities Equal to One?: Minority Coalition Groups and Section 2 of the Voting Rights Act*, 88 Fordham L. Rev. 2693, 2713 (2020).[16]

---

[16] *See also* Scotty Schenck, *Why* Bartlett *Is Not the End of Aggregated Minority Group Claims Under the Voting Rights Act*, 70 Duke L. J. 1883 (2021); Ben Boris, *The VRA at a Crossroads: The Ability of Section 2 to Address Discriminatory Districting on the Eve of the 202 Census*, 95 Notre Dame L. Rev. 2093, 2107 (2020) (concluding that "the Fifth Circuit should prevail, and that coalition districts satisfy the first *Gingles* requirement"); Dale E. Ho, *Two Fs for Formalism: Interpreting Section 2 of the Voting Rights Act in Light of Changing Demographics and Electoral Patterns*, 50 Harv. C.R.-C.L. L. Rev. 403, 437 (2015) ("Perhaps, then, these proposed rules—which would subtly increase the political salience of race—are not so much about sound judicial administration, but rather amount to an effort to frustrate § 2's purpose of empowering communities of color to elect their preferred candidates. If that is true, then the formalist interpretations of § 2 described above represent not a simple effort to update the statute in recognition of the growing political power of minority communities, but rather an effort to limit the statute's effectiveness in order to resist that rising tide."); Joanna E. Cuevas Ingram, *The Color of Change: Voting Rights in the 21st Century and the California Voting Rights Act*, 15 Harv. Latino L. Rev. 183, 229 (2012) ("The case law that has been handed down in the wake of seminal cases like *Gingles* and *Bartlett* has confirmed the right of multiracial and multiethnic coalitions to bring a joint claim under Section 2 of the Federal VRA, as long as they can show that they have voted as a cohesive political bloc and that a white majority has done the same, limiting the ability of such minority coalitions to freely elect a candidate of their choosing."); Aylon M. Schulte, *Minority Aggregation Under Section 2 of the Voting Rights Act: Toward Just Representation in Ethnically Diverse Communities*, 1995 U. Ill. Rev. 441 (1995).

The United States Court of Appeals for the Sixth Circuit reached a different conclusion. In *Nixon v. Kent County*, the Sixth Circuit, met with hefty dissent, rejected the validity of minority coalition suits, finding they were not "part of Congress' remedial purpose" in enacting the VRA. 76 F.3d 1381, 1393 (6th Cir. 1996). The Sixth Circuit began with its reading of the text of § 2. It reasoned that because § 2 speaks in the singular, using terms such as "a class" or "its members," an analysis of the text of § 2 "reveals no word or phrase which reasonably supports combining separately protected minorities." *Id.* at 1386-87. In reaching this conclusion, the Sixth Circuit relied heavily on dissents from members of this court. *Id.* at 1384 (citing Judge Higginbotham's dissents in *Campos*, 849 F.2d at 945, and *Midland*, 812 F.2d at 1503, and Judge Jones' concurrence in *Clements*, 999 F.2d at 894).

Until today, the Sixth Circuit was an outlier. *All* other circuits that have considered the issue ruled that minority coalition suits may be used to satisfy § 2. *See Pope v. Cnty. of Albany*, 687 F.3d 565 (2d Cir. 2012); *Badillo v. City of Stockton*, 956 F.2d 884 (9th Cir. 1992); *Concerned Citizens v. Hardee Cnty. Bd. of Comm'rs*, 906 F.2d 524 (11th Cir. 1990) (citing *Midland* and *Campos*); *see also Holloway v. City of Va. Beach*, 42 F.4th 266, 293–94 (4th Cir. 2022) (Gregory, C.J., dissenting) (finding that § 2 may be satisfied by minority coalitions, indicating that, though the majority did not reach the issue, certain judges on the Fourth Circuit would join our interpretation). With history in hand, we turn to the facts of this case.

## C

Texas has historically discriminated against both Black and Latino voters. And Galveston County is, by all accounts, the embodiment of the conditions which led to § 2's adoption. Because "a page of history is worth a

No. 23-40582

volume of logic," *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921), I detail Galveston County's storied history below.

The early history of Galveston County was characterized by its role as an epicenter of the nation's slave trade. In the nineteenth century, Galveston held the largest slave auction house west of the Mississippi River, where its mayor was an active participant.[17] Galveston's slave trade continued even after the Civil War.[18] In 1865, Galveston County's enslaved population gave birth to the now federally recognized Juneteenth celebration, a holiday that has been recognized by the Texas Legislature since the 1970s.[19] Juneteenth is now widely known as the day that enslaved people in Texas were finally freed.[20] Of course, the Juneteenth order did not, as a legal matter, emancipate individuals from slavery.[21] That was accomplished via President Lincoln's Preliminary Emancipation Proclamation of 1862 and final proclamation of 1863.[22] But these proclamations were largely ignored or subverted.[23]

If the 1800s were characterized by the slave trade, the 1900s were characterized by a new brand of racism—voter suppression. In the post-Civil War era, "race relations in the county reflected those seen across much of

---

[17] John Burnett, *The New Juneteenth Holiday Traces Its Roots to Galveston, Texas*, NPR (June 20, 2022, 5:00 AM), https://www.npr.org/2022/06/20/1105911785/the-new-juneteenth-federal-holiday-traces-its-roots-to-galveston-texas#:~:text=The%20city%2C%20which%20was%20the,the%20city's%20major%20slave%20dealer; Brett J. Derbes, *Snydor, John Seabrook (1812-1869)*, Texas State Historical Association (Nov. 17, 2021), https://www.tshaonline.org/handbook/entries/sydnor-john-seabrook.

[18] Burnett, *supra* note 3.

[19] *Id.*

[20] *Id.*

[21] Ed Cotham*, Juneteenth: Four Myths and One Great Truth*, The Daily News (June 18, 2014), https://www.galvnews.com/opinion/guest_columns/article_73af8892-f75d-11e3-8626-001a4bcf6878.html.

[22] *Id.*

[23] *Id.*

No. 23-40582

the South, including segregation and Jim Crow laws." Likewise, "'state-supported practices and laws in a variety of different areas of life' came together to segregate Latinos in Galveston County, a system termed Juan Crow."

Take, for example, the lengths to which Texas went to suppress the non-White vote. In 1902, the Texas Legislature imposed a poll tax on its voters.[24] And in 1923, Texas enacted the Statute of Texas, which allowed only White voters to participate in the Democratic primary election. *Nixon v. Herndon*, 273 U.S. 536, 540 (1927). The Statute of Texas made its way to the Supreme Court in 1927. In *Nixon v. Herndon*, a unanimous Supreme Court struck down the law as unconstitutional, in violation of the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 540-41. The Court spoke with forcefulness:

> The important question is whether the statute can be sustained. But although we state it as a question the answer does not seem to us open to a doubt. We find it unnecessary to consider the Fifteenth Amendment, because it seems to us hard to imagine a more direct and obvious infringement of the Fourteenth.

*Id.* The Supreme Court thus upheld the right to vote in Texas primary elections for all. *Id.* at 541.

After *Herndon*, the Texas Legislature promptly enacted a new statute, giving the State Executive Committee of a party the power to prescribe voting qualifications for its members. *Nixon v. Condon*, 286 U.S. 73, 81-82 (1932). And acting under the new statute, the State Executive Committee of the

---

[24] The state of Texas has resorted to the imposition of a poll tax many times throughout history. Dick Smith, *Texas and the Poll Tax*, 45 Sw. Soc. Sci. Q. 167 (1964). Indeed, the first poll tax was adopted as early as 1837. *Id.* However, it was not until 1902 that the poll tax became a prerequisite for one's eligibility to vote. *Id.*

No. 23-40582

Democratic party adopted a White-only primary election requirement for the 1928 election. *Id.* at 82. After being refused the right to vote again under the party's rule, the *Herndon* plaintiff sued. *Id.* at 83. The Supreme Court again invalidated the Texas statute, finding that the Committee members are representatives of the state, the members' action was State action, and thus that action was constrained by the Fourteenth Amendment. *Id.* at 89.

The saga of Texas' White-only primary did not end there. The Supreme Court had to, again, address the issue in 1944 in *Smith v. Allwright*, 321 U.S. 649 (1944). Only twenty-two days after the Supreme Court's decision in *Condon*, the Texas Democratic party, in a state convention, adopted its own White-only primary requirement. *Id.* at 656-57. After being denied the ability to vote in the Texas Democratic primary election of 1940 because of this rule, Lonnie E. Smith, a Black citizen of Harris County, Texas, sued. *Id.* at 650-51. In *Smith*, the Supreme Court recounted the collective impact of its jurisprudence in, *inter alia*, *Herndon* and *Condon*: "It may now be taken as a postulate that the right to vote in such a primary for the nomination of candidates without discrimination by the State, like the right to vote in a general election, is a right secured by the Constitution." *Id.* at 661-62.

The Court further examined whether the party's action in *Smith* violated that right. *Id.* at 663-64. The Supreme Court concluded that it did. *Id.* at 664. The Court found that Texas' specific statutory system made the party "an agency of the state in so far as it determines the participants in a primary election." *Id.* at 663. The Court concluded that the right to vote "is not to be nul[l]ified by a state through casting its electoral process in a form which permits a private organization to practice racial discrimination in the election. Constitutional rights would be of little value if they could be thus indirectly denied." *Id.* The Supreme Court's decision in *Smith* was the

No. 23-40582

culmination of a decades-long, and ultimately unsuccessful, attempt to maintain White-only primary elections in Texas.

In modern history, Galveston County has resisted the Black and Latino vote at every turn. From 1975 to 2013, the years where Galveston County was subject to § 5 preclearance,[25] the County's redistricting process required Attorney General intervention on six occasions.

One such occasion requiring federal intervention was in 2012. In the 2012 redistricting process, the Galveston County majority hired map-makers and business partners Thomas Hofeller and Dale Oldham. Nicknamed "the Michelangelo of the modern gerrymander,"[26] Hofeller was behind a 1980s strategy to increase Republican power in the South through the 1965 VRA.[27] By creating more majority-Black districts, the strategy sought to concentrate minority voting power into fewer districts, with the goal of making it easier for Republican candidates to win the remaining majority-White districts.[28] Hofeller infamously stated: "Redistricting is like an election in reverse! It's a great event. . . . Usually the voters get to pick the politicians. In redistricting,

---

[25] Section 5 of the VRA "provided that no change in voting procedures could take effect until it was approved by federal authorities in Washington, D.C.—either the Attorney General or a court of three judges." *Id.* at 537. "A jurisdiction could obtain such 'preclearance' only by proving that the change had neither 'the purpose nor the effect of denying or abridging the right to vote on account of race or color.'" *Id.* Prior to *Shelby County*, Galveston County was subject to the preclearance process, and it frequently required federal intervention.

[26] Michael Wines, *Thomas Hofeller, Republican Master of Political Maps, Dies at 75*, THE NEW YORK TIMES, (Aug. 21, 2018) https://www.nytimes.com/2018/08/21/obituaries/thomas-hofeller-republican-master-of-political-maps-dies-at-75.html.

[27] *Id.*

[28] *Id.*

No. 23-40582

the politicians get to pick the voters;" he also called the redistricting process "the only legalized form of vote-stealing left in the United States today."[29]

As confirmed by the district court in its extensive fact-finding after an exhaustive trial, when the 2021 redistricting process came around, the County, no longer constrained by § 5's preclearance, set to work to rid itself of its majority-minority district. Galveston County's governing body is called the "Galveston County Commissioners Court." The Commissioners court is made up of a county judge elected at-large as the presiding officer and four county commissioners elected from single-member precincts. In 2021, Judge Mark Henry was the county judge and had been since 2010. The four commissioners were Darrell Apffel (Precinct 1), Joe Giusti (Precinct 2), Stephen Holmes (Precinct 3), and Ken Clark (Precinct 4).

The majority leaders of Galveston County (consisting of Judge Henry and Commissioners Apffel, Giusti, and Clark) again hired Dale Oldham. Commissioner Holmes voted against his hiring. "Shortly after engaging Oldham, Judge Henry and the county's general counsel, Paul Ready, contacted Oldham to ask whether the county 'had to draw a majority-minority district,'" to which Oldham replied that the answer depended on the census data. The map ultimately proposed was "'the visualization of the instructions' Judge Henry provided Oldham,"—a map that resulted in no majority-minority districts in Galveston County. Though the County suggested the goal in redistricting was to create a coastal precinct, "Oldham admitted that it was possible to retain a majority-minority precinct while also creating a coastal precinct."

---

[29] Miles Parks, *Redistricting Guru's Hard Drives Could Mean Legal, Political Woes for GOP*, NPR, (June 6, 2019, 7:14 PM) https://www.npr.org/2019/06/06/730260511/redistricting-gurus-hard-drives-could-mean-legal-political-woes-for-gop.

No. 23-40582

Appellees sued under the VRA's § 2, alleging Galveston County's new maps impermissibly diluted their voting power. After a ten-day bench trial, the district court found Appellants' actions "fundamentally inconsistent with [§] 2 of the Voting Rights Act." It found Appellants' redistricting to be "egregious," "a textbook example of a racial gerrymander." The district court's 157-page Findings of Fact and Conclusions of Law details just how egregious Galveston County's § 2 violation was.

First, the district court held that the County's Black and Latino communities were both sufficiently large and geographically compact to satisfy that *Gingles* precondition. The district court cited *Clements* for the proposition that "[t]he cohesiveness of minority coalitions is 'treated as a question of fact, allowing aggregation of different minority groups where the evidence suggests that they are politically cohesive." The district court then found that the plaintiffs' illustrative plans demonstrated that the Black and Latino population in Galveston County is compact enough to form a majority of eligible voters in a reasonably configured precinct.

Next, the district court considered the second *Gingles* precondition—whether the plaintiffs are "politically cohesive." *Gingles*, 478 U.S. at 50-51; It found that "[t]he undisputed evidence shows that the combined Black and Latino coalition is highly cohesive." Indeed, it found that "over 75% of Black and Latino voters have voted for the same candidates in numerous elections." Accordingly, the district court concluded that "the county's Black and Latino populations act as a coalition and are politically cohesive."

The district court then evaluated the final *Gingles* precondition—whether "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50-51; The district court found that this condition was met. It is undisputed that certain

No. 23-40582

statistical evidence showed that "more than 85% of Anglos vote cohesively for candidates running in opposition to those supported by more than 85% of Black and Latino voters." The district court also credited the plaintiffs' evidence that "the degree of Anglo bloc voting is sufficient to defeat a minority-preferred candidate in each commissioner precinct in the enacted plan." The district court also found that the minority vote is thwarted "at least plausibly on account of race." And the County failed to present evidence sufficient to dispute this finding.[30] Accordingly, the district court found that each of the *Gingles* preconditions are met.

Finally, the district court evaluated, under the totality of the circumstances, whether the political process is "equally open" to the plaintiffs, a question that depends upon a "practical evaluation of the 'past and present reality.'" *Gingles*, 478 U.S. at 75. The district court spoke at length about the factors weighing in favor of a finding that § 2 had been violated. Worth noting, the district court considered proportionality. It clarified that "it is the status of the candidate as the *chosen representative of a particular racial group*, not the race of the candidate that is important." Thus, it is irrelevant to the analysis that one of the commissioners is Black, because, as the district court found, "[h]is precinct is predominantly Anglo and several witnesses . . . testified that he would not be the candidate of choice of Black and Latino voters."

The district court also considered whether the voices of Black and Latino voters were "shut out of the process altogether." Looking at the totality of the circumstances, the district court found that it was "stunning

---

[30] Of Appellants' coastal precinct argument, the district court determined that "a desire to create a coastal precinct cannot and does not explain or justify why [the map] . . . was drawn the way it was—and especially does not explain its obliteration of benchmark Precinct 3."

how completely the county extinguished the Black and Latino communities' voice on its commissioners court during the 2021's redistricting." The district court stated the following:

> Galveston County was created in 1838. From its founding, it would be 133 years before a Latino, Frank Carmona, was elected to commissioners court. And it would be 150 years before a Black, Wayne Johnson, won a seat. Commissioner Johnson's district, old Precinct 3, would continue to elect the minority community's candidate of choice right up until 2021, when Precinct 3 was summarily carved up and wiped off the map. Blacks' and Latinos' commissioner of choice was always a lonely voice on the court, but that commissioner's presence—whether it was Wayne Johnson or Stephen Holmes—meant that "minority voices [were] heard in a meaningful way." Id. The result of 2021's redistricting, however, has amounted to Black and Latino voters, as a coalition of like-minded citizens with shared concerns, "being shut out of the process altogether." Id.
>
> This is not a typical redistricting case. What happened here was stark and jarring. The commissioners court transformed Precinct 3 from the precinct with the highest percentage of Black and Latino residents to that with the lowest percentage. The circumstances and effect of the enacted plan were "mean-spirited" and "egregious" given that "there was absolutely no reason to make major changes to Precinct 3."

In conclusion, the district court aptly noted that "although Galveston County is no longer subject to preclearance, the [Appellants] still must comply with the edicts of[§] 2." But Galveston County's redistricting process amounted to "a clear violation of § 2."

I agree. And for the last several decades, so did our precedent. But today, the majority discards that well-established authority.

No. 23-40582

Now armed with the factual and historical context the majority opinion ignores, we turn to the merits.

## II

In my view, this case is a simple one, not only because traditional methods of statutory interpretation compel only one outcome, but critically because Appellants fail to carry their burden of persuasion as to why this court should overturn its precedent articulated in *Clements*, 999 F.2d at 864. Luckily for Appellants, the majority relieves them of this burden.[31]

## A

The majority contends that we do not have to reckon with the doctrine of stare decisis because we are merely overturning a panel opinion, which holds no precedential weight for the en banc court.[32] I first clarify that we are, indeed, overturning en banc precedent today. Next, I summarize why there is no grounds to do so.

According to the majority, *Clements* is not the operative precedent because the *Clements* decision "disposed of the minority coalition's Section 2 claims on other grounds." Thus, the majority claims, because the *Clements* decision "applied this court's precedent authorizing coalition claims and expressly stated that it would not 'revisit' the issue," "*Clements* cannot . . . be said to have issued an en banc holding on coalition claims," and the *Campos* panel decision is the operative precedent. That is blatantly incorrect.

---

[31] Indeed, the majority has long signaled its belief that the en banc court should "lay to rest the minority coalition theory of vote dilution claims." *Clements,* 999 F.2d at 894 & n. 2 (5th Cir. 1993) (*en banc*) (JONES, J., concurring).

[32] To be clear, even when overruling only a panel decision, though the stare decisis analysis is "not as exacting," "[t]hat does not mean that principles underpinning the doctrine of stare decisis have no place in the en banc court's decision." *Planned Parenthood of Greater Tex. Fam. Plan. Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 369 (5th Cir. 2020)

No. 23-40582

In *Clements*, the majority recognized that "whether different racial or ethnic minority groups . . . may combine to form a single minority group within the meaning of the Voting Rights Act" had raised questions. *Clements*, 999 F.2d at 863-64. However, the majority went on to conclude that "we have treated the issue as a question of fact, allowing aggregation of different minority groups where the evidence suggests that they are political cohesive," and the majority refused to revisit that settled question again. *Id.* at 864 (citing our decision in *Midland*). To say that the court in *Clements* disposed of the coalition claims on other grounds and thus did not issue an en banc holding on this issue is incorrect. Had a majority of the en banc court, in 1993, wished to reverse the panel's decision in *Midland*, it could have done so. But the *Clements* court did not do that.

Therefore, contrary to the majority's contention, today, this court has overturned four decades of en banc precedent without any consideration of whether such a diversion from stare decisis is appropriate. Now, Appellants must face the hurdle of overturning our en banc precedent head-on. Appellants cannot clear that hurdle.

We are a "strict stare decisis court." *Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777, 782 (5th Cir. 2012). And pursuant to the doctrine of stare decisis, "[s]etting aside any precedent requires a 'special justification' beyond a bare belief that it was wrong." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 413 (2010).[33] Here, Appellants have the

---

[33] The majority's citation to *Planned Parenthood of Greater Texas Family Planning and Preventative Health Services, Inc. v. Kauffman*, 981 F.3d 347, 369 (5th Cir. 2020), for the proposition that our stare decisis analysis is less exacting than that of the Supreme Court is misguided in the context of this case. In *Kauffman*, the en banc court was overturning a panel opinion, not another en banc decision. *Id.* ("That does not mean that principles underpinning the doctrine of stare decisis have no place in the en banc court's decision about whether to overturn or abrogate a *panel's* prior decision. But the analysis is not as exacting as that undertaken by the Supreme Court of the United States in applying the stare

No. 23-40582

burden of demonstrating why we should overturn our en banc precedent.[34] But they have come far short of doing so: Appellants did not cite the stare decisis factors, nor did they meaningfully engage in a discussion about stare decisis *at all*; in all their briefs, stare decisis was mentioned only once.[35]

**B**

Nor is there intervening Supreme Court precedent that casts doubt on the efficacy of coalition claims. The majority relies on the Supreme Court's decision in *Bartlett v. Strickland*, 556 U.S. 1 (2009), for the proposition that "decisions of the Supreme Court over the past two decades have undermined the validity of minority-coalition claims," justifying our revisiting this issue. However, *Bartlett* provides no such support.

In *Bartlett*, the Supreme Court held that crossover districts—districts where "minority voters make up less than a majority of the voting-age population," but where "the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate"—cannot be used to satisfy the requirements of a vote

---

decisis doctrine, as it must, in deciding whether to overturn its own precedent.") (emphasis added). But when an en banc court sits to overturn en banc precedent, the situation is much more akin to that of the Supreme Court, where decisions are made by the whole court, rather than "the majority vote of just three circuit judges." *Chambers v. Dist. of Columbia*, 35 F.4th 870, 879 (D.C. Cir. 2022). In the context of the en banc court overturning another en banc decision, especially when that decision involves statutory interpretation, I am convinced that the doctrine of stare decisis is in force to its fullest extent.

[34] The majority faults Appellees for failing to apply the typical stare decisis factors. But it is Appellants, not Appellees, who carry the substantial burden of demonstrating why overturning *Clements* is appropriate. *Patterson v. McLean Credit Union*, 491 U.S. 164, 172-73 (1989).

[35] Even if they managed more than a single reference to the doctrine, Appellants' case would still fail. After all, we heard essentially the same arguments they make today more than four decades ago in *Clements*. *Clements*, 999 F.2d at 894-898 (discussing the text, purpose, and the implications of minority coalition claims).

dilution claim under § 2. *Bartlett*, 556 U.S. at 13-14. At issue in *Bartlett* was the drawing of District 18, which encompassed portions of four North Carolina counties. *Id.* at 8. The district at issue was not a majority-minority district. *Id.* Even so, Black voters in District 18 had "the potential to join with majority [White] voters to elect the minority group's candidate of its choice." *Id.* In sum, District 18's Black citizens did not constitute a majority of voting age citizens, but a sufficient number of White voters were politically aligned with the Black voters and would thus allow the Black voters to elect their preferred candidate. The trial court disagreed. It concluded that "although African-Americans were not a majority of the voting-age population in District 18, the district was a 'de facto' majority-minority district." *Id.* at 9. This was "because African Americans could get enough support from crossover majority voters to elect the African-Americans' preferred candidate." *Id.* The North Carolina Supreme Court reversed on the grounds that "African-Americans do not 'constitute a numerical majority of citizens of voting age'" within District 18. *Id.*

The United States Supreme Court affirmed that decision. *Id.* at 14. In so doing, Justice Kennedy's plurality opinion made clear that § 2 "requires a showing that *minorities* 'have less opportunity than other members of the electorate to . . . elect representatives of their choice.'" *Id.* at 14 (emphasis added). It further noted that allowing crossover groups to satisfy § 2 would significantly disrupt the *Gingles* "majority-minority" requirement that had been in place for decades. *Id.* at 20. The plurality thus concluded that crossover districts cannot be used to satisfy the requirements of § 2. *Id.* Referring to a minority group's right to form coalitions with *White* voters, the Court also stated that "[n]othing in § 2 grants special protection to a minority groups' right to form political coalitions." *Id.* at 15. The majority here contends this purportedly supports its position that minority coalitions are merely "political coalitions" not protected by § 2 of the VRA.

No. 23-40582

This conclusion is misguided. For one, the plurality expressly chose *not* to extend its reasoning in *Bartlett* to minority coalitions. *Bartlett*, 556 U.S. at 13-14 ("But that term risks confusion with coalition-district claims in which two minority groups form a coalition to elect the candidate of the coalition's choice. We do not address that type of coalition district here." (internal citations omitted)). But critically, the similarities between *Bartlett* and this case matter far less than the differences. In crossover districts, *White* voters must vote with the minority population for the group to elect the candidate of its choice. *Bartlett*, 556 U.S. at 13. White voters are not protected under the VRA and are not plaintiffs in the suit. Minority coalitions by contrast present a different scenario where each individual voter is indeed expressly protected by § 2 (a). Rather than being "political coalitions,"[36] these groups find cohesion in their shared history of disenfranchisement and the VRA's protections resulting therefrom. That difference makes all the difference. While the majority may believe otherwise, it cannot root its opinion in Supreme Court authority. To the contrary, a reading of Supreme Court precedent shows that the Court has allowed minority coalition claims on multiple occasions.[37] *Bartlett* does not cast doubt on that reality. Nor does any other intervening decision after *Clements*.[38]

---

[36] The majority argues Plaintiffs are merely attempting to form a "political coalition." Given Galveston County's in-plain-sight political goals, however, the majority's concerns are misplaced.

[37] Moreover, the Supreme Court has favorably recognized minority coalition claims numerous times. *See, e.g.*, *Carey*, 430 U.S. at 150 n.5; *Wright*, 376 U.S. at 60.

[38] The majority also relies on *LULAC v. Perry*, 548 U.S. 399 (2006), a case discussing "influence districts," purporting that *LULAC* also weighs against minority coalition claims. But this argument is similarly unavailing. As the majority states, *LULAC* pertained to influence districts, where minority groups have "influence" in the election but do not constitute a majority. *Id.* at 445. Indeed, as the majority states, it is true that § 2 "requires more than the ability to influence the outcome between some candidates, none of whom is their candidate of choice." *Id.* The issue in *LULAC* is, at best, tangentially related to the issue before us today.

61

No. 23-40582

It is clear to me at this juncture that the "only relevant thing that has changed since [*Clements*] is the composition of this Court."[39] *Citizens United v. Fed. Elec. Comm'n*, 558 U.S. 310, 414 (2010) (STEVENS, J., with whom GINSBURG, BREYER, and SOTOMAYOR, J. join, concurring in part and dissenting in part). This is doubly shown by the fact that "the majority opinion is essentially an amalgamation of resuscitated dissents." *Id.*

Finding no grounds to overturn our well-founded precedent, in my view, our discussion should end here. However, because the majority forges ahead, so do I.

## III

Turning to matters of statutory interpretation, the majority contends that because § 2(b) refers to "a class" in the singular, plaintiffs who are members of different protected classes cannot coalesce to form a majority. The majority plucks these two words from the midst of the statute and insists that they constrict its scope. But this conclusion cannot survive basic principles of statutory interpretation and a review of the VRA's extensive legislative history.

"When interpreting a statute, we begin with 'the language of the statute itself.'" *United States v. Orellana*, 405 F.3d 360, 365 (5th Cir. 2005) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102,

---

Of course, I agree *LULAC* requires minority coalition groups to demonstrate "more than the ability to influence the outcome between some candidates." *Id.* Instead, the coalition must prove it can satisfy each of the *Gingles* conditions—including that the coalition can elect the candidate of its choice. But aside from clarifying this requirement, *LULAC* does not weigh, one way or another, on the question before us.

[39] "Today's ruling thus strikes at the vitals of stare decisis, 'the means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion' that 'permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals.'" *Citizens United*, 558 U.S. at 414 (quoting *Vasquez v. Hillery*, 474 U.S. 254, 265 (1986)).

108 (1980)). "We follow the 'plain and unambiguous meaning of the statutory language,' interpreting undefined terms according to their ordinary and natural meaning and the overall policies and objectives of the statute." *Id.* (quoting *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004)). In so doing, we must consider the basic principles of statutory interpretation outlined in 1 U.S.C. § 1, including that the singular includes the plural. *Seth B. ex rel. Donald B. v. Orleans Par. Sch. Bd.*, 810 F.3d 961, 975 n.52 (5th Cir. 2016) ("It is a basic rule of statutory construction that the singular includes the plural." *See* Antonin Scalia & Bryan A. Gardner, Reading Law: The Interpretation of Legal Texts 130 (2012) (quoting the rules of construction outlined in 1 U.S.C. § 1)). Moreover, "[w]hether a statutory term is ambiguous . . . does not turn solely on dictionary definitions of its component words." *Yates v. United States*, 574 U.S. 528, 537 (2015). "Rather, 'the plainness or ambiguity of statutory language is determined not only by reference to the language itself, but as well by the specific context in which that language is used, and the broader context of the statute as a whole.'" *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)) (alteration in original). "If the statute is ambiguous, we may look to the legislative history or agency interpretations for guidance." *Orellana*, 405 F.3d at 365.

We are additionally guided by the Supreme Court's mandate that "the [VRA] should be interpreted in a manner that provides 'the broadest possible scope' in combating racial discrimination." *Chisom,* 501 U.S. at 403.

## A

The majority contends that, based on the text, § 2(b) clearly prohibits coalition groups. The majority takes issue with the language in § 2(b): "a class of citizens," and "a protected class." The majority contends that "[h]ad Congress chosen explicitly to protect minority coalitions it could have

No. 23-40582

done so by [using the phrase] *classes* of citizens." But this misses the forest for the trees.

To reach its conclusion, the majority must reject well-established methods of statutory interpretation, jumping through hoops to find exceptions. But it need not be so difficult, for the analysis is far simpler than the majority contends: minority coalition claims are permissible under the plain text of the statute.

**1**

A reading of § 2 and of the VRA as a whole demonstrates that a reading of the term a "class" in the singular does not result in a prohibition of minority coalition claims. I turn first to the "specific context in which th[e] language is used" within § 2 itself. *Robinson*, 519 U.S. at 341.

In § 2, the singular term "a class" is encompassed by the larger phrase, "members of a class of citizens protected by subsection (a)." 52 U.S.C. § 10301.

Consider the last antecedent rule. This method of construction "provides that 'a limiting clause or phrase . . . should ordinarily be read as modifying on the noun or phrase that it immediately follows.'" *Lockhart v. United States*, 577 U.S. 347, 351 (2016). "The rule reflects the basic intuition that when a modifier appears at the end of a list, it is easier to apply that modifier only to the item directly before it." *Id.* Applied here, the phrase "protected by subsection (a)" modifies the noun "citizens," not the more distant noun "a class." Accordingly, "it is not the singular class that must be composed of a racial or language minority protected under subsection (a) but rather each citizen that makes up the class." Sette, *supra*, at 2727. To hold that the statute requires each citizen to have the same minority status is an improper reading of § 2.

Of course, as the majority points out, "as with any canon of statutory interpretation, the rule of the last antecedent 'is not an absolute and can assuredly be overcome by other indicia of meaning.'" *Lockhart*, 577 U.S. at 352 (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)). However, where, as here, the broader context "fortifies the meaning th[e] principle commands," there is no reason to disturb the interpretation urged by the rule. *Id.*

The broader context of § 2 within the VRA confirms the interpretation urged by the last antecedent rule. *Robinson*, 519 U.S. at 341 (terms must be considered in "the broader context of the statute as a whole"). It is "generally presum[ed] that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 777 (2020). In 1975, Congress amended the VRA to require that states and political subdivisions provide voting materials, including ballots, in non-English languages if a language minority makes up more than five percent of the citizens of voting age. 42 U.S.C. § 1973aa-1b (*codified as amended in* 52 U.S.C. § 10303(f)(3)). The VRA specifically states that the percentage must be made of "members of a *single* language minority." *Id.* (emphasis added). Had Congress intended to apply the same limiting requirement to § 2, it could have done so. But it never did. And on that basis, we must presume its omission was intentional. *Sulyma*, 140 S. Ct. at 777.

Accordingly, the broader context of § 2 and the VRA illuminates that the term "class," written in the singular but encapsulating the plural, does not prohibit minority coalition claims. *Cf. Bostock v. Clayton Cnty.*, 590 U.S. 644, 669 (2020) ("[T]here [is no] such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception.").

No. 23-40582

**2**

And what of the Dictionary Act? When interpreting the U.S. Code, the Dictionary Act provides a starting point. 1 U.S.C. § 1 (2024). The Dictionary Act "tells us to assume 'words importing the singular include and apply to several persons, parties, or things,' unless statutory context indicates otherwise." *Niz-Chavez v. Garland*, 593 U.S. 155, 164 (2021) (quoting 1 U.S.C. § 1). "The Dictionary Act does not transform every use of the singular 'a' into the plural 'several.'" *Id.* "Instead, it tells us . . . that a statute using the singular 'a' can apply to multiple persons, parties, or things." *Id.* (holding an act requiring the government to send "a notice" would permit the government to send multiple notices but does not permit the government to send a notice via multiple documents). The Dictionary Act applies in all instances except where the provided definition "seems not to fit," and the context "excus[es] the court from forcing a square peg into a round hole." *Rowland v. Ca. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 200 (1993). In my view, the Dictionary Act tells us that the term "a class" can apply to multiple classes. End of story.

The majority argues that the context indicates otherwise, pointing to the second sentence of § 2(b). That sentence provides, "[t]he extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered" when evaluating the final *Gingles* requirement—whether the electoral process is "equally open" to the plaintiffs. 51 U.S.C. § 10301(b). The majority contends that an inquiry into the electoral success of a protected class makes sense only if it is restricted to a specific racial or language-minority group. After all, the argument goes, "black voters in San Antonio would hardly be persuaded that a vote dilution claim lacked merit simply because whites, a minority in the majority-Hispanic city, were being elected to local office. Nor would

No. 23-40582

Hispanics in Houston see citywide elected black politicians as evidence against any dilution of Hispanic votes."

The majority's argument represents a misunderstanding of the *Gingles* analysis. By the time plaintiffs reach the question of whether the political process is "equally open," they must have already satisfied the three *Gingles* preconditions, including political cohesiveness and that the majority votes as a bloc. *Gingles*, 478 U.S. at 50-51. The second sentence of § 2(b) does not even come into play until these preconditions have been satisfied. So, if the final condition *is* reached, political cohesion must already be established. The majority stretches the second sentence of § 2(b) beyond reason. We cannot ignore one of the most "basic rule[s] of statutory construction" on such unconvincing grounds. Scalia & Gardner, *supra*, at 130.

## B

The legislative history further supports my interpretation. Though the majority would like the reader to believe that Congress has been silent with respect to minority coalitions, it has not. A review of the VRA's legislative history, as outlined in full above, indicates that the VRA was intended to extend to minority coalitions.

Recall that, in 1975, Congress amended the VRA to make clear it prohibited discrimination "on account of race or color, or in contravention of the guarantees set forth in [§ 1973b](f)(2)," *i.e.*, discrimination against language minority groups. *Chisom*, 501 U.S. at 392. As one mechanism to accomplish its goal, Congress prescribed that non-English language voting materials were required if a language minority makes up more than five percent of voting-age citizens within a state or subdivision. 42 U.S.C. § 1973aa-1b (*codified as amended in* 52 U.S.C. § 10303(f)(3)). In so doing, Congress enacted language that specifically stated that the five percent must be made of "members of a *single* language minority." *Id.* (emphasis added);

*cf. Loughrin*, 573 U.S. at 358 ("When 'Congress includes particular language in one section of a statute but omits it in another' . . . this Court 'presumes' that Congress intended a difference in meaning.") (alteration in original). This is an explicit, non-ambiguous indication that, if Congress wished for specific requirements to apply to the VRA, it would (and did) enact them. Also in 1975, Congress specifically and favorably relied on minority coalition cases in adopting the 1975 Amendments. S. Rep. No. 94-295 (relying on *Graves* and *CEDO*).

The legislative history also reveals that Congress relied on *Carey* and *Wright*—both minority coalition suits—in adopting the 1982 Amendments. S. Rep. No. 97-417, at 132, 173. Also recall that, in 1992, Congress recognized that language minority groups are, in effect, minority coalitions. Though there is only one category identifying all "Native Americans" as language minorities, Congress obviously understood the category to encompass speakers of many different languages. *See, e.g.*, S. Rep. No. 102-315, at 9 ("Lack of access to absentee voting information to Native Americans in their *native languages* is further documented by their experience in the 1984 general election.") (emphasis added); *id.* ("In another example, election officials provided little or no information in *Native American languages* regarding the process for purging names from their jurisdictions' voter registration lists.") (emphasis added); *id.* at 14 (discussing costs, and noting that "[i]n the case of *traditionally unwritten languages*, such as most *Native American languages*, only oral assistance is required") (emphasis added). Congress recognized the same with the category "Asian Americans," which explicitly encompasses voters with many different language and ethnic backgrounds. *Id.* at 12 (stating that the category encompasses, *inter alia*, Chinese, Filipino, Vietnamese, and Japanese voters).

And in its 2006 Amendments, Congress specifically contemplated that minority groups could "coalesce" or "combine" with other racial

minorities to form a majority for the purpose of § 5 of the VRA, which, at the time, was amended to track nearly the same language as § 2. *See* H.R. REP. NO. 109-478, at 71 ("Voting changes that leave a minority group less able to elect a preferred candidate of choice, either directly or *when coalesced with other voters*, cannot be precleared under Section 5.") (emphasis added); *see also* S. REP. NO. 109-295, at 21 ("Naturally occurring majority-minority districts have long been the historical focus of the Voting Rights Act. They are the districts that would be created if legitimate, neutral principles of drawing district boundaries . . . were combined with the existence of a large and compact minority population to draw a district in which *racial minorities* form a majority.") (emphasis added). This should be dispositive. But I go on.

## C

Let's return to the jurisprudence surrounding the VRA. The right to vote is one of the most highly-regarded constitutional rights. *See Reynolds*, 377 U.S. at 554. Through the Fifteenth Amendment and the VRA, Congress sought to address "the subtle, as well as the obvious" forms of voting discrimination that plagued the Nation. *Allen*, 393 U.S. at 566. Indicative of Congress' intention to uphold the right to vote for all, the Supreme Court has mandated that the VRA "should be interpreted in a manner that provides 'the broadest possible scope' in combating racial discrimination." *Chisom,* 501 U.S. at 403. To effectuate its mandate, the Supreme Court gave us *Gingles*, providing a roadmap for determining if the right to vote had been violated via vote dilution. *Gingles*, 478 U.S. at 50-51.

Now consider the facts of this case. In its lengthy opinion, the district court dutifully applied *Gingles*.[40] As to the second precondition, the district court found that "[t]he statistical analyses from general elections, statistical

---

[40] The first precondition in particular is at issue on appeal.

analyses from primary elections, and non-statistical evidence of cohesion all support the conclusion that Black and Latino voters in Galveston County act as a coalition." In other words, the plaintiff class is "politically cohesive." *Gingles*, 478 U.S. at 50-51. The district court also found that the third *Gingles* condition was met—"that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50-51. The court found that "[t]he undisputed evidence shows that Anglo voters in Galveston County vote cohesively and for candidates opposing those supported by a majority of Black and Latino Voters . . . at a rate sufficient to defeat the minority-preferred candidate consistently in each of the enacted commissioners-court precincts."

Finally, considering the totality of the circumstances, the district court found that "[t]he plaintiffs have demonstrated that the totality of the circumstances shows that Black and Latino voters in Galveston County have 'less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" When evaluating the totality of the circumstances, the district court noted that this was "not a typical redistricting case." Instead, the court noted, "[w]hat happened here was stark and jarring." The district court found "the circumstances and effect of the enacted plan were 'mean-spirited' and 'egregious' given that 'there was absolutely no reason to make major changes to Precinct 3.'"

The facts of this case are precisely the circumstances that the VRA sought to prevent: a "white majority vot[ing] sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate" (*Gingles* precondition three), resulting in the dilution of "politically cohesive" minority class (*Gingles* precondition two). But today, armed with only an atextual reading of § 2, the majority focuses on artificial subdivisions of the injured class, rather than focusing on the actions of Galveston County. To

No. 23-40582

imply, as the majority does, that discrimination is permissible so long as the victims of the discrimination are racially diverse, is not only an absurd conclusion but it is one with grave consequences.

Last, I write briefly to point out the implications of the majority's outcome. Judge Keith lucidly warned the Sixth Circuit of such pitfalls in his eloquent dissent in *Nixon*:

> Perhaps what is most disturbing is that the practical effect of the majority's holding requires the adoption of some sort of racial purity test, so that minority group members can be properly identified and kept in their place. If we are to make these distinctions, where will they end? Must a community that would be considered racially both Black and Hispanic be segregated from other Blacks who are not Hispanic? Should the dwindling numbers of Native Americans be further decimated by a parsing of Navaho from Apache? Must Puerto–Ricans and Dominicans in the same neighborhood be separated based on their separate cultural and historical backgrounds? Perhaps we will return to a time of classifying African–Americans as quadroons and octoroons for the purposes of racial classification.

*Nixon*, 76 F.3d at 1401-02 (internal citations omitted). The absurdities and judicial complicity in impossible racial classifications of which the dissent warns evinces the majority's unworkable standard.[41] And moreover, it is

---

[41] The majority does nothing to dispel this concern. The majority contends only that the "any part Black" metric addresses the issues presented by its new standard, relying on *Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003). But how exactly? The majority may be addressing Judge Keith's rhetorical note about returning to a time "of classifying African-Americans as quadroons and octoroons," but the majority does not engage at all with Judge Keith's chief concerns about individuals who are multi-racial or multi-lingual. Moreover, the majority's reliance on *Georgia v. Ashcroft* for the proposition that the "any part Black" metric addresses these concerns is misplaced. In a footnote, the Supreme Court in *Ashcroft* uses the "any part Black" metric, but it notes that this metric may have less relevance "if

No. 23-40582

clearly contrary to the text of § 2 and Congress' intent in adopting and amending the VRA.[42]

\*     \*     \*

Because the majority's conclusion is atextual, ahistorical, and it allows the Constitution to "ma[k]e a promise which the Nation cannot keep," I dissent. *Nixon*, 76 F.3d at 1404 (Keith, J., dissenting) (quoting *Jones v. Mayer Co.*, 392 U.S. 409, 443 (1967)).

---

the case involves a comparison of different minority groups." *Id.* This is, of course, the exact situation we are concerned with.

[42] Announcing its own concerns, the majority warns that minority coalitions suits, even if unsuccessful, "are extraordinarily costly and time-consuming for public entities to litigate." This litigation resulted from Galveston County's decision to rid itself of a majority-minority district that had existed for decades. Rather than leave well enough alone, Galveston County chose to expend its resources on a map-making process that was riddled with discriminatory intent. In my opinion, we cannot allow the County to absolve itself of liability for its bad faith redistricting on the basis that defending Appellees' claims is costly. In other words, Galveston County brought this upon itself.